1
2
3
4
5
6
7
8          **UNITED STATES DISTRICT COURT**

9          **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   TERRY BEMORE,                                  CASE NO. 08cv0311 LAB (WVG)

12                              Petitioner,         *DEATH PENALTY CASE*

13                                                  **ORDER:**

14        vs.                                       **(1) DENYING PETITIONER'S MOTION FOR SUMMARY JUDGMENT AND/OR AN EVIDENTIARY HEARING ON CLAIMS 27-28 AND 36-38 [Doc. No. 68];**

15

16

17

18   VINCENT CULLEN, Acting Warden of San          **(2) DENYING RESPONDENT'S REQUEST TO DISMISS CLAIMS 21-22 AND 24-26 ON THE BASIS OF PROCEDURAL DEFAULT; AND**
     Quentin State Prison,

19

20                              Respondent.         **(3) DENYING HABEAS RELIEF ON CLAIMS 21-22, 24-28, 34, AND 36-38**

21

22

23        Petitioner has filed a motion for summary judgment, or in the alternative, for an evidentiary

24   hearing, on Claims 27-28 and 36-38.[1]  (Doc. No. 68.)  Of the claims adjudicated in this Order,

25   Respondent: (1) requests that the Court dismiss Claims 21-22 and 24-26 on the basis of state

26

27   _____

28        [1] Petitioner did not file any motion on Claims 21-22, 24-26, 29 or 34.  Petitioner's Motion for Evidentiary Hearing on Claims 1-20, 23, and 30-33 (Doc. No. 69) and Claim 29 will be addressed in a separate, forthcoming order.  Petitioner has withdrawn Claim 35 from consideration.  (See Doc. No. 56.)  Therefore, this order will address Claims 21-22, 24-28, 34 and 36-38.

                                          1                                    08cv0311

procedural bars; (2) opposes Petitioner's motion for summary judgment; and (3) requests dismissal of all claims.  Given the extensive briefing and the nature of the claims, the Court finds these issues fully suitable for decision on the papers without oral argument.  For the reasons discussed below, Respondent's request for dismissal of Claims 21-22 and 24-26 on procedural default grounds is **DENIED**, Petitioner's motion for summary judgment and/or evidentiary hearing on Claims 27-28 and 36-38 is **DENIED**, and habeas relief is **DENIED** as to Claims 21-22, 24-28, 34, and 36-38.

## I. <u>PROCEDURAL HISTORY</u>

By an Information filed on December 31, 1986, Petitioner Terry Bemore and co-defendant Keith Cosby were charged with the robbery and burglary of the Aztec Liquor Store in San Diego and the murder of Kenneth Muck, on August 26, 1985.  Petitioner was arraigned on January 6, 1989, on an amended Information charging him with burglary, robbery and murder.  Petitioner's case was later severed from that of Mr. Cosby.

Petitioner was convicted on June 6, 1989, of one count of first-degree murder (Cal. Penal Code § 187), one count of robbery (Cal. Penal Code § 211), and one count of burglary (Cal. Penal Code § 459).   In addition, the jury found true two special circumstance allegations–murder in the commission of a robbery (Cal. Penal Code § 190.2(a)(17)(i)) and murder involving the infliction of torture (Cal. Penal Code § 190.2(a)(18)).  On August 7, 1989, the jury returned a verdict of death.  On November 2, 1989, the trial court denied Petitioner's motions for a new trial and for modification of the sentence, and sentenced him to death.

On automatic appeal (hereinafter "direct appeal") of this conviction and judgment to the California Supreme Court, Petitioner filed an opening brief on February 18, 1998.  Petitioner also filed a reply brief on May 29, 1998.  The California Supreme Court affirmed Petitioner's conviction and sentence in a decision issued on April 20, 2000.  <u>People v. Bemore</u>, 22 Cal. 4th 809 (2000).  On June 21, 2000, the California Supreme Court denied Petitioner's request for a rehearing, and on January 8, 2001, the Supreme Court of the United States denied his petition for a writ of certiorari.

On June 19, 2000, Petitioner filed a habeas petition with the California Supreme Court.  Petitioner also filed a reply brief on October 27, 2000.  The petition was denied on October 17, 2007, without an evidentiary hearing.

On January 13, 2009, Petitioner filed his Petition for a Writ of Habeas Corpus and attached exhibits with this Court, the operative pleading in this action.[2]  On March 4, 2009, Respondent filed a Motion to Dismiss for Failure to Exhaust, and on June 9, 2009, the Court issued an order holding that Claim 35 was the only unexhausted claim in the federal petition, and directing the parties to confer and discuss whether an agreement could be reached on how to proceed.  On August 10, 2009, Petitioner filed a status report stating his intention to withdraw Claim 35 from the federal petition and proceed on the remaining claims.  On November 4, 2009, Respondent filed an Answer.

On March 17, 2010, Petitioner filed a Motion for Summary Judgment on Claims 27, 28, 36, 37, and 38 of the Petition ["Mot."], Opening Brief ["Pet. Brief"], and a Motion for an Evidentiary Hearing on Claims 1-20, 23, and 30-33 of the Petition.  On June 7, 2010, Respondent filed a Merits Brief Opposing Petitioner's Motions ["Opp."], and on August 4, 2010, Petitioner filed a Reply.

## II.  TRIAL PROCEEDINGS

The Court refers the parties to the lengthy statement of evidence issued by the California Supreme Court in <u>Bemore</u>, 22 Cal. 4th at 817-34.  The California Supreme Court's factual findings are presumptively reasonable and entitled to deference in these proceedings.  <u>See</u> <u>Sumner v. Mata</u>, 449 U.S. 539, 545-47 (1981).

In order to provide a context for the Court's discussion of Petitioner's habeas claims, set forth below is a summary of evidence presented during the guilt and penalty phases.

### A.    Guilt Phase

There was little conclusive physical evidence linking Petitioner to the homicide, but some physical evidence linking him to the robbery and its proceeds.  Shoe prints were found at the crime scene that were similar to Petitioner's shoe size and type, but the shoes found in Petitioner's car and possession did not match the prints at the scene.  Hair evidence found at the scene was not matched to Petitioner, and blood evidence was inconclusive, as Petitioner and the victim had the same blood type.  The safe from the liquor store was recovered in a canyon, and shavings matching those from the safe were found in a garage rented to Petitioner.  Several witnesses observed a car similar to

---

[2] In citing to the filings in this case, the Court uses the pagination found in the Southern District's electronic docket, in which all page numbers are located on the top right-hand side of each document.

Petitioner's at the scene of the crime.  The case largely turned on admissions Petitioner made to several individuals.

Several individuals who lived near or associated with Petitioner around the time of the crime testified that he made admissions to them about the murder.  Angela Tabor, La Tonya Wadley, and Lloyd Howard all testified that Petitioner made admissions about the murder to them or in their presence.  Echo Ramey testified that she observed incriminating behavior from Petitioner on the night of the crime.  Glen Heflin testified that Petitioner made admissions to him about the crime when both were incarcerated in the San Diego County Jail.

Petitioner took the stand in his own defense and claimed that he was committing a different crime, the robbery of a record store in El Cajon, at the time of the Aztec robbery and murder.  Petitioner admitted that he aided in opening the Aztec safe and shared in the proceeds of the robbery after the crime took place, but denied any involvement in the murder of Kenneth Muck.  Petitioner denied making any admissions to the witnesses that testified against him.

1.    Prosecution's Case-In-Chief

The murder occurred at the Aztec Liquor store in San Diego on the evening of August 26, 1985.  The lone victim was the store's night clerk Kenneth Muck.

Felicia Insunza, who lived in East San Diego near Aztec Liquor in 1985, testified that she regularly heard the store's alarm set for a few seconds at 10 p.m. on weekdays, and one hour later on Saturdays.  (RT 22869-73.)  Ms. Insunza testified that she failed to hear the alarm one evening, and awoke the next morning to find the area around the liquor store roped off.  (Id.)  Sandra McIndoe, who lived within view of the store, testified that her live-in boyfriend John Verdugo called her to the window one evening at about 9:30 or 10:00 p.m., where they viewed two people standing near a sedan.  (RT 22879-86.)  The next morning, Mr. Verdugo told her there had been a robbery homicide at the liquor store the prior evening.  (Id.)

John Riley, a clerk at Aztec Liquor, testified that on the evening of August 26, 1985, he went to the store at the behest of the owner, arriving at 10:45 p.m.  (RT 22898-912.)  He used the key to unlock the front door, saw a soda carton and blood everywhere, and left to cross the street and call the police.  (Id.)  Mr. Riley stated that in the 15-20 minutes it took for the police to arrive, he did not see

4

anyone enter or leave the store, and recalled only Mr. Muck's vehicle, a yellow pickup, in the parking lot, along with a cab in the street.  (Id.)

San Diego Police Department ["SDPD"] Officer Thomas Jauregui responded to the radio call and met with Mr. Riley.  (RT 22927-28.)  He and Officer Silva then proceeded to the store, and Jauregui, familiar with the interior of the store, entered first.  (RT 22930-32.)  Jauregui testified that he saw Mr. Muck lying on the floor, obviously deceased, then exited the rear of the store, checked the back for possible suspects, and finding none, secured the scene.  (RT 22932-38.)

Elmer Willeford, the manager at Aztec Liquor, testified that Mr. Muck only had the combination for the safe's lower portion, in order to fill the register drawer with change.  (RT 22941-46.)  Willeford, notified by the store's owner of the robbery and murder, went to the store to place orders, and noticed that 15 boxes of cigarettes were missing from the back room.  (RT 22946-48.)

Dr. Otto Heinkel, the owner of Aztec Liquor, testified that he or wife would regularly go to the store, open the safe to pick up deposits, and prepare the register for the following day.  (RT 22955-57.)  Mr. Heinkel stated that the store clerks were instructed to keep less than $200 in the register and to hand over the money if robbed, and that at the time of the robbery there should have been $1200 in the safe.  (RT 22957-61.)  Heinkel explained that there were several silent alarms located in the store, the back door was kept locked, and the store clerks had keys only to the front door.  (RT 22961-69.)

Detective Patrick Padillo testified that a blood trail, drag marks, and bloody shoe prints were found at the scene.  (RT 22976-81.)  Padillo stated that two different sizes of shoe prints were recovered, and while the smaller ones were concentrated near the rear of the store, only the larger shoe prints were located near the victim's body.  (Id.)  Padillo also testified regarding the search conducted on Petitioner's car, which recovered items such as Petitioner's wallet, shoes, two knives, bullets and stained clothing.  (RT 23000-16.)  Padillo testified as to the search of the rented Bates Street garage, and the recovery of metal shavings later compared to shavings taken from the Aztec safe.  (Id.)

Walter Cardwell, who lived near the Aztec Liquor store, testified that he saw victim Kenneth Muck just before 10 p.m. that evening, when returning a plunger he had borrowed from Muck earlier that evening.  (RT 23073-80.)  Cardwell stated that he and Muck talked a bit while Cardwell's child played nearby.  (Id.)  Cardwell saw a maroon Buick in the area that evening, which he later identified

by selecting it from among other cars in an impound lot. (RT 23080-95.) Patrick Harn, an investigator for the District Attorney's office, stated that he took Cardwell to the lot, was not told what kind of car they were looking for, and Cardwell pointed out a maroon Buick. (RT 23117-27.)

Richard Cooksey, an investigator with the San Diego Police Department, testified regarding his attempts to identify the type of shoes that could have made the prints found at the crime scene by looking in shoe stores for matching patterns. (RT 23145-56.) Cooksey stated that he found a similar pattern in a size 13 Puma shoe. (Id.) Cooksey explained that the print found near the body was bigger than shoes taken from Cosby, and acknowledged that the shoes recovered from Petitioner did not match the prints either. (RT 23156-69.)

Detective Richard Carey testified on the collection of evidence in October 1985, including three knives and a money bag. (RT 23173-78.) Carey stated that Crime Stoppers called him and said a lady called to say she would leave some evidence in a dumpster. (Id.)

Jackie Robertson, the apartment manager at the Bates Street apartment building where Petitioner rented a garage, testified that Cosby and Petitioner hung out together. (RT 23206-16.) Robertson stated that he heard a metal-on-metal noise late in the evening in August 1985, and thought it was Petitioner, Cosby, and Patterson. (RT 23216-20.) Robertson stated that he later saw a safe in the garage that had been worked on. (RT 23220-26.) Robertson suggested a drill to expedite the process, and stated that Keith and Troy primarily worked on the safe, while Petitioner told Robertson not to get involved. (Id.) Robertson stated that he heard about the Aztec Liquor crimes on the radio, which made him nervous. (Id.) Later, Keith and Troy came in, put 2-3 money bags on the table, a throwing knife, and a mop, the latter which Robertson and his girlfriend Patti Hill kept for a month. (RT 23228-37.) The couple later saw a Crime Stoppers video on the Aztec crime, and Hill made Robertson put the money bags and knives in the dumpster, at which time Robertson also saw papers relating to Aztec in the dumpster. (RT 23237-41.) Robertson acknowledged that he received immunity from the District Attorney's office regarding his status as an accessory after the fact. (RT 23241-43.) Robertson also stated that many guys went in and out of garage that night, including several individuals from Los Angeles, who were ostensibly drug dealers. (RT 23250-55.) Robertson testified that only Keith Cosby was continually present in the garage that evening. (Id.)

08cv0311

Patti Hill testified that she lived on Bates Street in 1985, and heard banging noises on the night of the Aztec robbery. (RT 23297-304.) She stated that Petitioner asked to see the paper early the next morning. (Id.) Hill saw a mop in the dumpster the next day, and told Robertson to get it; she also said that the day after the banging, she witnessed Petitioner washing something metallic and shiny in the sink. (Id.) Hill testified that she later heard Bemore ask Troy Patterson for help, and the two left in Petitioner's maroon car, and several days later, Hill heard Cosby ask Bemore, "Did you get rid of it?" (RT 23304-12.) She was aware of the Crime Stoppers television program, and on several occasions she turned in items relating to this case. (Id.) Hill stated that she received $1000 from Crime Stoppers, and the police moved them to Spring Valley and paid for several things. (Id.)

Rudy VanZetten lived in a home in North Park near a canyon in September 1985, when on the morning of September 11, he saw what looked like a suitcase in the canyon. (RT 23327-34.) Upon closer inspection, VanZetten discovered it was a safe that had been drilled open, and his wife called the police. (Id.) Georgina Inniss, with the San Diego Police Department, testified to the collection of evidence, including shavings from the Bates Street garage, and several items from Bemore's car, including a wallet, papers in Petitioner's name, AAA card of Robert Johnson, and shoes with red stains. (RT 23334-50.)

Officer Joanna Silva, with SDPD's traffic division, testified that she stopped a 1971 maroon Buick on September 11, 1985 for speeding when a man she identified as Petitioner came bursting out of the car with his hands up, startling her. (RT 23351-60.) Silva stated that Troy Patterson was also in the car, intoxicated, so she sent him to detox. (Id.) Silva stated that she had been the first officer at the Aztec crime scene, and had backed up Officer Tom Jauregui at that scene. (RT 23360-61.)

SDPD Patrol Officer James Morrison testified about his contact with Keith Cosby on October 26, 1985, stating that a car driven by Cosby ran over a bus stop and speed limit sign and onto the front yard of a house. (RT 23371-75.) Morrison discovered Cosby did not have a California driver's license, upon which the car was impounded and towed from the scene. (Id.)

Paul Sham, an evidence technician with the SDPD, testified that the metal filings recovered from the Bates Street garage were similar in composition to metal of the safe from the Aztec Liquor store. (RT 23382-94.)

08cv0311

John Simms, a criminalist with the City of San Diego, testified that he compared the shoe prints recovered in this case to the Pumas located by Detective Padillo and that the pattern was consistent with that type of Puma shoe.  (RT 23404-16.)  Simms stated that he also compared hair found near the victim's hand to both Petitioner and Cosby, but found it was not similar to either man.  (RT 23430-36.)

Glenn Heflin, an inmate at the South Bay correctional facility, testified that he had prior contacts with Petitioner in the downtown jail while Heflin was there on an attempted burglary charge.  (RT 23451-55.)  Heflin explained that he was in a tank with Petitioner for three months and was later moved because he became a witness against Thompson, who was close to Petitioner. (RT 23455-58.)  Heflin explained that Petitioner was the tank captain, and had once threatened him for taking too long on the phone, stating that Heflin would not be the first person he had killed.  (RT 23460-65.)  After he and Petitioner became friendly again after the phone incident, Heflin stated that he was writing a letter and Bemore asked what his charges were; upon hearing it was attempted burglary, Petitioner said not to worry, that he had something to worry about because he killed someone in one of his robberies, adding that the stupid SOB should have opened the safe.  (RT 23465-68.)  Heflin acknowledged that when he first informed on Thompson, he failed to mention any of the statements Petitioner had made to him; Heflin reported the statements to police after Petitioner threatened him in 1988 during a subsequent incarceration.  (RT 23468-73.)  Heflin stated that he had made a deal for his testimony and that he had to testify truthfully.  (RT 23473-74.)  Heflin denied being a member of the Aryan Brotherhood, stated that he did have some prison tattoos, and testified that he initially went to the district attorney's investigator to arrange for protection.  (RT 23476-88.)

Angela Tabor, an inmate in Las Colinas Jail, testified that she hung out on Bates Street in 1985, and knew both Petitioner and Keith Cosby.  (RT 23525-31.)  Tabor once overheard Petitioner and Cosby talking when Cosby told Petitioner, "Man you didn't have to do that," to which Petitioner replied that "if the mf did what I told him he might still be alive."  (RT 23531-34.)  One morning, Tabor stated she saw a safe in the garage, and Cosby and Petitioner asked if she had tools they could borrow.  (RT 23544-49.)  Tabor admitted that when she heard Petitioner and Cosby talking, it was

1   always in general terms, and neither specifically mentioned the crimes at Aztec Liquor. (RT 23558-60.)

2       Troy Patterson acknowledged that he had been in prison several times in the past for felony

3   offenses, and stated that he lived on Bates Street in the summer of 1985. (RT 23568-73.)  Patterson

4   said that there was a safe in Jackie Robertson's garage in August of that year, which he helped attempt

5   to drill open with Petitioner, Keith Cosby, and Robertson. (Id.)  Although the safe was not opened in

6   his presence and he did not receive any money for his efforts, Patterson stated he received a gram of

7   cocaine soon after. (Id.)  Patterson stated that the safe was later kept in an empty apartment, but after

8   media coverage continued regarding the Aztec robbery, Patterson became concerned, and helped

9   dispose of the safe. (RT 23573-75.)  After he helped dump the safe in North Park, he got drunk and

10   had contact with police 15 minutes later due to a traffic stop, after which he was sent to detox. (RT

11   23575-80.)  Patterson stated that he and Petitioner switched clothes sometimes, but while Petitioner

12   never wore his shoes, he did wear Petitioner's. (Id.)  Patterson acknowledged that he was arrested for

13   robbery in 1986, and the district attorney offered a deal for his testimony in this case. (RT 23589-93.)

14   Patterson stated that he asked for a transfer to another correctional facility, but had not yet gotten it.

15   (Id.)  Patterson also stated that he was familiar with Petitioner's car, and stated that not many people

16   wear Petitioner's shoe size, which is 13. (RT 23593-99.)  Patterson admitted that he used Petitioner's

17   car to commit crimes without Petitioner, including petty thefts, primarily stealing bottles from liquor

18   stores. (RT 23599-603.)

19       Echo Ramey testified that she lived on Bates Street in 1985 with her boyfriend Stacy along

20   with Troy Patterson, and Petitioner came by one night in August, sweaty, jumpy and asking for Troy.

21   (RT 23613-17.)  Ramey stated she did not see blood, but that Petitioner asked for a duffel or something

22   to cover a safe. (Id.)  Ramey stated that while she did not see a safe that evening, she saw one later,

23   in the apartment across from hers. (Id.)  Ramey heard about the Aztec Liquor robbery and murder the

24   next day and later heard Petitioner telling another individual to be careful driving his car because there

25   was a safe in the trunk. (RT 23617-19.)

26       Richard Cooksey, the DA's office investigator, testified as to his involvement in a search of

27   Petitioner's Buick Electra undertaken a year after the police department's search of the vehicle, and

28   to his conversations with Echo Ramey, Stacy and Troy Patterson.  Cooskey stated that they recovered

08cv0311

size 12D New Balance shoes from the vehicle, and when Patterson was interviewed, he said Puma shoes could have been involved in the crime. (RT 23621-23.) Cooksey stated that Patterson was generally only forthcoming about the safe, and did not initially provide much other information; only after he spoke to Stacy and Echo and returned to speak to Patterson a second and third time did Patterson mention things Cosby had told him about the Aztec Liquor robbery and murder. (RT 23629-35.) Cooksey said Patterson did not ask for a deal, but expressed interest in one, and Cooksey stated that neither Stacy nor Echo were offered any promises to secure their cooperation. (Id.) Patterson also informed Cooksey that he had given Petitioner some black and red shoes, and identified similar ones from a catalog page. (RT 23638-50.) Cooksey admitted that he did tell Patterson that the defense would portray Patterson as the "patsy," and Patterson's identification of the shoe may have come after that statement. (RT 23641-50.) Additionally, Cooksey stated that while Patterson first said he was alone when Petitioner came by the night of the Aztec Liquor crimes, he later said both Echo and Stacy were present, yet always maintained that Petitioner came by that evening for a duffel or box. (RT 23650-54; 23671-73.)

Detective Richard Carey was recalled to the stand and testified that the first description of a possible suspect that was issued listed a height of 5'10." (RT 23690-93.)

Lloyd Howard, who lived and sold drugs on Bates Street in the summer of 1985, testified that he had prior felony convictions. (RT 23708-11.) Howard stated that he knew both Cosby and Petitioner from that time, and had sold drugs to Petitioner. (RT 23711-15.) Howard stated that he heard about the Aztec Liquor robbery and murder soon after the crimes happened, connected the safe on Bates to it a day or two later, and heard who was involved shortly after. (Id.) Howard added that Petitioner and Cosby hung out together, that he had heard how the victim in the Aztec robbery was killed, and that he saw Petitioner with a knife in the late summer of 1985. (Id.) Howard stated that Keith Cosby talked a lot, was a braggart, and mentioned the robbery and murder in his presence on two occasions, both with Petitioner present. (RT 23717-20.) Howard stated that the first time they were drinking beer in the area and Cosby stated that after the victim had been stabbed two or three times he may have already been dead, but Petitioner continued stabbing the man for no reason. (Id.) After Cosby made this remark, Petitioner told Cosby to shut up, and replied that if the victim had not fought

08cv0311

1   back or had done what Petitioner told him to do he would not have had to stab him so many times.

2   (Id.) Howard stated that he knew everyone in the Bates area, and while he used cocaine daily in 1985,

3   he was five months sober at the time of trial.  (RT 23726-36.)

4        Kim Strickler testified that she lived with Lloyd Howard on Bates Street in 1985, and knew

5   both Petitioner and Cosby.  (RT 23752-57.)  Strickler stated that she heard about the Aztec crime on

6   the news, and saw Petitioner around that time with scratches on his back when he came to their

7   apartment.  (Id.)  Strickler stated that Cosby was around at that time as well, and she saw a bloody shirt

8   and Cosby got a hose.  (Id.)  Strickler stated that there were numerous rumors floating around after the

9   Aztec robbery and murder, and stated that the night Petitioner and Cosby came to their apartment was

10  the same night as the robbery.  (RT 23760-64.)

11       Brian Kennedy, a crime scene reconstruction expert, discussed where the attack of Mr. Muck

12  took place, and stated that the victim was in more than one position when the wounds were made.  (RT

13  23787-805.)  Kennedy concluded that Muck was seated at one point during the attack, and lying down

14  at another point.  (RT 23805-27.)

15       LaTonya Wadley, who also lived on Bates Street in the summer of 1985, knew Cosby and

16  Petitioner, who hung out together, and knew Howard, who dealt drugs in the area.  (RT 23836-41.)

17  Wadley heard about the Aztec robbery and murder on the news, and that same day she saw Petitioner

18  with his head newly shaved, acting nervous and paranoid, and overheard his stated concern about

19  changing clothes and shoes.  (Id.)  Sometime after the Aztec crimes, Wadley was alone in an apartment

20  with Petitioner when he had been doing cocaine, and Petitioner told her he was worried about what

21  was in the trunk of his car.  (RT 23841-46.)  Petitioner started to pace, and spoke of blood, footprints,

22  and of stabbing someone 20 times, then talked about leaving and going to Louisiana or Arkansas.

23  (Id.)  Petitioner also told Wadley that Cosby ran his mouth and may have to be taken care of before

24  Petitioner left the area.  (Id.)  Wadley acknowledged that when she was arrested in 1988, she had

25  initially confused Aztec Liquor with an AM-PM when talking to investigator Cooksey.  (RT 23846-

26  50.)

27       The parties stipulated that criminalist Brown would, if called as a witness, testify that several

28  items tested positive for type O blood, that victim Muck's blood type was O, and Petitioner's blood

1    type was also O.  (RT 23872-88.)  Brown would also state that the knife recovered from the Bates

2    Street dumpster tested presumptively positive for blood, but there was not enough to type, and that a

3    running shoe tested positive for type O blood.  (Id.)

4        Robert Bucklin, a forensic pathologist, noted that the victim had suffered numerous abrasions

5    and cutting injuries.  (RT 23891-905.)  Bucklin stated that the victim suffered a cut to his jugular vein,

6    which resulted in a slower flow of blood than a cut to the artery.  (RT 23905-13.)  The victim also

7    suffered superficial cuts to his arms, abrasions on his knuckles, a deep, penetrating leg wound on his

8    lower right leg which nicked the bone, but no defensive wounds.  (Id.)  Bucklin stated that he marked

9    over 20 wounds on the victim, several of which were potentially fatal.  (RT 23913-20.)  Bucklin stated

10   that one potentially fatal wound went into the victim's liver and duodenum, another was a wound to

11   the victim's back which entered his lungs and lower heart, and yet another wound entered the victim's

12   chest cage.  (RT 23913-33.)  Bucklin stated that one of the knives he was shown, which was recovered

13   from Petitioner's car, could have caused some of the victim's wounds.  (RT 23934-39.)

14       2.    Defense Case

15       John Verdugo, who lived on 53rd Street near Aztec Liquor, stated that he saw something

16   unusual at 9:15 or 9:30 p.m. on the night of the crime.  (RT 23942-48.)  Verdugo stated that he noticed

17   a vehicle parked in the rear area of the store, and that a man approximately 6'1" with nappy hair placed

18   something long across the car's back seat, and got into the car.  (Id.)  Verdugo stated that he later saw

19   the vehicle in an impound lot, and that it could have been a maroon Buick Electra.  (Id.)  Verdugo

20   stated that he was familiar with the store alarm at Aztec Liquor, but could not recall if he heard the

21   alarm that night.  (RT 23948-50.)

22       Investigator Cooksey stated that he showed several sets of photos to Wadley, including both

23   lineups and individual photos, and while she did not identify Cosby in the photo lineup, she did

24   identify his individual photo.  (RT 23974-78.)  Wadley also selected Petitioner's photo from a group,

25   but Cooksey conceded that it may have taken her a few minutes to do so.  (Id.)

26       Defendant Terry Bemore took the stand, testifying that he previously worked as an officer with

27   the Palo Alto Police Department and had served in the Army, moving to San Diego after leaving the

28   military.  (RT 23990-92.)  Bemore stated that he had experimented with drugs prior to meeting Jackie

Robertson through a course sponsored by welfare, but that he used drugs regularly after his introduction to Robertson. (RT 23992-93.) Bemore stated that he also previously held a job with the San Diego County humane society, for which he had a gun and a uniform. (RT 23993-96.) Bemore admitted that during his employment with the humane society, he stole and committed robberies using the .38 caliber weapon that he carried at work. (Id.) On the day of the Aztec crimes, Bemore used cocaine earlier in the day and later went to the K-Mart in El Cajon about 9 p.m. that evening with Johnny, Troy and Cosby, to case it for stealing. (RT 23996-24000.) Bemore stated that he entered the store, and came back outside to find his car gone, which left him with a gun but no money. (Id.) Bemore stated he then saw the nearby Wherehouse Records store, entered, said he needed to get a checkbook to pay for a record, exited and then re-entered and robbed the store. (RT 24000-04.) Bemore stated that there were not many people in the store at that time, and after the robbery he went to the nearby mall and got in a cab, which he took to Imperial and 54th in order to make a drug purchase. (Id.) Bemore explained that if he had bought the drugs on Bates he would have had to share. (Id.) Bemore then told the cab driver to take him to Bates Street, but the driver refused and dropped him at 54th and University, after which Bemore walked to Bates. (Id.) Bemore stated that he smoked the drugs in an empty apartment, then went to buy more drugs. (RT 24004-05.) Bemore stated that he did not recall getting scratches, but that it could have been from a fight he had with a man named Tex days earlier. (RT 24005-06.) After buying additional drugs, Bemore stated he saw the other men with his car, screamed at them, to which they told him to shut up; it was then he noticed the safe in the back seat with blood on it. (RT 24005-09.) Cosby and Patterson bought cocaine, which Bemore made them share for use of his car. (Id.)

Bemore stated that he, Cosby, and Patterson placed the safe in Bemore's rented garage and attempted to open it with the aid of Jackie Robertson. (RT 24009-16.) Bemore stated that the other two men did not want to give him a third of the contents because he had not accompanied them in the robbery, but Bemore again pointed out the use of his car, and got a portion of the money contained in both the top and bottom of the safe's compartments. (Id.) Bemore acknowledged that he had previously had 20-30 throwing knives in his car. (Id.) He stated that once the money had been divided, he gathered a number of items to place in the dumpster, which included money bags and a

mop.  (RT 24016-20.)  Bemore stated that he helped get rid of the safe in September, but denied knowing that a murder had been committed because he did not read the paper.  (Id.)  He stated that the blood found on his shoes was from stab wounds he suffered shortly before his arrest.  (RT 24020-22.)

Bemore acknowledged knowing Glen Heflin, but asserted that they had only one confrontation, over drugs in the jail tank, as Bemore was a tank captain and punished those with drugs.  (RT 24022-27.)  Bemore denied telling Angela Tabor or LaTonya Wadley that he was involved with the Aztec crimes, and stated that he knew both Cosby and Patterson were involved in it, even though neither individual directly told him they were.  (RT 24027-29.)  Bemore stated that he was committing a robbery at Wherehouse Records at the time that the Aztec crimes and murder of Kenneth Muck took place.  (RT 24029-31.)

Bemore admitted that he had a serious cocaine addiction, and explained that he started committing robberies because simply stealing items was insufficient to support his cocaine habit, and also admitted that he sometimes used a gun in the robberies.  (RT 24033-43.)  He explained that it did not matter that the K-Mart in El Cajon was across the street from the Police Department because he wanted cocaine.  (RT 24060-69.)  Bemore stated that in robbing the record store he displayed the weapon near the register, told the cashier to open it, but because the cashier was slow, he grabbed the money and left.  (RT 24069-77.)  Bemore stated that when Troy Patterson and Keith Cosby arrived with his car, he was more concerned about drugs and money than the blood on the safe, and that he helped throw away stuff because his car was involved and because he got some of the monetary proceeds from the robbery.  (RT 24091-103.)

Bemore conceded that he was familiar with area surrounding the Aztec Liquor store, and stated that he may have gone to that store in the past.  (RT 24122-26.)  He explained that he felt safe staying on Bates Street because the robbery he committed was in another city.  (Id.)  Bemore denied talking to LaTonya Wadley or Jackie Robertson about stabbing someone and denied having a conversation with Keith Cosby about a killing with Angela Tabor present.  (RT 24122-30.)  Bemore stated that he was arrested and bound over for the Wherehouse robbery and attended a preliminary hearing where witnesses testified that he committed the robbery.  (RT 24135.)

08cv0311

1    Yolanda Salvatierra, who worked at the Wherehouse Records store in 1985, stated that on

2    August 26 at 9 p.m., a man came in, asked about records, then went out to get his checkbook.  (RT

3    24285-88.)  Salvatierra stated that the same man returned to the store, said he had his checkbook with

4    him all along, pulled out small gun, and asked her to open the register.  (Id.)  Salvatierra acknowledged

5    that she testified previously about the robbery in November 1986 and identified Petitioner as the

6    robber at that time but stated that she was unsure who robbed her when she testified in 1986, was not

7    sure of her identification, and was currently unsure if Petitioner was the assailant.  (RT 24288-95.)

8        Carrie Jacobs, whose prior testimony was read to the jury due to her unavailability as a witness,

9    lived in El Cajon in 1985, and was in the Wherehouse Records store on August 26 during the robbery.

10    (RT 24341-43.)  Jacobs was not aware that a robbery had occurred until the suspect left, and described

11   the suspect as a man, 6'1", muscular African-American, with close-shaven hair, who was wearing a

12   shirt, shorts, and worn-out tennis shoes.  (Id.)  Jacobs identified Petitioner as the perpetrator, after

13   previously identifying Petitioner at a line up and picking his photo out of an array when police came

14   to her home after the robbery.  (RT 24343-67.)

15       Gary Kruse was an inmate in the San Diego County Jail in the same tank as Petitioner and Glen

16   Heflin in September 1987.  (RT 24456-59.)  Kruse expressed familiarity with the Aryan Brotherhood

17   prison gang, and stated that Heflin told him that he was a member.  (Id.)  Kruse stated that he only saw

18   verbal conflicts between Petitioner and Heflin, and saw Petitioner knock Heflin's drugs from a table

19   on one occasion.  (Id.)

20       3.    Prosecution's Rebuttal

21       Reese Jones, a professor of Psychiatry and licensed physician with a sub-specialty in

22   psychopharmacology, testified regarding the effects of cocaine on the brain.  (RT 24365-87.)  Jones

23   stated that the crime in this case was not consistent with delirium or drug intoxication.  (RT 24387-88.)

24   Jones conceded on cross-examination that for an addict, obtaining the drug does become a

25   preoccupation in life.  (RT 24388-89.)

26       Officer Thomas Sumrow responded to the Wherehouse robbery, and stated that the witness

27   descriptions of the perpetrator both said he had an athletic build, and noted that neither said the

28   individual was slender or anemic looking.  (RT 24389-401.)  Sumrow stated that the original

1   description was of a black male, 6'3" and 200 lbs.  (Id.)  Sumrow acknowledged that the report

2   regarding witness Kim Rainer's original description listed an estimated height of 6'4" or 6'5".  (RT

3   24409-10.)

4        Kim Rainer, who worked at the Wherehouse store at the time of the robbery, stated that she

5   was shook up by the robbery and therefore initially described the perpetrator as taller than he actually

6   was.  (RT 24410-13.)  Rainer later amended her description to state that the assailant was likely 6'2",

7   athletic, and very muscular.  (RT 24413-15.)  Rainer did not recall the assailant's face, but believed

8   he had fair skin and a lighter complexion than Petitioner.  (RT 24415-19.)

9        Investigator Cooksey stated that he had recently conducted further investigation regarding the

10  Wherehouse robbery.  (RT 24467-75.)  Cooksey failed to find any underground or covered parking

11  structure as described by Petitioner in his testimony.  (Id.)  Cooksey also conducted a time experiment,

12  explaining that the distance from K-Mart to Wherehouse was 0.7 miles down Fletcher Parkway, and

13  that it would only take minutes to get to the freeway from the area.  (Id.)  Cooksey drove the route,

14  obeying all speed limits and stopping at all lights, and found the time it took to travel from

15  Wherehouse to Aztec Liquor was less than 16.5 minutes.  (Id.)

16  **B.    Penalty Phase**

17       At the penalty phase, the prosecution introduced evidence of two prior unadjudicated offenses

18  committed by Petitioner, an assault on Kevin Oliver and the sexual assault of Zelda Carlton.

19       In mitigation, the defense called numerous witnesses, including Petitioner's friends, coaches,

20  teachers, co-workers, wife and brothers, who traced Petitioner's life from childhood through college

21  and beyond, including his studies and employment in the ministry, in law enforcement, the military

22  and at the humane society.  The defense also offered expert testimony, in the form of a clinical

23  psychologist who had studied families associated with chemical dependency.

24       The defense also offered the testimony of numerous correctional officers, correctional

25  personnel, and inmates who testified regarding Petitioner's good behavior and positive contributions

26  to the prison environment.   In rebuttal, the prosecution introduced evidence of Petitioner's

27  involvement in a food tampering incident in the jail and involvement in intimidating another inmate

28  by making sexual overtures.

1         1.      Prosecution Case

2         Jacqueline Oliver testified that she went to Bates Street with her husband in October 1985 to

3   retrieve a TV she had loaned out, and upon her exit from her friend's building, was confronted by

4   people sitting on her car.  (RT 24741-47.)  Oliver stated that a man she identified as Petitioner left,

5   returned shortly thereafter with a gun and bottle, argued with her husband, and hit him with the bottle.

6   (RT 24747-59.)  After this, a melee broke out, an ambulance came, and they went to the hospital.  (Id.)

7   Petitioner was also at the hospital in an adjacent area, said he had been stabbed, and threatened Mrs.

8   Oliver, her husband, and their children.  (RT 24759-60.)  Kevin Oliver added that when he put the TV

9   in the trunk of their car, Petitioner put a gun to his head.  (RT 24768-72.)  After an exchange of words,

10  he was hit with a bottle.  (RT 24772-75.)  Mr. Oliver stated that he never threw a punch, tried only to

11  leave, and had no weapon at any point during the assault.  (Id.)

12        Zelda Carlton lived on Bates Street in 1985 and knew Lloyd Howard, who she allowed to use

13  her apartment to sell rock cocaine in exchange for drugs.  (RT 24786-90.)  Carlton testified that in

14  October or November 1985, several guys were at her apartment one evening, and all but one left, who

15  she then told to leave as well.  (RT 24790-94.)  Carlton stated that she went into another room, and

16  that same man came into her room with a knife, stating "I'm going to have you."  (RT 24794-800.)

17  The man told her not to scream, cut her gown, and raped and assaulted her, keeping the knife on her

18  the entire time.  (Id.)  After the man left, she threw up, cleaned up, went into her childrens' room and

19  said they had to go, after which they went to Texas.  (RT 24800-02.)  Carlton stated that she called

20  both of her sisters after the rape, crying and hysterical, and told them each what had happened,

21  repeating her account to each sister once she arrived in Texas.  (RT 24802-08.)  Carlton identified

22  Petitioner as her assailant.  (Id.)  Carlton acknowledged that she had been a victim of a different sexual

23  assault in the past, but did not share this fact with her sisters, and never reported the past assault.  (RT

24  24820-23.)

25        Cynthia Moreno stated that she received a call from her sister Zelda Carlton in the fall of 1985,

26  in which Zelda was crying and said she had been raped by a man with a knife who told her if she

27  screamed he would kill her.  (RT 24828-32.)  Moreno stated that when Carlton returned to Texas

28  weeks later, she repeated the account which was consistent with her earlier statement.  (RT 24832-34.)

17

1    Sarah Parker also received a phone call from her sister Zelda Carlton in the fall of 1985, during which

2    Carlton was distraught, upset, crying and wailing, and said she had been raped by a black man.  (RT

3    24834-37.)  Carlton stated that the assault took place in her home, and that he had a knife and told her

4    she better not say anything about it.  (Id.)  Parker said she spoke to her sister again about the incident

5    when Zelda came home to Texas, and Carlton's account was consistent with what she had said on the

6    phone weeks earlier.  (Id.)

7         Lloyd Howard, who sold rock cocaine in 1985 on Bates Street using Zelda Carlton's apartment,

8    recalled a time when he was at Carlton's apartment with Petitioner, Zelda and her kids.  (RT 24846-

9    49.)  Howard stated that he left later that night and Petitioner stayed, and Carlton came to Howard's

10   apartment the next morning, crying, shaking and scared, and told him that Petitioner had put a knife

11   to her throat and raped her.  (Id.)  Howard stated that he observed a small cut on Carlton's neck, and

12   thereafter told his drug sellers that Petitioner was not to come on the street, as Howard felt responsible

13   for what had happened.  (Id.)

14        2.    Defense Case

15        Ray Daugherty, Petitioner's half-brother, stated that Petitioner was the youngest of four

16   children and the only child by a different father.  (RT 24865-67.)  Daugherty explained that

17   Petitioner's father drank, the couple fought often, and later divorced.  (Id.)  Petitioner's mother

18   suffered from rheumatoid arthritis and underwent numerous operations when they were children.  (RT

19   24867-71.)  Daugherty explained that their brother Don was violent, used drugs and alcohol, was shot

20   and stabbed several times over the years, and is now deceased.  (Id.)  Another brother Bobby was not

21   violent, but was on medication for epilepsy, and had committed several burglaries in the past.  (Id.)

22   Daugherty stated that he had been convicted of 5-6 burglaries as well, and had also used drugs in the

23   past.  (Id.)  Daugherty explained that their family had a caretaker when their mother was ill, and she

24   also used drugs.  (RT 24874-77.)  Daugherty admitted that he had used Petitioner as a lookout when

25   committing robberies when Petitioner was between the ages of 10 and 12.  (Id.)

26        Kenneth Daugherty, another brother of Petitioner, explained that he, unlike several of his

27   siblings, did not get into legal trouble.  (RT 24877-82.)  The witness explained that when their mother

28   got sick, a caretaker named Tilda George helped out, who was cruel to the children and locked up their

food.  (Id.)  Daugherty explained that George physically abused him and Petitioner, beating them with extension cords and canes.  (Id.)  The witness stated that Petitioner was 8 or 9 years old at the time, and described the experience as "pure hell."  (Id.)

Sharon Lauderdale, Petitioner's cousin, stated that numerous individuals in their extended family suffered from drinking problems.  (RT 24889-94.)  Lauderdale explained that Petitioner, his mother, and the rest of their family came to live with her family when his mother became ill and was confined to a wheelchair.  (Id.)  Lauderdale stated that Petitioner's brothers used drugs, often came home drunk, and one brother, Don, hit her.  (RT 24894-902.)

Dr. Edward Mongan, a physician specializing in the treatment of arthritis, treated Petitioner's mother for severe rheumatoid arthritis, and stated that she was already in a wheelchair by the time he first saw her.  (RT 24902-09.)  Dr. Mongan explained that she asked for help at home, and was on medication for arthritis in addition to antidepressants and tranquilizers for anxiety.  (Id.)  Mongan had concerns about the number of medications she took and the possibility of overmedication, and believed she was dependent on the drugs.  (RT 24909-20.)

James Smith, a childhood friend of Petitioner's in south central Los Angeles, stated that Petitioner was a popular child, stood up against gangs and drugs, often helped out weaker kids and helped out his mother at home.  (RT 24924-32.)  Smith stated that while neither he nor Petitioner had religious ties as children, Petitioner lived Christian and later went into the ministry.  (RT 24932-34.)  James Mason, another friend of Petitioner's since childhood, lived a few blocks away and visited Petitioner's home often.  (RT 24940-47.)  Mason stated that he drank a little and smoked pot, and was allowed to do both when at Petitioner's home.  (Id.)  Mason stated that he never smelled dinner cooking there, nor ever saw Petitioner eat at home or have spending money.  (Id.)  Mason and Petitioner lost contact later, and Mason acknowledged that he had not seen Petitioner recently.  (RT 24047-50.)

Stephen Bucky, a clinical psychologist, testified regarding children and families associated with chemical dependency.  (RT 24953-63.)  Bucky stated that based on his research and statistics, children raised with an alcoholic or chemically dependant parent, as Petitioner was with his alcoholic father and mother's dependency on pain medication, are significantly more likely to develop a dependency

1   or addiction of their own. (RT 25014-18.) Bucky conceded that according to his studies, individuals

2   raised in a family with substance abuse would exhibit similarities to sociopaths on a number of

3   dimensions, but would exhibit differences on others. (RT 25036).

4         Carl Reed, who grew up with Petitioner in south central Los Angeles and played basketball

5   with him, stated that in high school, Petitioner worked supervising kids at the Boys and Girls Club.

6   (RT 25040-43.) Lionel Harris, a high school teacher and basketball coach, stated that Petitioner was

7   the team captain, and was chosen as such by the team. (RT 25043-47.) Harris stated that Petitioner

8   was intelligent, but only an average student who did not try hard. (Id.) Harris stated that he knew of

9   Petitioner's home situation and knew he had used some drugs in high school. (Id.)

10        Daphne Earvin dated Petitioner in high school, described him as kind and affectionate, and

11  stated that Petitioner cared for his mother due to her illness. (RT 25047-51.) Earvin and Petitioner

12  went to church and Bible study together, and she stated that they never had a real break up, but that

13  contact became less over time. (RT 25051-58.) Earvin stated that she last spent time with him in

14  1983, when they had dinner and went to church together; she also visited him in jail in 1985. (Id.)

15        Aubry Walker has also been friends with Petitioner since high school. (RT 25059-62.)

16  Walker, a police officer, stated he entered law enforcement because of Petitioner's own interest in the

17  field. (Id.) Walker and Petitioner were on the basketball team together in high school; Walker knew

18  of his mother's illness and admired Petitioner's strong religious background. (Id.) Freeman Williams,

19  who also played basketball with Petitioner in high school, stated that he never saw Petitioner smoke

20  or drink. (RT 25063-71.) Williams and Petitioner both attended colleges in Oregon, but while

21  Williams went on to play in the NBA, Petitioner was unhappy and left college. (Id.)

22        Reverend Cecil Edwards knew Petitioner through his son, and testified that he occasionally

23  prayed with Petitioner at his home and felt he was the kind of young man he wanted his son to be

24  friends with. (RT 25071-75.) Edwards stated that Petitioner's faith was genuine, and he heard later

25  that Petitioner wanted to join the ministry, but acknowledged that he lost contact with Petitioner in the

26  preceding 5-6 year period. (Id.) Gloria Edwards, the minister's wife, met Petitioner when he was in

27  high school when he helped her with the PTA, stating he came to their home sometimes, and spent

28  time there after his mother died. (RT 25075-81.) Edwards found Petitioner to be nice, trustworthy,

and friendly, and would have chosen him to be her son.  (Id.)  She also stated that she met his wife and baby later on, and last saw Petitioner approximately 5 years ago.  (Id.)  Albert Edwards, Cecil and Gloria's son, stated that he has been friends with Petitioner since 1971, that they attended high school together, and they also saw each other around college after Petitioner returned to Southern California.  (RT 25081-93.)  Petitioner and Edwards had discussions on religion, and Petitioner also expressed an interest in law enforcement.  (Id.)  Edwards stated that he last saw Petitioner in 1985, when he met Keith Cosby and Jackie Robertson, and at that time Petitioner admitted to him that they might be into drugs.  (Id.)  Edwards stated that at this last visit, he noted that Petitioner's personality had changed, but denied Petitioner was ever violent or cruel, and stated Petitioner was still employed when Edwards last saw him.  (Id.)

Joseph Barnes, who had known Petitioner since high school, worked as the basketball coach at Pasadena City College when Petitioner attended, and Petitioner married his wife's niece, who he met as a student there.  (RT 25098-102.)  John Hardy, Petitioner's counselor at Pasadena City College, stated that Petitioner had tutoring assistance when he was enrolled there, but was unfamiliar with Petitioner previously attending a college in Oregon.  (RT 25102-11.)

Earl Muse, currently a counselor for the California Youth Authority, attended school with Petitioner from junior high through Pasadena City College, and played basketball with him.  (RT 25112-19.)  Muse found Petitioner funny and likeable, but stated that Petitioner changed when his mother died, when he started drifting, missing class, and using drugs such as marijuana, PCP and alcohol.  (Id.)  Muse became concerned and spoke to their coach about it, angering Petitioner, who left for another school at the end of the year.  (Id.)  Muse asserted that even though Petitioner got hostile with him, he was never violent.  (Id.)

Stephen Griffin, who knew Petitioner through basketball at Barton County Community College in Kansas in 1976 and 1977, stated that the season before Petitioner arrived was not good, but the season Petitioner played was a standout year for the program.  (RT 25125-35.)  Griffin stated that Petitioner was the only black person on the team, and made a huge contribution to the team, as a record holder and a gentleman.  (Id.)  Griffin explained that he and Petitioner also had a spiritual friendship,

spoke about religion often, and that he met Petitioner's girlfriend Bernetta. (Id.) Griffin stated that the last time he saw Petitioner was at an alumni game in 1983. (Id.)

Mark Miller, who met Petitioner when he attended George Fox College in Oregon, stated that his father was the basketball coach there, and had recruited Petitioner. (RT 25136-43.) Miller stated that Petitioner was not happy in Oregon, at the small school with a small percentage of black students, and Petitioner moved with Miller's family to Kansas. (Id.) Miller, who was 17 at the time of the move, did not want to move, and Petitioner helped him with homesickness, and lived with the family. (Id.) Miller stated that he looked to Petitioner as a big brother, and that Petitioner was active in the church. (Id.)

Thelma Johnson met Petitioner at a church they both attended in Kansas, and stated that Petitioner lived on her property. (RT 25143-49.) Petitioner had previously lived with other students, but did not like the atmosphere, as it was not conductive to studying, and accepted her offer of a place to stay. (Id.) Johnson states that her husband was also close with Petitioner, who she described as a beautiful young man who was full of love. (Id.)

Marion Scott, a minister and restaurant owner in Kansas, knew Petitioner from church. (RT 25149-55.) Scott stated that while he was initially wary of Petitioner due to the fact that he was from a violent part of Los Angeles, he found that Petitioner was never that violent, and became family to him, describing him as a "rarity" who preached in white churches. (Id.)

Lorin Miller, a basketball recruiter who worked in Oregon and Kansas, recruited Petitioner out of high school. (RT 25155-85.) Miller stated that Petitioner was originally unhappy in Oregon and moved back to California. (Id.) However, when Miller moved to Kansas for a job, he got Petitioner to move as well. (Id.) Miller stated that Petitioner had tremendous potential as a person, was never mean or violent, and was a better-than-average player. (Id.) Miller stated that Petitioner was recruited heavily from the school in Kansas, and later went to Morehead State, a Division One school. (Id.)

Andre Jones played basketball with Petitioner at Morehead State University in Kentucky in 1977 and 1978 season. (RT 25196-203.) Johnson was the team captain and recalled Petitioner as a good player, but did not recall not recall him playing game. (Id.) Johnson stated that there were only 3-4 black players on the whole team, including himself and Petitioner, and that Johnson and maybe

08cv0311

one other black player got to play, as the black players did not get the same chance to show their skills as white players.  (Id.)  Johnson explained that Morehead was located in eastern Kentucky,  in a predominantly white town in the mountains.  (Id.)

Benjamin Braziel met Petitioner in elementary school, and they grew up together, attending high school and San Jose State together.  (RT 25209-20.)  Braziel knew Petitioner was cared for by an ill mother, and stated that when visiting Petitioner's home, he witnessed drugs being used there. (Id.) Braziel also stated that Petitioner was in the ministry, and he has one of Petitioner's Bibles.  (Id.) Braziel stated that he went away from his faith for a time and Petitioner brought him back.  (Id.)

Steven Petillo, a police officer with the City of Palo Alto, was hired at the same time as Petitioner and attended the academy with him, driving in each day together.  (RT 25220-38.)  Petillo considered Petitioner a friend, and stated that Petitioner performed well and was well-liked at the academy.  (Id.)  Petillo stated that Petitioner was ranked in the top third of their class, but stated that Petitioner failed to complete the probationary period.  (Id.)

Larry Ellis, a pastor, stated that he and Petitioner were ministers in training at the same time in Redwood City, where Petitioner became was a licensed minister.  (RT 25255-70.)  Ellis believes he first met Petitioner's wife Bernetta around the time she and Petitioner got married, and thinks Petitioner attended Simpson Bible College for a time.  (Id.)  Ellis stated that he also counseled Petitioner and his wife on their marital problems.  (Id.)

Vitruvius Brooks met Petitioner as a teenager and they attended high school together.  (RT 25279-82.)  After high school, Petitioner flew into town to attend Brooks' mother's funeral in May 1981, was a pall bearer, and recited the Lord's prayer at the service.  (Id.) Brooks stated that Petitioner was attending the ministry at the time, and consoled Brooks.  (Id.)

John Culberson was in Petitioner's Army unit in Fort Lewis, Washington, in the early 1980's. (RT 25282-87.)  Culberson stated that Petitioner entered as an E3, and was recommended for promotion to E4, but did not receive it because of a problem with his feet that slowed him down.  (Id.) Culberson explained that they served in an infantry unit which entailed a great deal of marching and walking, but aside from the foot problems, Petitioner was a model soldier, both dependable and likable.  (Id.)

Paul Culver, a Humane Society officer for San Diego County, trained Petitioner for a position and found him to be easygoing and reliable.  (RT 25292-300.)  Culver stated that he observed Petitioner in the field where he was professional and cool-headed.  (Id.)  Culver did not harbor any suspicions regarding Petitioner using drugs and was unaware of family problems, but did recall some mention of financial problems.  (Id.)  Culver stated that he and Petitioner did not really socialize outside of work.  (Id.)  Culver also explained that their officers carried weapons that they purchased on their own.  (Id.)  Culver stated that Petitioner's employment was terminated a few days after Petitioner was arrested and jailed for stealing liquor from a supermarket.  (Id.)

Orthopedic surgeon Dr. James McSweeney examined Petitioner in May 1988 for a complaint of bilateral foot pain.  (RT 25301-09.)  Petitioner stated that he had a basketball accident in 1973 and had pain in his left foot ever since.  (Id.)  Petitioner told Dr. McSweeney that he also had right foot pain in the military.  (Id.)  McSweeney performed an exam, took x-rays, and found metatarsalgia bilateral, a disorder with inflammation of joint capsules.  (Id.)  Dr. McSweeney stated that he discovered an old fracture and other injuries and prescribed special footwear.  (Id.)

Fred Lee, Director of the San Diego Humane Society, hired Petitioner in December 1984 as a night person, and later promoted him to humane law enforcement, where the duties included the investigation of complaints of animal abuse. (RT 25316-26.) Petitioner went through the training, and the position included carrying a firearm.  (Id.)  Lee stated that Petitioner had a nice appearance, was good at talking to people, and his background in law enforcement was a good fit for the position.  (Id.)  The panel approved Petitioner, who was then appointed and sworn in.  Lee stated that Petitioner's performance was good at first, but he later had problems with punctuality and problems completing work.  (Id.)  Lee was later notified that Petitioner had been arrested for shoplifting or burglary in east San Diego County, and Petitioner failed to show up for work after that, so his appointment was revoked and he was terminated in August 1985.  (Id.)  Petitioner stopped in once in late October 1985 just to talk, appearing thin and in ill-health.  (Id.)

Ira Woods, an employee of the Humane Society, met Petitioner through work, and had some contact with him and his family at church.  (RT 25334-39.)  Petitioner also attended bible study at Woods' home, and Woods felt that Petitioner's knowledge of the Bible was good.  (Id.)

24

Benjamin Patterson, the stepfather of Petitioner's wife, states that he became aware of Petitioner's cocaine use in 1985, when Petitioner came to him and admitted he had a drug problem. (RT 25344-48.) Patterson is an alcoholic and told Petitioner where the central office for Narcotics Anonymous was located, but does not know if Petitioner ever went there. (Id.) Patterson also once visited Petitioner in the hospital in 1985, where Petitioner told him he was clean since his arrival and would stay clean. (Id.)

Bernetta Bemore, Petitioner's wife, testified that they met as junior college students in Pasadena in 1976. (RT 25348-53.) Bernetta's mother was a recovering alcoholic who stopped drinking when she was 26, and her father was the first black city councilman in their area and an accountant with his own firm. (Id.) Bernetta does not drink or use any drugs, and fell in love with Petitioner's spiritual side, believing he would give up the marijuana he sometimes used when they met. (Id.) She stated that Petitioner told her he had his first sexual experience at age 11 or 12 with the wife of his oldest brother. (Id.) Bernetta acknowledged that the differences in their backgrounds was a concern to him, but she felt that he fit in well with her family. (Id.)

Bernetta and Petitioner were dating when his mother died, and she testified that it affected him strongly, after which he made a point to try to change and to stop drinking and using drugs. (RT 25353-64.) After his mother's death, Petitioner moved to Kansas for more college, and she visited him there. (Id.) After attending Morehead State in Kentucky, however, Petitioner again started drinking and using drugs, but was not using drugs when he went into the ministry in 1980, and they got married shortly thereafter. (Id.) Bernetta stated that Petitioner later left the ministry for financial reasons, started the police academy, and she became pregnant. (Id.) Petitioner was terminated from the police department a month before she was due, which she stated was stressful; after the firing, he again started to drink and use drugs. (Id.) Later on, he enlisted in the Army, where Bernetta stated he did well and seemed to enjoy himself. (Id.) After his discharge from the military, she got pregnant again, went on welfare to cover the birth, and he took a job with the Humane Society. (Id.)

Bernetta stated that Petitioner was in a lot of pain at that time, as he had received a medical discharge from the military, and he drank heavily. (RT 23564-68.) She stated that Petitioner stopped the substance abuse when he was hired at the humane society in December 1984, but started drinking

again in April 1985. (Id.) Bernetta stated that Petitioner was a good husband even when on drugs or she would not have stayed, and that he was an excellent father to the girls. (Id.)

Bernetta testified that she tried to talk to Petitioner at different points about his drug and alcohol use, and he appeared to be winning the battle at times. (RT 25371-76.) She stated that Petitioner underwent a change in the spring of 1985, as he was sleeping a lot since he was working two jobs, one in security and one at the Humane Society. (Id.) She noted that during this time he also drank a lot and was gone for long periods of time. (Id.) During this period, Petitioner kept bringing up the idea of divorce, resulting in their separation in June 1985, but he continued to visit her and the children. (Id.) On his visits, Bernetta felt that Petitioner did not look good, and she was concerned. (Id.) In July 1985, Petitioner told her that he was addicted to cocaine, they discussed entering marriage counseling, and she started attending NA meetings. (Id.) Petitioner said he attended NA meetings, but that they were not for him. (Id.) Bernetta saw Petitioner only a few times in August 1985, and he called once from jail after he had been arrested for shoplifting. (Id.) Prior to this call, she declined when Petitioner asked her to get him from jail, as she did not want to enable him. (Id.) At this point, Petitioner pushed for a divorce so she did not go down with him. (Id.) Bernetta stated that she saw Petitioner once in September 1985, and not at all in October 1985 until he was stabbed and placed in the ICU, where she spoke to him over the phone but was too afraid to see him in the hospital. (Id.)

Bernetta testified that she started divorce proceedings after a later hospital visit, but never completed the proceedings, and she still considered them to be married. (RT 25376-81.) She stated that she still wanted to be married to him, had visited him in jail, and had taken the kids for visits. (Id.) She had not told their children of Petitioner's conviction, as she was waiting to see what happens, although the children knew he was in jail and would be there a long time. (Id.) However, Bernetta stated that Petitioner was still the childrens' father who talked to them about their problems and helped her out with discipline. (Id.) Petitioner spoke to the children about drugs and alcohol and the wrong decisions he made in the past. (Id.) Bernetta stated that the kids still needed a father and she needed help in raising them. (Id.) She stated that Petitioner was never violent around her or the children, and had expressed remorse for putting the family through everything. (RT 25389-91.)

Several correctional officers, personnel, and fellow inmates from the San Diego County Jail testified regarding their interactions with Petitioner during his incarceration, including his leadership abilities, good behavior, and spirituality. Deputy Marshal Melvin Fay stated that he had multiple contacts with Petitioner as an inmate and found him to be polite and respectful, with a good sense of humor. (RT 25401-06.) Fay described a fight that broke out between two inmates that Fay attempted to break up with Petitioner's assistance, stating that Petitioner was "a big help" in bringing the situation under control. (Id.)

Deputy Kevin Randall saw Petitioner often between November 1987 and November 1988 when running security checks, as Petitioner was a tank trustee. (RT 25407-10.) Randall stated that Petitioner was always courteous, ran his module well, and stated that he never witnessed Petitioner acting violently. (Id.) Randall acknowledged hearing about a food contamination incident where someone put disinfectant in the inmates' food, and hearing that Petitioner verbally or physically threatened inmate Glenn Helfin. (RT 25410-19.)

Mark O'Connor, a jail training coordinator, found Petitioner to be a cooperative, cordial and pleasant inmate, noting that this was not his experience with all inmates. (RT 25423-27.) O'Connor said that Petitioner served as a tank trustee, that periodic tension in a tank was normal, and that he heard Petitioner had prevented injuries to deputies. (Id.) O'Connor noted that Petitioner was written up once by a new deputy, but that the situation was resolved in Petitioner's favor. (Id.) O'Connor was aware of the poisoning investigation regarding that tank, and acknowledged that Petitioner might have been written up, and was definitely moved from the tank. (RT 25427-38.) O'Connor stated that in his experience Petitioner was a help in dealing with other inmates, and stated that it would be an easier jail to operate if every inmate was like Petitioner. (Id.)

Deputy Sheriff Joseph Spina knew Petitioner for several years and stated that Petitioner ran a quiet tank with few problems. (RT 25442-45.) Spina knew Petitioner once had a fight with a white man named Cooper who was a member of the Aryan Brotherhood, but noted that Cooper started it and had been the inmate to receive a write-up. (Id.) Spina said there were no write-ups on Petitioner as far as he knew, which was remarkable given the length of time Petitioner had been incarcerated. (Id.) Spina stated that Petitioner once volunteered for a bad cell with a poor vent in order to give his own

08cv0311

cell to another inmate, he and Petitioner talked on occasion, and it was on Petitioner's advice that Spina started to learn Spanish. (Id.) Spina conceded that he was a little worried about testifying for Petitioner in the current proceedings and acknowledged that Petitioner was moved to a solo cell because of the poisoning incident, but stated that he was not involved in the investigation and thus did not know if Petitioner was actually involved in the poisoning incident. (RT 25445-49.)

Deputy Burton Quick was a jail trustee deputy in 1986, stated that he had over 30 contacts with Petitioner, and never saw him act violently. (RT 25450-54.) Quick stated that he and Petitioner engaged in several discussions on religion, that Petitioner said he did bible study in the tank, and one day told Quick he had prayed for him. (Id.) Quick stated that he only had positive contacts with Petitioner, and never saw any manipulativeness from him. (Id.) Quick was not aware of the official result of the poisoning investigation, but Petitioner told Quick he was not part of it, and Quick never heard anything official to the contrary. (RT 25460-62.)

David De Haas, a Baptist minister and the supervising chaplain for the jails, stated that he knew Petitioner the longest of any inmates, considered their relationship to be pastoral, but also considered Petitioner a friend. (RT 25470-75.) De Haas stated that he continued to meet with Petitioner every other week in a professional visiting area, and noted that Petitioner was particularly supportive a few years ago when De Haas' wife of 40 years died. (Id.) De Haas noted that prisons, like jails, have religion programs available. De Haas stated that Petitioner is a family man, and would have something to contribute as he noticed Petitioner had the respect of other inmates. (RT 25475-77.)

Harry Olmsted, who previously served as a volunteer jail chaplain, first met Petitioner in the fall of 1987. (RT 25482-85.) Olmsted acknowledged that some tension existed in Petitioner's tank at first, but he noticed it getting better after Petitioner went back to religion. (Id.) Olmsted also did some work with nursing homes, which Petitioner participated in by praying for the people in those homes, sending letters, and writing songs. (Id.) Olmsted stated that Petitioner also conducted Bible studies in the tank, and opined that Petitioner would be a great asset in the prison system in this capacity. (Id.) Olmsted heard of numerous positive interactions Petitioner had with several guards at the jail, noting that some guards even addressed Petitioner by his first name, which is very unusual. (RT 25485-87.)

1    Fred Campbell, the pastor of Mt. Zion Baptist Church in Redwood City, first met Petitioner

2    in the late 1970's, and performed the Bemore wedding ceremony. (RT 25549-54.) Campbell testified

3    that Petitioner became a Minister-in-training at the church, was later licensed, and worked with the

4    church's youth department. (Id.) Campbell had contact with Petitioner after he moved to San Diego,

5    and spoke him on the phone during Petitioner's hospital stay, but Petitioner did not mention his drug

6    problems to Campbell. (Id.) Campbell stated that he believes there has been further development in

7    Petitioner's spiritual side since his imprisonment, a growth in his writings, and believes Petitioner is

8    more suited now to ministry-related activities. (RT 25554-57.) Campbell stated that Petitioner had

9    expressed a desire to work on his faults, wanted to be a better father, and believed he could still do a

10   lot of good. (Id.)

11        3.        Prosecution's Rebuttal Case

12    Daniel Juarez, an jail inmate as of June 1988, testified he was a Mexican Mafia dropout in the

13   Protective Custody tank who had two prior felony convictions for assault with a deadly weapon as well

14   as parole revocations, and had spent 12 years in prison in addition to multiple periods of time

15   incarcerated in jails. (RT 25725-28.)  Juarez had recently been released, but denied that the District

16   Attorney's office was involved in the decision to release him. (Id.) Juarez stated that on June 8, 1988,

17   when he was still in the county jail, there was a problem with the evening meal, and that he knew there

18   would be a problem before it happened. (RT 25731-35.) Juarez testified that he had heard Petitioner

19   and several other inmates discussing a plot to make people think everyone got poisoned as a joke by

20   putting something in the food. (Id.) Juarez acknowledged that he had been charged for possessing

21   marijuana in jail. (RT 25762.)

22    Steve Mouzas of the San Diego County Sheriff's office, who served as the jail's cook, stated

23   that he served the meal of roast beef, mashed potatoes and gravy, broccoli and bread pudding on June

24   8, 1988. (RT 25801-06.) Mouzas testified that he also supervised the placement of food on trays, and

25   stated that the beverage was in a big container, and would be distributed when the food was delivered

26   to the cells. (Id.) Mouzas stated that the cart for 2F was a lockdown cart that was treated differently

27   than the others and was secured with a lock so the food could not be tampered with. (Id.) Mouzas

28   stated that the cart was locked that day without any unusual smell, and a deputy took the cart for

serving.  (Id.)  The cart returned early, Mouzas was asked to check the food; after checking 5-6 trays, he found that one tray had something wrong with it and smelled very bad, like a "full toilet that had been sitting there for a few days."  (Id.)  Mouzas checked the other trays, but stated that was the only unusual one, and there had been no other complaints about the food that day.  (Id.)  Mouzas stated that a new cart was immediately prepared and sent out for that tank.  (Id.)

Deputy Tim Rybka was the first responder to the jail tank alarm on June 8, where he spoke to Petitioner, the tank trustee, who said "Deputy Rybka, I think- would you smell this tray, this food has been contaminated."  (RT 25809-12.)  Petitioner handed over a tray which smelled like it had fecal matter on it, after which Rybka directed Petitioner to push the cart back out of the tank, while the other inmates were running around screaming and gagging.  (Id.)  Rybka stated that Petitioner was removed as the tank captain over this incident, was put in a cell by himself, and was allowed out only for showers or visitation.  (Id.)  Rybka stated that after the tampering incident and the transfer, on one occasion the deputies forgot to turn on the telephones for Petitioner, upon which they heard screaming and banging, but that Petitioner quieted down when they turned on the phones. (RT 25817-19.)  Rybka stated that Petitioner may have manipulated some of the smaller, milder, or more inexperienced deputies such as Quick, Fay or O'Connor, but that Rybka was not easily manipulated, having served in the Army and as a bar bouncer for 8 years.  (RT 25823-26.)

Inmate Richard Luken, incarcerated on a conviction for manslaughter, conceded that he agreed to testify in an agreement with the District Attorney's office, who would take into account his cooperation when it came time for sentencing and not prosecute him for the food tampering incident. (RT 25843-46.)  Luken stated that he was housed in 2F, and Petitioner was the tank trustee.  (Id.) Luken stated that he, Ricky Thompson and Petitioner were part of a plan instigated by Petitioner to tamper with the food.  (RT 25846-48.)  Luken testified that the inmates planned to soak cigarette butts for the nicotine, and would then put the nicotine in the drink to make all the inmates sick, as Petitioner surmised that they would probably be taken to the hospital, and one or all three might be able to escape.  (Id.)  Petitioner told Luken that he had previously attempted an escape when he went to a doctor about his feet, but found security was too tight.  (RT 25848-49.)  Luken acknowledged that he

30

1   and Petitioner intimidated Rodney Wilson by telling Wilson they wanted sex and making advances

2   on him almost immediately after Wilson's placement in their tank.  (RT 25855-57.)

3        Deputy Sheriff Scott Seitz was on duty June 8 at the time of the tampering incident, and stated

4   that there was nothing wrong with the tray before it was sent down to the tank, but the inmates

5   complained, became sick, and were transported to the hospital.  (RT 25895-901.)  Seitz was also on

6   duty when Rodney Wilson was put in the tank with Petitioner, and stated that 45 minutes later Wilson

7   seemed extremely frightened.  (RT 25901-03.)  Wilson reported that other inmates had made

8   homosexual statements and advances on him and volunteered to go to the homosexual tank; Seitz

9   spoke to Petitioner and told him to leave Wilson alone.  (Id.)  Seitz also stated that one night on duty

10  he was reviewing paperwork regarding cell placement and noticed several inmates were in solitary

11  cells under "keep separate" orders from Petitioner, and Seitz reasoned that moving those inmates back

12  to 2F and placing Petitioner in a solitary cell would free up three cells, so Petitioner was moved.  (RT

13  25905-09.)

14        Rodney Wilson, who was assigned to jail tank 2F in 1988, testified that he passed a note to the

15  deputy his first night in the tank, asking to be removed because he had been accosted by other inmates

16  making sexual overtures and did not think it was a game.  (RT 25917-20.)  Wilson stated that

17  Petitioner, the tank captain, was one of the inmates making overtures, as was Ricky Thompson, a

18  friend of Petitioner's.  (Id.)  Wilson was moved from the tank, but stated that the pressure from

19  Petitioner continued.  (Id.)  Wilson stated that, in his experience, Petitioner used physical force against

20  people, that the intimidation often occurred at lock down and that Petitioner grilled new arrivals to the

21  unit; Wilson also stated that Petitioner karate kicked some inmates, pretending he had flash backs to

22  Vietnam.  (RT 25920-26.)

23        Edward Augustine, who investigated the food tampering incident, stated that he conducted

24  interviews of the inmates in tank 2F, and witness Juarez did not ask for favors for his testimony.  (RT

25  25953-58.)  Investigator Cooksey testified that he did not make a deal with inmate Rodney Wilson to

26  get his testimony or cooperation in this case.  (RT 25975-77.)  Cooksey also denied that any deals with

27  were made with Daniel Juarez.  (Id.)

28        4.    Defense's Sur-Rebuttal

08cv0311

Harold Erickson, a mechanic, testified that he was in jail custody from April to November 1988, placed in tank 2F, and developed a friendship with Petitioner. (RT 25979-82.) Erickson stated that Petitioner helped him out with some problems, met his family on a visit day, and never seemed to be a bully. (Id.) Erickson stated that in his experience, Petitioner had a kind heart, and noted that Petitioner held Bible studies, in which Erickson occasionally participated. (Id.) Erickson stated that he also knew Wilson, did not witness any intimidation by Petitioner, and opined that Wilson and Petitioner appeared friendly to each other. (Id.) Erickson stated that Petitioner intervened in a problem Wilson had with a third inmate, resulting in all three being moved to individual cells. (Id.) Erickson opined that Wilson did not appear scared, but did seem very verbal and two-faced. (Id.) Erickson also stated that he never saw Petitioner do anything to the food or drink on June 8, but admitted that he ate that evening while on the phone. (RT 29985-87.)

Joshua Davis was a trustee who delivered the dinner cart on the day of the food tampering incident. (RT 26014-17.) Davis stated the 2F cart had a lock on it that was not locked that day, and therefore anyone could get into it. (Id.) Davis noted that the cook appeared to be under the influence of alcohol that day, and testified that he had seen the cook drunk on prior occasions. (Id.)

Inmate Randolph Moore recalled seeing Daniel Juarez with crystal methamphetamine in the tank, and stated that when Petitioner saw it, he swept the drugs to the floor, said they were not going to have drugs in their tank, and had a deputy remove Juarez from the tank. (RT 26025-27.) Moore never saw Petitioner threaten any inmates or behave violently, and only saw him yell once. (RT 26027-30.) Moore stated that Petitioner was more readily classified as the tank clown, but appeared to spend many of his days reading his Bible. (Id.) Moore stated that inmate Wilson was close with Ricky Thompson, and that Moore never witnessed any threats. (RT 26031-33.) Moore also recalled the food tampering incident, and stated that he did not see Petitioner place anything in the food. (RT 26034-37.)

Robert Stites stated that he knew Petitioner during his prior jail incarceration. (RT 26052-55.) Stites, a martial arts instructor, shared some of his knowledge with Petitioner, such as the mental aspects of martial arts. (Id.) Stites stated that Petitioner was not a violent person, was humorous during their exercises, and shared his religion with Stites. (Id.) Inmate Andrew Holland stated that

1   he knew Petitioner, whom he considered a friend and a friend in God.  (RT 26058-60.)  Holland, who

2   was not really religious prior to his incarceration, stated that Petitioner made him more spiritual.  (Id.)

3        Former Chief Deputy District Attorney of San Diego County Brian Michaels stated that he was

4   familiar with Petitioner's case and was the original prosecuting attorney.  (RT 26075-84.)  Michaels

5   stated that he had knowledge of a document entitled "Cooperating Individual Benefits Record" for an

6   inmate David Juarez, and that the document appeared to show the witness was given a bargain in

7   exchange for testimony.  (Id.)  Michaels stated that the document also had the name Preckel on it. (Id.)

8        Manual Juarez, an inmate incarcerated at the Donovan facility in Otay Mesa, stated that he had

9   prior conversations with his brother David, who said he was going to be a witness in a case for the

10   prosecution.  (RT 26089-92.)  Juarez stated that David never said the testimony would help his brother

11   and never said he would refuse to testify unless they helped his brother.  (Id.)

12        Joan Bradley, a defense investigator, testified that she spoke to Manual Juarez at South Bay

13   Jail, who told her that his brother David said there was no way he would cooperate with the District

14   Attorney unless Manual got something out of it.  (RT 26108-10.)  According to Bradley, Juarez told

15   her that David had stated, "If they want him bad enough they'll do it."  (Id.)  Bradley acknowledged

16   that she only told Juarez that she was on the Bemore case, but did not mention which side she worked

17   for.  (Id.)

18        Judge Allan Preckel previously served as a Deputy District Attorney prior to his judgeship, and,

19   based on his review of the cooperating witness document, believed that a joint decision was made to

20   pass on the prosecution of Juarez, but denied that it was quid pro quo for his cooperation.  (RT 26128-

21   34.)  Preckel acknowledged that Juarez's cooperation was likely a factor in the decision, but stated that

22   the facts of the case and the small amount of drugs involved would have been an equal factor.  (Id.)

23   Preckel stated that given the information contained in the documents he reviewed, his mind was not

24   to prosecute.  (Id.)

25        Richard Castro, a fellow inmate, stated that Petitioner ran the tank well, and there were hardly

26   any problems.  (RT 26134-40.)  Castro stated that Petitioner had a good rapport with the deputies, and

27   acknowledged that they played some jokes on new people, that one joke was sexual, but that there was

28   never any actual assault.  (Id.)  Castro stated that he became friends with Petitioner and maintained

contact after his release.  (Id.)  Castro stated that he also knew Luken as a bully, and knew David Juarez, who they called Lying Dave and Scandalous Dave, who often made up stories to garner attention.  (Id.)

Inmate Phillip Dunn, incarcerated from May to September 1988 in tank 2F, knew Juarez, and stated that he saw Juarez with drugs that included both marijuana and crystal meth.  (RT 26154-61.) Dunn stated that when Petitioner came in he knocked the drugs to the floor.  (Id.)  Dunn stated that Petitioner was not the type to start fights, that he was a leader, and was notably religious.  (Id.)

Deputy Sheriff David Gentry worked in the downtown jail and had prior contact with Luken regarding a fight in tank 2F on April 16, 1989.  (RT 26174-77.)  Gentry prepared an inmate status report the same day inmate Gloss said Luken "cold cocked" him, and although Gloss admitted he had been antagonizing Luken, he maintained that Luken started the physical confrontation.  (Id.) According to Gentry, Luken admitted throwing the first punch, said that he was testifying in a case, and that Gloss had been calling him a rat and a snitch.  (RT 26177-80.)

### III.  PROCEDURAL DEFAULT

Respondent contends that Claims 7 ¶ K, 12, 13, 19- 21, 22 ¶¶ B, C, D, and 23-26 should be dismissed on procedural default grounds.  (Opp. at 19-20.)  When a state court's rejection of a federal claim is based on a violation of a state procedural rule that is adequate to support the judgment and independent of federal law, a habeas petitioner has procedurally defaulted his claim.  Coleman v. Thompson, 501 U.S. 722, 729-30 (1991).  A state procedural rule is adequate if it has been "firmly established and regularly followed" by the state court.  Ford v. Georgia, 498 U.S. 411, 424 (1991). The procedural rule is independent if it is not "interwoven with the federal law."  Michigan v. Long, 463 U.S. 1032, 1040-41 (1983).  If a state procedural ground is an adequate and independent ground for dismissal, a federal court will not consider the merits of the claims unless a petitioner can show sufficient cause for the default and resulting prejudice, or show that a failure to consider the claims would result in a fundamental miscarriage of justice.  See Coleman, 501 U.S. at 750.

In the instant case, Petitioner filed his automatic appeal on February 18, 1998, and his first state habeas petition on June 19, 2000.  In an April 2000 order denying his direct appeal, the California Supreme Court held that federal Claim 22 had "been waived for failure to timely and adequately object

at trial." <u>Bemore</u>, 22 Cal. 4th at 854.  Additionally, in an October 2007 order denying the state habeas petition, the California Supreme Court held that federal habeas Claims 19, 21, and 23 "[e]xcept insofar as they assert ineffective assistance of trial counsel . . . are barred under *In re Seaton* (2004) 34 Cal.4th 193, 199-200 because they were not properly preserved in the trial court." (Lodgment No. 19.)  The state supreme court further held that federal habeas Claims 24, 25, and 26, "[e]xcept insofar as they assert ineffective assistance of trial counsel . . . are barred under *In re Dixon* (1953) 41 Cal.2d 756, 759 because they could have been, but were not, raised on appeal."  (<u>Id</u>.)

As an initial matter, Respondent errs in asserting federal Claims 12, 13, and 20 were procedurally barred by the state court.  According to the Court's review of the state appellate and habeas briefs and decisions, those three claims were raised in the state habeas petition as claims 12, 13, and 18, respectively, and the California Supreme Court denied each of those claims solely on the merits.  Moreover, Respondent also errs in his claim that Claim 7 ¶ K is procedurally defaulted.  Claim 7 alleges trial counsel was ineffective for failing to develop mental state evidence and section K deals with supporting assertions of Petitioner's mental state, claiming that the District Attorney had called Petitioner "crazy," and that other witnesses referred to him as "crazy."  (Pet. at 64.)  The Court's review of the state briefs and decisions reveals that Claim 7 was also raised on state habeas as claim 7, and was denied solely on the merits.

Therefore, contrary to Respondent's assertion that eleven claims were rejected in part on due to procedural bars, the Court observes that the state supreme court only rejected a total of seven claims in whole or in part based on procedural bars.  These claims include federal habeas Claims 19 and 21-26.  Respondent's contention that the procedural bars imposed on Claims 21-22 and 24-26 render the claims procedurally defaulted in this Court is addressed in this Order[3].

## A.    Claims 21 and 24-26

The California Supreme Court denied these claims with citation to two separate state procedural bars: <u>Dixon</u> and <u>Seaton</u>.  The Ninth Circuit has held that the Respondent bears the burden of pleading and ultimately proving the existence of an adequate and independent procedural bar, with

---

[3] The procedural bars imposed by the state court on Claims 19 and 23 will be addressed in a separate, forthcoming order adjudicating Petitioner's Motion for Evidentiary Hearing.

08cv0311

1   Petitioner bearing an interim burden of placing the adequacy of the defense at issue.  See Bennett v.

2   Mueller, 322 F.3d 573, 585 (9th Cir. 2003).  Once the initial burden of pleading the existence of an

3   adequate and independent state procedural bar is met, the interim burden of placing the adequacy of

4   the procedural bar in issue shifts to the Petitioner, and "[t]his must be done, at a minimum, by specific

5   allegations by the petitioner as to the adequacy of the state procedure.  The scope of the state's burden

6   of proof thereafter will be measured by the specific claims of inadequacy put forth by the petitioner."

7   Bennett, 322 F.3d at 584-85.  If Petitioner fails to meet this interim burden, "federal habeas review is

8   barred unless the prisoner can demonstrate cause for the procedural default and actual prejudice, or

9   demonstrate that the failure to consider the claims will result in a fundamental miscarriage of justice."

10  Noltie v. Peterson, 9 F.3d 802, 804-05 (9th Cir. 1993); Coleman, 501 U.S. at 750; Park v. California,

11  202 F.3d 1146, 1150 (9th Cir. 2000).

12      In the instant case, Respondent has met his initial burden under Bennett of pleading the

13  existence of adequate and independent procedural bars to federal Claims 21 and 24-26.  See Bennett,

14  322 F.3d at 585; see also Ans. at 18; Opp. at 19-20.  Yet Petitioner has not attempted, in either the

15  Motions for Summary Judgment or Evidentiary Hearing, nor in the Reply brief, to meet the interim

16  burden of placing the adequacy of these procedural bars in issue.  Thus, the Dixon and Seaton

17  procedural bars stand in regards to Claims 21 and 24-26, and the Court cannot proceed to the merits

18  of these claims unless Petitioner can demonstrate cause and prejudice, or that a fundamental

19  miscarriage of justice will result if these claims are not considered.  See Coleman, 501 U.S. at 750.

20  However, the Court notes that the claims at issue contain allegations of ineffective assistance of

21  counsel for failure to raise the claims in prior state appeals, which could conceivably constitute cause

22  for the procedural default, and prejudice, if the claims are found to have merit.  A determination on

23  whether cause and prejudice exists would require the Court to engage in a detailed analysis of each

24  claim.

25      Alternatively, established precedent in this Circuit dictates that a court's decision on the issue

26  of procedural default is to be informed by furthering "the interests of comity, federalism, and judicial

27  efficiency."  Boyd v. Thompson, 147 F.3d 1124, 1127 (9th Cir. 1998).  Thus, where, as here, deciding

28  the merits of a claim proves to be less complicated and less time-consuming than adjudicating the issue

of procedural default, a court may exercise discretion in its management of the case to reject the claims on their merits and forgo an analysis of cause and prejudice.  <u>Batchelor v. Cupp</u>, 693 F.2d 859, 864 (9th Cir. 1982).

As set forth below, Claims 21 and 24-26 fail on their merits.  Accordingly, the Court declines to render an opinion on whether Petitioner has established cause and prejudice sufficient to excuse these procedural defaults and will instead deny Claims 21 and 24-26 on the merits.  While acknowledging that it could not <u>grant</u> relief on a claim found to be procedurally defaulted absent a showing of cause and prejudice or a fundamental miscarriage of justice, the Court is not prevented from addressing the merits of these claims, and denying them based on a merits review.

**B.   Claim 22**

Respondent contends federal habeas Claim 22 is procedurally defaulted because the state supreme court rejected it "on the independent state procedural ground that the failure to timely and adequately object at trial forfeited the claim."  (Ans. at 17.)  In Claim 22, Petitioner contends that the prosecutor improperly requested that the jury draw an inference regarding Petitioner's lack of remorse. The California Supreme Court denied this claim on appeal, stating in part:

> We agree with the Attorney General that the foregoing claims have been waived for failure to timely and adequately object at trial. (*People v. Crittenden*, *supra*, 9 Cal.4th 83, 146, and cases cited.) As noted by the trial court in reaching a similar conclusion below, defense counsel requested a sidebar conference in the midst of the prosecutor's remarks on remorse, but did not object on any particular legal ground. Although counsel was not allowed to approach the bench and the prosecutor was asked to resume his argument, nothing in the court's statements suggested that defense challenges were foreclosed once the prosecutor finished making his point. Again, however, no objection was made. Since no specific claim of misconduct was presented while trial was underway and curative steps could have been taken, the matter has not been preserved on appeal.

<u>Bemore</u>, 22 Cal. 4th at 854-55.

At trial, when the prosecutor made the remarks that are the subject of Claim 22, defense counsel interjected, asking "Your Honor, Can we have a side bar, please?" to which the trial court declined, stating "That's not necessary.  Let Mr. Anear continue his statement, please," and the prosecutor continued his argument.  (RT 26337-38.)  Defense counsel did not interject further or raise an objection after the prosecutor concluded the statement.

08cv0311

After the conviction and sentence in this case, defense counsel moved for a new trial, arguing that they had objected to the prosecutor's statement *by requesting a side bar*, even though they failed to make any explicit or formal objection to the comments. (RT 24604.) The trial judge responded that his request to let the prosecutor continue his statement only meant that the court wanted to hear the complete statement before any objection was made, in order to make an "intelligent ruling." (RT 26408.) The trial court reasoned that "[n]othing more was forthcoming after he completed his statement, so I think it's pretty clear that you waived any objection. I certainly did not intend, and I don't think there was any reasonable interpretation of my remark that I was foreclosing any further discussion on the matter." (Id.)

Second chair defense counsel stated that while "[w]e accept the Court's ruling," the defense wanted to clarify on the record that they "both assumed we'd been sort of tacitly overruled." (RT 26413.) Lead defense counsel noted that "I took the Court's remarks, the tone and tenor of the remarks to mean to sit down and shut up." (RT 26425.) To this, the Court reiterated "I don't think it was reasonable for the defense to conclude that that was the end of the matter and I didn't want to hear anymore about it and I was foreclosing any further discussions on the matter, either right then, or as Ms. Barranco suggested, a moment or two later when Mr. Anear did conclude." (RT 26426.)

While defense counsel made a timely interjection in order to request a side bar conference, it is plainly evident that counsel failed to follow up with any specific objection to the prosecutor's remarks that was "so stated as to make clear the specific ground of the objection or motion." (Id.) After the prosecutor finished his statement, defense counsel did not re-raise their prior request for a sidebar nor did they raise a specific objection to the remarks. California's contemporaneous objection rule has been repeatedly upheld by the Ninth Circuit. See Paulino v. Castro, 371 F.3d 1083, 1092-93 (9th Cir. 2004); Rich v. Calderon, 187 F.3d 1064, 1069-70 (9th Cir. 1999); Vansickel v. White, 166 F.3d 953, 957-58 (9th Cir. 1999). Petitioner fails to make an attempt to challenge the adequacy or independence of this procedural bar, and thus has not met his interim burden under Bennett. See id., 322 F.3d at 585 (stating that once the state has met the initial burden of pleading the existence of an adequate and independent procedural bar, the burden of placing the adequacy of the procedural bar in issue shifts to the Petitioner).

08cv0311

1    Yet, as quoted above, the California Supreme Court, after concluding federal Claim 22 was

2    waived due to defense counsel's failure to properly object and preserve the issue for appeal,

3    nevertheless proceeded to address the merits of the claim on direct appellate review. Additionally, the

4    Court notes that Claim 22, like the claims addressed above in relation to the Dixon and Seaton

5    procedural bars, contains an allegation of ineffective assistance of counsel. Rather than engage in a

6    detailed analysis of Claim 22 to determine whether cause and prejudice exists, the Court will exercise

7    its discretion to address, and reject, Claim 22 on the merits, as discussed in greater detail below. See

8    Boyd, 147 F.3d at 1127; Batchelor, 693 F.2d at 864.

9                              **IV. STANDARDS OF REVIEW**

10   **A.    Standard of Merits Review under AEDPA**

11   Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal

12   habeas corpus claims:

13       The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain
         an application for a writ of habeas corpus in behalf of a person in custody pursuant to
14       the judgment of a State court only on the ground that he is in custody in *violation of the
         Constitution or laws or treaties of the United States.*
15

16   28 U.S.C. § 2254(a) (emphasis added).

17   In Lindh v. Murphy, 521 U.S. 320, 336 (1997), the United States Supreme Court held that the

18   new provisions of the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA") "generally

19   apply only to cases filed after the Act became effective." In capital habeas actions, cases are typically

20   commenced by the filing of requests for appointment of counsel and stays of execution of the

21   petitioners' death sentences. See McFarland v. Scott, 512 U.S. 849, 856-57 (1994). Petitioner filed

22   his request for appointment of counsel and stay of execution on February 15, 2008 and filed his

23   petition with this Court on January 13, 2009. AEDPA became effective on April 24, 1996, when the

24   President signed it into law. See id. Accordingly, AEDPA applies to this case.

25   Relevant to this case are the changes AEDPA rendered to 28 U.S.C. § 2254(d),

26   which now reads:

27       (d) An application for a writ of habeas corpus on behalf of a person in custody
         pursuant to the judgment of a State court shall not be granted with respect to any claim
28       that was adjudicated on the merits in State court proceedings unless the adjudication
         of the claim-

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254(d)(1)-(2) (West. 2006).

A decision is "contrary to" clearly established law if it fails to apply the correct controlling authority, or if it applies the controlling authority to a case involving facts materially indistinguishable from those in a controlling case, but nonetheless reaches a different result. See Williams v. Taylor, 529 U.S. 362, 413 (2000). A decision involves an "unreasonable application" of federal law if "the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." Id.; Bruce v. Terhune, 376 F.3d 950, 953 (9th Cir. 2004).

Even when the federal court undertakes an independent review of the record in the absence of a reasoned state court decision, the federal court must "still defer to the state court's ultimate decision." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002). If the state court decision does not furnish any analytical foundation, the review must focus on Supreme Court cases to determine "whether the state court's resolution of the case constituted an unreasonable application of clearly established federal law." Greene v. Lambert, 288 F.3d 1081, 1089 (9th Cir. 2001). Federal courts also look to Ninth Circuit law for persuasive authority in applying Supreme Court law, and to determine whether a particular state court decision is an "unreasonable application" of Supreme Court precedent. Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004).

Claims 1-13, 16-21, 23-26, 29-34, and 36-38 were each denied on the merits by the California Supreme Court in an October 2007 Order which stated in full:

Petitioner's application for leave to file Exhibit 61, filed October 27, 2000, is granted. The petition for writ of habeas corpus, filed June 19, 2000, is denied. All claims are denied on the merits. Except insofar as they assert ineffective assistance of trial counsel, Claims 21, 22, and 23 are barred under *In re Dixon* (1953) 41 Cal.2d 756, 759 because they could have been, but were not, raised on appeal. Except insofar as they assert ineffective assistance of trial counsel, Claims 17, 19, and 20 are barred under *In re Seaton* (2004) 34 Cal.4th 193, 199-200 because they were not properly preserved in the trial court. George, C.J., was absent and did not participate.

08cv0311

(Lodgment No. 19.) Because these Claims were denied on the merits without a statement of reasoning, the Court will conduct an independent review of the record with respect to Claims 21, 24-26, 34, and 36-38.[4]  See Pirtle, 313 F.3d at 1167; see also Richter v. Hickman, 578 F.3d 944, 951 (9th Cir. 2009).

## B.       Standard for Evidentiary Hearing

AEDPA also limited the circumstances under which district courts may grant an evidentiary hearing.  28 U.S.C. § 2254(e)(2) provides:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing unless the applicant shows that–
> (A) the claim relies on--
>   (i)   a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>   (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Under AEDPA, when determining whether to grant an evidentiary hearing, the district court must first ascertain whether the petitioner has failed to develop the factual basis of a claim in state court.  Insyxiengmay v. Morgan, 403 F.3d 657, 670 (9th Cir. 2005).  As explained by the Supreme Court:

> For state courts to have their rightful opportunity to adjudicate federal rights, the prisoner must be diligent in developing the record and presenting, if possible, all claims of constitutional error.  If the prisoner fails to do so, himself or herself contributing to the absence of a full and fair adjudication in state court, § 2254(e)(2) prohibits an evidentiary hearing to develop the relevant claims in federal court, unless the statute's other stringent requirements are met.

Williams v. Taylor, 529 U.S. 420, 437 (2000).

If the petitioner has not failed to develop the facts in state court, an evidentiary hearing is required if (1) the petitioner establishes a colorable claim for relief – i.e., petitioner alleges facts that, if proven, would entitle him to habeas relief; and (2) the petitioner did not receive a full and fair

---

[4] Claims 1-13, 16-20, and 30-33 are the subject of Petitioner's Motion for an Evidentiary Hearing.  (See Doc. No. 69.)  Therefore, in the forthcoming order adjudicating that Motion, the Court will undertake an independent review of the record with respect to those claims and Claim 29.

1    opportunity to develop those facts.  Earp v. Ornoski, 431 F.3d 1158, 1167 (9th Cir. 2005).  The second

2    requirement is met by a showing that:

> (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state
> factual determination is not fairly supported by the record as a whole; (3) the
> fact-finding procedure employed by the state court was not adequate to afford a full and
> fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the
> material facts were not adequately developed at the state-court hearing; or (6) for any
> reason it appears that the state trier of fact did not afford the habeas applicant a full and
> fair hearing.

7    Townsend v. Sain, 372 U.S. 293, 312 (1963), overruled on other grounds by Keeney v. Tamayo-Reyes,

8    504 U.S. 1 (1992).

## V. DISCUSSION

10   The claims adjudicated in this Order include multiple allegations of prosecutorial misconduct

11   and trial court error, in addition to claims alleging violations of international law, discrimination in

12   charging, actual innocence, prejudice arising from delays in the state appellate process, and prejudice

13   arising from Petitioner's lengthy confinement under a sentence of death.

14   Petitioner moves for summary adjudication, or in the alternative, an evidentiary hearing on

15   Claims 27, 28, and 36-38.  Petitioner did not file a motion for either summary judgment or an

16   evidentiary hearing on Claims 21, 22, 24, 25, 26, 29, and 34.[5]  Respondent seeks the denial of all

17   claims in the federal petition without an evidentiary hearing.  (Ans. at 12.)

**A.    Claim 21 - Prosecutorial Misconduct in False Arguments to the Jury on the Murder and
        Special Circumstances**

20   In Claim 21, Petitioner alleges that the prosecutor "committed prejudicial misconduct in falsely

21   arguing to the jury during the guilt phase that Petitioner formed the requisite intent with respect to the

22   first degree murder and related special circumstances, since he himself referred to Petitioner as 'bug-

23   shit crazy' during the time of the homicide," in violation of the Fifth, Sixth, Eighth and Fourteenth

24   Amendments to the Constitution.  (Pet. at 217.)  Petitioner additionally contends that to the extent this

25   claim could have been raised by state appellate counsel, he was denied his right to the effective

---

[5] Petitioner moves for an evidentiary hearing on Claims 1-20, 23, and 30-33 [Doc. No. 69].
As stated previously in section IV.A, supra, the Court will adjudicate that motion, along with Claim
29, in a separate order.

1   assistance of counsel on appeal.  (Id.)   Petitioner has not moved for summary judgment or for an

2   evidentiary hearing on this claim.

3          Respondent maintains that the California Supreme Court reasonably rejected the claim, and

4   contends that "[t]he state trial record refutes Bemore's claim of misconduct" and "shows instead that

5   the state trial prosecutor properly argued from the evidence surrounding the homicide" that Petitioner

6   formed the requisite intent for the charged crimes and special circumstances.  (Ans. at 53.)

7   Respondent additionally argues that "[t]he words 'going crazy' in interviews with Bemore's

8   acquaintance were no more than a shorthand colloquelism [sic] never intended as a legal description

9   of Bemore's mens rea."  (Id.)

10          Petitioner presented this claim to the state court as Claim 19 of his state habeas petition.

11   (Lodgment No. 15.)  The California Supreme Court considered and rejected this claim, stating "All

12   claims are denied on the merits ... Except insofar as they assert ineffective assistance of trial counsel,

13   Claims 17, 19, and 20 are barred under In re Seaton (2004) 34 Cal.4th 193, 199-200 because they were

14   not properly preserved in the trial court."  (Lodgment No. 19.)  As discussed above in Section III,

15   supra, the Court will review this claim on the merits irrespective of the state court's application of

16   procedural bars.

17          Inappropriate statements by a prosecutor, particularly during closing arguments, may present

18   a claim of constitutional magnitude if the comments were so prejudicial that they rendered the trial

19   fundamentally unfair.  Donnelly v. DeChristoforo, 416 U.S. 637 (1974).  To succeed on a prosecutorial

20   misconduct claim, a petitioner must demonstrate that the misconduct was "so egregious that it infects

21   the trial with such unfairness as to make the resulting conviction a denial of due process."  Darden v.

22   Wainwright, 477 U.S. 168, 193 (1986).

23          In closing arguments to the jury regarding the murder of Kenneth Muck at the Aztec Liquor

24   store, the prosecutor argued that:

25          The intention here was to hurt the man, to make him open the safe; the intention here
            was to kill the man. [¶] You heard specific intent to kill.  This cries out, somebody
26          intended to kill this man.

27          . . .

28          Recall there's this time frame, some 15 minutes.  What does it tell you?  Well, when
            the man stabbed him in the back, probably at that point he intended to kill him, but

                                                      43                                      08cv0311

1    when he comes back after some period of time and renders those last blows to the chest
     there's absolutely no doubt that the person that did had the specific intent to kill the
2    man. There is no doubt at that point that the man had premeditated the attack. He had
     planned it. He had gone back and killed this man. And he had the opportunity to
3    deliberate, should I do it or should I not? Yeah. That guy's a witness. I'll take him
     out. [¶] That's a classic first degree murder. Malice. It's premeditated and there's
4    deliberation.

5    (RT 24564-65.)

6        Petitioner alleges that the prosecutor falsely argued to the jury that he had the requisite intent

7    for first degree murder and the special circumstances when the prosecutor actually "believed that

8    Petitioner was not mentally competent at the time of the homicide." (Pet. Brief at 211.) In support

9    of this contention, Petitioner directs the court's attention to the handwritten notes and transcripts from

10   several interviews the prosecutor conducted with witness Troy Patterson, contained in discovery

11   materials obtained by defense counsel. In discussing the circumstances surrounding the homicide, and

12   the statements of witness Echo Ramey, the prosecutor used the term "goes crazy" or "went crazy" at

13   several points during the interview, in reference to the commission of the homicide, at one point

14   stating:

15       We know that when you - - when you, according to ECHO, told her that BEMO did the
         stabbing, okay, and that he went crazy, we know two things, one is that BEMO did do
16       the stabbing, okay, and two, that he did go crazy.

17   (Ex. No. 9 to Pet. at 11.) Later in the same interview with Patterson, the prosecutor, in discussing

18   levels of culpability, stated:

19       I mean, if you go together with somebody and you both kill the clerk, or you - - one guy
         says you go get 'im, and that guy does, well both of you are into it at the same level of
20       culpability. But if one guy is tryin' to pull the other guy off, or one guy goes absolutely
         bug-shit crazy, and does something, and the other guy doesn't want to have any part
21       of it, that's a whole bit of different. . .

22   (Id. at 13.)

23       In a declaration submitted in support of the federal petition, Troy Patterson states that Petitioner

24   "had been constantly using mind-altering drugs" in the summer of 1985 and the drug use "made him

25   crazy that entire time." (Ex. 19 at 2.) Patterson asserts that Petitioner's defense attorneys at trial were

26   uninterested in Petitioner's mental state, and never questioned Patterson "as to how crazy he

27   [Petitioner] was at the time of the killing." (Id.) Patterson also states that "I remember the district

28   attorney telling me that Terry went crazy and stabbed the man who was killed in the Aztec Liquor

08cv0311

Store.  They were tape recording the interview, so Terry's attorney should have known that even the prosecutor was saying he was crazy."  (Id.)

Based on a review of Mr. Patterson's interviews with prosecutor Anear and investigator Cooksey, it is clear that the prosecutor's use of the term "crazy" in reference to Petitioner was not indicative of his own personal beliefs regarding Petitioner's mental state at the time of the homicide. For example, in the interview with Troy Patterson, the prosecutor states that "when *you*, according to ECHO, told her that BEMO did the stabbing, okay, and that he went crazy," and it is plainly evident that the reference to Petitioner going "crazy" was a citation to a statement by Echo Ramey, and that it was actually from *Patterson*, not the prosecutor, that the statement "he went crazy" originated.  (Id. at 13.)

Additionally, the reference to "bug shit crazy" was made during a hypothetical discussion on levels of culpability, in which the prosecutor was distinguishing a situation in which two individuals shared equal culpability to a situation in which one individual bore greater responsibility for the crime. There is no indication that the use of the term "crazy" in this exchange represented the prosecutor's personal belief.  In fact, the Court agrees with Respondent's assertion that the references to someone "crazy" committing the homicide or Petitioner "going crazy" were simply colloquialisms used as shorthand in the interview, and were not intended as a description of Petitioner's mental state at the time of the crime.

The "touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." Smith v. Phillips, 455 U.S. 209, 219 (1982), (citing Brady v. Maryland, 373 U.S. 83 (1963)).  As an initial matter, the Court does not concur with Petitioner's contention that the prosecutor actually believed that Petitioner was mentally incompetent at the time of the crime, in part because it is highly unlikely that the prosecutor's true beliefs can be accurately extrapolated from the statements provided.  Moreover, regardless of the prosecutor's personal belief regarding Petitioner's mental state, it is clear that a prosecutor is entitled to argue reasonable inferences based on the evidence presented at trial.  See Menendez v. Terhune, 422 F.3d 1012, 1037 (9th Cir. 2005); see also Ceja v. Stewart, 97 F.3d 1246, 1253-54 (9th Cir. 1996) ("Counsel

1   are given latitude in the presentation of their closing arguments, and courts must allow the prosecution

2   to strike hard blows based on the evidence presented and all reasonable inferences therefrom.")

3          Based on a review of the record, and in light of the evidence presented at trial, the prosecution

4   offered a reasonable and believable theory of the crime.  The prosecutor's argument that Petitioner

5   committed an intentional murder was amply corroborated by the testimony of multiple witnesses,

6   including pathologist Robert Bucklin, who testified that he did not identify any defensive wounds on

7   the victim, witnesses Angela Tabor and Lloyd Howard, who stated that Petitioner indicated that the

8   victim fought "back" and was stabbed because he did not do as Petitioner directed, and witness Glen

9   Heflin, who stated that Petitioner admitted to stabbing a man who should have opened the safe as

10  directed.  These witnesses, among others, support the prosecution's contention that the murder was

11  intentional.  As such, it was not unreasonable, nor a misrepresentation of the facts, for the prosecutor

12  to argue that Petitioner acted with intent amounting to reckless disregard for human life.  Petitioner

13  fails to demonstrate that the prosecutor's argument, which was supported by ample evidence, was "so

14  egregious" that it infected his trial with such unfairness as to result in a denial of due process.  See

15  Darden, 477 U.S. at 193.

16         Petitioner also asserts that the prosecution was told repeatedly by several witnesses that

17  "Petitioner was not mentally present during the period prior to the homicide and immediately

18  thereafter." (Pet. Brief at 213.)  However, Petitioner fails to offer the identity of the alleged witnesses

19  who informed the prosecutor of their beliefs regarding Petitioner's mental acuity at the time of the

20  homicides, and the Court cannot credit this vague assertion.

21         In a related argument, Petitioner points out that the prosecution's notes from an interview

22  conducted with witness Kim Strickler in October 1986 indicated that co-defendant Keith Cosby

23  bragged to her about his involvement in the events at Aztec, stating that the "Man started fighting

24  'BEMO' [] 'BEMO' started stabbing him and fighting him back."  (Ex. 49 at 2.)  Kim Strickler

25  testified at trial that she noticed fresh scratches on Petitioner shortly after the Aztec incident.  (RT

26  23755-56.)  Petitioner asserts that Ms. Strickler's statement and trial testimony suggests that it was

27  actually the victim who initiated the physical altercation, and alleges that this contradicts the

28  prosecution's assertion that Petitioner tortured Muck.  Based on the Strickler interview notes and

46

testimony, Petitioner alleges that the prosecutor "misrepresented to the jury in his arguments that Petitioner possessed intent and a reckless disregard for human life in connection with the Aztec Liquor homicide." (Pet. Brief at 213.)

Under California law, the torture special circumstance only requires that: "The murder was intentional and involved in infliction of torture." Cal. Penal Code § 190.2(a)(18). It is conceivable that, if the victim indeed initiated the confrontation, Petitioner did not intend the murder. But, it is also possible that even if the victim initiated the physical confrontation, Petitioner formed an intent to murder the victim during the course of the robbery. Thus, even if it was true that the victim initiated the confrontation that lead to his death, it does not prevent the prosecutor from arguing, based on the evidence, that Petitioner possessed "intent and a reckless disregard for human life" in the commission of the homicide at the Aztec Liquor store.

Additionally, the trial court gave general instructions to the jury regarding arguments in summation, as follows:

> [S]tatements of counsel are not evidence, must not be considered by you as evidence. It is hoped that their statements will be helpful to you in your assessment of the evidence and in your application of the law to the evidence . . . but their statements about the evidence are not evidence and their statements about the law of course are not the instructions on the law. And you are not bound in any way by their suggestions as to how you ought to apply the law to the facts as you find them.

(RT 24498.)

Here, it is evident that the prosecutor's argument to the jury "did not manipulate or misstate the evidence," and cannot accurately be characterized as constituting misconduct. Darden, 477 U.S. at 182. Having reviewed the trial record in light of the standard clearly set forth by the Supreme Court, this Court cannot conclude that the prosecutor's arguments to the jury regarding Petitioner's intent "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly, 416 U.S. at 643. Therefore, based on an independent review of the record, the Court cannot conclude that the state supreme court's rejection of this claim was contrary to, or an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts. Williams, 529 U.S. at 412-13.

1    The Court also remains unpersuaded that the failure to raise this claim in the state supreme

2    court constituted ineffective assistance of counsel.  The allegations of prosecutorial misconduct raised

3    in this claim do not amount to a due process violation and do not merit habeas relief, and thus there

4    are no grounds for a finding that appellate counsel was ineffective for failing to raise this claim on

5    appeal.  See Boag, 769 F.2d at 1344; Baumann v. United States, 692 F.2d 565, 572 (9th Cir. 1982)

6    ("The failure to raise a meritless legal argument does not constitute ineffective assistance of counsel.")

7    Moreover, when filing an appeal, "counsel has no constitutional obligation to raise every non-frivolous

8    issue requested by the defendant."  Miller v. Keeney, 882 F.2d 1428, 1434 (9th Cir. 1989), (citing

9    Jones v. Barnes, 463 U.S. 645, 751-54 (1983)).  Petitioner fails to demonstrate that appellate counsel's

10   failure to raise this issue on appeal constitutes an error so serious that "there is a reasonable probability

11   that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

12   Strickland v. Washington, 466 U.S. 668 (1984).  Petitioner does not merit habeas relief on Claim 21.

13   **B.      Claim 22- Prosecutorial Misconduct - Asking Jury to Consider Lack of Remorse**

14   In Claim 22, Petitioner alleges that the "prosecutor improperly requested that the jury draw

15   inferences of lack of remorse" during his penalty phase closing argument, violating Petitioner's rights

16   under the Fifth, Sixth, Eighth and Fourteenth Amendments.  (Pet. at 220.)  Petitioner additionally

17   asserts "[t]o the extent defense counsel failed to object to the prosecutor's misconduct, Petitioner was

18   denied ineffective [sic] assistance of counsel."  (Id. at 221.)  Petitioner also contends that "[t]o the

19   extent this claim could have been raised by state appellate counsel, Petitioner was prejudicially denied

20   his right to effective assistance of [sic] on appeal."  (Id.)  Petitioner has not moved for summary

21   judgment or for an evidentiary hearing on this claim.

22   Respondent maintains that the state court reasonably rejected this claim on appeal, and asserts

23   that Petitioner's claim of prosecutorial misconduct is procedurally barred because trial counsel failed

24   to preserve the issue for appeal with a timely or adequate objection.  (Ans. at 53.)  Respondent also

25   contends that Petitioner has never presented the state supreme court with his allegation of ineffective

26   assistance of counsel for failing to adequately object and preserve the claim on appeal, and states this

27   aspect of the claim is therefore unexhausted.  (Id. at 56.)

28   1.      State Court's Decision

48

08cv0311

On direct appeal, after recounting the events at trial, which this Court has outlined in section III, A, <u>supra</u>, and recounts in relevant part in the discussion below, the California Supreme Court rejected this claim on the merits, reasoning in part as follows:

> We agree with the Attorney General that the foregoing claims have been waived for failure to timely and adequately object at trial. (*People v. Crittenden, supra*, 9 Cal.4th 83, 146, and cases cited.) As noted by the trial court in reaching a similar conclusion below, defense counsel requested a sidebar conference in the midst of the prosecutor's remarks on remorse, but did not object on any particular legal ground. Although counsel was not allowed to approach the bench and the prosecutor was asked to resume his argument, nothing in the court's statements suggested that defense challenges were foreclosed once the prosecutor finished making his point. Again, however, no objection was made. Since no specific claim of misconduct was presented while trial was underway and curative steps could have been taken, the matter has not been preserved on appeal.
>
> No misconduct or constitutional error occurred in any event. "[R]emorse is universally deemed a factor relevant to penalty. The jury, applying its common sense and life experience, is likely to consider that issue in the exercise of its broad constitutional sentencing discretion no matter what it is told." (*People v. Keenan* (1988) 46 Cal.3d 478, 510 [250 Cal.Rptr. 550, 758 P.2d 1081].) We have rejected misconduct claims based on prosecutorial comments about the unavailability of remorse as a mitigating factor where, as here, the defendant denied guilt as a witness in the capital trial and did not otherwise urge remorse as a basis for mercy. (E.g., *People v. Holt* (1997) 15 Cal.4th 619, 691 [63 Cal.Rptr.2d 782, 937 P.2d 213] [prosecutor said, "You saw [defendant] testify in the guilt phase of the trial. Simply more lies [and] no remorse"]; *People v. Osband* (1996) 13 Cal.4th 622, 724 [55 Cal.Rptr.2d 26, 919 P.2d 640] [prosecutor argued that when defendant "got up here [i.e., testified at the guilt phase] and told you about that crime ... did you get any sense at all that he was sorry for his conduct?"]; *People v. Thompson, supra*, 45 Cal.3d 86, 123 [prosecutor asked, "what remorse have we heard about from [defendant on the stand]? ... Not one thing has been said to indicate that [he] has a sign of remorse for what he did"].)
>
> More to the point, the prosecutor merely anticipated predictable defense argument urging sympathy for defendant and sought to negate its mitigating effect by highlighting defendant's apparent lack of concern for the murder victim. Contrary to what is suggested on appeal, the prosecutor did not mention defendant's failure to testify or to admit guilt at the penalty phase, and commented only on his testimony at the guilt phase. Nor did the prosecutor suggest that the absence of remorse was an independent factor in aggravation. Indeed, consistent with the trial court's instructions, the prosecutor explicitly acknowledged that the contrary was true. [FN20] Under the circumstances, no impropriety occurred.
>
> > FN20 The jury was told that the "absence of a statutory mitigating factor does not constitute an aggravating factor" at the penalty phase.

<u>Bemore</u>, 22 Cal.4th 809, 854-55.

2.     Merits

Petitioner contends that the prosecutor made a comment regarding the defendant's failure to express remorse which amounted to "an improper comment on his failure to testify" in violation of

49

<u>Griffin v. California</u>, 380 U.S. 609 (1965).  (Pet. at 221.)  During the penalty phase closing arguments, in asking the jury to view the crime from the victim's perspective, the prosecutor posed a rhetorical question about what type of person would stab another human being 37 times, which preceded the following statement by prosecutor Anear, and resulting exchange:

> Did you hear a single word of remorse uttered by Mr. Bemore when he testified?  Now, that's not a factor in - -
>
> Mr. Mc Kecknie:   Your Honor, Can we have a side bar, please?
> The Court:   That's not necessary.  Let Mr. Anear continue his statement, please.
> Mr. Anear:   Now, that's not a factor in aggravation, but you can consider the lack of remorse, balancing it against factors in mitigation.

(RT 26337-38.)

Petitioner asserts that the prosecutor's argument that the jury should consider this lack of remorse in their penalty determination "constituted the use of a nonstatutory aggravating factor under both *People v. Boyd* (1985) 38 Cal.3d 762 and *People v. Davenport* (1985) 41 Cal.3d 247."  (Pet. at 221.)  For the reasons provided in the discussion on procedural bars (<u>see</u> Section III, B, <u>supra</u>), this Court will address Claim 22 on the merits.

Respondent counters that the prosecutor accurately "explain[ed] to the jury that the failure to express remorse is not a factor in aggravation" and contends that the prosecutor's comment that the lack of remorse could be weighed against the mitigating evidence "was merely another way of saying that jurors may consider a capital defendant's lack of concern for the victim in assessing the strength of the mitigating evidence."  (Ans. at 55.)

Petitioner testified during the guilt phase at trial, but declined to testify during the penalty phase, and contends that the prosecutor's closing argument at the penalty phase was specifically directed at his failure to testify at the penalty phase.  Based on this Court's review of the trial record, it is clear that the prosecutor did not comment on the lack of penalty phase testimony from Petitioner, but expressly stated in closing arguments, "Did you hear a single word of remorse from Mr. Bemore <u>when he testified</u>?"  (emphasis added.)  It is clear that this comment referred to and was made in direct response to Petitioner's one occasion of testimony, which came at the guilt phase of the trial.  The Court finds no support in the record or pleadings for Petitioner's contention that the prosecutor's

1  statement constituted an improper comment on his failure to testify at the penalty phase. See Griffin,

2  380 U.S. at 611.

3          The record also reflects that the prosecutor did not improperly argue that a lack of remorse was

4  a factor in aggravation, but in fact admitted that the opposite was true, that it was "not a factor in

5  aggravation, but you can consider the lack of remorse, balancing it against factors in mitigation." (RT

6  26337-38.) Moreover, any error that could have ensued from the prosecutor's remark was ameliorated

7  by the trial court's specific instructions to the jury directing that "[t]he absence of a statutory

8  mitigating factor does not constitute an aggravating factor." (RT 26292.)  Absent evidence to the

9  contrary, this Court must presume the jury understood and followed the trial court's instructions.

10 Weeks, 528 U.S. at  233.

11         Even were the Court to conclude that the prosecutor made an improper reference to Petitioner's

12 failure to express remorse during his testimony, Petitioner fails to demonstrate that this brief reference,

13 which was placed into context and was also the subject of a specific jury instruction, and which came

14 at the end of nearly 40 day trial, rendered the trial fundamentally unfair.[6]  Donnelly, 416 U.S. at 647-

15 48; Sassounian v. Roe, 230 F.3d 1106-07 (9th Cir. 2000). Compare Hall v. Whitley, 935 F.2d 164,

16 165-66 (9th Cir. 1991) (rejecting claim of prosecutorial misconduct where a prosecutor attributed the

17 "brazen" nature of a murder to the defendant's heroin use, reasoning that the comments were "isolated

18 moments in a three day trial" and did not render the trial fundamentally unfair), with Sechrest v.

19 Ignacio, 549 F.3d 789 (9th Cir. 2008) (prosecutor's repeated false and inflammatory statements in

20 closing argument suggesting that the parole board could, and likely would, commute a life sentence

21 if the jury did not return a verdict imposing the death penalty, violated the petitioner's right to a fair

22 trial).

23         After independently reviewing the trial record as a whole, it is clear that Petitioner fails to

24 demonstrate that the prosecutor's remarks "so infected the trial with unfairness as to make the resulting

25 conviction a denial of due process."  Donnelly at 643; see also Claim 21, supra.  The California

26

27 ─────────────

28       [6] The guilt phase included 19 court days of testimony, argument by counsel, conferences
between counsel and the trial court, and jury deliberations. (CT 1718-47.) The penalty phase included
20 days of testimony, argument by counsel, conferences between counsel and the trial court, and jury
deliberations.  (CT 1749-75.)

08cv0311

1    Supreme Court's conclusion that the prosecutor's argument was not an improper comment on

2    Petitioner's failure to testify and that remorse was a relevant factor to the jury's determination on

3    penalty was not objectively unreasonable.   Moreover, the prosecutor correctly conceded that a lack

4    of remorse was not an aggravating factor, and did not act improperly in arguing that it could

5    nevertheless be considered by the jury to negate sympathy for the defendant.   As stated in the

6    discussion of Claim 21, the trial court clearly instructed the jury that "statements of counsel are not

7    evidence, must not be considered by you as evidence," further minimizing any potentially harmful

8    effect that the prosecutor's remark could have had on the fairness of the proceedings in this case.   As

9    such, Petitioner fails to demonstrate that the California Supreme Court's rejection of this claim on

10    appeal was objectively unreasonable.

11        Petitioner also contends that defense counsel's failure to properly object to this remark

12    constituted ineffective assistance of counsel.  (Pet. at 223.)  A review of the direct appellate and state

13    habeas briefs reveals that Petitioner failed to raise this allegation in state court, and it is therefore

14    unexhausted.  While the Court may not grant relief on an unexhausted claim, the Court may reject an

15    unexhausted claim on the merits.  See 28 U.S.C. § 2254(b)(2); see also Gatlin v. Madding, 189 F.3d

16    882, 889 (9th Cir. 1999).  Here, trial counsel's failure to properly raise this objection does not rise to

17    the level of prejudicially ineffective assistance because the remark did not amount to constitutional

18    error of any dimension.  As such, even a timely and specific objection to the prosecutor's remarks

19    would have ultimately failed, and Petitioner cannot demonstrate that trial counsel's failure to object

20    resulted in prejudice.  See Baumann, 692 F.2d at 572 ("The failure to raise a meritless legal argument

21    does not constitute ineffective assistance of counsel.")  Petitioner fails to demonstrate that "there is

22    a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would

23    have been different."  Strickland, 466 U.S. at 694.  Similarly, the Court is unpersuaded that the failure

24    to raise this claim on appeal constituted ineffective assistance of counsel.  See Boag, 769 F.2d at 1344;

25    Baumann, 692 F.2d at 572.

26        An independent review of the record reveals that Petitioner has failed to show that trial

27    counsel's failure to raise a specific and timely objection to the prosecutor's comments constituted

28    ineffective assistance of counsel, or that the prosecutor's statements constituted prejudicial

misconduct.  Therefore, this Court cannot say the state court's denial of Claim 22 was contrary to, or an unreasonable application of, clearly established federal law, or that it was based upon an unreasonable determination of the facts.  <u>Williams</u>, 529 U.S. at 412-13.  Accordingly, Petitioner does not merit habeas relief on this claim.

## C.     Claim 24- Trial Court Error for Failing to Adequately Question a Juror on her Observation of Petitioner in Prison Garb, Manacles, and Handcuffs

In Claim 24, Petitioner alleges that the "trial court erred in failing to adequately question an alternate juror, Beatrice Darnell, concerning her observation of Petitioner in prison garb, manacled and handcuffed, and whether such information was related to the jury panel," violating Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.  (Pet. at 227.)  Petitioner also contends that to the extent this claim could have been but was not raised by state appellate counsel, he was denied his right to the effective assistance of counsel on appeal.  (<u>Id.</u>)  Petitioner has not moved for summary judgment or for an evidentiary hearing on this claim.

Petitioner presented this claim to the state court as Claim 21 of his state habeas petition.  The California Supreme Court considered and rejected this claim, stating "All claims are denied on the merits ... Except insofar as they assert ineffective assistance of trial counsel, Claims 21, 22, and 23 are barred under <u>In re Dixon</u> (1953) 41 Cal.2d 756, 759 because they could have been, but were not, raised on appeal." (Lodgment No. 19.)  As discussed above in Section III, <u>supra</u>, the Court will review this claim on the merits irrespective of the state court's application of procedural bars.

Respondent maintains that the California Supreme Court reasonably rejected this claim, arguing that "[a] single juror's brief view of the defendant outside the courtroom does not require removal of the juror" and noting that this juror, when questioned by trial counsel, affirmatively assured the court that the observation of Petitioner would not affect her impartiality. (Ans. at 57.)  Respondent also notes that, at the behest of defense counsel, the trial court gave the jury an explicit instruction that any restraints observed on the defendant had no bearing on his guilt or innocence and were not to be considered.  (<u>Id.</u> at 57-58.)

The trial record reflects that when it came to the court's attention that Ms. Darnell had observed the defendant outside of the courtroom in jail clothes and handcuffed, the trial court turned

08cv0311

over the inquiry to counsel, allowing both parties to question the prospective juror on what she had

viewed, and whether it would affect her ability to discharge her duties as a juror.  The prosecutor

declined to pose any questions, but defense counsel conducted the following inquiry:

> Q:   Yesterday morning when you were here did you see the bailiffs bring Mr.
>      Bemore over to the courtroom?
> A:   Yes, I did.
>
> Q:   And when you saw him he was in jail clothes and handcuffs?
> A:   Uh-huh.
>
> Q:   Is that correct?
> A:   Yes.
>
> Q:   And we talked about this in voir dire before we started the - - this portion of the
>      trial.  Do you think seeing him being brought in handcuffs and jail clothes
>      would affect you as a juror, if you wind up as part of the main panel?
> A:   Oh, heaven's no.
>
> Q:   You expected to see him in custody, did you not?
> A:   Well, I would think he probably would be brought in custody to the - - you
>      mean in handcuffs?
>
> Q:   Yes, Ma'am.
> A:   Well, I've seen many go by in handcuffs.
>
> Q:   So that would have no affect on you?
> A:   No.

(RT 22806-07.)

After this inquiry, defense counsel did not voice any concerns about the juror's ability to remain

impartial, nor did counsel raise any objection to Ms. Darnell's continued presence as an alternate on

the jury panel.

      As noted, the trial court also issued a curative instruction to the jury at the conclusion of the

guilt phase evidence, as follows:

> The fact that Mr. Bemore is in custody awaiting the outcome of these proceedings and
> your decision concerning whether any charges or accusations against him have been
> proven beyond a reasonable doubt by the evidence and under the law, the fact that he
> is brought to and from the courtroom here by the bailiffs, that at some point in the
> process you may have observed him to be handcuffed and in the company of two
> bailiffs, none of that has any bearing whatsoever on his guilt, none of that is evidence
> of anything, and none of that must be considered by you in any way in determining
> whether his guilt has been proved by the evidence and under the law beyond a
> reasonable doubt.

(RT 24494-95.)

A jury is presumed to understand and follow the trial court's instructions. Weeks, 528 U.S. at 233; Richardson v. Marsh, 481 U.S. 200, 211 (1989). Petitioner has not provided the Court with any evidence that his trial jury ignored the trial court's specific instruction that they disregard any potential observation of Petitioner in restraints or in the company of bailiffs in their deliberations or determination of guilt. Instead, Petitioner offers speculation, suggesting that because the trial court failed to specifically inquire whether Ms. Darnell had related her observations to other jurors or alternate jurors, "[t]he possibility of contamination was reasonable given that an alternate, Elizabeth Davison, was subsequently chosen to replace a juror who had been discovered sleeping during the trial," and was later selected to serve as foreperson. (Pet. at 228.) The allegations made in Claim 24 are without evidentiary support, reached through Petitioner's presumption that the jury disregarded the specific instructions of the court.

During the defense presentation in the guilt phase, lead defense counsel noted that he had observed Ms. Darnell reading a magazine during testimony, and after a sidebar discussion, both parties stipulated to dismissing her from the jury panel. (RT 24321-25.) The trial court accepted the stipulation, noting that there had been a prior incident involving Ms. Darnell's potential lack of attention during an earlier portion of the trial, that she was an alternate juror, and that there were several other alternates still on the panel. (Id.) Thus, Ms. Darnell did not even remain in the jury box through the end of the guilt phase testimony, further limiting any opportunity she may have had to impart what she had seen to other jurors, assuming she harbored any inclination to do so, of which there is no evidence.

Taking into account the limited potential impact of Ms. Darnell's observations due to her truncated tenure on the jury panel and the trial court's curative instruction, and the lack of any appreciable evidence regarding the effect her observations had on the jury panel that decided Petitioner's case, the Court remains unpersuaded that the failure to raise this claim on appeal constituted ineffective assistance of counsel. The allegations raised here do not amount to a due process violation and do not merit habeas relief, and thus there are no grounds for a finding that appellate counsel was ineffective for failing to raise this claim on appeal. See Boag, 769 F.2d at 1344; Baumann, 692 F.2d at 572. Moreover, as stated above in the discussion of Claim 21, appellate

08cv0311

1  "counsel has no constitutional obligation to raise every non-frivolous issue requested by the

2  defendant." <u>Miller</u>, 882 F.2d at 1434, citing <u>Jones</u>, 463 U.S. at 751-54. Petitioner fails to demonstrate

3  that appellate counsel's failure to raise this issue on appeal constitutes an error so serious that "there

4  is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

5  would have been different." <u>Strickland</u>, 466 U.S. at 694.

6      This Court cannot say the state court's denial of Claim 24 was contrary to, or an unreasonable

7  application of, clearly established federal law, or that it was based upon an unreasonable determination

8  of the facts. <u>Williams</u>, 529 U.S. at 412-13. Accordingly, Petitioner does not merit habeas relief on

9  this claim.

10  **D.    Claim 25- Trial Court Error in Failing to Excuse Juror Zerr**

11      In Claim 25, Petitioner asserts the trial court committed prejudicial error in refusing to excuse

12  juror Edgar Zerr on the basis of his involvement with the San Diego District Attorney's office and San

13  Diego law enforcement as a witness in another case, in violation of Petitioner's rights under the Fifth,

14  Sixth, Eighth, and Fourteenth Amendments. (Pet. at 229.) Petitioner additionally contends that to the

15  extent this claim could have been raised by state appellate counsel, he was denied his right to the

16  effective assistance of counsel on appeal. (<u>Id.</u>) Petitioner did not move for summary judgment or for

17  an evidentiary hearing on this claim.

18      Respondent maintains that the state supreme court reasonably rejected this claim on appeal,

19  and the trial court was within its discretion in denying trial counsel's motion to excuse Juror Zerr

20  because "substantial evidence supports its determination that the events did not render juror Edgar Z.

21  biased towards the prosecution." (Ans. at 58.)

22      Petitioner presented this claim to the California Supreme Court in a state habeas petition, and

23  the state court rejected the claim in part based upon state procedural bars. As discussed above in

24  Section III, <u>supra</u>, the Court will review this claim on the merits irrespective of the state court's

25  application of procedural bars.

26      The Sixth Amendment "guarantees to the criminally accused a fair trial by a panel of impartial,

27  'indifferent' jurors." <u>Irvin v. Dowd</u>, 366 U.S. 717, 722 (1961); <u>Green v. White</u>, 232 F.3d 671, 676 (9th

28  Cir. 2000). The Ninth Circuit has explicitly stated that "[a]ctual bias against a defendant on a juror's

08cv0311

1   part is sufficient to taint an entire trial." Id., 232 F.3d at 676, citing United States v. Allsup, 566 F.2d

2   68, 71 (9th Cir. 1977).   Bearing directly on this Court's analysis of the instant claim, the Supreme

3   Court has noted that a trial judge's findings on juror bias are "presumptively correct" on federal habeas

4   review.  Smith, 455 U.S. at 218.

5           The trial record reflects that after the guilt phase verdict but prior to the commencement of the

6   penalty phase proceedings, Juror Zerr sent a note to the trial court regarding a situation involving his

7   live-in girlfriend.  The trial court summoned Zerr to court, where the juror explained to the parties that

8   his girlfriend ran her vehicle into Zerr's truck and then into the side of her step-father's car during a

9   dispute with her step-father.  Juror Zerr noted that while he did not press charges against his girlfriend,

10  her step-father had pressed charges, which included assault with a deadly weapon.  (RT 24696-97.)

11  Zerr explained that he had retained an attorney for his girlfriend, and acknowledged that while he did

12  not consider himself a victim and would not be pressing charges, he would likely be a witness in the

13  case.  (RT 24697-98.)   Zerr stated that he alerted the trial court in hopes that he could attend an

14  upcoming hearing in his girlfriend's case, and to ensure that all parties were made aware of the

15  situation.  (RT 24699.)

16          The prosecutor questioned Juror Zerr as follows:

17      Q:   Do you feel that you can give all the parties still in this case, including the
             defendant, a fair hearing and not be affected by the kind of personal problems
18           that you find yourself with now?

19      A:   Yes, sir.

20  (RT 24702.)

21  The trial court then posed additional questions to Juror Zerr:

22
        Q:   Do you feel that - - that that's going to be distracting to you and take your attention
23           away from - - from these proceedings and your duties here as a juror?

24      A:   No, sir.

25      Q:   You the kind of person that can separate those things out and while you're here
             devote attention to this and while you're there devoting attention to that matter
26           and keep them separate do you think?

27      A:   Yes, sir.

28  (RT 24703.)

57                                                          08cv0311

1    Defense counsel argued that Juror Zerr should be excused from further service in the case,

2    noting that under "the old Civil Code section 602," the juror would be excused, although

3    acknowledging that Zerr did not fall under the current codification because he was not married to his

4    live-in girlfriend. (RT 24709.) While stating the objection to Zerr's continued inclusion on the jury

5    panel, defense counsel conceded that "I am more concerned about the appearance that I am the

6    actuality." (Id.) After this initial inquiry, the trial court declined to excuse Zerr at that time and took

7    the matter under submission. (RT 24711.)

8    The trial court later conducted another inquiry into Zerr's schedule at the behest of defense

9    counsel, who expressed concerns that Zerr's intention to attend a court hearing for his girlfriend would

10   conflict with an upcoming expert witness for the defense. (RT 24817-19.) Zerr affirmed that the

11   anticipated testimony did not present a conflict with his schedule. At the same time, the trial court

12   again inquired into whether Zerr felt he could remain impartial, and the juror assured the court that he

13   still had the ability to judge the case fairly. (RT 24858-60.) After this inquiry, the trial court again

14   declined to excuse Juror Zerr from service. (Id.) Juror Zerr remained on the panel that rendered

15   Petitioner's penalty verdict.

16   The record before this Court is bereft of any firm evidence that Juror Zerr was actually biased

17   due to the legal situation of his significant other, and Petitioner's allegations are based solely on

18   speculative conclusions derived from the trial transcripts. Instead, merely the *appearance* of bias,

19   rather than any genuine demonstration of partiality, appears to be the basis for Petitioner's assertion

20   of prejudicial error. Indeed, in both the petition and the opening brief, Claim 25 centers on the

21   assertion that an individual "should not be allowed to sit on a trial if there is even an appearance of

22   bias" followed by the conclusion that "[u]nder the circumstances, it is difficult to have confidence in

23   the death penalty verdict against Petitioner." (Pet. at 230.) However, contrary to the conclusions

24   drawn by Petitioner, the Fourth Circuit has reasoned, and this Court agrees, that "the fact that the juror

25   had relatives who were subject to arrest and jury trials does not give rise an inference that the juror was

26   biased against the appellant; indeed, arguably, the more commonsense assumption is that a juror with

27   this background would be biased in *favor* of the accused." Jones v. Cooper, 311 F.3d 306, 313 (4th

28   Cir. 2002) (emphasis in original).

1    The mere fact that Juror Zerr's girlfriend had been subject to arrest and the potential for trial,

2    without any indication that this situation impacted the juror's ability to remain impartial, is an

3    insufficient basis upon which to conclude that the trial court erred in allowing Zerr to remain on the

4    jury panel.  In this instance, the Court is persuaded that Petitioner was properly provided with "a jury

5    capable and willing to decide the case solely on the evidence before it."  McDonough Power

6    Equipment, Inc. v. Greenwood, 464 U.S. 548, 554 (1984) (quoting Smith, 455 U.S. at 217).   From

7    an examination of the record, it is evident that the trial court conducted a timely and thorough inquiry

8    into Juror Zerr's ability to remain fair and impartial, provided counsel with ample opportunity to

9    question the juror, and based on a lack of any indication of bias from these inquiries, reasonably

10   declined to remove Juror Zerr from the jury panel.

11    This Court rejects Petitioner's contention that the state court's denial of Claim 25 was contrary

12   to, or an unreasonable application of, clearly established federal law, or that it was based upon an

13   unreasonable determination of the facts.  Williams, 529 U.S. at 412-13.  As this claim fails on the

14   merits, the Court also remains unpersuaded that the failure to raise this claim on appeal constituted

15   prejudicially ineffective assistance of counsel.  See Boag, 769 F.2d at 1344; Baumann, 692 F.2d at

16   572.  Petitioner does not merit habeas relief on this claim.

17   **E.    Claim 26- Trial Court Error in Denying Motion to Exclude Testimony of Cynthia**

18   **Moreno Regarding Statements of Alleged Rape Victim**

19    In Claim 26, Petitioner alleges that the "trial court erred at the penalty phase in denying the

20   defense motion to exclude the hearsay testimony of Cynthia A. Moreno regarding statements of the

21   alleged rape victim," in violation of Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth

22   Amendments to the Constitution. (Pet. at 231.) Petitioner additionally contends that to the extent this

23   claim could have been raised by state appellate counsel, he was denied his right to the effective

24   assistance of counsel on appeal.  (Id.)  Petitioner has not moved for summary judgment or for an

25   evidentiary hearing on this claim.

26    Respondent maintains that the state supreme court's rejection of this claim on appeal was

27   reasonable. (Ans. at 59.) Respondent additionally argues that the "state trial record reveals the state

28   trial court was well within its discretion in concluding that the statements made by Zelda C. to

Moreno, another sister, were within the excited utterance exception to the hearsay rule because they were volunteered when Zelda C. was crying and hysterical and because Zelda C. was still under the influence of the perceived events notwithstanding the passage of time between the rape and the phone call." (Id.) (citations omitted.) Respondent also notes that even had this testimony been excluded, the jury would have still heard testimony concerning Zelda C.'s statements to Lloyd Howard the morning after the assault describing Petitioner's rape while holding a knife to her throat. (Id.)

Petitioner presented this claim to the state court as Claim 23 of his state habeas petition, which the California Supreme Court rejected on the merits, and in part based on state procedural bars. However, as discussed above in Section III, supra, the Court will review this claim on the merits irrespective of the state court's application of procedural bars.

State evidentiary rulings are not generally cognizable on a federal habeas proceeding, unless the admission of evidence violated a petitioner's due process right to a fair trial. Estelle v. McGuire, 502 U.S. 62, 70 (1991); Gordon v. Duran, 895 F.2d 610, 613 (9th Cir. 1990). In order to show a due process violation, a petitioner must demonstrate that the trial court's ruling was so prejudicial that it rendered his trial fundamentally unfair. Ortiz-Sandoval v. Gomez, 81 F.3d 891, 897 (9th Cir. 1996); Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991).

During the penalty phase, the prosecution introduced as evidence in aggravation the prior uncharged rape of Zelda Carlton in 1985. Carlton's sister Cynthia Moreno was called to testify about several statements Carlton made to her shortly after the alleged sexual assault. Moreno testified that in the fall of 1985, her sister called her by telephone, crying and "very emotional." (RT 24829.) Defense counsel objected, and at a side bar, raised a hearsay objection to Moreno's testimony. (Id.) The prosecutor argued that the statements fell under "1240, spontaneous declaration," stating that they were made "at or near the time of the event" and maintaining that the victim was "still under the effects of it." (RT 24830.) Defense counsel contested this assertion, noting that "in the discovery, with one of the sisters it said she called her a few days later." (Id.) The defense additionally argued that the testimony was not relevant, to which the prosecutor countered that he was not offering the testimony as a prior consistent statement. (Id.) The trial court held as follows:

> I think the teaching of the cases is on the excited utterance or spontaneous exception
> to the hearsay rule, it's not the mere passage or short duration of time, it's as Mr. Anear

suggested, whether it appears that the declarant is still acting substantially under the influence of the exciting event. Therefore, that theory is that lends the essential foundation of trustworthiness that is at the heart of all the hearsay objections. [¶] I think also there's a line of cases that hold that in these sorts of cases that since it is expected ones would make a fresh complaint, so to speak, that that's an independent grounds for its admission I think.

(RT 24831.)

The trial court overruled the defense's hearsay objection, and allowed Moreno to continue her testimony. (Id.) Moreno testified that she received a call from her sister shortly after the assault, in which Carlton "said that she had been raped and that the man had a knife, and that he had told her if she screamed that he would kill her. And she was very frightened. And she was crying and almost incoherent. I kept telling her to calm down and talk with me, tell me what had happened." (RT 24832.)

Petitioner asserts that "[t]he hearsay concerning the alleged rape was prejudicial, and supported the jury's finding of death. The trial court erred in admitting the unreliable statement. Consequently Petitioner was prejudiced and a reversal as to penalty is warranted." (Pet. Brief at 222.) Petitioner also argues that "[t]he trial court's denial of the defense motion to exclude the hearsay testimony of Ms. Moreno with respect to the alleged rape of Carlton discouraged trial counsel from making the same motion with respect to Carlton's other sister, Sarah Parker, thereby prejudicing Petitioner." (Id. at 222-23.) Under clearly established federal law, even if the Moreno and/or Parker testimony was erroneously admitted, Petitioner must still demonstrate prejudice in order to warrant habeas relief. See Ortiz-Sandoval, 81 F.3d at 897; Jammal, 926 F.2d at 919.

Based on a review of the penalty phase transcripts, the Court finds that the direct evidence of the uncharged sexual assault was substantial, independent from the hearsay testimony of Cynthia Moreno. The victim, Zelda Carlton, testified in detail regarding the assault. (RT 24786-823.) She stated that Petitioner was in her apartment as an associate of Howard's. (RT 24786-90.) Carlton stated that Petitioner refused to leave when she asked, followed her into her bedroom brandishing a knife, and forced himself upon her. (RT 24790-800.) Carlton stated that after he left, she gathered her children to tell them they were leaving for Texas. (RT 24800-02.) Carlton stated that she called her sisters to relate the incident, and also informed Lloyd Howard. (RT 24802-08.) Howard then testified that one night after leaving Carlton's apartment, Petitioner remained there, and Carlton came

to him the following morning to inform him that Petitioner had put a knife to her throat and raped her. (RT 24846-49.) Howard stated that when he confronted Petitioner with this information, Petitioner said something about letting Carlton come between their friendship. (Id.) The testimony of Carlton and Howard amply supported the prosecution's case in aggravation, and was persuasive evidence of the prior uncharged sexual assault. As the Moreno and/or Parker testimony was cumulative to that of Lloyd Howard, even if the trial court had erred in admitting the Moreno testimony, any error would have been harmless.

As for the specific allegations raised in Claim 26, Petitioner fails to demonstrate that the trial court's ruling allowing the testimony of Cynthia Moreno was so prejudicial that it rendered his trial fundamentally unfair. See Ortiz-Sandoval, 81 F.3d at 897; Jammal, 926 F.3d at 919. Therefore, Petitioner does not merit habeas relief on this claim. Accordingly, as the claim is without merit, appellate counsel did not err in failing to raise this claim on appeal. See Jones v. Smith, 231 F.3d 1227, 1239 n.8 (9th Cir. 2000) (appellate counsel's failure to raise issues on appeal does not constitute ineffective assistance when it would not have provided grounds for reversal). Thus, the state supreme court's rejection of this claim on appeal was not contrary to, nor an unreasonable application of, clearly established federal law, nor was it based upon an unreasonable determination of the facts.

**F.     Claims 27 and 28- Trial Court Error in Instructing the Jury on Consideration of Unadjudicated Offenses and in Failing to Properly Instruct the Jury on the Consideration of Factors in Aggravation**

In Claim 27, Petitioner alleges that the "trial court's instructions to the jury during the penalty phase allowed the jury to impose the death penalty on the basis of previously unadjudicated offenses" in violation of Petitioner's constitutional rights under the Fifth, Eighth and Fourteenth Amendments. (Pet. at 233.) In Claim 28, Petitioner alleges that the trial court erred "in failing to instruct the jury that the only aggravating factors it could consider were those it unanimously agreed existed and unanimously agreed were aggravating," in violation of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the Constitution. (Pet. at 236.) Petitioner moves for summary judgment on both claims, or in the alternative, for an evidentiary hearing. (Mot. at 4-7.)

Respondent maintains that the California Supreme Court reasonably rejected both claims on direct appeal.  (Ans. at 59.)

    1.    State Court's Decision

On direct appeal, the California Supreme Court rejected these claims under the heading "Miscellanous Claims," as follows:

> Towards the end of his opening brief, defendant makes a shotgun attack on the validity of the death judgment and the constitutionality of the statutory scheme under which it was obtained. All such claims have failed in this court many times before. We decline to reconsider past decisions, and reject each claim again here in summary fashion. Contrary to defendant's arguments:
>
> ...
>
> 7. The death penalty law is not defective insofar as it fails to require (1) written findings as to the aggravating factors supporting a death judgment, (2) proof beyond a reasonable doubt of any such aggravating factors, (3) jury unanimity on the dispositive aggravating factors, (4) a finding that aggravating factors outweigh mitigating factors beyond a reasonable doubt, and (5) a finding beyond a reasonable doubt that death is the appropriate penalty. (*People v. Rodriguez*, *supra*, 42 Cal.3d 730, 777-779.)

Bemore, 22 Cal.4th at 859.

    2.    Merits

The California penal code allows the jury to consider prior unadjudicated offenses in determining penalty in a capital trial, directing that:

> In determining the penalty, the trier of fact shall take into account any of the following factors if relevant:
>
> ...
>
> (b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence.

(Cal. Penal Code § 190.3.)

In Petitioner's case, the jury was given initial instructions regarding its ability to consider evidence of Petitioner's prior unadjudicated offenses as aggravating factors:

> Before you may consider any such criminal acts allegedly involving the express or implied use of force or violence or the threat of force or violence, before you may consider any such criminal acts as an aggravating circumstance in this case you must first be satisfied beyond a reasonable doubt that Mr. Bemore did in fact commit such acts.  You may not consider any evidence of any other criminal acts as an aggravating circumstance . . . So again, the presence or absence of criminal activity by Mr. Bemore which involve [sic] the use or attempted use of force or violence or the express or implied threat to use force or violence, but *you can consider that as an aggravating*

*circumstance only if you first find in fact and as judges of the fact beyond a reasonable doubt and to a moral certainty that he did in fact commit such acts.*

(RT 26283-84) (emphasis added.)

After the prosecutor's closing statement, the Court offered an additional jury instruction, as follows:

I did emphasize that the burden is on the People to prove the truth of each of these allegations of criminal activity, and each essential element of each of those allegations beyond a reasonable doubt and to a moral certainty . . . [¶] The burden of course is on the People to prove beyond that same reasonable doubt that Mr. Bemore is the person who engaged in that criminal activity, if you find that such criminal activity occurred. [¶] And if, after considering the circumstances of the identification of Mr. Bemore as the perpetrator of those acts and any other evidence in the case, you have a reasonable doubt whether he was the person who engaged in that criminal activity, of course you have to give him the benefit of that doubt and find that he did not. And, therefore, the truth of the asserted circumstance in aggravation has not been established beyond a reasonable doubt.

(RT 26341.)

The Supreme Court has never held that allowing a jury to impose the death penalty based in part on the commission of unadjudicated offenses violates a defendant's constitutional rights. In fact, in Nichols v. United States, 511 U.S. 738, 747 (1994), the Supreme Court noted approvingly that "[s]entencing courts have not only taken into consideration a defendant's prior convictions, but have also considered a defendant's past criminal behavior, even if no conviction resulted from that behavior." Id. Several circuit courts, including the Ninth Circuit, have specifically held that evidence of prior criminal activity that did not result in a criminal conviction may be used in aggravation in a capital penalty phase proceeding. See McDowell v. Calderon, 107 F.3d 1351, 1366 (9th Cir.1997), amended 116 F.3d 364 (9th Cir.1997), vacated in part by 130 F.3d 833, 835 (9th Cir.1997) (en banc) (a sentencer may rely on prior criminal conduct not resulting in a conviction if the evidence in question has "some minimal indicium of reliability beyond mere allegation."); see also Devier v. Zant, 3 F.3d 1445, 1464 (11th Cir. 1993).

Petitioner protests the trial court's decision to allow the admission of unadjudicated prior offenses in the penalty phase, reasoning that these jurors, who had only recently convicted Petitioner of special circumstance murder, would not be able to objectively evaluate the evidence offered in aggravation. (Mot. at 5.) Petitioner argues that this error was compounded by requiring each juror "to perform this feat in isolation," which "deprived jurors of the ability to test and justify their

positions, an essential safeguard against bias." (Id. at 5-6.) Petitioner contends that absent a consensus among the entire jury as to whether he committed each of the prior offenses, the jury's decision was unreliable, and violated his constitutional rights.

In support of Claim 27, Petitioner cites to several state court decisions, noting that Alabama, Pennsylvania, Tennessee, Indiana, and Washington have concluded that the use of unadjudicated offenses in penalty phase aggravation violates the federal constitution, and have discontinued the use of such evidence in capital proceedings.[7] (Id. at 4-5.) While informative, reference to these state court cases fail to constitute persuasive authority that would compel Petitioner's desired conclusion, as this Court's scope of review is limited to clearly established federal law. See Davis, 384 F.3d at 638.

Ultimately, the Court cannot conclude that the California Supreme Court acted unreasonably in rejecting this claim on appeal. The trial record demonstrates that the jurors in Petitioner's case were properly instructed under existing California law that they must be convinced beyond a reasonable doubt of Petitioner's guilt before they could consider the prior unadjudicated offenses in aggravation. (RT 26283-84.) Thus, in the absence of clearly established federal law supporting Petitioner's contention that the consideration of unadjudicated offenses in his case resulted in a violation of his rights, the Court is constrained to conclude that the state supreme court's denial of this claim was not contrary to, nor an unreasonable application of, clearly established federal law. Claim 27 must fail.

In Claim 28, Petitioner argues that, pursuant to the trial court's instructions, each juror was to evaluate the evidence of the two prior unadjudicated offenses (the Oliver assault and Carlton rape) in isolation, and urges that the trial court erred in failing to require unanimity in concluding whether the offenses had been proven beyond a reasonable doubt. Petitioner asserts "unanimity with regard to

---

[7] Petitioner also quotes from a Louisiana district court decision, in contending that "[o]ther courts have reached similar conclusions" about disallowing the use of unadjudicated criminal conduct in penalty phase proceedings. (Mot. at 5.) However, upon review of the cited case, the Court notes that while the Eastern District of Louisiana ordered a hearing on the admissibility of such evidence, it did not, like the other states noted above, declare such evidence per se inadmissible. See United States v. Davis, 912 F.Supp. 938, 949 (E.D. La. 1996) ("Nevertheless, allowing unadjudicated crimes to be introduced in the penalty phase is a policy choice, the wisdom of which this court cannot question. This court is persuaded that Congress did not intend a per se rule excluding such information; had they so intended, they would have said so, and nowhere in the statutory language is such an exclusion even implied. Furthermore, the court believes that the admission of unadjudicated criminal conduct in the penalty phase is constitutional under current caselaw, assuming safeguards are in place to insure the necessary heightened reliability and offset the risk of undue prejudice, confusion of the issues and/or misleading of the jury.")

aggravating factors is constitutionally required," citing a federal death penalty statute[8] and <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000).  The Court's review of the federal death penalty statute, 18 U.S.C. § 3593, reveals that while it requires unanimity with regard to an aggravating factor, it does not require the degree of unanimity proposed by Petitioner.  Even if it did, the requirement would not be a constitutional one; state death penalty statutes needn't mirror the federal statutes in order to be legitimate.

Nor does the Court find any indication that such a high level of specificity is mandated by any existing Supreme Court precedent.  In <u>Apprendi</u>, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." <u>Id.</u>, 530 U.S. at 490. Petitioner proposes that, in order for a jury to unanimously find true the aggravating factor of a prior unadjudicated offense, the jury must also unanimously agree as to each of the prior offenses offered to support that factor in aggravation.  In his case, Petitioner asserts that they jury must unanimously agree that Petitioner committed the Oliver assault or the Carlton sexual assault before that factor in aggravation could be considered by the jury in its penalty phase deliberations.  Yet, the issue resolved in <u>Apprendi</u> was whether the judge, as opposed to the jury, must find the facts supporting imposition of the death penalty, and as such, its holding has no bearing on the considerably more limited claim raised by Petitioner.

Petitioner additionally contends that Cal. Penal Code §§ 1158 and 1158a, which require special findings before a sentencing enhancement can be imposed in a non-capital case, runs contrary to the fundamental tenet that "[c]apital defendants are entitled, if anything, to more rigorous protections than those afforded non-capital defendants." (Mot. at 8.)  However, the cited statutes concern jury or judicial findings as to a *prior conviction* or whether a defendant was armed at the time of an offense. Reference to California Penal Code section 190.3(c) reveals that the "presence or absence of any prior felony conviction" is listed as a separate factor in aggravation than 190.3(b), the latter of which is the

---

[8] Petitioner directs the Court to 21 U.S.C. § 848(k) in arguing that unanimity on aggravating factors is constitutionally required, and that the federal death penalty statute adheres to this requirement.  However, the Court notes that the cited section of the United States Code was repealed in 2006.  The current death penalty statute is located at 18 U.S.C. § 3593, and the Court will use the statute currently in effect in conducting its analysis.

sole subject of the instant claim.  Neither state statute concerns or relates to the use of prior *uncharged* criminal activity, and Petitioner fails to cite to any authority demonstrating that California Penal Code §§ 1158 or 1158(a) has any relation to or impact on the admissibility or consideration of prior unadjudicated offenses at the penalty phase of a capital trial.

In sum, Petitioner fails to demonstrate that the state death penalty statute violates the federal constitution, or that the trial court's instructions to the jury regarding the consideration of aggravating factors resulted in any constitutional violation.  This Court cannot conclude that the state supreme court's denial of these claims on appeal were contrary to, or an unreasonable application of, clearly established federal law, or that the denials were based upon an unreasonable determination of the facts. Williams, 529 U.S. at 412-13.  Accordingly, Petitioner does not merit habeas relief on Claims 27 or 28.  Petitioner's motion for summary judgment is denied.

As these claims can be decided based on the record, Petitioner's claims of instructional error regarding the aggravating evidence and unadjudicated prior offenses do not warrant an evidentiary hearing.  See Baja v. Ducharme, 187 F.3d 1075, 1087 (9th Cir. 1999); see also Totten v. Merkle, 137 F.3d 1172, 1176 (9th Cir. 1998) ("[A]n evidentiary hearing is not required on issues that can be resolved by reference to the state court record.") (emphasis omitted.)

**G.    Claim 34- Actual Innocence**

In Claim 34, Petitioner claims he is "innocent of first degree murder, the special circumstance findings of robbery and torture, and of the facts and assertions resulting in the conviction and death judgment," and asserts that his conviction and sentence consequently stand in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments. (Pet. at 279.)  Petitioner additionally contends that to the extent this claim could have been raised by state appellate counsel, he was denied his right to the effective assistance of counsel on appeal.  (Id.)  Petitioner did not move for summary judgment or for an evidentiary hearing on this claim.

Petitioner presented this claim to the state court as Claim 29 of his state habeas petition.  The California Supreme Court considered and rejected this claim, stating "All claims are denied on the merits." (Lodgment No. 19.)  Respondent maintains that the state supreme court's rejection of this

1  claim was reasonable, and Petitioner's claim is "refuted by the evidence introduced in Bemore's state

2  court trial." (Ans. at 62.)

3       In Herrera v. Collins, 506 U.S. 390 (1993), the United States Supreme Court assumed without

4  deciding that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial

5  would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there

6  were no state avenue open to pursue such a claim." Id. at 417.  The Supreme Court refrained from

7  announcing a standard for evaluating a freestanding innocence claim, but cautioned that the threshold

8  would necessarily be "extraordinarily high." Id. at 418.  The Ninth Circuit later expanded on this

9  analysis, holding that "a habeas petitioner asserting a freestanding innocence claim must go beyond

10  demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent."

11  Carriger v. Stewart, 132 F.3d 463, 476 (9th Cir. 1997).

12       Petitioner, citing to allegations raised in Claims 7 through 9, asserts that he "was unable to

13  form the requisite intent to be criminally responsible for the charges for which he was convicted due

14  to his mental illness, organic impairment, and drug-induced state." (Pet. Brief at 260.)  Additionally,

15  citing to allegations made in Claims 8 and 19, Petitioner contends that "there was available evidence

16  at the time of trial that refuted the torture special circumstance," and asserts that counsel was

17  ineffective in failing to use this evidence in his defense at trial. (Id.)  Petitioner also contends that the

18  prosecutor was aware of information that suggested the killing did not involve torture. (Id. at 261.)

19  Finally, citing to allegations made in Claims 19-21, Petitioner asserts that "testimonial evidence that

20  Petitioner engaged in incriminating conduct and made admissions concerning the robbery-homicide

21  were unreliable." (Id.)

22       The Ninth Circuit has indicated that post-conviction evidence whose sole function is to

23  "undercut the evidence presented at trial" is insufficient support for a freestanding claim of actual

24  innocence. Carriger, 132 F.3d at 477.  Here, Petitioner fails to offer new evidence to substantiate his

25  claim of actual innocence, instead reiterating the allegations made in other claims in his federal

26  petition, and cannot meet the "extraordinarily high" threshold contemplated by Herrera.

27       For instance, Petitioner's contention regarding his drug-induced state at the time of the murder

28  was actually presented to the jury through the testimony of multiple witnesses, including Petitioner

himself.  In fact, Petitioner testified during the guilt phase that he had ingested cocaine early in the evening of the murder and again later that night.  (See RT 23996-24004.)  On cross-examination, Petitioner acknowledged that he had started using rock cocaine in the summer of 1985, which led to the loss of his job, a deterioration in his appearance, and the commission of numerous robberies.  (RT 24033-40.)  Dr. Reese Jones, a professor of psychiatry and licensed physician, testified at the guilt phase on the effect of drug interactions in the brain, specifically that of rock cocaine, and admitted that the use of cocaine could lead to a delusional state.  (RT 24365-87.)  Thus, the evidence Petitioner presents here was already considered by the jury, which nevertheless voted to convict Petitioner, and as such, lends no support to Petitioner's claim of actual innocence.

Moreover, Petitioner explicitly acknowledges that there was evidence available to defense counsel at trial regarding mental state defenses and Petitioner's mental competence.  (See Pet. Brief at 62) ("There was substantial evidence available to defense counsel that Petitioner lacked the requisite mental state [to] be guilty of robbery or murder. . ."); (see also id. at 94)("There was evidence available to trial counsel that Petitioner was mentally incompetent.")  Similarly, Petitioner's assertions regarding available evidence refuting the torture special circumstance, and the prosecutor's knowledge of such, stem from evidence presented in co-defendant Cosby's trial, which took place prior to Petitioner's trial.  Petitioner notes that the same prosecutor handled both cases and was therefore "aware that the defense experts in that [co-defendant's] case was able to effectively refute the robbery and torture allegations."  (Pet. at 280.)  In Herrera, the petitioner advanced a freestanding claim of actual innocence based on newly discovered evidence.  Here, Petitioner merely reiterates allegations of constitutional violations, each one also contained in separate claims elsewhere in the petition, and has combined them here under a claim entitled "Innocence."  The allegations raised here would at most, if proven, "demonstrat[e] doubt" about Petitioner's guilt as to the special circumstances or his ability to form the requisite intent for first-degree murder, but they fail to "affirmatively prove" his innocence.  See Carriger, 132 F.3d at 476.

Finally, Petitioner asserts that the case against him rested primarily on the testimony of unreliable witnesses, drug addicts and convicts who were motivated by personal gain, and were given favorable treatment by the prosecution for their testimony.  Petitioner also asserts that there was no

direct physical evidence linking him to the crime.  The trial record reflects that defense counsel actively contested the materiality of the physical evidence and its connection or lack thereof to Petitioner.  The jury heard that the shoes found in Petitioner's car did not match the prints in the liquor store, heard that one knife found in his car could have made several of the wounds on the victim, heard of the hair evidence that did not match Petitioner, and heard of the inconclusive blood typing evidence.  (RT 23009; 23934-39).  As with the testimony on Petitioner's drug use, the jury was presented with this evidence and nevertheless voted to convict Petitioner, which again lends no support to a claim of actual innocence.

Petitioner's allegations of his inability to form the requisite intent to be criminally responsible for the charges, the available and unused evidence regarding the torture special circumstance and mental state defenses, and the assertion that unreliable testimonial evidence was introduced at trial are each addressed in other claims in the instant Petition, and here serve at most only to undercut the evidence presented at trial, but fail to advance a "truly persuasive demonstration of 'actual innocence.'" Herrera, 506 U.S. at 417.  Petitioner's claim of actual innocence fails on the merits, and the state court's denial of this claim was neither contrary to nor an unreasonable application of clearly established federal law.  Williams, 529 U.S. at 412-13.

**H.     Claim 35- Improper Instruction to the Jury- CALJIC No. 8.85**

On August 10, 2009, Petitioner and Respondent submitted a joint status report to the Court, in which Petitioner stated that he was abandoning Claim 35, and wished to proceed on the remainder of the claims contained in his federal Petition.  (See Doc. No. 56.)  Respondent did not object to the abandonment of Claim 35.  (Id.)  Accordingly, the Court shall not consider this claim.

**I.     Claim 36- DA's Death Penalty Charging Practices**

In Claim 36, Petitioner alleges that the "district attorney's death penalty charging practices are unconstitutionally arbitrary, capricious and discriminatory" in violation of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.  (Pet. at 286.)  Petitioner additionally contends that to the extent this claim could have been raised by state appellate counsel but was not, he was denied his right to the effective assistance of counsel on appeal.  (Id.)  Petitioner moves for summary judgment on this claim, or in the alternative, for an evidentiary hearing.  (Mot. at 8-11;15.)

08cv0311

Petitioner presented this claim to the state court as Claim 30 of his state habeas petition.  The California Supreme Court considered and rejected this claim, stating "All claims are denied on the merits."  (Lodgment No. 19.)  Respondent maintains that the state supreme court's rejection of this claim was reasonable, contending that "[a] defendant sentenced to death under a properly channeled death penalty scheme cannot prove a constitutional violation by showing that other persons whose crimes were superficially the same did not receive the death penalty or through statistics showing an apparent racial discrepancy in capital sentencing."  (Ans. at 62-63.)

Petitioner relies heavily on the 1991 declaration of political science professor and attorney Edward J. Bronson, which was originally filed in support of a different case originating from San Diego County.  Starting in 1968, Bronson had conducted "substantial research on various aspects of the administration of justice" and stated that he had previously testified as an expert witness regarding "the possible abuse of prosecutorial discretion in death penalty charging and in the use of peremptory challenges."  (Ex. 58 to Pet. at 2.)  In the introduction section of his declaration, Bronson states:

> I am informed and believe that the death penalty is imposed at best in an arbitrary and capricious manner in San Diego County, the State of California, and the United States as a whole.  I am informed and believe that the death penalty is applied in a discriminatory manner, resulting in the disparate and discriminatory application of the death penalty against those who are black, those who kill white victims, those who kill women, and those who are male.

(Id. at 3.)

In discussing prosecutorial charging practices, Bronson cites to several articles and academic studies conducted between the late 1970's to the mid-1980's, including the Baldus study, which was offered in the Supreme Court case of McClesky v. Kemp, 481 U.S. 279 (1987).  Bronson concedes that most of the data available is from the Southern and Midwestern United States, and explains that when an attempt was made to compile comparable data in California, it was "met with massive resistance by the Attorney General and by District Attorneys around the state, and the effort was abandoned."  (Id. at 8.)  For California, Bronson instead utilizes statistics regarding homicide victims from a report issued by the California Attorney General's office, racial composition of victims of death row inmates obtained from "one unofficial survey of victims of death row inmates in California" and

71

1   the racial composition on death row obtained from the Department of Corrections to conclude that

2   "[t]hese figures are sufficiently disproportionate to suggest probable discrimination." (<u>Id.</u> at 10.)

3        Bronson also touches on topics ranging from discrimination in homicide charging in San Diego

4   County and racial under-representation in the jury venire, to racial distribution in the Superior Court,

5   the District Attorney's office, the defense bar, and law enforcement.   (<u>Id.</u> at 16-22.)  Bronson states

6   that capitally charged cases disproportionately involve victims other than black males, asserting that

7   at the time of his declaration in 1991 "no one has ever been sentenced to death for killing a black

8   person in San Diego County," and adds that in the 58 identified cases in which special circumstances

9   were charged in San Diego County, only 3 cases involved black victims.  (<u>Id.</u> at 16.)

10        While Petitioner asserts the Bronson declaration supports his contention that there is "direct

11   evidence" of discriminatory charging and sentencing in <u>his</u> case, the Court notes that the Bronson

12   declaration was originally filed in support of a different petitioner's case, and therefore obviously

13   contains no mention of Mr. Bemore, or any direct evidence regarding the charging decisions made in

14   his own case.  In fact, in lieu of direct evidence, Petitioner relies primarily on the general statistical

15   data set forth and interpreted by Professor Bronson for the prior case, yet specifically concludes and

16   alleges that "[t]he decision-makers *in Petitioner's case* impermissibly considered race when seeking

17   a death sentence."  (Pet. Brief at 267) (emphasis added).

18        Petitioner also asserts that a "system of purposeful discrimination in charging capital cases in

19   California, generally, and San Diego County, existed at the time Petitioner was prosecuted," supported

20   by "anecdotal information demonstrating that DA [sic] office was replete with racism."  (<u>Id.</u> at 251.)

21   In advancing this argument, Petitioner cites a 1991 San Diego newspaper article in which an

22   unidentified San Diego prosecutor "laughingly" related the facts of a murder case involving a

23   confrontation between two black individuals.  (<u>Id.</u>)

24        To substantiate a claim of constitutional magnitude, Petitioner must demonstrate that "the

25   decisionmakers in *his* case acted with discriminatory purpose." <u>McClesky</u>, 481 U.S. at 292 (emphasis

26   in original).  Without "exceptionally clear proof," this Court cannot infer that the prosecutors abused

27   their discretion in pursuing the death penalty in Petitioner's case.  <u>Id.</u> at 297.  In fact, the Supreme

28   Court has specifically noted that "[a]bsent facts to the contrary, it cannot be assumed that prosecutors

will be motivated in their charging decisions by factors other than the strength of their case and the likelihood that a jury would impose the death penalty if it convicts." Gregg v. Georgia, 428 U.S. 153, 225 (1976) (White, J., concurring).  Here, neither the statistics offered in the Bronson and Baldus declarations, originally offered in support of prior cases, nor the newspaper article involving the unnamed San Diego prosecutor regarding a murder case prosecuted several years after Petitioner's case, supports Petitioner's allegation that the San Diego District Attorney's office relied on any impermissible considerations in pursuing the death penalty *in his case*.  Petitioner fails to provide this Court with any concrete evidence indicating that the prosecutor's decision to seek the death penalty in this case was motivated by anything outside the bounds of the law.

Petitioner argues that the statistics and anecdotal evidence discussed in the Bronson declaration support a conclusion that in San Diego County the death penalty is disproportionately sought in murders that involve black defendants and white victims, and concludes that he suffered from similar discrimination in his case.  Nevertheless, as in McClesky, Petitioner "offers no evidence specific to his own case that would support an inference that racial considerations played a part in his sentence," instead relying almost exclusively on the statistics offered in the Bronson declaration, and the conclusions drawn from it, as sufficient proof of discrimination.  Id., 481 U.S. at 293.  The Supreme Court rejected a statistical approach in McClesky.  Petitioner fails to demonstrate that the decision makers in his case impermissibly considered race in pursuing the death penalty.  This claim fails on the merits, and the state court's denial of this claim was thus neither contrary to nor an unreasonable application of clearly established federal law.  Williams, 529 U.S. at 412-13.  As such, Petitioner's motion for summary judgment is denied.  Further, as Petitioner fails to demonstrate a colorable, factual basis for his allegations of constitutional error in Claim 36, an evidentiary hearing is not warranted. See Baja, 197 F.3d at 1078; Ortiz v. Stewart, 149 F.3d 923, 934 (9th Cir. 1998).

## J.    Claim 37- International Law

In Claim 37, Petitioner asserts that his "conviction and sentence violate international law and the Fifth, Sixth, Eighth and Fourteenth Amendments." (Pet. at 290.)  Specifically, Petitioner alleges that due to the errors set forth in his federal petition and appellate briefs, his conviction and sentence stand in violation of international law, including the Universal Declaration of Human Rights, the

08cv0311

International Covenant on Civil and Political Rights ["ICCPR"], and the American Declaration of the Rights and Duties of Man, and that the imposition and execution of the death penalty in this case would violate the ICCPR. (Id.) Petitioner asserts that his conviction and sentence violate international law because: (1) the errors at trial and on appeal deprived him of his rights to a fair trial and review and (2) the imposition of the death penalty for single victim felony murder violates international law. (Pet. Brief at 268.)  Petitioner contends that to the extent this claim could have been raised by state appellate counsel but was not, he was denied his right to the effective assistance of counsel on appeal. (Pet. at 290.)  Petitioner moves for summary judgment on this claim, or in the alternative, for an evidentiary hearing.  (Mot. at 11-13; 15.)

Petitioner presented this claim to the state court as Claim 31 of his state habeas petition.  The California Supreme Court considered and rejected this claim, stating "All claims are denied on the merits."  (Lodgment No. 19.)  Respondent maintains that the state supreme court's rejection of this claim was reasonable because "California's death penalty law does not violate international norms in contravention of the prohibition on cruel and unusual punishment."  (Ans. at 63.)

A court must give legal effect to a treaty that: (1) confers individual rights and (2) is self-executing.  See Cornejo v. County of San Diego, 504 F.3d 853, 856 (9th Cir. 2007).  Applying this standard, the United States Supreme Court has explicitly stated that "the [Universal] Declaration does not of its own force impose obligations as a matter of international law" and that "although the Covenant [ICCPR] does bind the United States as a matter of international law, the United States ratified the Covenant on the express understanding that it was not self-executing and so did not itself create obligations enforceable in the federal courts." [9] Sosa v. Alvarez-Machain, 542 U.S. 692, 734-35 (2004).  Moreover, several circuit courts, including the Ninth Circuit, have considered and rejected the contention that such international agreements can serve as a source of privately enforceable judicial

---

[9] An examination of the congressional record reveals that the ICCPR was ratified with a declaration that the treaty was not self-executing, and with the express reservation that the United States would continue to implement the death penalty.  See 138 Cong. Rec. S4781, S4783 (daily ed. Apr. 2 1992) ("The Senate's advice and consent is subject to the following reservations. . . the United States reserves the right, subject to its Constitutional constraints, to impose capital punishment on any person (other than a pregnant woman) duly convicted under existing or future laws permitting the imposition of capital punishment. . ."); id. at S4784 ("[T]he United States declares that the provisions of Articles 1 through 27 of the [ICCPR] are not self-executing.")

rights.  See Serra v. Lappin, 600 F.3d 1191, 1197 (9th Cir. 2010) (concluding that the Universal Declaration and the ICCPR "do not confer judicially enforceable rights"); Garza v. Lappin, 253 F.3d 918, 923 (7th Cir. 2001) (stating that "the American Declaration of the Rights and Duties of Man . . . is merely an aspirational document that, in itself, creates no directly enforceable rights."); Wesson v. US Penitentiary Beaumont, Texas, 305 F.3d 343, 348 (5th Cir. 2002) (per curiam); Buell v. Mitchell, 274 F.3d 337, 372 (6th Cir. 2001).  Thus, the United States, in entering these international agreements, clearly intended that the ICCPR, American Declaration and Universal Declaration of Human Rights would not be self-executing.[10]  The Supreme Court has never held any one of these documents to be self-executing.  Accordingly, the California Supreme Court did not err in its application of clearly established federal law by rejecting this claim on state habeas review.

Petitioner also asserts that "[i]nfliction of the death penalty on Petitioner in light of the errors identified would constitute arbitrary deprivation of life in violation of customary international law." (Pet. Brief at 268.)  Even assuming customary international law, also known as *jus cogens*, would prohibit the application of the death penalty in Petitioner's case, it does not create a private right of action.  In Buell v. Mitchell, 274 F.3d 337 (6th Cir. 2001), the Sixth Circuit explained:

> We hold that the determination of whether customary international law prevents a State from carrying out the death penalty, when the State otherwise is acting in full compliance with the Constitution, is a question that is reserved to the executive and legislative branches of the United States government, as it is their constitutional role to determine the extent of this country's international obligations and how best to carry them out.

Id. at 376.

The Ninth Circuit has agreed with this reasoning, holding that "customary international law is not a source of judicially enforceable private rights in the absence of a statute conferring jurisdiction over such claims."  Serra, 600 F.3d at 1197 (declining to imply a private right of action in favor of prisoners alleging government's payment of low wages violated *jus cogens* norms of international law.)  Here too, Petitioner's claim must fail, as he "can point to no statute that brings [his] claim within

---

[10] Petitioner's citation to Trans World Airlines, Inc. v. Franklin Mint Corp., 466 U.S. 243 (1984), is unpersuasive, as that case involved a self-executing treaty, and is thus distinguishable from the present claim regarding the ICCPR, which the Supeme Court held was not self-executing.  See Sosa, 542 U.S. at 734-35.

1   [this Court's] purview." Id.[11]  While the United States is decidedly in the minority among nations in

2   its retention of capital punishment (see Claim 38, infra), Petitioner provides no persuasive evidence,

3   and this Court finds none, demonstrating that the abolition of capital punishment has "risen to the level

4   that the international community as a whole recognizes it as *jus cogens*, or a norm from which no

5   derogation is permitted."  Buell, 274 F.3d at 373.

6       Therefore, the Court must conclude that the California Supreme Court's rejection of this claim

7   on state habeas was objectively reasonable, and the state court did not err in its application of

8   controlling federal law in denying this claim.  Petitioner's motion for summary judgment is denied.

9   Moreover, Claim 37 does not warrant an evidentiary hearing because Petitioner fails to demonstrate

10  that there exists any colorable, factual basis for his allegations of constitutional error.  See Williams

11  v. Calderon, 52 F.3d 1465, 1484 (9th Cir. 1995); Baja, 187 F.3d at 1078.

12  **K.**      **Claim 38- Execution After Lengthy Confinement Under Death Sentence Constitutes**

13           **Cruel and Unusual Punishment**

14       In Claim 38, Petitioner asserts that the "execution of Petitioner after lengthy confinement under

15  sentence of death would constitute cruel and unusual punishment," in violation of the Eighth and

16  Fourteenth Amendments.  (Pet. at 291.)  Petitioner additionally contends that to the extent this claim

17

18      [11]  Petitioner contends that the Supreme Court, in The Paquete Habana, 175 U.S. 677 (1900),
    held that international law "must be considered and administered in United States courts whenever
19  questions of right depending on it are presented for determination," but Petitioner omitted a decisive
    statement from that decision.  (Mot. at 12.)  In that decision, the Supreme Court stated that:

20
         International law is part of our law, and must be ascertained and administered by the
21       courts of justice of appropriate jurisdiction as often as questions of right depending
         upon it are duly presented for their determination. For this purpose, *where there is no*
22       *treaty and no controlling executive or legislative act or judicial decision*, resort must
         be had to the customs and usages of civilized nations, and, as evidence of these, to the
23       works of jurists and commentators who by years of labor, research, and experience
         have made themselves peculiarly well acquainted with the subjects of which they treat.

24
    The Paquete Habana, 175 U.S. at 700 (emphasis added).
25
    Here, there are controlling judicial decisions dictating that neither the cited treaties or documents, nor
26  *jus cogens*, provides a private right of action enforceable in federal court, and the Court is thus
    constrained to apply clearly established federal law in rejecting the instant claim.  Petitioner's citation
27  to Murray v. The Charming Betsy, 6 U.S. 64 (1804), which Petitioner utilizes in arguing that "[t]o the
    extent possible, courts must construe American law as to avoid violating principles of international
28  law," (mot. at 12), is similarly unavailing in light of the Supreme Court's decision in Sosa and Ninth
    Circuit's decision in Serra.

could have been raised by state appellate counsel, he was denied his right to the effective assistance of counsel on appeal.  (Id.)  Petitioner moves for summary judgment on this claim, or in the alternative, for an evidentiary hearing.  (Mot. at 13-15.)

Petitioner presented this claim to the state court as Claim 32 of his state habeas petition.  The California Supreme Court considered and rejected this claim, stating "All claims are denied on the merits."  (Lodgment No. 19.)  Respondent maintains that the state supreme court's rejection of this claim was reasonable because "the time a defendant spends awaiting execution does not amount to cruel and unusual punishment under the Eighth Amendment."  (Ans. at 63.)

Petitioner asserts that the United States "stands virtually alone among the nations of the world in confining individuals for periods of many years while continuously under sentence of death," maintains that such lengthy confinement is cruel and unusual, and adds that confinement under such circumstances also stands in violation of international human rights law.  (Pet. at 293.)

The Supreme Court has never held that execution following a lengthy term of incarceration on death row constitutes cruel and unusual punishment, and has repeatedly declined to address the question.  See Lackey v. Texas, 514 U.S. 1045 (1995) (mem.) (Stevens, J., discussing denial of certiorari and observing that the claim has not been addressed, noting "the Court's denial of certiorari does not constitute a ruling on the merits"); see also Thompson v. McNeil, ___ U.S. ___, 129 S.Ct. 1299 (2009) (mem.); Smith v. Arizona, 552 U.S. 985 (2007) (mem.); Foster v. Florida, 537 U.S. 990 (2002) (mem.).

Nevertheless, several circuit courts, including the Ninth Circuit, have specifically addressed this issue, and have each steadfastly rejected this claim, often citing the lack of any Supreme Court precedent supporting the claim.  See Allen v. Ornoski, 435 F.3d 946, 958-60 (9th Cir. 2006) (collecting cases) (observing that "[t]he Supreme Court has never held that execution after a long tenure on death row is cruel and unusual punishment" and that Petitioner "cannot credibly claim that there is any clearly established law, as determined by the Supreme Court, which would support his Lackey claim"), citing White v. Johnson, 79 F.3d 432, 437-39 (5th Cir. 1996) (noting that "[t]he state's interest in deterrence and swift punishment must compete with its interest in insuring that those who are executed receive fair trials with constitutionally mandated safeguards. . . White has benefited from

1   this careful and meticulous process and cannot now complain that the expensive and laborious process

2   of habeas corpus appeals which exists to protect him has violated other of his rights"); see also

3   Thompson v. Secretary for Department of Corrections, 517 F.3d 1279, 1284 (11th Cir. 2008)

4   ("Especially given the total absence of Supreme Court precedent that a prolonged stay on death row

5   violates the Eighth Amendment guarantee against cruel and unusual punishment, we conclude that

6   execution following a 31-year term of imprisonment is not in itself a constitutional violation.").

7       Petitioner acknowledges that the Ninth Circuit has rejected claims of this type in the past, such

8   as in Richmond v. Lewis, 948 F.2d 1473 (9th Cir. 1990), vacated on other grounds, 986 F.2d 1583 (9th

9   Cir. 1993), but asserts simply that "that rejection was deprived of persuasive force when the Arizona

10  Supreme Court subsequently reduced Richmond's death sentence to a sentence of imprisonment

11  because he had changed during his excessively long confinement on death row." (Pet. Brief at 269.)

12  As an initial matter, the Court notes that Petitioner's conclusion represents only a partial account of

13  the state court's ruling, which was considerably more nuanced than Petitioner suggests.

14      The Arizona Supreme Court's decision in State v. Richmond, 886 P.2d 1329 (Ariz. 1994),

15  cited *several* factors that led to its decision to commute the sentence, such as changes in law that had

16  occurred since the date of the original offense, which led to the possibility of considering new

17  information in sentencing Richmond in the event of a remand, and concluded:

18      It is against this backdrop of competing interests that we endeavor to dispassionately
        review and reweigh the evidence . . . As our analysis demonstrates, capital sentencing
19      law has undergone significant change since Richmond committed his offense.  The
        resulting legal maze makes it troublesome for us to reaffirm his death sentence in a
20      sensible and nonarbitrary manner.  This difficulty, together with evidence that [the]
        defendant has apparently changed since his crime, persuades us that we should reduce
21      his sentence to life in prison and bring an end to this unfortunate saga.

22  Id., 886 P.2d at 1334 (footnote omitted), abrogated on other grounds by State v. Mata, 916 P.2d 1035

23  (Ariz. 1996).

24      _____ Moreover, the Arizona Supreme Court decision in State v. Richmond does not deprive the

25  Ninth Circuit's decision in Richmond v. Lewis of its precedential value, nor does it effectively counter

26  the large number of United States Supreme Court decisions repeatedly declining to hold that a lengthy

27  incarceration on death row constitutes a due process violation.  In fact, the Ninth Circuit has

28  specifically indicated that "[a]lthough the opinion was subsequently vacated, Richmond [v. Lewis]

1   remains persuasive authority. . ." McKenzie v. Day, 57 F.3d 1493, 1494 (9th Cir. 1995) (en banc)[12].

2   In the absence of any United States Supreme Court decision supporting Petitioner's contention, this

3   Court shall follow clearly articulated Ninth Circuit precedent, and reject Petitioner's argument on the

4   merits.

5        As an extension of the argument advanced in Claim 37, Petitioner asserts that his lengthy

6   confinement under sentence of death violates both "customary international law and article 7 of the

7   International Covenant on Civil and Political Rights [ICCPR]." (Pet. Brief at 269.) The Court

8   addressed and rejected the international law claim regarding Petitioner's conviction and sentence in

9   the prior claim (see Claim 37, supra), and reiterates that federal courts and Congress have explicitly

10  held that the ICCPR is not self-executing, and that in ratifying the treaty, the United States Senate filed

11  specific reservations expressing a specific intention to continue to charge, prosecute and impose the

12  death penalty on criminal defendants in this country. See 138 Cong. Rec. S4781, S4783-84. Thus,

13  Petitioner's argument with respect to the ICCPR is without merit.

14       Petitioner also asserts that "[t]he prohibition against the imposition of torture and cruel,

15  inhuman, and degrading treatment and punishment is a principle of *jus cogens* which is not subject to

16  derogation and overrides any principle of domestic law, state or federal, to the contrary." (Pet. at 294.)

17  Notwithstanding Petitioner's protestations to the contrary, as *jus cogens* does not imply a private right

18

19       [12] In McKenzie, the Ninth Circuit "adopted [Richmond's] analysis of this issue as our own,"
    in rejecting an inmate's claim that "to execute him after the great delay that has occurred between his

20  conviction and date of execution (20 years), combined with the repeated resetting of his execution date
    (8 times), and the allegedly unconstitutional conditions of his confinement" would constitute cruel and

21  unusual punishment, quoting from Richmond as follows:

22       A defendant must not be penalized for pursuing his constitutional rights, but he also
         should not be able to benefit from the ultimately unsuccessful pursuit of those rights.

23       It would indeed be a mockery of justice if the delay incurred during the prosecution of
         claims that fail on the merits could itself accrue into a substantive claim to the very

24       relief that had been sought and properly denied in the first place. If that were the law,
         death-row inmates would be able to avoid their sentences simply by delaying

25       proceedings beyond some threshold amount of time, while other deathrow [sic]
         inmates-less successful in their attempts to delay-would be forced to face their

26       sentences. Such differential treatment would be far more "arbitrary and unfair" and
         "cruel and unusual" than the current system of fulfilling sentences when the last in the

27       line of appeals fails on the merits. We thus decline to recognize Richmond's lengthy
         incarceration on death row during the pendency of his appeals as substantively and

28       independently violative of the Constitution.

    McKenzie, 57 F.3d at 1493-94.

of action and this Court declines to construe one, the Court must reject Petitioner's contention that lengthy confinement under sentence of death violates customary international law.  See Claim 37, supra; Serra, 600 F.3d at 1197.[13]

Accordingly, the state supreme court's denial of this claim was neither contrary to nor an unreasonable application of clearly established federal law.[14]  Williams, 529 U.S. at 412-13. Petitioner's motion for summary judgment is denied.  As Petitioner fails to demonstrate a colorable, factual basis for his allegations of constitutional error, an evidentiary hearing is not warranted on Claim 38.  See Baja, 197 F.3d at 1078; Ortiz, 149 F.3d at 934.

## VI.    CERTIFICATE OF APPEALABILITY

The Anti-Terrorism and Effective Death Penalty Act ("AEDPA") amended 28 U.S.C. § 2253 to require a "certificate of appealability" ["COA"] in order to take an appeal from the denial of a section 2254 petition on a claim-specific basis.  Specifically, section 2253(c) provides:

> (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from–
>
> > (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
> >
> > (B) the final order in a proceeding under section 2255.
>
> (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

---

[13] Petitioner's cited decisions involving capital cases from the countries of Jamaica, Zimbabwe and the United Kingdom (see Mot. at 14) do not alter or inform this Court's analysis, as this Court's review is limited to whether the state court's adjudication of Petitioner's claim was contrary to, or an unreasonable application of, clearly established federal law.  In conducting its review, as stated in section IV.A , supra, this Court looks to United States Supreme Court precedent, and to Ninth Circuit decisions for persuasive authority in applying Supreme Court precedent.  See Williams, 529 U.S. at 412-13; Davis, 384 F.3d at 638.

[14] Petitioner's citation to the Unites States Supreme Court decision in Roper v. Simmons, 543 U.S. 551 (2005), is unavailing, as the Court's holding was limited to a prohibition on the execution of individuals who had committed their offenses as juveniles, based in part on overwhelming international disapproval and disuse of the practice, acknowledging that "it is fair to say that the United States now stands alone in a world that has turned its face against the juvenile death penalty." Id., 543 U.S. at 577.  The Court cannot draw similar parallels to the instant claim, noting that 58 countries presently retain the death penalty in law or in practice. See Amnesty International- Abolitionist and retentionist countries, http://www.amnesty.org/en/death-penalty/abolitionist-and-retentionist-countries.

(3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

The Supreme Court has elaborated on the application of this requirement, stating that "[w]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy section 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000); see also Miller-El v. Cockrell, 537 U.S. 322, 327 (2003) ("Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that Petitioner will not prevail.")

Additionally, the Supreme Court has stated that a claim may also warrant a certificate of appealability when the "questions are adequate to deserve encouragement to proceed further." Barefoot v. Estelle, 463 U.S. 880, 893 (1983), overruled in part on other grounds, Lindh v. Murphy, 521 U.S. 320 (1997). Mindful of the "relatively low" threshold for granting a certificate of appealability, Jennings v. Woodford, 290 F.3d 1006, 1010 (9th Cir. 2002), and that a petitioner does not need to demonstrate "that he should prevail on the merits," Lambright v. Stewart, 220 F.3d 1022, 1025 (9th Cir. 2000), the Court finds Claims 27, 28, 36, and 38 suitable for a COA.

## VII.  CONCLUSION

For the reasons discussed above, Petitioner's motion for summary judgment, or in the alternative for an evidentiary hearing, on Claims 27, 28, 36, 37, and 38 [Doc. No. 68] is **DENIED**. The Court additionally concludes that habeas relief is not warranted on Claims 21-22, 24-28, 34, and 36-38, and **DENIES** those claims on the merits.

The Court will, in the final order, **GRANT** a COA on Claims 27, 28, 36, and 38 and **DENY** a COA on Claims 21-22, 24-26, 34 and 37.

**IT IS SO ORDERED.**

DATED:  March 22, 2011

*Larry A. Burns*

**HONORABLE LARRY ALAN BURNS**
United States District Judge