1
2
3
4
5
6
7
8                        **UNITED STATES DISTRICT COURT**
9                      **SOUTHERN DISTRICT OF CALIFORNIA**
10

11   TERRY BEMORE,                            CASE NO. 08cv0311 LAB (WVG)
12                          Petitioner,       *DEATH PENALTY CASE*
13                                            **ORDER:**
14                                            **(1) DENYING PETITIONER'S**
                                              **MOTION FOR EVIDENTIARY**
15        vs.                                 **HEARING ON CLAIMS 1-20, 23, AND**
                                              **30-33 [Doc. No. 69];**
16
                                              **(2) DENYING RESPONDENT'S**
17                                            **REQUEST TO DISMISS CLAIM 19**
                                              **AND 23 ON THE BASIS OF**
18                                            **PROCEDURAL DEFAULT;**
19   KEVIN CHAPPELL, Acting Warden of San     **(3) DENYING HABEAS RELIEF ON**
     Quentin State Prison,                    **CLAIMS 1-20, 23, AND 29-33**; **AND**
20                          Respondent.
                                              **(4) DENYING PETITIONER'S**
21                                            **MOTION FOR LEAVE TO TAKE**
                                              **DEPOSITIONS [Doc. No. 110]**
22
23
24        Presently before the Court is Petitioner's motion for an evidentiary hearing on Claims 1-20,
25   23 and 30-33 [Doc. No. 69] and Respondent's request to dismiss Claims 19 and 23 on the basis of
26   state procedural bars. Respondent opposes Petitioner's motion for an evidentiary hearing and requests
27   dismissal of all claims. The Court held oral argument on Friday, September 14, 2012, at which
28   Petitioner conceded that an evidentiary hearing was not necessary on Claim 13, 15, 17, 19-20, 23, and

30-32.  For the reasons discussed below, Respondent's request for dismissal of Claims 19 and 23 on procedural default grounds is **DENIED**, Petitioner's motion for an evidentiary hearing on Claims 1-12, 14, 16, 18, and 33 is **DENIED**, habeas relief is **DENIED** as to Claims 1-20, 23, and 29-33, and Petitioner's motion for leave to take depositions is **DENIED**.

# I. <u>PROCEDURAL HISTORY</u>

On June 6, 1989, Petitioner was convicted of the August 26, 1985 murder and robbery of Kenneth Muck and robbery of the Aztec Liquor Store in San Diego.  Specifically, Petitioner was convicted of one count of first-degree murder, one count of robbery, and one count of burglary.  In addition, the jury found true two special circumstance allegations - murder in the commission of a robbery and murder involving the infliction of torture.  On August 7, 1989, the jury returned a sentence of death.  On November 2, 1989, the trial court denied Petitioner's motions for a new trial and for modification of the sentence, and sentenced him to death.

On automatic appeal (hereinafter "direct appeal") of his conviction and judgment to the California Supreme Court, Petitioner's conviction and sentence were affirmed in a decision issued on April 20, 2000.  <u>People v. Bemore</u>, 22 Cal. 4th 809 (2000).  The California Supreme Court subsequently denied Petitioner's request for a rehearing, and on January 8, 2001, the Supreme Court of the United States denied his petition for a writ of certiorari.

On June 19, 2000, Petitioner filed a habeas petition with the California Supreme Court.  The petition was denied on October 17, 2007 without an evidentiary hearing.

On January 13, 2009, Petitioner filed his Petition for a Writ of Habeas Corpus and attached exhibits with this Court, the operative pleading in this action.[1]  Petitioner subsequently dropped Claim 35, the one unexhausted claim in his Petition, and on November 4, 2009, Respondent filed an Answer.

On March 17, 2010, Petitioner filed a Motion for Summary Judgment and/or an Evidentiary Hearing on Claims 27-28 and 36-38 of the Petition, an Opening Brief ["Pet. Brief"], and a Motion for an Evidentiary Hearing on Claims 1-20, 23, and 30-33 of the Petition ["Mot."].  On June 7, 2010, Respondent filed a Merits Brief Opposing Petitioner's Motions ["Opp."], and on August 4, 2010,

---

[1] In citing to the filings in this case, the Court uses the pagination found in the Southern District's electronic docket, in which all page numbers are located on the top right-hand side of each document.

Petitioner filed a Reply.  On March 22, 2011, the Court denied Petitioner's Motion for Summary Judgment and/or an Evidentiary Hearing on Claims 27-28 and 36-38, and denied habeas relief on Claims 21-22, 24-28, 34, and 36-38.  (See Doc. No. 88.)

## II.  TRIAL PROCEEDINGS

The Court incorporates by reference the overview of the evidence presented during the guilt and penalty phases of trial as detailed in the Order on Petitioner's Motion for Summary Judgment issued on March 22, 2011.  (See Doc. No. 88.)

## III.  PETITIONER'S CLAIMS

In order to provide a structure for the Court's discussion of Petitioner's habeas claims, set forth below is a list of the claims contained in the federal Petition along with a parenthetical noting whether the claim was previously raised on direct appeal[2], in the state habeas petition, or both.  The claims are as follows:

Claim 1 -    Fraud of Trial Counsel - Obtaining and Using Defense Funds (previously raised as claim 1 of state habeas petition)

Claim 2 -    Conflict of Interest of Trial Counsel - Misappropriation of Funds (previously raised as claim 2 of state habeas petition)

Claim 3 -    Conflict of Interest of Trial Counsel - Fraud of Investigator Small (previously raised as claim 3 of state habeas petition)

Claim 4 -    Conflict of Interest of Trial Counsel - Gambling Habit of Lead Counsel (previously raised as claim 4 of state habeas petition)

Claim 5 -    Conflict of Interest of Trial Counsel - Racism of Lead Counsel (previously raised as claim 5 of state habeas petition)

Claim 6 -    Conflict of Interest of Trial Counsel - Cumulative Effect of Conflicts (previously raised as claim 6 of state habeas petition)

Claim 7 -    Ineffective Assistance of Trial Counsel - Failure to Investigate and Present Mental Defenses at the Guilt Phase (previously raised as part of claim 7 of state habeas petition)

---

[2] In citing to claims raised on direct appeal, the Court uses the Roman numerals found in that filing.

| | | |
|---|---|---|
| 1 | Claim 8 - | Ineffective Assistance of Trial Counsel - Failure to Challenge Torture Special |
| 2 | | Circumstance (previously raised as claim 8 of state habeas petition) |
| 3 | Claim 9 - | Ineffective Assistance of Trial Counsel - Failure to Investigate and Present Evidence |
| 4 | | of Petitioner's Mental Incompetence at Trial (previously raised as claim 9 of state |
| 5 | | habeas petition) |
| 6 | Claim 10 - | Ineffective Assistance of Trial Counsel - Alibi Defense (previously raised as claim 10 |
| 7 | | of state habeas petition) |
| 8 | Claim 11 - | Ineffective Assistance of Trial Counsel - Performance in Selecting the Jury (previously |
| 9 | | raised as claim II on direct appeal and claim 11 of state habeas petition) |
| 10 | Claim 12 - | Ineffective Assistance of Trial Counsel - Witness Latonya Wadley (previously raised |
| 11 | | as claim 12 of state habeas petition) |
| 12 | Claim 13 - | Ineffective Assistance of Trial Counsel - Failure to Move for Mistrial on Juror's Out- |
| 13 | | of-Court Experiment (previously raised as claim 13 of state habeas petition) |
| 14 | Claim 14 - | Ineffective Assistance of Trial Counsel - Failure to Investigate and Present Mitigation |
| 15 | | Evidence at the Penalty Phase (previously raised as part of claim 7 of state habeas |
| 16 | | petition) |
| 17 | Claim 15 - | Ineffective Assistance of Trial Counsel - Failure in Presenting Evidence on Petitioner's |
| 18 | | Life in Custody (previously raised as claim IV on direct appeal) |
| 19 | Claim 16 - | Ineffective Assistance of Trial Counsel - Failure to Investigate Uncharged Carlton |
| 20 | | Rape (previously raised as claim 14 of state habeas petition) |
| 21 | Claim 17 - | Ineffective Assistance of Trial Counsel - Testimony of Sarah Parker (previously raised |
| 22 | | as claim 15 of state habeas petition) |
| 23 | Claim 18 - | Ineffective Assistance of Trial Counsel - Cumulative Effect (previously raised as claim |
| 24 | | 16 of state habeas petition) |
| 25 | Claim 19 - | Brady Violation - Testimony of Investigator Cooksey (previously raised as claim 17 |
| 26 | | of state habeas petition) |
| 27 | Claim 20 - | Brady Violation - Failure to Disclose Favorable Treatment Given to Witnesses |
| 28 | | (previously raised as claim 18 of state habeas petition) |

08cv0311

| | | |
|---|---|---|
| 1 | Claim 23 - | Juror Misconduct - Juror Albarrin's Out-of-Court Experiment (previously raised as |
| 2 | | claim 20 of state habeas petition) |
| 3 | Claim 29 - | State Delay in Appointing Counsel and Interference With Attorney-Client Relationship |
| 4 | | (previously raised as claim 24 of state habeas petition) |
| 5 | Claim 30 - | Ineffective Assistance of Appellate Counsel (previously raised as claim 25 of state |
| 6 | | habeas petition) |
| 7 | Claim 31 - | Conflict of Interest of Appellate Counsel (previously raised as claim 26 of state habeas |
| 8 | | petition) |
| 9 | Claim 32 - | State Supreme Court Erred in Failing to Find Trial Counsel Prejudicially Ineffective |
| 10 | | During Voir Dire (previously raised as claim 27 of state habeas petition) |
| 11 | Claim 33 - | State Supreme Court's Denial of Petitioner's Constitutional Rights (previously raised |
| 12 | | as claim 28 of state habeas petition) |

## IV.  PROCEDURAL DEFAULT

Of the claims adjudicated in this Order, Respondent contends that Claims 7 ¶ K, 12, 13, 19, 20 and 23 are procedurally barred.  The Court has previously concluded that Claims 7 ¶ K, 12, 13 and 20 were denied by the California Supreme Court solely on the merits, and that there are no procedural bars to prevent the Court's review of those claims on the merits.  (Doc. No. 88 at 35.)  Claims 19 and 23 may be procedurally defaulted, however.[3]

Established precedent in this Circuit dictates that a court's decision on the issue of procedural default is to be informed by furthering "the interests of comity, federalism, and judicial efficiency." Boyd v. Thompson, 147 F.3d 1124, 1127 (9th Cir. 1998).  Thus, where, as here, deciding the merits of a claim proves to be less complicated and less time-consuming than adjudicating the issue of procedural default, a court may exercise discretion in its management of the case to reject the claims on their merits and forgo an analysis of cause and prejudice.  See Batchelor v. Cupp, 693 F.2d 859,

---

[3] The Court incorporates by reference the discussion of procedural default contained in the March 22, 2011 Order.  (See Doc. No. 88 at 35-37.)  As with Claims 21 and 24-26, Respondent has met the initial burden under Bennett v. Mueller, 322 F.3d 573, 585 (9th Cir. 2003), but Petitioner has not attempted to meet the interim burden.  (Id.)  As such, the procedural bars stand unless Petitioner is able to demonstrate cause and prejudice, or that a fundamental miscarriage of justice will result if the claims are not considered.  (Id.)  Such an analysis would require a detailed analysis of these two claims.

08cv0311

864 (9th Cir. 1982); see also Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002) (citing Lambrix v. Singletary, 520 U.S. 518, 525 (1997)).

As set forth below, Claims 19 and 23 fail on their merits. Accordingly, the Court declines to reach the issue of whether they are procedurally defaulted. While the Court acknowledges that it could not grant relief on a claim found to be procedurally defaulted absent a showing of cause and prejudice or a fundamental miscarriage of justice, it is not prevented from addressing the merits of these claims and denying them based on a merits review.

## V. STANDARDS OF REVIEW AND CLEARLY ESTABLISHED LAW

### A.     Standard of Merits Review

Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in *violation of the Constitution or laws or treaties of the United States.*

28 U.S.C.A. § 2254(a) (West 2006) (emphasis added).

As Petitioner filed his request for appointment of counsel and stay of execution on February 15, 2008 and filed his petition with this Court on January 13, 2009, the Anti-terrorism and Effective Death Penalty Act of 1996 ["AEDPA"] applies to his case. See Lindh v. Murphy, 521 U.S. 320, 336 (1997) (holding that the provisions of AEDPA "generally apply only to cases filed after the Act became effective" on April 24, 1996.)

Relevant to this case are the changes AEDPA rendered to 28 U.S.C. § 2254(d), which now reads:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
> > (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254(d)(1)-(2) (West 2006).

A decision is "contrary to" clearly established law if it fails to apply the correct controlling authority, or if it applies the controlling authority to a case involving facts materially indistinguishable from those in a controlling case, and reaches a different result. See Williams v. Taylor, 529 U.S. 362, 413 (2000). A decision involves an "unreasonable application" of federal law if "the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." Id.; Bruce v. Terhune, 376 F.3d 950, 953 (9th Cir. 2004).

Even when the federal court undertakes an independent review of the record in the absence of a reasoned state court decision, the federal court must "still defer to the state court's ultimate decision." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002). If the state court decision does not furnish any analytical foundation, the review must focus on Supreme Court cases to determine "whether the state court's resolution of the case constituted an unreasonable application of clearly established federal law." Greene v. Lambert, 288 F.3d 1081, 1089 (9th Cir. 2001). Federal courts also look to Ninth Circuit law for persuasive authority in applying Supreme Court law, and to determine whether a particular state court decision is an "unreasonable application" of Supreme Court precedent. Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. ___, 131 S.Ct. 770, 786 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

Of the claims adjudicated in this Order, Claims 1-14, 16-20, 23, and 29-33 were each denied on the merits by the California Supreme Court in an October 2007 Order which stated in relevant part:

> The petition for writ of habeas corpus, filed June 19, 2000, is denied. All claims are denied on the merits. Except insofar as they assert ineffective assistance of trial counsel, Claims 21, 22, and 23 [Claims 24, 25, and 26 in the federal Petition] are barred under *In re Dixon* (1953) 41 Cal.2d 756, 759 because they could have been, but were not, raised on appeal. Except insofar as they assert ineffective assistance of trial counsel, Claims 17, 19, and 20 [Claims 19, 21, and 23 in the federal Petition] are barred under *In re Seaton* (2004) 34 Cal.4th 193, 199-200 because they were not properly preserved in the trial court. George, C.J., was absent and did not participate.

(Lodgment No. 19.)

Because these Claims were denied on the merits without a statement of reasoning, the Court will conduct an independent review of the record with respect to Claims 1-14, 16-20, 23 and 29-33

08cv0311

in order "to determine whether the state court clearly erred in its application of Supreme Court Law." See Pirtle, 313 F.3d at 1167; see also Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000) (in the absence of a reasoned decision by the state court, "[o]nly by [an independent review of the record] may we determine whether the state court's decision was objectively unreasonable.")  With respect to the remaining claims, which as set forth in the discussion of Claims 11[4] and 15, the state supreme court denied in a reasoned decision, the Court will determine whether that adjudication was contrary to, or an unreasonable application of, clearly established federal law, or whether it was based upon an unreasonable determination of the facts.

**B.**  **Standard for Evidentiary Hearing**

AEDPA also limited the circumstances under which district courts may grant an evidentiary hearing.  Section 2254(e)(2) provides:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing unless the applicant shows that–
> (A) the claim relies on--
>   (i)  a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>   (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C.A. § 2254(e)(2) (West 2006).

Under AEDPA, when determining whether to grant an evidentiary hearing, the district court must first ascertain whether the petitioner has failed to develop the factual basis of a claim in state court.  Insyxiengmay v. Morgan, 403 F.3d 657, 670 (9th Cir. 2005).  As explained by the Supreme Court:

> For state courts to have their rightful opportunity to adjudicate federal rights, the prisoner must be diligent in developing the record and presenting, if possible, all claims of constitutional error.  If the prisoner fails to do so, himself or herself contributing to

---

[4] Aspects of Claim 11 were raised on both direct appeal and state habeas review and therefore, to the extent that the California Supreme Court issued a reasoned opinion on certain contentions, the Court will review the state supreme court's direct appeal opinion in order to determine, pursuant to section 2254(d), whether its adjudication was contrary to, or an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts.  See Williams, 529 U.S. at 413.

1    the absence of a full and fair adjudication in state court, § 2254(e)(2) prohibits an
2    evidentiary hearing to develop the relevant claims in federal court, unless the statute's
     other stringent requirements are met.

3    Williams v. Taylor, 529 U.S. 420, 437 (2000).

4          If the petitioner has not failed to develop the facts in state court, an evidentiary hearing is

5    required if (1) the petitioner establishes a colorable claim for relief – i.e., petitioner alleges facts that,

6    if proven, would entitle him to habeas relief; and (2) the petitioner did not receive a full and fair

7    opportunity to develop those facts. Earp v. Ornoski, 431 F.3d 1158, 1167 (9th Cir. 2005). The second

8    requirement is met by a showing that:

9          (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state
           factual determination is not fairly supported by the record as a whole; (3) the
10         fact-finding procedure employed by the state court was not adequate to afford a full and
           fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the
11         material facts were not adequately developed at the state-court hearing; or (6) for any
           reason it appears that the state trier of fact did not afford the habeas applicant a full and
12         fair hearing.

13   Townsend v. Sain, 372 U.S. 293, 312 (1963), overruled on other grounds by Keeney v. Tamayo-Reyes,

14   504 U.S. 1 (1992).

15         However, the United States Supreme Court recently held that for claims previously decided

16   on the merits by a state court a federal habeas court's "review under § 2254(d)(1) is limited to the

17   record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster,

18   563 U.S. ___, 131 S.Ct. 1388, 1398 (2011). The Supreme Court also noted that "[a]lthough state

19   prisoners may sometimes submit new evidence in federal court, AEDPA's statutory scheme is

20   designed to strongly discourage them from doing so." Id. at 1401. Under Pinholster, it does not serve

21   the interests of judicial economy to grant or hold an evidentiary hearing prior to conducting a review

22   under section 2254(d). The Court will therefore conduct a section 2254(d) review concurrent with the

23   evaluation of whether Petitioner's federal habeas claims warrant an evidentiary hearing.

24   **C.    Ineffective Assistance of Counsel**

25         In Claims 7-18 and 30, Petitioner alleges multiple instances of ineffective assistance of trial

26   and state appellate counsel. Generally, to prevail on a claim alleging ineffective assistance of counsel,

27   a petitioner must demonstrate (1) that counsel "made errors so serious that counsel was not functioning

28   as the 'counsel' guaranteed the defendant by the Sixth Amendment," and (2) that "the deficient

                                                          9

1   performance prejudiced the defense." Campbell v. Wood, 18 F.3d 662, 673 (9th Cir. 1995) (quoting
2   Strickland v. Washington, 466 U.S. 668, 687 (1984)).

3          To establish deficient performance, Petitioner must demonstrate that the representation he
4   received "fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688. Moreover,
5   due to the difficulties inherent in evaluating the contested behavior from counsel's perspective at the
6   time, there exists a strong presumption that counsel's conduct "falls within the wide range of
7   reasonable professional assistance." Id. at 689. Thus, Petitioner must overcome the presumption that
8   the challenged action might be considered sound trial strategy. Id.

9          To establish prejudice, Petitioner must demonstrate that "there is a reasonable probability that,
10  but for counsel's unprofessional errors, the result of the proceeding would have been different." Id.
11  at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome."
12  Id. In addition, individual deficiencies that may not by themselves meet the Strickland prejudice
13  standard may, when considered cumulatively, constitute sufficient prejudice to justify granting the
14  writ. Harris v. Wood, 64 F.3d 1432, 1438 (9th Cir. 1995).

15         The process of determining penalty phase prejudice requires courts to "evaluate the totality of
16  the available mitigation evidence – both that adduced at trial, and the evidence adduced in the habeas
17  proceeding – in reweighing it against the evidence in aggravation." Williams (Terry Williams) v.
18  Taylor, 529 U.S. 362, 397-98 (2000). A court "must carefully weigh the mitigating evidence (both that
19  which was introduced and that which was omitted or understated) against the aggravating evidence,"
20  and then determine whether there is a reasonable probability that the sentencer "would have concluded
21  that the balance of the aggravating and mitigating circumstances did not warrant death." Mayfield v.
22  Woodford, 270 F.3d 915, 928 (9th Cir. 2001) (quoting Strickland, 466 U.S. at 695).

23         Moreover, when a federal habeas court is reviewing a claim of ineffective assistance of counsel
24  previously adjudicated on the merits by a state court, the Supreme Court has recently reasserted that:

25         The pivotal question is whether the state court's application of the Strickland standard
           was unreasonable. This is different from asking whether defense counsel's performance
26         fell below Strickland's standard. Were that the inquiry, the analysis would be no
           different than if, for example, this Court were adjudicating a Strickland claim on direct
27         review of a criminal conviction in a United States district court. Under AEDPA,
           though, it is a necessary premise that the two questions are different. For purposes of
28         § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect

                                                    10

1    application of federal law." <u>Williams</u>, <u>supra</u>, at 410, 120 S.Ct. 1495. A state court must
2    be granted a deference and latitude that are not in operation when the case involves
    review under the <u>Strickland</u> standard itself.

3  <u>Richter</u>, 131 S.Ct. at 785.

4        With respect to Claims 1-20, 23, 29, and 32-33, Petitioner contends that to the extent these

5  claims could have been raised by state appellate counsel, he was denied his right to the effective

6  assistance of counsel on appeal.  As with the above standard, in order to warrant relief, Petitioner must

7  demonstrate that appellate counsel's failure to raise these issues on appeal constitutes an error so

8  serious that "there is a reasonable probability that, but for counsel's unprofessional errors, the result

9  of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694.

10       However, it is well-established that when filing an appeal, "counsel has no constitutional

11  obligation to raise every non-frivolous issue requested by the defendant." <u>Miller v. Keeney</u>, 882 F.2d

12  1428, 1434 (9th Cir. 1989) (citing <u>Jones v. Barnes</u>, 463 U.S. 645, 751-54 (1983)).  Moreover, the

13  Ninth Circuit has held that "[t]he failure to raise a meritless legal argument does not constitute

14  ineffective assistance of counsel." <u>Baumann v. United States</u>, 692 F.2d 565, 572 (9th Cir. 1982); <u>see</u>

15  <u>also</u> <u>Boag v. Raines</u>, 769 F.2d 1341, 1344 (9th Cir. 1985).

16  **D.**    **Conflict of Interest**

17       In Claims 1-6 and 31, Petitioner asserts multiple instances of trial and appellate counsel's

18  conflicts of interest that affected their representation.  To establish an ineffective assistance of counsel

19  claim based on a conflict of interest, he must demonstrate that: (1) counsel actively represented

20  conflicting interests and, (2) an actual conflict of interest adversely affected counsel's performance.

21  <u>Cuyler v. Sullivan</u>, 446 U.S. 335, 348-50 (1980).  In contrast to a general claim of ineffective

22  assistance of counsel, if he is able to satisfy both prongs under <u>Sullivan</u>, prejudice is presumed.  <u>See</u>

23  <u>id.</u> at 349-50 (a petitioner who can demonstrate "that a conflict of interest actually affected the

24  adequacy of his representation need not demonstrate prejudice") (citing <u>Holloway v. Arkansas</u>, 435

25  U.S. 475, 487-91 (1978)).

26       An attorney's simultaneous representation of multiple defendants may give rise to a conflict

27  of interest, as can a case of successive representation.  <u>Mannhalt v. Reed</u>, 847 F.2d 576, 580 (9th Cir.

28  1988).  While the Supreme Court has found that the applicability of <u>Sullivan</u> to attorney ethical

conflicts remains an open question, the Court recognized that circuit courts have applied it "unblinkingly" to a wide variety of alleged conflicts.  See Mickens v. Taylor, 535 U.S. 162, 174 (2002); see also Earp v. Ornoski, 431 F.3d 1158, 1184 fn. 23 (9th Cir. 2005) (collecting cases).  For instance, the Ninth Circuit has held that an attorney's private financial interests may constitute an actual conflict of interest.  See United States v. Hearst, 638 F.2d 1190, 1194-95 (9th Cir. 1980) (attorney's private book deal regarding client's case created a potential conflict of interest); Quintero v. United States, 33 F.3d 1133, 1135 (9th Cir. 1994) (attorney accepting compensation for representation from a third party created a potential conflict of interest).

To establish the second prong under Sullivan, Petitioner must demonstrate that the conflict actually "affected the counsel's performance, as opposed to a mere theoretical division of loyalties." Mickens, 535 U.S. at 171.  In other words, he must show that "some effect on counsel's handling of particular aspects of the trial was 'likely.'"  United States v. Miskinis, 966 F.2d 1263, 1268 (9th Cir. 1992).  The Ninth Circuit has clarified that the adverse effect "must be one that significantly worsens counsel's representation of the client before the court or in negotiations with the government," reasoning that a conflict limited to causing problems in the attorney-client relationship but without a significant impact on counsel's representation is insufficient to constitute an adverse effect under Sullivan.  United States v. Mett, 65 F.3d 1531, 1535-36 (9th Cir. 1995).

## VI. DISCUSSION

The claims adjudicated in this Order consist of numerous allegations against trial counsel, including fraud, conflicts of interest, and ineffective assistance in investigating and preparing for trial, during voir dire, and at the guilt and penalty phases of Petitioner's trial.  Petitioner also alleges Brady error, prosecutorial misconduct, juror misconduct, and he asserts multiple claims of error by state appellate counsel and the state supreme court.

Petitioner moves for an evidentiary hearing on Claims 1-20, 23, and 30-33, but does not seek an evidentiary hearing on Claim 29.  Respondent seeks the denial and dismissal of all claims in the federal petition without an evidentiary hearing.

///

///

08cv0311

1    **A.    Claim 1 - Fraud of Trial Counsel - Obtaining and Using Defense Funds**

2        In Claim 1, Petitioner contends that lead defense counsel "(a) fraudulently obtained funds under

3    Penal Code section 987.9, (b) committed perjury in order to mislead the court into granting funds, and

4    (c) failed to use for the defense substantial funds provided by the court," and that second chair counsel

5    "failed to apprise the court and client of the fraud and misconduct upon learning of same," which

6    deprived Petitioner of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments. (Pet. at

7    9.) He primarily relies on the declarations of three individuals: Elizabeth Barranco, Richard Kharas

8    and Jo-Ellan Dimitrius.

9        Elizabeth Barranco, second chair trial counsel, asserts that the court funds for the defense

10   investigator and law clerks were used inappropriately. Ms. Barranco states that in 1987, lead counsel

11   Logan McKechnie told her that the large sums needed for investigation were being spent on

12   investigation into a series of fifty-five robberies, named the "Tall Black Male" series. (Exhibit 3 to

13   Petition ["Ex."] at ¶ 13.) She states that because Petitioner had been charged with several robberies

14   in the series, the defense initially hoped to "disprove petitioner was the 'Tall Black Male' by

15   thoroughly investigating the robberies that were charged along with those that weren't," but the

16   charged robberies were eventually deleted from an amended information filed on January 6, 1989.

17   (Id.) She asserts that the money used to pay investigator Charles H. Small "was simply an excuse and

18   that little if no work was being done to investigate the Tall Black Male series." (Id. at ¶ 14.) Ms.

19   Barranco also alleges that some investigative funds were being directed to investigator Small's wife

20   to "type up transcripts of the various tape recorded interviews provided in discovery," which was

21   "unnecessary since the DA's office also provided transcripts," and that when her law clerks applied

22   for approved payments "the account was dry due to payments to Small." (Id.) Ms. Barranco also

23   alleges that when Small accompanied her on several productive investigative trips, "it became apparent

24   that Mr. Small was suggesting travel to various places for the sole purpose of earning easy money and

25   not for any reason necessary to the case," and states that on several trips, Small overbilled on per diem

26   charges. (Id. at ¶ 17-18.)

27       Richard Kharas, who worked as a law clerk for lead counsel Logan McKechnie from 1987 to

28   1989, states in a 1999 declaration that he never worked on Petitioner's case, but learned through

1    "documents submitted to me by Petitioner's investigator, and habeus [sic] counsel, that Logan had

2    falsely billed my time on the Bemore case."  (Ex. 4 at ¶ 10-11.)  Mr. Kharas asserts that the over

3    $7,000 in bills submitted to the court in his name "was completely fraudulent and perjurious on

4    Logan's part; I never spent so much as one minute on the case."  (Id. at ¶ 11.)  Records submitted by

5    habeas counsel show disbursements to Kharas totaling $7,642.00.  (Ex. 2.)

6         Jury consultant Jo-Ellan Dimitrius states that Mr. McKechnie advised her that she could "tack

7    on" hours to her billing, and when she declined he said, "It does not matter. It is state money."  (Ex.

8    17 at ¶ 18.)  Mr. McKechnie initially suggested a hotel room for her stay in San Diego during the trial,

9    but Ms. Dimitrius felt the hotel was too expensive, and relocated to less costly accommodations.  (Id.)

10        Petitioner asserts that "[t]he fraudulent billing of defense counsel deprived Petitioner of the

11   meaningful utilization of the funds ordered for his defense" and caused harm, such as:

12        a.   Depriving Petitioner of "funds essential for investigative and expert services;"
          b.   Denying Petitioner the "right to conflict-free counsel;"
13        c.   Counsel failed to "adequately investigate and refute the prosecution's evidence
               and arguments presented at the guilt phase;"
14        d.   Counsel "failed to present any defense to the torture-murder special
               circumstance, even though that was successfully done in the prior trial of the
15             co-defendant;"
          e.   Counsel failed to pursue an investigation "for the purpose of combating the
16             torture-murder allegation;"
          f.   "There were insufficient funds available to utilize the available experts who
17             testified in the Cosby case that there was a reasonable doubt as to the torture-
               murder special circumstance;"
18        g.   "There were insufficient funds for the employment and utilization of mental-
               state experts to establish that Petitioner lacked the requisite intent to justify the
19             finding of the torture-murder special circumstance as true;"
          h.   Counsel "failed to investigate and develop available mental defenses that
20             Petitioner did not have the requisite intent for first degree murder or robbery,
               and that he was legally insane;"
21        i.   Counsel "did not have the necessary to employee [sic] and call as witnesses
               essential psychiatric, psychological, neuropsychological and neurological
22             experts;" and
          j.   "There were insufficient funds to investigate and present facts which would
23             have established the available mental defenses."

24   (Pet. Brief at 38-39.)

25        Extensive as this list is, Petitioner fails to show that any of the alleged failures on the part of

26   trial counsel are actually attributable to a lack of funding.  Whether the Court examines Petitioner's

27

28

                                                14                                    08cv0311

1   contentions under the rubric of conflict of interest[5] or ineffective assistance of counsel,[6] he fails to

2   offer any facts indicating that the alleged fraud had a demonstrable affect on the quality of his

3   representation at trial.

4        Petitioner fails to even offer reasoned support for his speculative assertions of harm.  For

5   instance, while Petitioner asserts that there were insufficient funds available to employ the use of

6   expert witnesses or investigative work regarding the torture special circumstance or mental state

7   issues, he utterly fails to provide any factual support for these contentions.  In fact, there is no evidence

8   before this Court that any defense requests for expert or investigative assistance were denied due to

9   a lack of available funds.[7]  To the contrary, a document submitted by Petitioner entitled "987.9 Fund

10  Final Accounting" lists disbursements to eight individuals classified as "Expert" under "Type of

11  Service." (Ex. 2.) These individuals include: Dr. Charles Petty, Dr. Kenneth Fineman, Ph.D., Jo-Ellan

12  Dimitrius, Isabel Wright, Ph.D., Steven Bucky, Ph.D., Dr. James McSweeney, Faye Girsh, and an

13  individual identified only as Scott.  (See id.)  The record also belies Petitioner's contention that there

14  were insufficient funds for multiple avenues of investigation.  According to the fund accounting, while

15  the bulk of investigative funds were paid to Charles Small, disbursements for investigative services

16  were also made to seven other individuals or firms.  (See id.)

17       The information provided by second counsel likewise does not support Petitioner's contention

18  that a lack of funding was the reason for, or a contributing factor in, any failure to present mental

19  defenses.  Instead, Ms. Barranco states that a "lack of experience regarding the presentation of mental

20  health evidence caused me to abandon my initial inquiry into petitioner's mental health condition."

21  (Ex. 3 at ¶ 8.)  And, while anecdotal information provided by Ms. Dimitrius and Ms. Barranco

22

23      [5] Claim 1 is entitled "Fraud of Trial Counsel," and Claims 2-6 are entitled "Conflict of Interest of Trial

24  Counsel."  However, in the arguments advanced regarding Claim 1, Petitioner makes several references to counsel's conflict of interest.  (See Pet. Brief at 38-39; Reply at 12.)

25      [6] Petitioner also alleges that counsel's fraud deprived him of the effective assistance of counsel.  (See

26  Pet. Brief at 39-40.)

27      [7]  The record reveals one mention of a denied request but fails to indicate any reason for the denial. Ms. Barranco states that one of Mr. McKechnie's funding requests was denied, a request for Mr. Small to

28  receive court funds "enabling him to sit in the courtroom observing the trial." (Ex. 3 at ¶ 21.)  At any rate, this does not even appear to be a request for investigative assistance, as there was no mention of any proposed avenues of investigation.

suggests that lead counsel McKechnie and investigator Small indulged freely in court-provided funds that were intended for preparing for and conducting Petitioner's defense at trial, at no point in her thirteen page declaration does Ms. Barranco allege that certain avenues of investigative or expert assistance were discarded or abandoned due to a lack of funding. Not only does Petitioner fail to offer any evidence that requests for funding were denied due to a lack of available funds, but he fails to provide timesheets, work logs, or other means of factual support for his unsubstantiated allegation that the investigator and lead counsel were fraudulently billing and siphoning money from Petitioner's case for their own personal use.

The Court acknowledges that the information regarding Mr. Kharas, taken as true, evinces billing improprieties, but that does not establish that the wrongful disbursement of less than $8,000 of the $293,678.18 spent by Petitioner's defense team left counsel with insufficient funds for investigation or expert assistance in this case. Even given the indication that some of the funds may not have been used as intended, Petitioner has failed to demonstrate that he was prejudiced by counsel's actions. See Strickland, 466 U.S. at 687. Asserting that he was deprived of "essential" services due to lead counsel's actions, without offering any facts tending to show that the alleged financial irregularities contributed to, or caused, the deficient acts alleged, is insufficient to state a colorable claim for relief. See James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief."). The California Supreme Court's rejection of this claim was not an objectively unreasonable application of clearly established federal law. Because Claim 1 fails to state facts which, if true, would entitle Petitioner to habeas relief, an evidentiary hearing is not warranted. See Earp, 431 F.3d at 1167.

## B.   Claim 2 - Conflict of Interest of Trial Counsel - Misappropriation of Funds

In Claim 2, relying on similar allegations as Claim 1, Petitioner asserts that lead trial counsel had a conflict of interest as he "fraudulently obtained defense funds from the court which he converted to his own personal use, rather than to the benefit of his client's defense," and states that "[b]y diverting the funds from use on behalf of Petitioner to his personal use, the attorney rendered it impossible for essential defenses to be developed and presented." thereby violating Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments. (Pet. Brief at 41; Pet. at 23.)

1    Even assuming that counsel's alleged diversion of funds could prove to be an actual conflict

2  of interest, Petitioner has not demonstrated that any such alleged conflict had an adverse impact on

3  counsel's performance.  See Sullivan, 446 U.S. at 348-50.

4    To support this claim, Petitioner reiterates the facts alleged in support of Claim 1.  (Pet. Brief

5  at 41-46.)  He attempts to demonstrate an adverse impact by generally alleging that the fraudulent

6  billing by lead counsel deprived Petitioner of funds for his defense, resulting in counsel's failure to

7  (1) pursue multiple avenues of investigation and (2) utilize the assistance of experts.  Petitioner also

8  asserts that due to the conflict of interest, counsel did not investigate and refute the prosecution's case-

9  in-chief, and failed to undertake an investigation to combat the torture murder allegation.  (Pet at 34.)

10  Claim 2 suffers from the same deficiencies in pleading identified in Claim 1, as no factual support is

11  offered for Petitioner's assertion that any failure to investigate these avenues was due to a lack of

12  available funds, or bears any connection to the alleged financial improprieties of lead counsel.

13    Petitioner also claims that there were "insufficient funds available" to utilize experts that had

14  previously testified in the Cosby case regarding the torture murder special circumstance or to retain

15  mental health experts to testify regarding Petitioner's lack of intent or legal insanity.  (Pet at 35.)  Yet,

16  again, Petitioner does not demonstrate that the failure to retain these experts is attributable to a lack

17  of funds.  Nor does he establish that it was lead counsel's financial conflict of interest that prevented

18  the retention of expert witnesses, rather than a tactical decision by counsel, or even the ineffective

19  assistance of counsel, as discussed in Claim 8.

20    As such, based on an independent review of the record, this Court concludes that the California

21  Supreme Court's rejection of this claim was not an objectively unreasonable application of clearly

22  established federal law.  Thus, neither an evidentiary hearing or habeas relief is warranted.

23  **C.    Claim 3 - Conflict of Interest of Trial Counsel - Fraud of Investigator Small**

24    Petitioner's third claim asserts that lead counsel "had a conflict of interest because he tolerated

25  the fraud of his subordinate, Charles H. Small, in order to conceal his infidelity from his wife."  (Pet.

26  at 36.)  The effect of this alleged chicanery, according to Petitioner, was to deprive him of "essential

27  investigative and expert services, and, viable guilt phase, special circumstance and penalty-phase

28  defenses," in violation of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.  (Id.)

Ms. Barranco relates an incident in which she asserts Mr. Small set up a trip out of state in order to justify fees, and indicates that Mr. Small often overstated or double-billed per diem amounts. (Ex. 3 at ¶¶ 17-18.) Ms. Barranco also states that she discovered Mr. Small "was paid in advance from the general trust account" by Mr. McKechnie, and Small would then "turn in post dated bills equaling the amount he was paid," and asserted that his work "clearly did not justify the huge payments he was receiving." (Id. at ¶ 19.) In her declaration, Ms. Barranco also explains that:

> When I again confronted Logan regarding my suspicions about Small's fraudulent billing practices, Logan confided in me that he was aware of Small's improprieties. Logan stated that he continued to tolerate Small because the investigator knew that Logan had cheated on his wife, Barbara, on some business trip the two had taken. Logan was afraid that Small would reveal this information to his wife if crossed.

(Id. at ¶ 20.) Petitioner maintains that "[t]he investigator was submitting false bills that were knowingly accepted and paid by Mr. McKechnie. Small was paid a total of $145,851.81 for Bemore, nearly half of the $293,678.18 advanced to Mr. McKechnie by the court under section 987.9. It was for 5,800 hours of work, much of which was never performed." (Pet. Brief at 51.)

Here again, Petitioner has not produced evidence in support of his contention that "much of" the work billed by Mr. Small was not actually performed. Petitioner has provided the Court with two spreadsheets listing payment amounts made to investigator Small and other service providers (see Ex. 1 and 2), but the submitted documentation does not contain any itemized lists of tasks or billing that would indicate what work Mr. Small is alleged to have completed, or to have fraudulently billed to the trial court without completing. The Court simply cannot conclude that the billing was fraudulent based only on the vague and generalized assertions offered here. At any rate, Petitioner's claim is without merit because he has not shown that there is any connection between any allegedly fraudulent billing and the quality of counsel's representation at trial.

Repeating the arguments made in support of Claims 1 and 2, Petitioner attempts to demonstrate an adverse impact by generally alleging that fraudulent billing by investigator Small and lead counsel McKechnie deprived Petitioner "of funds for essential investigative and legal services," which resulted in counsel's failure to both pursue multiple avenues of investigation and to utilize the assistance of experts. (Pet. at 38.) He also repeats the assertion that due to this alleged conflict of interest, the defense failed to investigate and refute the prosecution's case-in-chief, failed to undertake an

1   investigation to combat the torture murder allegation, and failed to retain mental health experts. (Id.)

2   And, as with the prior claims, there is no showing that counsel's failure to investigate certain potential

3   avenues of defense or retain expert assistance was attributable to a lack of available funds caused by

4   Small's allegedly fraudulent billing.

5       Having independently reviewed the record, the Court concludes that the California Supreme

6   Court's rejection of this claim was not an objectively unreasonable application of clearly established

7   federal law. Conclusory allegations that Petitioner was deprived of "essential" investigative and legal

8   services due to lead counsel's conflict is insufficient to state a colorable claim for relief. See James,

9   24 F.3d at 26. No evidentiary hearing is warranted, nor does this claim merit habeas relief.

10  **D.    Claim 4 - Conflict of Interest of Trial Counsel - Gambling Habit of Lead Counsel**

11      In Claim 4, Petitioner alleges that lead counsel had a gambling addiction which constituted an

12  actual conflict of interest, and as a result, counsel neglected to adequately investigate and prepare

13  Petitioner's defense at trial and lied to his client about the trial preparation and defense, in violation

14  of Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments. (Pet. at 39.)

15      McKechnie was known to spend time and money at a card room run by a client named Mary.

16  (See Ex.7, Decl. of legal secretary Gloria Work.) Law clerk Richard Kharas first met Mr. McKechnie

17  at Mary's card room, noted that "Logan was primarily a daytime player, usually Monday through

18  Friday during working hours," that McKechnie "lost consistently, often as much as $300 to $500 at

19  one sitting," and that McKechnie also played cards at several other gambling establishments where

20  he also lost consistently. (Ex. 4 at ¶¶ 7-8.) Mr. Kharas also attended two all-night poker games where

21  Mr. McKechnie lost $2000 and $5500. (Id. at ¶ 9.) Mr. Kharas believed that McKechnie "was

22  committing major billing fraud to provide funds for his gambling addiction, and to pay for his lavish

23  lifestyle." (Id. at ¶ 11.)

24      Petitioner intimates that McKechnie gambled away some of the money he received for the

25  defense of his case. (Pet. Brief at 54-55; see also Ex. 1.) However, aside from the information

26  indicating that Mr. McKechnie may have billed over $7,000 under Mr. Kharas' name for work not

27  performed by Mr. Kharas (see Ex. 4), Petitioner provides no support for his contention that a

28

"substantial amount" of the over $293,000 billed was not used as intended.[8]   The information regarding the Kharas billing is troubling, but Petitioner has not shown that this incident bears any connection to Mr. McKechnie's gambling, or that it resulted in prejudice to Petitioner.

In particular, Petitioner asserts that counsel "deceived and lied to the client," and details a list of counsel's failings allegedly resulting from his gambling activities, including:

a.   Claiming he was working on the case, when in fact he devoted little time to it other than court appearances;

b.   Repeatedly stating that [Petitioner] would be acquitted and 'walk,' meaning Petitioner would be acquitted of the charges;

c.   Telling [Petitioner] that the planned false alibi evidence would win, when it clearly was doomed to failure;

d.   Concealing from Petitioner the results of a psychological evaluation reflecting that he suffered from significant mental disorders;

e.   Not disclosing to [Petitioner] that the discovery material contained evidence of mental illness;

f.   Failing to ascertain the full expert [sic] of Petitioner's mental disorders. Not investigating and preparing available mental defenses;

g.   Giving Petitioner the understanding that the only available defense at the guilt phase was a weak and false alibi;

h.   Concealing from [Petitioner] that there were other guilt-phase defenses available to him;

i.   Depriving Petitioner of an informed and knowing choice as to guilt-phase defenses [and] failing to investigate and prepare defenses to the torture special-circumstance charge;

j.   Not attending and becoming knowledgeable as to the defense evidence, testimony and experts presented in the prior trial of the co-defendant, against whom the special circumstances were not found true;

k.   Leading Petitioner to believe that he was in command of the case facts and legal issues, when in actuality he was not;

l.   Failing to inform [Petitioner] that he was entitled to conflict-free counsel.

(Pet. Brief at 52.)   Petitioner asserts that because of his alleged gambling addiction, lead counsel "made no reasonable effort to prepare or investigate the facts and law of Petitioner's case," including an alleged failure to read the discovery materials, prepare and adequately conduct jury selection, and competently prepare and present a viable guilt phase defense, defense to the special circumstances, and a viable penalty phase defense.   (Pet. at 41.)   Again, however, no demonstrable connection has been shown between lead counsel's gambling and any alleged deficiencies in his representation of Petitioner.   Petitioner's assertion that Mr. McKechnie "was not a successful gambler, and suffered heavy losses" does not compel the conclusion that he used Petitioner's case as a "cash cow," as

---

[8] Petitioner also repeats his earlier assertion that the billings of investigator Small were not legitimate, but as discussed in relation to Claim 3, he fails to offer any support for the allegation that "much of" the work Mr. Small billed for was not performed.

Petitioner indicates.  (Pet. Brief at 54.)  As with the prior claims of conflict of interest, Petitioner fails to demonstrate that the alleged inadequacies of lead counsel are reasonably attributable to his propensity for gambling.

The state court's rejection of this claim was not an objectively unreasonable application of clearly established federal law.  There is no evidence that McKechnie's gambling constituted a genuine conflict of interest, nor that the lawyer's gambling activities actually "affected [his] performance."  Mickens, 535 U.S. at 171.  Having independently reviewed the record, Petitioner is not entitled to habeas relief on Claim 4.  An evidentiary hearing is not warranted on this claim.

## E.    Claim 5 - Conflict of Interest of Trial Counsel - Racism of Lead Counsel

In Claim 5, Petitioner, who is African-American, contends that McKechnie had a conflict of interest due to his racism against African-Americans, rendering it "impossible for McKechnie to effectively represent [him]," in violation of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.  (Pet. at 49.)

Second chair trial counsel Elizabeth Barranco asserts that:

> Logan and Charlie Small were also prejudiced against black people.  I remember Logan and Small making racial jokes about an investigator, Jim Murphy, who is African-American.  On the times when we traveled to petitioner's boyhood neighborhood in South Central Los Angeles, Small would frequently irritate me with the racist comments he made about the people we would see walking down the street.  In my opinion Logan and Small's feelings toward black people prevented them from investigating prosecution witnesses who were African American because they did not want to be around them.  I think it also affected the way the client testified.  Petitioner told me that just before he took the witness stand, Logan leaned over and whispered to him, "Just don't act like a nigger" or words to that effect.  I remember that petitioner found this statement unnerving enough to tell me about it later.

(Ex. 3 at ¶ 26.)

Significantly, however, Petitioner fails to identify *any* witnesses lead counsel or his investigator failed to interview, fails to articulate what information those witnesses could have provided, and fails to indicate how such information would have assisted in his defense.  In other words, the claim fails because Petitioner fails to establish that the asserted conflict affected the adequacy of his representation.  Sullivan, 446 U.S. at 348-50.

The only evidence of the epithet Mr. McKechnie allegedly used in speaking to Petitioner is Ms. Barranco's second-hand statement.  Assuming the truth of her assertion, racist remarks, in certain

contexts, may constitute a genuine conflict of interest.  See Frazer v. United States, 18 F.3d 778, 783-85 (9th Cir. 1994) (reversing and remanding denial of relief with instructions to hold an evidentiary hearing, where attorney called defendant a "stupid nigger son of a bitch" and threatened to be ineffective if defendant insisted on going to trial, as counsel's behavior fell below constitutionally required standards.)  Yet, Petitioner's situation is distinguishable from Frazer.  There, the racial epithet was part of a verbal assault against the defendant, and was accompanied by a direct and particularized threat of substandard legal representation.  No such threat, or verbal assault, is alleged here.

Moreover, the account of the incident is vague.  Ms. Barranco states that Petitioner told her, an unspecified amount of time after the incident, that Mr. McKechnie either used a racial epithet in speaking to Petitioner "or words to that effect" just before Petitioner testified in his own defense.  (Ex. 3 at ¶ 26.)  The record shows that Ms. Barranco was in court the day Petitioner testified (see RT 24044), yet she does not assert that she heard any such remark first-hand.  Petitioner, who submitted a declaration in support of the petition (see Ex. 65), has not offered an account of this exchange.  Additionally, in contrast to the defendant in Frazer, Petitioner failed to make any motion to remove counsel from his case, nor did he offer any indication that he was uncomfortable with his representation after the alleged remark was supposedly uttered.

Given such a charged remark, one would expect a noticeable effect on the defendant, but there is none indicated in the trial record.  Mr. McKechnie, who conducted Petitioner's direct examination, questioned Petitioner regarding prior employment with the Palo Alto Police Department and San Diego Humane Society, his Army service, and his drug use, and led Petitioner through an account of his whereabouts and actions on the day of the crime.  Mr. McKechnie also questioned Petitioner extensively on his prior altercations and prior incarcerations.  The trial record discloses no outward signs of Petitioner's animosity toward or discomfort with counsel and reflects that counsel conferred with Petitioner numerous times throughout the trial proceedings.  Moreover, Petitioner's declaration, which does not mention the remark, does not assert that McKechnie's allegedly racist remark caused any deterioration in the attorney-client relationship.

For all these reasons, the Court concludes that the state court's rejection of this claim was not an objectively unreasonable application of clearly established law.  Although Ms. Barranco states that

08cv0311

1    the remark "affected the way the client testified," Petitioner himself does not support her conclusory

2    assertion. As such, the claim does not establish a basis for habeas relief. See James, 24 F.3d at 26.

3    Even were the Court to conclude that lead counsel and the defense investigator harbored prejudice

4    against African-Americans that amounted to an actual conflict of interest, Petitioner has not shown

5    that these attitudes had an adverse impact on the adequacy of counsel's representation. See Sullivan,

6    446 U.S. at 349-50. An evidentiary hearing is not warranted.

7    **F.      Claim 6 - Conflict of Interest of Trial Counsel - Cumulative Effect**

8           In Claim 6, Petitioner asserts that the "cumulative effects of the conflicts of interest of Logan

9    McKechnie, including his gambling, fraud and racism" deprived Petitioner of his rights guaranteed

10   under the Fifth, Sixth, Eighth and Fourteenth Amendments. (Pet. at 51.)

11          In some cases, the "cumulative effect of multiple errors can violate due process even where no

12   single error rises to the level of a constitutional violation or would independently warrant reversal."

13   Parle v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007) (citing Chambers v. Mississippi, 410 U.S. 284,

14   290 (1973)). Petitioner asserts that the cumulative effects of lead counsel's fraud and conflicts of

15   interest violated Petitioner's constitutional rights. (Pet. Brief at 61.) However, as discussed in the

16   resolution of Claims 1-5, Petitioner fails to demonstrate that counsel's fraud or alleged conflicts had

17   any adverse impact on the quality of his representation. Because Petitioner fails to demonstrate that

18   the alleged conflicts bear any connection to his trial performance, "there is nothing to accumulate to

19   a level of a constitutional violation." Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002) (citing

20   Fuller v. Roe, 182 F.3d 699, 704 (9th Cir. 1999), overruled on other grounds by Slack v. McDaniel,

21   529 U.S. 473, 482 (2000)).

22          Accordingly, based on an independent review of the record, the California Supreme Court's

23   rejection of this claim was not an objectively unreasonable application of clearly established federal

24   law. An evidentiary hearing is not warranted on Claim 6.

25   **G.      Claims 7 and 14 - Ineffective Assistance of Trial Counsel - Failure to Investigate and**

26           **Present Mental Defenses at the Guilt Phase and Mitigation Evidence at the Penalty Phase**

27          In Claim 7, Petitioner alleges that trial counsel: (1) failed at "the guilt and special circumstance

28   phase, and penalty phase" to properly "advise Petitioner of the availability of viable mental defenses,"

including the defense of his "inability at the time of the homicide to form the required mental state to be guilty of murder and robbery;" (2) failed to "investigate and present the defense of insanity;" and (3) failed to "request related instructions," violating Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.  (Pet. at 52.)[9]  In Claim 14, Petitioner asserts that defense counsel was prejudicially ineffective for "failing to investigate, discover and present evidence of mental illness, learning disabilities, social history and other issues in mitigation" during the penalty phase, violating his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.  (Pet. at 136.)  The central contention of both claims is that trial counsel had ample evidence of Petitioner's compromised mental state, yet failed to develop and present it at either the guilt or penalty phases of trial.

     1.    <u>Factual Background Pertaining to Claims 7 and 14</u>

At the behest of defense counsel Barranco, Petitioner underwent several days of psychological testing in January and March 1988, administered by Dr. Kenneth Fineman and Mary Alambaugh, Ph.D.  Ms. Barranco sought the services of Dr. Fineman based on an article about the "sun children" phenomenon, as follows:

> Such people were described as members of minority groups coming from poor homes and gaining admission into the upper class "white" world by virtue of their talents. Where to most people they would appear to have been favored and thus have no excuse for subsequent criminal conduct, in fact, that behavior, most of which was drug related, was a product of the unique stress they experienced from having to live in two different worlds.  I initially consulted with Dr. Fineman to see if petitioner fit the profile described in the news article I read.  I thought he might because his personal history was consistent with what the article described.

(Ex. 3 at ¶ 8.)  After conducting the evaluation and testing, Dr. Fineman prepared a report and submitted it to Ms. Barranco.  (<u>See</u> Ex. 8.)  The report alighted counsel to "several diagnostic considerations," including "Bi-polar affective disorder," "intermittent explosive disorder," and "anti-social personality disorder," and acknowledged "[t]he fact that Mr. Bemore evidences a condition of mild, diffuse organic impairment further complicates the diagnostic picture.  His impairment, it must

---

[9]  Petitioner has acknowledged that, although these claims were raised together in state court (in claim 7 of the state habeas petition, <u>see</u> Lodgment No. 15), the claims of guilt and penalty phase ineffective assistance of counsel have been raised separately in this Court as Claims 7 and 14. (<u>See</u> Doc. No. 46- Pet. Opp. to MTD for Failure to Exhaust at 6.)  Therefore, despite Petitioner's allusion to the penalty phase in the statement of Claim 7, the Court construes Claim 7 to be pertain to the guilt phase and Claim 14 to pertain to the penalty phase.

be stressed, is quite mild and not discernable under ordinary conditions." (Id. at 15-17.)  The report also indicated that Petitioner's "high energy level and restlessness would be consistent with a residual attention deficit disorder of adulthood" and that "[t]he pattern of subtle deficits of attention, motivation, speech perception, slowed psycho-motor responses and difficulty with spatial-localization suggest some mild neurological impairment of a diffuse nature," which Dr. Fineman reasoned could either be "a function of residual attention deficit disorder and accompanying learning disability or may be a function of other factors, including chronic drug use," as admitted by Petitioner.  (Id. at 10.)

However, Dr. Fineman also indicated that the "[r]esults of personality testing reveal a man who, although casual and affable, is quite alert and subtly controlling," and stated that, "[u]nfortunately, beneath the surface warmth he has little regard for others, experiencing people as either objects or obstacles."  (Id.)  Dr. Fineman wrote that "[t]here is a potentially dangerous combination of fearlessness, lack of anxiety about consequences and need for immediate gratification, that put him at a high risk for acting out," and noted that Petitioner "can be quite self-centered and impulsive, using whatever means are necessary to achieve his desires."  (Id. at 11.)  Dr. Fineman also stated that Petitioner "is not frightened of his impulses, other people or the consequences of his actions.  He is seldom bothered by feelings of guilt or anxiety," and noted that "Mr. Bemore will admit to feeling guilty about his failures as a husband and father but the only person he appears to be genuinely attached to was his mother who died when he was 8."  (Id. at 12.)  Ms. Barranco was "shocked" by the contents of the Fineman report, stating:

> If I recall, it contained little if no mention of the "sun children" phenomenon and whether petitioner fit into that profile.  Instead, it diagnosed him with some significant impairments that I thought were completely inapposite with the guilt and penalty phase defense and evidence we were planning on presenting at trial...
>
> I was angry that the "sun children" idea that had initially drawn me to Dr. Fineman had been virtually ignored by him in his report.  Still, I assumed that any other expert reviewing the Fineman test results would draw the same conclusions about my client.  Those conclusions were contrary to Logan's defense that petitioner did not commit the homicide and my penalty phase plan to present him as a good guy with a drug problem, garnering whatever benefit I could from the lingering notion of reasonable doubt.  I placed my copy of the Fineman report in the back of a file drawer and wished I'd never read it.  No follow-up work was done by Dr. Fineman nor any other mental health expert.
>
> I never showed petitioner Dr. Fineman's report and only discussed it with him in minimal detail.  I did not relate to him any of Fineman's diagnoses.  I remember simply telling him that the report was "bad" and something we needed to bury.

1  (Ex. 3 at ¶¶ 9-11.)

2      Dr. Fineman recounted his involvement in Petitioner's case in an October 19, 2000 declaration,

3  stating that he presented Ms. Barranco with the rough draft evaluation in order to justify expected

4  payments and the continuance of the evaluation.  (Ex. 60 at ¶ 4.)  Dr. Fineman explained that:

5
       As I had found significant evidence of mental disorders, and other psychological
6      dysfunctions, that could give rise to various mental defenses, I felt that with the rough
       draft in hand the counsel for Mr. Bemore would direct me to provide further
7      investigation on the factors in my evaluation which were consistent with their defense
       strategies...
8
       Since there was evidence of serious mental disorders, I informed trial counsel of the
9      test results and advised that a guilt-phase defense of diminished capacity was possible
       in this case, but recommended that further development was necessary.
10
       Nevertheless trial counsel chose not to pursue this course of action and terminated my
11     involvement on the case.  I was not called as a witness at the penalty phase.

12  (Id. at ¶¶ 4, 8-9.)  Since the time of trial, Dr. Fineman had reviewed materials pertaining to Petitioner's

13  case of which he was not previously aware, including the statements of Angela Tabor, Troy Patterson,

14  Keith Cosby, Echo Ramey, and the declarations of Drs. Bucky and Rosenthal, and concluded that:

15     The available evidence of Mr. Bemore's mental illness and drug-induced violence
       appears to undermine the finding of sociopathy in this case.  The facts suggests [sic]
16     that his conduct was not the product of a manipulative or sociopathic personality, but
       of mental disturbance exacerbated by prolonged and extensive drug-ingestion...
17
       Evidence of Mr. Bemore's mental disorders coupled with his drug intoxication at the
18     time of the homicide gave rise to the guilt-phase defense of whether he was able to
       form the requisite intent for murder and robbery...
19
       My evaluation also established mitigating evidence concerning Mr. Bemore's mental
20     difficulties.

21  (Id. at ¶¶ 15, 17-18.)

22      Dr. Fred Rosenthal, a psychiatrist and medical doctor, reviewed the Dr. Fineman's testing,

23  report, and declaration, reviewed background material on Petitioner, and met with Petitioner.  He

24  submitted a declaration[10] detailing his opinion, stating:

25

26     [10] The declaration submitted in support of the federal Petition was signed in 2009, while the declaration
       submitted to the California Supreme Court in support of the state habeas petition was signed in 2000.  Upon
27     comparison of the 2000 and 2009 declarations, it appears that the 2009 declaration contains 5 additional
       paragraphs (¶¶ 29-33), and a reference to meeting with Petitioner in 2008 (contained in paragraph 2) that were
28     not before the state court that adjudicated the claim on the merits.  Thus, in accordance with Pinholster, the
       Court will limit its consideration to the 2000 Rosenthal declaration that was previously presented to the
       California Supreme Court.  See id., 131 S.Ct. at 1398 (A habeas court's review under section 2254 (d)(1) "is

08cv0311

It is understood that Mr. Bemore's trial counsel in 1988 had received Dr. Fineman's report and then placed it in a file without taking any action on the findings, or even revealing the psychological conclusions to their client. In my opinion this was shortsighted and negligent. Given the findings of Dr. Fineman, development of Mr. Bemore's mental and emotional state during the period embracing the homicide was mandatory...

From my review of the material including Dr. Fineman's report, psychological testing data, background material and observations of his behavior by others during the general period of the homicide, I agree with the conclusions of Dr. Fineman that Mr. Bemore has a serious chronic mental condition which could include bipolar disorder, intermittent explosive disorder and organic brain damage...

In my opinion, based upon the report of Dr. Fineman and the other material I have reviewed, Mr. Bemore was not able at the time of the homicide to form the requisite specific intent, premeditate, deliberate, or harbor malice required for murder and robbery because of his extreme mental disorders and intoxication.

Furthermore, in my opinion Mr. Bemore did not have the intent required for the special circumstances of torture and robbery because of his mental disorders and intoxicated condition.

As to the penalty phase, in my opinion at the time of the offense the capacity of Mr. Bemore to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, or the affects of intoxication...[and]...Mr. Bemore's mental state and related history of early family problems would have been crucial for the penalty phase.

(Lodgment No. 15, Ex. 41 at ¶¶ 6, 12, 18-21.)

Psychologist Steven Bucky, who was called as a penalty phase witness in order to provide limited testimony about Petitioner growing up in a family with chemical dependency, states that "[m]y role in the entire process was weak. It was not clear how my testimony would benefit Mr. Bemore." (Ex. 14 at ¶ 8.) He adds that "[d]efense counsel neither asked me to conduct any psychological testing of Mr. Bemore nor requested that I give an opinion as to his mental state at the time of the homicide." (Id. at ¶ 7.) Dr. Bucky did not have any knowledge of the Fineman report or testing at the time of trial, was first provided with the Fineman report during state habeas proceedings, and opines that:

Based upon the psychological evaluation of Dr. Fineman, mental defenses could have been available to Mr. Bemore at both the guilt and penalty phases. I would have recommended that mental defenses be pursued for both phases, had I known at the time of trial of Dr. Fineman's findings and been asked by counsel to give an opinion.

(Id. at ¶¶ 10-11.) Ms. Barranco confirms that she "did not inform [Dr. Bucky] that petitioner had been psychologically tested. Further, I never disclosed to him the Fineman report." (Ex. 3 at ¶ 10 fn 1.)

limited to the record that was before the state court that adjudicated the claim on the merits.")

Jury selection expert Jo-Ellan Dimitrius concurred that the findings in Dr. Fineman's report "would have all given rise to mental defenses at both the guilt and penalty phases," and states that had the information been disclosed to her, "I would have suggested that the client be informed and that there be a full investigation into the preparation and presentation of mental defenses. Also, this information would have been important in questions to prospective jurors." (Ex. 17 at ¶ 23.)

Defense counsel also retained Isabel Wright, Ph.D, a social anthropologist to assist in the penalty phase presentation. Dr. Wright conducted an investigation into Petitioner's background, which included reviewing his schooling and employment records and interviewing Petitioner, his wife, family members, and other witnesses. (CT 1486.) Dr. Wright was not called as a penalty phase witness, but sent a letter dated October 2, 1989 to the trial judge before sentencing, explaining that the purpose of her letter was to apprise the trial court of two factors which "may not have been emphasized sufficiently in the case. The first was why [Petitioner] did not appear to have made the most of the opportunities in his life, and the second was the influence of Crack [sic] cocaine on [Petitioner's] life." (CT 1487.) She explained that "[l]ike many children who grow up in chaotic environments, [Petitioner] was handicapped psychologically," and because of his upbringing, "when he could not control events he resorted to blaming the system or 'copping out' by escaping into substance abuse, in the same way that members of his family had done." (Id.) Dr. Wright elaborated on the effect drug use had on Petitioner, as follows:

> Once [Petitioner] started using Crack he was no longer able to control his behavior. He changed completely from the cheerful, considerate individual described by his friends and family during the Penalty Phase into a Crack addict, a person with a disease that drives them to any lengths to satisfy their addiction. This does not absolve [Petitioner] of the responsibility of first deciding to use the drug, nor does it exonerate him for the crime he committed. It does explain, however, that once he was addicted his behavior was controlled by the drug, he did not control his behavior. I do not believe that [Petitioner] knew the disastrous effect Crack would have on him before he smoked it. He probably thought of it as just another drug which he could control his craving for, like other substances he had taken during his life.

(CT 1489.) The trial court expressed concern that Dr. Wright had not been called to testify before the jury, as her findings and opinion had not been subject to cross-examination, yet stated that "I have read her report and I have in mind its contents, but I frankly have not placed very much weight upon that report." (RT 26463-64.)

Petitioner also directs the Court to several exhibits and documents as anecdotal evidence of his mental state around the time of the homicide.  As an initial matter, several of these exhibits were never submitted to the California Supreme Court for consideration.  Because the Supreme Court instructs that a habeas court's review under section 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits," this Court will not consider Exhibits 61 through 65[11] or Exhibit 76[12] in deciding whether the California Supreme Court's rejection of this claim on direct appeal was contrary to, or an unreasonable application of, clearly established federal law or based upon an unreasonable determination of the facts.  See Pinholster, 131 S.Ct. at 1398; see also 28 U.S.C. § 2254(d)(1)-(2).

However, the Court will consider other documents and arguments previously presented to the state supreme court, now offered as anecdotal evidence of Petitioner's mental state at the time of the homicide.  For instance, in an interview with the prosecution, Troy Patterson described a conversation he had with co-defendant Keith Cosby, in which Cosby stated that Petitioner "went crazy"[13] on the victim and then almost went after Cosby as well, which caused Cosby to tell Petitioner there was something wrong with him.  (Ex. 10 at pp. 113-14, Discovery pp. 4109-10.)  Mr. Patterson also submitted a declaration in support of the petition, in which he stated that:

> [I]f he was involved in killing the man, drugs along with the mental problems he already had must have been the reason for it.  Terry had been constantly using mind-altering drugs during that period, including when the Aztec incident occurred.  They made him crazy that entire time, and his mental problems were worst.  He would just flip out, go out of his mind and lose control of himself.  To put it bluntly, he was messed up...

---

[11] The California Supreme Court denied the state habeas petition on October 17, 2007.  Exhibits 61-65, the declarations of Kenneth Daughtery, Lionel Harris, Sharon Lauderdale, Elizabeth Barranco, and Terry Bemore, each appear to have been signed in January 2009 and none of these five exhibits were included in the exhibits submitted to the state supreme court for review.  (See Lodgment No. 15.)

[12] Exhibit 76, the declaration of Keith Cosby, was signed in May 2011 and was not before the California Supreme Court when it adjudicated state habeas claim 7 on the merits.

[13] Relatedly, to the extent Petitioner relies on the trial prosecutor's use of the word "crazy" as evidence of Petitioner's mental state, the Court has previously ruled on that contention.  In adjudicating Claim 21, this Court rejected "Petitioner's contention that the prosecutor actually believed that Petitioner was mentally incompetent at the time of trial, in part because it is highly unlikely that the prosecutor's true beliefs can be accurately extrapolated from the statements provided."  (Doc. No. 88 at 45.)  Petitioner offers no basis upon which to reverse that holding, and the trial prosecutor's use of the colloquial term "crazy" is not evidence of Petitioner's actual mental state at the time of the crime.

1
2
3

> When I testified against Terry in his trial, I could have explained how crazy he was had his attorneys asked me.  But they did not ask me any questions about Terry's mental state.  They did not seem interested in establishing that.  Even before trial the defense attorneys did not question me as to how crazy he was at the time of the killing.  I never understood why there was no interest in this.

4  (Ex. 19 at ¶¶ 7-8.)

5      Echo Ramey also spoke of Petitioner's behavior on the night of the homicide, stating that

6  although Petitioner generally "was a real calm person," that when she answered the door that evening,

7  "he looked totally different, I mean, he was like sweaty, his eyes were big, he was like I don't know,

8  he just looked really like crazy." (Ex. 13 at p. 14.)  Angela Tabor, another acquaintance, stated that,

9  "I knew Terry smoked a lot of crack cocaine.  I also believe Terry was doing other drugs because of

10  how crazy he was acting.  He was either smoking shirm [sic] or PCP or both." (Ex. 20 at 2.)

11        2.    <u>Claim 7 - Guilt and Special Circumstances Phase</u>

12      Petitioner asserts that trial counsel: (1) failed to pursue or inform Petitioner of evidence that

13  suggested he may have lacked the requisite mental state for the charged offenses; (2) failed to provide

14  their experts with a complete profile of Petitioner to assist the experts in generating accurate findings;

15  and (3) failed to develop or present any mental state evidence at the guilt phase of trial.  (Pet. Brief at

16  62-63.)  Petitioner contends that had counsel pursued and presented evidence of Petitioner's mental

17  state, it may have resulted in negating the intent required for robbery or first degree murder with

18  special circumstances.  (<u>Id.</u>)

19      Under <u>Strickland</u>, trial counsel has a "duty to make reasonable investigations or to make a

20  reasonable decision that makes particular investigations unnecessary." <u>Id.</u> at 691.  As stated above,

21  trial counsel Barranco retained Dr. Fineman in November 1987, who examined and tested Petitioner

22  over four days in January and March 1988, and provided counsel with a rough draft report in May

23  1988, nearly a year prior to the commencement of the guilt phase.  Dr. Fineman states that he advised

24  counsel that "a guilt-phase defense of diminished capacity was possible in this case," but trial counsel

25  declined to pursue the matter despite his recommendation.  (Ex. 60 at ¶ 8.)  With respect to the guilt

26  phase, Ms. Barranco acknowledged experiencing frustration with the fact that Dr. Fineman's

27  "conclusions were contrary to Logan's defense that petitioner did not commit the homicide," and

28  confirms that she declined to conduct follow-up work.  (Ex. 3 at ¶ 8.)

1    Here, Dr. Fineman, Dr. Bucky, and Dr. Rosenthal each assert that mental state defenses were

2    available at the guilt phase, and Ms. Barranco concedes a failure to pursue those defenses.  Yet, this

3    Court's analysis of the claim is limited to whether the California Supreme Court's rejection of this

4    claim was an unreasonable application of Strickland.  See Richter, 131 S.Ct. at 785.  Even as trial

5    counsel now belatedly concedes that she should have pursued a more extensive mental state

6    investigation, it is evident from the record that the decision not to further pursue mental defenses was

7    a strategic decision at the time it was made, was based on investigation, and is thus entitled to

8    deference.  See Strickland, 466 U.S. at 690-91 ("[S]trategic choices made after less than complete

9    investigation are reasonable precisely to the extent that reasonable professional judgments support the

10   limitations on investigation.").  At any rate, "the relevant inquiry under Strickland is not what defense

11   counsel could have pursued, but rather whether the choices made by defense counsel were reasonable."

12   Siripongs v. Calderon, 133 F.3d 732, 736 (9th Cir. 1998).  AEDPA demands that this Court

13   "determine what arguments or theories supported or, as here, could have supported the state court's

14   decision; and then it must ask whether it is possible fairminded jurists could disagree that those

15   arguments or theories are inconsistent with the holding in a prior decision of this Court."  Richter, 131

16   S. Ct. at 786.  Here, there is a "reasonable argument that counsel satisfied Strickland's deferential

17   standard."  Id. at 788.  Specifically, there is a reasonable argument that trial counsel acted in a

18   constitutionally satisfactory manner by retaining Dr. Fineman for four days of testing and examination,

19   providing the expert with materials on Petitioner's case and background, obtaining and considering

20   that expert's evaluation, and, based on the that initial investigation, declining to pursue further mental

21   state investigation in favor of presenting the previously planned alibi defense.

22       To the extent Petitioner asserts counsel failed to meet any affirmative duty to furnish Dr.

23   Fineman with adequate information[14] (see Pet. Brief at 84), that contention appears to be contradicted

24   by: (1) Dr. Fineman's prior statement that he "reviewed material regarding Mr. Bemore's background

25   and the case;" (see Ex. 60 at ¶ 3); and (2) existing Ninth Circuit case law.  Dr. Fineman acknowledges

26   that he reviewed materials regarding Petitioner and his case, then later in the same declaration

27   _____

28       [14] Petitioner advances a similar argument regarding trial counsels' penalty phase performance and information counsel failed to provide to testifying penalty phase witness Dr. Bucky, which the Court addresses separately in the adjudication of Claim 14.

1    contends that information provided in the declarations of Cosby, Patterson, Tabor and Ramey was

2    "withheld" from him.  (Ex. 60 at ¶ 19.)  The Ninth Circuit has rejected imposing a duty on counsel,

3    when investigating the possibility of a guilt-phase mental defense, "to acquire sufficient background

4    information on which an expert can base reliable psychiatric conclusions, independent of any request

5    for information from an expert..."  Hendricks v. Calderon, 70 F.3d 1032, 1038-39 (9th Cir. 1995).

6    Here, counsel provided Dr. Fineman with background information on Petitioner, and Petitioner does

7    not allege that Dr. Fineman requested any information which counsel failed to provide.  Accordingly,

8    counsels' conduct was not deficient in this regard.

9        Moreover, this Court ultimately need not reach a conclusion on whether counsel's performance

10   was deficient, because for the following reasons, Petitioner fails to demonstrate prejudice.  See

11   Strickland, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack

12   of sufficient prejudice, which we expect will often be so, that course should be followed.")  Had

13   counsel pursued a mental state defense at the guilt phase, any favorable expert testimony would have

14   been outweighed by the threat of damaging cross-examination regarding Dr. Fineman's initial findings,

15   which included a diagnostic consideration of antisocial personality disorder.  Indeed, Dr. Fineman

16   concluded that the "[r]esults of personality testing reveal a man who, although casual and affable, is

17   quite alert and subtly controlling," and opined that, "[u]nfortunately, beneath the surface warmth he

18   has little regard for others, experiencing people as either objects or obstacles."  (Ex. 8 at ¶ 10.)

19       In addition, as addressed more thoroughly in the adjudication of Claim 10, a mental state

20   defense would have directly conflicted with Petitioner's defense of alibi/innocence.[15]  See United

21   States v. Stern, 519 F.2d 521, 524-25 (9th Cir. 1975) ("While a defendant may plead inconsistent

22   defenses, here it appears that competent counsel might well have concluded that it would not have

23   been in [defendant's] best interest to do so.").  For instance, Petitioner asserts that Keith Cosby, his

24   co-defendant, could have offered testimony regarding Petitioner's impaired behavior and use of drugs

25

26       [15] For the same reason, counsel's decision not to elicit mental state testimony from the prosecution's
     psychiatric expert was reasonable.  Despite the fact that Petitioner does not make any explicit allegation in the
27   federal Petition to this effect, Dr. Rosenthal faults trial counsel for failing to challenge Dr. Jones on a number
     of points, including his testimony that cocaine use did not impair memory, cognition, or prevent the formation
28   of criminal intent, and the expert's failure to consider that Petitioner had used alcohol in addition to cocaine
     around the time of the homicide, which would have "compound[ed] his confusion and disoriented mental
     state."  (Lodgment No. 15, Ex. 41 at ¶¶ 22-23.)

                                                  32                                      08cv0311

just prior to the murder.  (Pet. Brief at 80.)  However, Mr. Cosby had previously made statements to police, and testified in his own defense at his trial, that Petitioner was the primary perpetrator of the Aztec robbery/homicide.  (See Lodgment No. 16, Ex. 1 at 12949-50 - Cosby told police that Petitioner pushed the victim into the store, and when Cosby entered the store after being called in by Petitioner, he observed the victim lying on his back on the floor, and saw blood.)  Had the defense called Mr. Cosby to testify on Petitioner's behalf, these prior statements and testimony could have been introduced, which would have sharply contradicted Petitioner's alibi defense.

Finally, a mental state defense appears inconsistent with the facts of the instant crimes.  A forensic pathologist testified at trial that the victim suffered over twenty wounds, several of which were potentially fatal on their own, and no defensive wounds.  A crime scene reconstructionist and blood splatter expert testified that the attack took place over a minimum of 15 minutes, that the victim was seated at one point during the attack and laying at another point, and that the attack was long enough in duration for some clotting of earlier wounds to occur prior to the infliction of additional wounds.  These findings are consistent with unsuccessful attempts to procure the combination to the safe, which was later carried from the Aztec store to Petitioner's garage, drilled open, and disposed of.  It is also consistent with Petitioner's own admissions to several testifying acquaintances that: he killed someone in one of his robberies and that the victim should have opened the safe (as he told Glen Heflin); that had the victim done as he was told, he would still be alive (as he stated in the presence of Angela Tabor); and that if the victim had not fought back, he would not have had to stab him so many times (as he stated in the presence of Lloyd Howard).  At the sentencing hearing, the trial court concluded that the commission of the crime was deliberate and intentional, as follows:

> I'm not shocked by the guilty verdict, I'm convinced beyond any reasonable doubt, beyond any lingering doubt, to I think as absolute a certainty as humanly possible that Mr. Bemore is unquestionably guilty of the murder in the first degree of Mr. Muck...
>
> Contrary to counsel's comment during closing arguments on sentencing, I don't find that the murder of Mr. Muck was the act of a "drug-crazed person who interfered in God's plan for Mr. Muck."  In my judgment the evidence is - - makes it manifestly clear to me that at the time of the slaughter of Mr. Muck Mr. Bemore was not a "drug-crazed person."  As Dr. Jones made it clear, and I think as your common sense would suggest to you, this was purposeful, goal oriented, premeditated, deliberate, intentional conduct on his part.

(RT 26461, 26473.)

33

Additionally, the cases cited by Petitioner in support of this claim are distinguishable and do not compel the requested relief.  In <u>Jennings v. Woodford</u>, 290 F.3d 1006 (9th Cir. 2001), the Ninth Circuit found that trial counsel rendered ineffective assistance at the guilt phase "by failing to investigate mental health and drug abuse issues that might have raised reasonable doubt about [petitioner's] ability to form the requisite intent to justify a first degree murder conviction."  <u>Id.</u> at 1013.  But in that case, unlike this one, a mental state defense was the defendant's only viable option, as Jennings' alibi was "weak and uncorroborated."  <u>Id.</u> at 1019.  Also, the "wealth of mental health and drug abuse evidence at the ready" in Jennings' case did not appear to cut both ways like the Fineman report, which raised the possibility of bipolar disorder, intermittent explosive disorder, and anti-social personality disorder, the latter of which would have severely hampered defense attempts to negate intent.  <u>Id.</u>

Meanwhile, in <u>Daniels v. Woodford</u>, 428 F.3d 1181 (9th Cir. 2005), trial counsel's representation was found to be prejudicially deficient because although prison psychiatrists had diagnosed petitioner as schizophrenic as early as 1965, a retained expert "did not review any of [petitioner's] medical records and was only able to conduct a cursory examination."  <u>Id.</u> at 1207.  The Ninth Circuit noted as significant that Daniels' crime took place prior to the abolishment of California's diminished capacity defense in 1982, under which evidence of mental illness could serve as a defense against first-degree murder despite "[s]ubstantial evidence supporting a finding of premeditation and deliberation."  <u>Id.</u> (citation omitted).  In contrast, and despite Dr. Fineman's recommendation to trial counsel that a diminished capacity defense was possible, the Aztec murder took place in August 1985, and that defense[16] was not available at Petitioner's trial.

Petitioner's reliance on <u>Bloom v. Calderon</u>, 132 F.3d 1267 (9th Cir. 1997), is similarly unpersuasive.  In that case, trial counsel rendered ineffective assistance at the guilt phase by failing to obtain a psychiatric expert to examine Petitioner until shortly before trial and failing to provide the

---

[16] While a diminished capacity defense was not available to Petitioner at trial, the Court acknowledges that California would allow the "introduction of evidence of mental illness when relevant to whether a defendant actually formed a mental state that is an element of a charged offense, but [does] not permit an expert to offer an opinion on whether a defendant had the mental capacity to form a specific mental state or whether the defendant actually harbored such a mental state."  <u>People v. Coddington</u>, 23 Cal. 4th 529, 582 (2000), <u>overruled on other grounds</u> <u>Price v. Superior Court</u>, 25 Cal. 4th 1046 (2001).

34

expert with the information he requested regarding Petitioner's background in a case where that individual was the sole defense expert witness and "[c]ounsel's theory of defense rested, at least in part, on a psychiatric defense." Id. at 1278.  In contrast, Petitioner's trial counsel retained an expert well in advance of trial who conducted a battery of tests over several days of evaluation, and who "reviewed material regarding Mr. Bemore's background and the case." (Ex. 60 at ¶ 3.) Unlike counsel in Bloom, Petitioner's counsel did not advance an ill-prepared mental state defense, but instead declined to pursue such a defense in favor of a theory of alibi/innocence.

Petitioner has not shown a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.  As such, based on an independent review of the record, Petitioner fails to demonstrate that the California Supreme Court's rejection of this claim was an objectively unreasonable application of Strickland.  See Richter, 131 S. Ct. at 785.  An evidentiary hearing is not warranted.

### 3. Claim 14 - Penalty Phase

Petitioner alleges that trial counsel failed to competently "investigate, discover and present evidence of mental illness, learning disabilities, social history and other issues in mitigation." (Pet. Brief at 136.)  Specifically, Petitioner contends that counsel failed to pursue available mitigation evidence suggested by the Fineman report, and failed to provide the experts they did retain, including Dr. Bucky and Dr. Fineman, with adequate information about Petitioner's social history and corroborative evidence of mental illness, which allowed the prosecution to emphasize that Petitioner did not suffer from mental illness or emotional disturbance.[17]  (Id. at 146-48.)

---

[17]  Petitioner also contends that "[t]he prosecutor went on to argue that the absence of any mental illness or emotional disturbance could be used as an aggravating factor," and asserts that this was in error, as CALJIC 8.85 factor (d) could only be used in mitigation, citing to Claim 22.  (Pet. Brief at 148.)  Claim 22 alleged prosecutorial misconduct stemming from the prosecutor's reference to Petitioner's lack of remorse, and this Court previously rejected Claim 22 on the merits.  (See Doc. No. 88.)  To the extent Petitioner asserts that the prosecutor's argument regarding his lack of mental illness was error that constituted prosecutorial misconduct, a review of the direct appellate and state habeas briefs reveal that this contention was never presented to the California Supreme Court, and is therefore unexhausted.  While the Court may not grant relief on an unexhausted claim, the Court may reject an unexhausted claim on the merits.  See 28 U.S.C. § 2254(b)(2); see also Gatlin v. Madding, 189 F.3d 882, 889 (9th Cir. 1999).

Here, Petitioner's contention is without merit, as a review of the trial transcripts clearly indicate that the prosecutor did not argue that the absence of mental illness could be considered in aggravation.  (See RT 26297 - "You [the jury] decide whether they're factors in aggravation or factors in mitigation.  It's up to you to determine.  And the fact, as the court has pointed out, that there's an absence of a factor in mitigation doesn't make it a factor in aggravation. [¶] But in this situation Mr. - - Mr. Bemore when he killed Mr. Muck wasn't

1    Petitioner first argues that counsel's investigation into mental state mitigation evidence was

2    deficient, as the information contained in the Fineman report should have triggered further

3    investigation.  Dr. Fineman states simply that "[m]y evaluation also established mitigating evidence

4    concerning Mr. Bemore's mental difficulties." (Ex. 60 at ¶ 18.)  Dr. Rosenthal, who reviewed Dr.

5    Fineman's materials as well as other background information after trial, opined that in Petitioner's

6    case, "mental state and related history of early family problems would have been crucial for the penalty

7    phase."  (Ex. 41 at ¶ 21.)  Jury expert Dimitrius concurs that the findings in Dr. Fineman's report

8    "would have all given rise to mental defenses at both the guilt and penalty phases," and had the

9    information been disclosed to her, "I would have suggested that the client be informed and that there

10   be a full investigation into the preparation and presentation of mental defenses." (Ex. 17 at ¶ 23.)

11   Petitioner also asserts that trial counsel failed to meet an affirmative duty to provide their

12   testifying expert with adequate background information on Petitioner. (Pet. Brief at 140.) Despite the

13   fact Dr. Bucky acknowledged in his penalty phase testimony that trial counsel had provided him with

14   material on Petitioner's background and copies of interviews with family members (see RT 25014),

15   he presently expresses concern that he was not previously aware of, or provided with, Dr. Fineman's

16   report.  (Ex. 14 at ¶ 10.)

17   In Hendricks, the Ninth Circuit indicated that a counsel's duty to investigate a defendant's

18   mental condition differs between the guilt and penalty phases, because "[e]vidence of mental problems

19   may be offered to show mitigating factors in the penalty phase, even though it is insufficient to

20   establish a legal defense to conviction in the guilt phase."  Id., 70 F.3d at 1044.  This divergent

21   standard appears to apply to counsel's duty to provide information to expert witnesses. See Wallace

22   v. Stewart, 184 F.3d 1112, 1117 (9th Cir. 1999) (citing Caro v. Calderon, 165 F.3d 1223, 1226 (9th

23   Cir. 1999)) ("Although the lawyer's failure to develop and relay medical evidence did not constitute

24

25

26   under the influence of any extreme mental or emotional disturbance.")  However, even were the Court to
     conclude that the prosecutor's argument was in error, Petitioner's contention is without merit for the reasons
27   previously outlined in the adjudication of Claim 22, namely that the jury was properly instructed and the Court
     must presume, absent evidence to the contrary, that the jury understood and followed instructions; and because
28   Petitioner fails to demonstrate that this brief reference constituted misconduct "so egregious that it infects the
     trial with such unfairness as to make the resulting conviction a denial of due process."  (See Claim 22, Doc.
     No. 88); Darden v. Wainwright, 477 U.S. 168, 193 (1986).

08cv0311

1    ineffective assistance at the guilt phase, we concluded that sentencing-where mitigation evidence may

2    well be the key to avoiding the death penalty-is different." ).

3           In several of the above cases, relied upon by Petitioner, trial counsel not only failed to provide

4    medical or mental state evidence in mitigation, but abjectly failed to present virtually <u>any</u> evidence in

5    mitigation.  <u>See</u> <u>Hendricks</u>, 70 F.3d at 1043-44 (in which counsel failed to conduct mitigation

6    investigation, failed to pursue or present evidence of mental impairments or about the defendant's hard

7    childhood and drug problems, and called three penalty phase witnesses who "did little to aid in

8    Hendricks' fight for his life."); <u>Wallace</u>, 184 F.3d at 1116-17 (in which counsel failed to explore

9    defendant's mental state or conduct any investigation into his dysfunctional family background, failed

10   to provide such information to retained experts, and failed to even contact the defendant's immediate

11   family members to obtain background information that was "easily within his reach.").  These cases

12   stand in stark contrast to counsel's performance at Petitioner's penalty phase trial.  Meanwhile, even

13   though trial counsel in <u>Caro</u> presented some background and character evidence in mitigation, they

14   failed to investigate, present evidence, and inform examining experts of Caro's repeated and prolonged

15   exposure to, and brain damage from, pesticides and other toxic chemicals; the reviewing court was

16   emphatic in stressing the uniqueness of that situation, stating that it "must be understood that Caro's

17   brain injuries and poisoning are different from the facts of any other case that has been called to the

18   court's attention." <u>Caro</u>, 165 F.3d at 1229; <u>see also</u> <u>Caro v. Woodford</u>, 280 F.3d 1247 (9th Cir. 2002).

19   Again, the facts confronted in <u>Caro</u> are inapposite to Petitioner's situation.

20          At oral arguments, Petitioner referred to the Ninth Circuit's recent decision in <u>Detrich v. Ryan</u>,

21   677 F.3d 958 (9th Cir. 2012), which is similarly distinguishable from Petitioner's case.  In <u>Detrich</u>,

22   trial counsel failed to conduct a mitigation investigation despite documents which put counsel on

23   notice that the defendant had an "extremely troubled" childhood that involved a broken home, child

24   abuse, and alcohol use at a young age.  <u>Id.</u> at 975.  Moreover, Detrich's counsel failed to consult with

25   any mental health professional to assist in his client's mitigation case, and presented no mental health

26   evidence to the sentencing court.  <u>Id.</u> at 976.  As discussed below, the state record here clearly shows

27   that Petitioner's trial counsel conducted an extensive background investigation, in addition to retaining

28   a mental health expert to conduct testing and evaluation.

In her penalty phase opening argument, Ms. Barranco stated that "[w]hat I hope to do though is present enough evidence to you to show you who is Terry Bemore, where did he come from, how did he end up a crack addict on Bates Street in the summer of 1985 in San Diego."  (RT 24862.)  Counsel noted that the jury would hear how Petitioner had been "born into a poor family," how family members suffered from drug and alcohol problems, and that Petitioner had been raised in a "pretty terrible" home situation.  (RT 24862-63.)  Counsel also stated that Petitioner had "some incredible achievements," conceded that he also had suffered "some pretty incredible failures," and stated that she also planned to present what kind of man he would be in prison, as well as provide insight into Petitioner's religious beliefs and current family situation.  (RT 24863-64.)

The defense called over forty witnesses to testify about Petitioner's childhood, adolescence, education, athletics, religious beliefs, employment, marriage and family life, and his behavior in prison.  Several witnesses spoke of the environment in which Petitioner was raised: his older siblings abused drugs and alcohol and committed crimes, his mother was ill and abused prescription medication, and the caretaker his mother hired inflicted physical abuse on Petitioner and his brother.  Witnesses also testified that Petitioner first used marijuana at age 9 or 10 and had his first sexual experience with his brother's wife at age 11 or 12.  At that same age Petitioner's brother used him as a lookout in committing burglaries.  An expert witness, Dr. Bucky, testified that children raised with a chemically dependent parent were significantly more likely to develop an addiction of their own.

Several witnesses testified regarding Petitioner's athletic ability and related pursuit of higher education through college basketball scholarships.  Petitioner's wife and several other witnesses spoke about Petitioner's employment history, which included stints in the military, ministry, law enforcement, and humane society.  These witnesses also detailed Petitioner's failed attempts at employment, struggles with substance abuse, and eventual descent into cocaine addiction.  Several correctional officers and jail chaplains testified regarding their past and present positive interactions with Petitioner and the future contributions they believed he could make to the jail environment.

In closing, counsel stated that "I take exception to Mr. Anear's [the prosecutor] qualification that there's no severe emotional disturbance.  How can you say a person who is a street crack addict has no emotional problems?  That's the whole reason they're - - they're acting in that way."  (RT

08cv0311

26345-46.)  Counsel pointed to the testimony and evidence of drug use, violence, alcohol, sex and poverty that permeated Petitioner's upbringing. (RT 26352-54.) Counsel noted that when Petitioner's mother fell ill his world fell apart, and she asserted that "for his whole life he's known nothing other than this chaotic life style where the older brothers reigned and their life styles reigned." (RT 26357.) Counsel also contended that in addition to the example set by his older brothers, Petitioner learned from his mother, her illness and her reliance on medications that "[t]his is how you cope, when life gets tougher you take a pill, you take a drug, you escape." (RT 26359.) Counsel urged the jury to vote for life without parole, stating that "his life is not one of those unredeemable ones," and that the jury should consider "his potential for contribution." (RT 26384.)

Here, it was not objectively unreasonable for the California Supreme Court to conclude that trial counsel's efforts in preparing and presenting evidence at the penalty phase were sufficient to satisfy the dictates of <u>Strickland</u>.  The state supreme court could have reasonably concluded that counsel's penalty phase investigation and presentation were indicative of a strategic choice to explain the Aztec robbery and murder of Mr. Muck as aberrant acts attributable to Petitioner's addiction to crack cocaine and to portray Petitioner- prior to and upon recovery from his descent into substance abuse- as a non-violent, religious, hard-working individual who strove to rise above his upbringing, better himself, and provide for his wife and children.

"[W]hile the Constitution requires that a criminal defendant receive effective assistance of counsel, the presentation of expert testimony is not necessarily an essential ingredient of a reasonably competent defense."  <u>Bonin v. Calderon</u>, 59 F.3d 815, 834 (9th Cir. 1995) (trial counsel acted reasonably in refraining from presenting expert testimony in mitigation, when such testimony would have opened door to repeated discussion on the defendant's brutal crimes and whether they fit the asserted diagnosis). Here, it is likely that any favorable expert mental state testimony would have been outweighed by the threat of damaging cross-examination regarding Dr. Fineman's initial analysis that the "[r]esults of personality testing reveal a man who, although casual and affable, is quite alert and subtly controlling," and that "[u]nfortunately, beneath the surface warmth he has little regard for others, experiencing people as either objects or obstacles." (Ex. 8 at ¶ 10.)

///

The Ninth Circuit's decision in <u>Frierson v. Woodford</u>, 463 F.3d 982 (9th Cir. 2006), is instructive.  In <u>Frierson</u>, trial counsel failed to consult with the retained psychiatrist or review reports generated by several experts and "was therefore unaware that a diagnosis of antisocial personality disorder even existed, and unaware of the extent of Frierson's chronic drug abuse," and the reviewing court reasoned that "[b]ecause strategy presupposes investigation, [counsel's] actions cannot be attributed to strategy."  <u>Id.</u> at 992.  In contrast, the state record in Petitioner's case reflects that Ms. Barranco reviewed the Fineman report, was aware of the diagnostic considerations that included anti-social personality disorder, and based on that information, made a decision to refrain from presenting such evidence.  Ms. Barranco also presented ample evidence of Petitioner's drug use and abuse in mitigation.  <u>See Frierson</u>, 463 F.3d at 991 ("The most evident lapse in professional competence was [trial counsel's] failure to prepare and present evidence of Frierson's chronic substance abuse for purposes of mitigation.")

Dr. Fineman's testing results, while raising a possibility of "mild, diffuse organic impairment," in addition to bi-polar affective disorder and intermittent explosive disorder, clearly indicated that anti-social personality disorder was also a potential diagnosis.  (Ex. 8 at 15-17.)  Despite the fact that Dr. Rosenthal's declaration fails to acknowledge that anti-social personality disorder was one of the three diagnostic considerations in Dr. Fineman's report (despite a lengthy discussion of the other two potential diagnoses), and that Dr. Fineman's declaration states that "[t]he more significant of my findings was the possibility of bipolar disorder," also omitting any mention or discussion of anti-social personality disorder, it is highly improbable that such information could have been kept from the jury had counsel presented expert testimony on Petitioner's mental state.

While Dr. Bucky now states that had he been provided with the Fineman materials, he would have recommended an investigation into Petitioner's mental state, he has never offered a diagnosis of Petitioner and does not indicate how his testimony would have been changed or strengthened by the Fineman report.  Had counsel provided Dr. Bucky with Dr. Fineman's testing results and report, he would have been subject to cross-examination on those materials upon which his opinion relied.  A protracted discussion on whether Petitioner fit the diagnostic criteria for anti-social personality disorder would have significantly undercut testimony about the prospect of other mental difficulties

1  or the possibility that Petitioner suffered from mild organic impairment.  Moreover, Dr. Fineman's

2  opinion that Petitioner was "seldom bothered by feelings of guilt or anxiety" and could be "quite self-

3  centered and impulsive, using whatever means are necessary to achieve his desires" would likely have

4  destroyed the effectiveness of the chosen penalty phase theory that Petitioner was ultimately "a good

5  guy with a drug problem."  (See Ex. 8 at ¶¶ 10-12; Ex. 3 at ¶ 10.)

6       At any rate, even were the Court to conclude that Petitioner has made a sufficient showing of

7  deficient performance, he fails to demonstrate prejudice.  See Strickland, 466 U.S. at 697.  In

8  determining prejudice, a reviewing court must "evaluate the totality of the available mitigation

9  evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding – in

10  reweighing it against the evidence in aggravation."  Williams, 529 U.S. at 397-98; see also Bonin, 59

11  F.3d at 834 (same).  In this case, it was not unreasonable for the California Supreme Court to conclude

12  that Petitioner's demonstration of prejudice fell short of a Strickland violation.  The evidence advanced

13  by the Fineman report and the declarations of Drs. Fineman, Bucky and Rosenthal establish only that

14  mental state mitigation evidence may have been available at the penalty phase, but Petitioner fails to

15  demonstrate any reasonable probability that the jury in his case, having been presented with all the

16  evidence now asserted, "would have concluded that the balance of the aggravating and mitigating

17  circumstances did not warrant death."  Mayfield v. Woodford, 270 F.3d 915, 928 (9th Cir. 2001)

18  (quoting Strickland, 466 U.S. at 695).  Additionally, "[t]he likelihood of a different result must be

19  substantial, not just conceivable."  Richter, 131 S.Ct. at 792.

20       In mitigation, a review of the state record clearly shows that trial counsel presented the jury

21  with substantial evidence on Petitioner's upbringing in a broken and impoverished home, surrounded

22  by substance abuse, criminal activity, and suffering physical abuse at the hands of a caretaker.  The

23  jury also heard about Petitioner's efforts to better himself through athletics, religion, education,

24  employment and starting a family.  Trial counsel effectively demonstrated that Petitioner's criminal

25  and violent activity bore a temporal correlation to his use and abuse of crack cocaine.  The potential

26  mental state mitigation evidence Petitioner now advances presents a double-edged sword: the

27  possibility of "mild" organic impairment and other potential mental disorders are tempered strongly

28  by the fact that Petitioner evidently also showed indications of anti-social personality disorder.

1    In aggravation, Petitioner's crime was brutal and ruthless - he tortured and murdered a liquor

2   store clerk during a robbery, inflicting at least 20 stab wounds over a period of 15 minutes in order to

3   attain access to a safe which he ended up carrying away from the crime scene anyway, the contents of

4   which he spent on drugs.  Evidence was also introduced regarding two prior unadjudicated offenses.

5   The first was an assault committed against a man who had gone to Petitioner's neighborhood to

6   retrieve a television from a friend, had a verbal altercation with Petitioner during which Petitioner hit

7   him in the head with a bottle, put a gun to his head, and threatened him and his family when both men

8   were transported to the hospital.  The second was the sexual assault of a woman who Petitioner

9   threatened and raped by knifepoint in her own home with her children in a neighboring room.

10   "The pivotal question is whether the state court's application of the <u>Strickland</u> standard was

11   unreasonable."  <u>Richter</u>, 131 S. Ct. at 785.  Here, Petitioner fails to demonstrate that "fairminded

12   jurists could disagree" on the correctness of the state supreme court's rejection of this claim, and relief

13   is therefore precluded.  <u>See id.</u> at 786 ("If this standard is difficult to meet, that is because it was meant

14   to be.")  Neither habeas relief nor an evidentiary hearing is warranted on Claim 14.  <u>See</u> <u>Schriro v.</u>

15   <u>Landrigan</u>, 550 U.S. 465, 474 (2007) ("[I]f the record refutes the applicant's factual allegations or

16   otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."); <u>see</u>

17   <u>also</u> <u>Totten v. Merkle</u>, 137 F.3d 1172, 1176 (9th Cir. 1986) (same).

18   **H.      Claim 8 - Ineffective Assistance of Trial Counsel - Failure to Challenge Torture Special**

19   **Circumstance**

20   In Claim 8, Petitioner contends that defense counsel at trial were prejudicially ineffective in

21   failing to dispute that the murder victim was tortured, violating his rights under the Fifth, Sixth, Eighth

22   and Fourteenth Amendments.  (Pet. at 85.)  He asserts that "counsel did not even bother to sit in on

23   the Cosby trial" and subsequently "were not aware of the impressive array of evidence presented in

24   the Cosby trial [] that refuted the torture special circumstance."  (Pet. Brief at 103.)  The trial record

25   refutes this contention, as it is clear that lead counsel requested, and was granted, daily transcripts of

26   Mr. Cosby's trial because, "I anticipate that the majority of witnesses who will testify in the guilt

27   portion of their case will also be those testifying in the guilt portion of Mr. Bemore's case." (RT 7566-

28   67.)  Later exchanges during Petitioner's trial demonstrate lead counsel's awareness of testimony

1   presented at Mr. Cosby's trial.  (See e.g. RT 22996) (Mr. McKechnie asserted at a side bar conference

2   that a witness's testimony at Petitioner's trial and in prior interviews was "different than what it was

3   in the trial of Mr. Cosby.")

4        Additionally, the record before the Court reveals that trial counsel conducted at least some

5   investigation, including contacting and consulting with an expert regarding the victim's cause of death.

6   Specifically, one defense funding request indicates that trial counsel "consulted with Richard Petty

7   M.D., a forensic pathologist," who "reviewed the coroner's report in the case against Mr. BEMORE

8   and made certain comparisons regarding the manner of death with the autopsy report concerning the

9   case against co-defendant Cosby." (Ex. 5 at 4.) This appears to belie Petitioner's contention that trial

10  counsel simply failed to make any attempt to counter or dispute the evidence of torture.  It is also

11  evident that his trial counsel made pretrial and investigative efforts to counter and limit the evidence

12  introduced regarding the torture-murder special circumstance.  Counsel moved to join Mr. Cosby's

13  motion concerning Detective Kennedy's testimony, and secured the same "limit [of] the expert

14  testimony concerning blood splatter" as was presented in Mr. Cosby's trial.  (RT 18179-81.)  Trial

15  counsel also filed and argued, with counsel for co-defendant Cosby, a motion to strike the torture

16  special circumstance prior to trial.  (RT 33-60) (see e.g., RT 34-35, in which second chair trial counsel

17  contended that "the mention of the word torture I think to the jury is going to be unduly prejudicial,"

18  and stated that "based on all the facts we have, there simply isn't enough to show torture," and argued

19  that "in this case where what you have are stab wounds - there - there's a case I cited which says stab

20  wounds alone are not enough, because it could have been a flurry of violence just as easily as it could

21  have been torture.") Then, when the trial court rejected those attempts, counsel moved to limit the

22  evidence introduced on torture.

23        While Petitioner expends great effort in detailing the testimony of a number of defense experts

24  called to testify at co-defendant Cosby's trial,[18] Respondent offers a contrasting account of the Cosby

25

26        [18] Petitioner specifically identifies four expert witnesses who testfied for the Cosby defense regarding
    the torture special circumstance: Keith Inman, a criminalist who testified on the bloodstain patterns; Donald

27  A. Kennedy, Ph.D., a Fluid Dynamicist who testified for five days about the bloodstain and crime-scene
    analysis performed by the prosecution experts; Thomas Dean Noguchi, M.D., a forensic pathologist who

28  testified about the knife wounds, the weapons used to make the wounds, and disputed the prosecution's
    evidence about the length of time involved in the murder; and Hormez Guard, M.D., a forensic pathologist who
    also offered testimony about the knife wounds, the victim's manner of death, and opined that the knives in

1    trial defense, indicating credibility issues and past errors in the work of several of those expert

2    witnesses.[19]  (See Pet. Brief at 97-103; Ans. at 37-38.)  Petitioner emphasizes the fact that the jury did

3    not find true either the robbery or torture special circumstance against Mr. Cosby for the Aztec crimes.

4    (See Pet. Brief at 96, 97, 103; Cosby CT 2246.)   However, Respondent adds that the Cosby jury

5    volunteered that their vote on both special circumstances was 11 to 1 in favor of a true finding.  (Ans.

6    at 104; Cosby RT 17394.)

7         Regardless of the strength of the witnesses called in the Cosby case, or the result of that trial,

8    Petitioner fails to demonstrate that his own trial counsel was prejudicially deficient in declining to

9    employ a similar defense strategy.  Mr. Cosby admitted his presence at the Aztec crime scene but

10   contended that Petitioner was the primary perpetrator of the robbery, torture, and murder.  In contrast,

11   as detailed below, Petitioner presented a defense of alibi, claiming that he was innocent of the Aztec

12   crimes, and at the time of Mr. Muck's murder, was in a neighboring city committing another robbery

13   and buying drugs with the proceeds of that robbery.

14        Given these respective defenses, Mr. Cosby had a much better reason to attempt to counter the

15   evidence of torture, while it appears that Petitioner's alibi defense was inconsistent with a comparable

16   strategy.  Had Petitioner's trial jury found reasonable doubt due to the alibi defense, they would never

17   have reached a decision on the torture special circumstance.  If Petitioner had challenged the torture

18   special circumstance, it could have either diluted the alibi defense or allowed the implication that the

19   primary defense of alibi could be rejected, and would have resulted in needlessly protracted testimony

20   emphasizing the gruesome nature of the victim's suffering and death.  Ultimately, Petitioner fails to

21   demonstrate that trial counsel's decision to employ an alibi defense and to avoid extensive testimony

22

23

24   _____

     evidence did not cause the wounds of the deceased.  (Pet. Brief at 97-103.)

25

26        [19] Respondent notes that the prosecutor's cross-examination of Inman revealed that the crime scene
     photographs he used for his analysis were second generation photographs which were of limited use in
     interpreting the scene; witness Donald Kennedy had never been to a crime scene, had limited experience on
27   some types of blood patterns, and had never undertaken schooling in forensic blood pattern analysis; witness
     Thomas Noguchi had worked with and respected Dr. Bucklin, the prosecution's testifying forensic pathologist,
28   and had referred cases to him; and Hormez Guard had produced error-filled autopsy reports in the past, had
     previously worked under Dr. Bucklin, and had been terminated as a consultant to the San Diego Medical
     Examiner's Office.  (Ans. at 37-38.)

                                            44                                   08cv0311

1   dwelling on the wounds suffered by the victim and the sufficiency of the evidence supporting the

2   torture allegation was not the result of "sound trial strategy."  Strickland, 466 U.S. at 689.

3          At any rate, even had trial counsel mounted a successful defense to the torture murder special

4   circumstance by attempting to demonstrate that the victim was not tortured, Petitioner was convicted

5   of first degree murder and the jury also found true a special circumstance of murder in the course of

6   a robbery.  Thus, regardless of the finding on the torture special circumstance, the case would have

7   proceeded to a penalty phase, where the jury would still have been able to consider the circumstances

8   of the gruesome crime, one in which the victim had suffered well over thirty stab wounds, in

9   determining the appropriate penalty.  Petitioner has not shown any "reasonable probability that, but

10  for counsel's unprofessional errors, the result of the proceeding would have been different."

11  Strickland, 466 U.S. at 694.  Based on an independent review of the record, it is clear that the

12  California Supreme Court's rejection of this claim was not objectively unreasonable.  See Richter, 131

13  S. Ct. at 785.  Neither an evidentiary hearing nor habeas relief is warranted on this claim.

14  **I.    Claim 9 - Ineffective Assistance of Trial Counsel - Failure to Investigate and Present**

15         **Evidence of Petitioner's Mental Incompetence at Trial**

16         In Claim 9, Petitioner asserts that trial counsel "failed to investigate, seek a hearing and present

17  evidence that Petitioner was mentally incompetent during crucial pretrial and trial proceedings," in

18  violation of his constitutional rights guaranteed under the Fifth, Sixth, Eighth and Fourteenth

19  Amendments.  (Pet. at 99.)

20         The conviction of a legally incompetent defendant violates the constitutionally guaranteed right

21  to due process of law.  Cooper v. Oklahoma, 517 U.S. 348, 354 (1996); Cacoperdo v. Demosthenes,

22  37 F.3d 504, 510 (9th Cir. 1994).  The test for competency is "whether the defendant has 'sufficient

23  present ability to consult with his lawyer with a reasonable degree of rational understanding' and has

24  'a rational as well as factual understanding of the proceedings against him.'"  Godinez v. Moran, 509

25  U.S. 389, 396 (1993) (quoting Dusky v. United States, 362 U.S. 402 (1960)); Hernandez v. Ylst, 930

26  F.2d 714, 716 n.2 (9th Cir. 1991).  Factors relevant to this determination include "evidence of a

27  defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence

28  to stand trial."  Drope v. Missouri, 420 U.S. 162, 180 (1975) (citing Pate v. Robinson, 383 U.S. 375

1   (1966)); see also United States v. Lewis, 991 F.2d 524, 527 (9th Cir. 1993).   The burden of

2   establishing mental incompetence rests with the petitioner.  Boag v. Raines, 769 F.2d 1341, 1343 (9th

3   Cir. 1985).

4          The record before the Court fails to show that Petitioner was incompetent to stand trial.  The

5   Court's independent review of the record offers no evidence of any outbursts by Petitioner, nor any

6   inappropriate or outlandish behavior.   Similarly, the record lacks any indication that either of

7   Petitioner's defense attorneys harbored a suspicion that Petitioner lacked the competency to stand trial.

8   See Medina v. California, 505 U.S. 437, 450 (1992) ("defense counsel will often have the best-

9   informed view of the defendant's ability to participate in his defense"); Odle v. Woodford, 238 F.3d

10  1084, 1088 (9th Cir. 2001).  Ms. Barranco submitted two declarations in support of the federal

11  petition, yet at no point in either declaration does she indicate a belief that Petitioner may have been

12  incompetent, that he failed to understand the proceedings, or that he was unable to assist her in

13  preparing a defense at trial.

14         The record is similarly devoid of any evidence that other involved parties expressed doubts

15  about Petitioner's competence during trial.  Jury expert Jo-Ellan Dimitrius found Petitioner to be "a

16  delight to work with," described him as "cooperative, trusting and grateful," and stated that on Ms.

17  Dimitrius's last day in court, Petitioner "thanked me profusely for my efforts."  (Ex. 17 at ¶ 22); see

18  Hernandez v. Ylst, 930 F.2d at 718 ("[w]e deem significant the fact that the trial judge, government

19  counsel, and Hernandez's own attorney did not perceive a reasonable cause to believe Hernandez was

20  incompetent.") Psychologist Steven Bucky interviewed Petitioner between the trial's guilt and penalty

21  phases.  (RT 25014-17.)  Social anthropologist Isabel Wright, Ph.D wrote a letter to the trial court

22  judge prior to Petitioner's sentencing hearing and stated that in the course of her work she "had many

23  conversations with Terry."  (CT 1486-89.)  Benjamin Braziel also a wrote a letter on Petitioner's

24  behalf prior to the sentencing hearing and described Petitioner as an "intelligent and understanding

25  man."  (CT 1492.)  Not one of these individuals, each of whom had contact with Petitioner before and

26  during the time of trial, expressed a concern that Petitioner lacked the ability to understand the

27  proceedings or was incapable of assisting counsel in his own defense.  See Dusky, 362 U.S. at 402.

28  ///

46

1    Petitioner's primary evidence supporting this claim is the declaration of psychiatrist Dr. Fred

2    Rosenthal,[20] who cites liberally from the 1988 Fineman evaluation.  Dr. Rosenthal states:

3        As observed in the [Fineman] report: "Mr. Bemore may be an adult who as a child had
         an attention deficit disorder that seriously impacted his ability to attend to and profit
4        from his environment.  His present high energy level and restlessness would be
         consistent with a residual attention deficit disorder of adulthood.  A disorder of
5        childhood which has never been resolved." That, in combination with the other mental
         disabilities of Mr. Bemore, e.g., bi-polar affective disorder, organic impairment,
6        pathologically impaired judgment, should have alerted trial counsel that their client
         might not have been able to assist them in conducting a defense in a rational manner
7        under Penal Code § 1367(a).  The residual attention deficit disorder would have made
         it difficult for Mr. Bemore to have followed and understood the lengthy and complex
8        pretrial and trial proceedings.

9    (Lodgment No. 15, Ex. 41 at ¶ 25.)

10    What Dr. Rosenthal's report does not mention is that in Dr. Fineman's 1988 evaluation, the

11   psychologist found Petitioner to be "pleasant, agreeable, cooperative and compliant throughout the

12   lengthy hours of testing." (Ex. 8 at 2.)  Moreover, the Fineman evaluation also contained results of

13   intelligence testing indicating that Petitioner was "functioning at the low end of the average range,"

14   which Dr. Fineman stated was "a surprising finding in that in conversation at a social level, Mr.

15   Bemore presents as a highly articulate and intelligent man." (Id. at 14.)  Dr. Fineman also concluded

16   that Petitioner had "mild, diffuse organic impairment," but added that Petitioner's "impairment, it must

17   be stressed, is quite mild and not discernable under ordinary conditions." (Id. at 17.) Moreover, while

18   Dr. Fineman's declaration criticizes counsel for failing to pursue guilt or penalty phase defenses

19   regarding Petitioner's mental state *at the time of the crime*, the psychologist does not allege that

20   Petitioner lacked competence *to stand trial*.  (Ex. 60.)

21    In any event, Dr. Rosenthal's opinion regarding competency, first offered in June 2000, over

22   ten years after Petitioner's trial and based largely on Dr. Fineman's 1988 report, is certainly not to be

23   given greater weight than the perceptions of the trial court, Petitioner's own counsel, and other medical

24   and professional personnel who came into contact with Petitioner at the time of his trial.  None of these

25

26

27        [20]As stated earlier in footnote 10, while the 2009 Rosenthal declaration was not presented to the
     California Supreme Court, a declaration signed in 2000 was submitted in support of the state habeas petition.
     Despite the fact that paragraphs 25 of the 2000 and 2009 declarations appear to be identical, the Court will,
28   in an abundance of caution, limit its consideration to the 2000 Rosenthal declaration.  See Pinholster, 131 S.Ct.
     at 1398 (A habeas court's review pursuant to § 2254(d) "is limited to the record that was before the state
     court.")

08cv0311

1   people raised any doubts about Petitioner's competency to stand trial.  See Williams v. Woodford, 384

2   F.3d 567, 608 (9th Cir. 2004) (in considering facts and evidence presented in support of a claim of a

3   petitioner's incompetence at trial, the reviewing court will "disfavor retrospective determinations of

4   incompetence, and give considerable weight to the lack of contemporaneous evidence of a petitioner's

5   incompetence to stand trial.")

6       Claim 9 is without merit because Petitioner does not show that counsel performed deficiently

7   or that he suffered any actual prejudice.  Strickland, 466 U.S. at 689.  A reviewing court must

8   "examine the reasonableness of counsel's conduct 'as of the time of counsel's conduct.'"  United

9   States v. Chambers, 918 F.2d 1455, 1461 (9th Cir. 1990) (quoting Strickland, 466 U.S. at 690.)  The

10  record does not support Petitioner's claim that he was unable to understand the proceedings against

11  him or assist counsel in preparing a defense.  In the absence of any evidence arising from Petitioner's

12  actions at the time of trial, and the lack of any indication from counsel, the court, or other individuals

13  involved in the trial proceedings that Petitioner was not competent, the Court cannot fault trial counsel

14  for failing to raise this issue at trial.

15      Based on an independent review of the record, the state court's rejection of this claim was not

16  an objectively unreasonable application of clearly established federal law.  Petitioner is not entitled

17  to an evidentiary hearing on this claim.  See Schriro, 550 U.S. at 474.

18  **J.    Claim 10 - Ineffective Assistance of Trial Counsel - Alibi Defense**

19      In Claim 10, Petitioner asserts that trial counsel was prejudicially ineffective in presenting an

20  alibi defense, and failed to investigate and consider other available defenses, such as mental defenses,

21  violating his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.  (Pet. at 104.)

22          1.    Exhaustion

23      The exhaustion of available state judicial remedies is generally a prerequisite to a federal

24  court's consideration of claims presented in habeas corpus proceedings.  See 28 U.S.C. § 2254(b);

25  Rose v. Lundy, 455 U.S. 509, 522 (1982).  To exhaust state judicial remedies, a petitioner must present

26  the California Supreme Court with a chance to rule on the merits of every issue raised in his or her

27  federal habeas petition.  28 U.S.C. § 2254(b), (c); Granberry v. Greer, 481 U.S. 129, 133-34 (1987).

28

1    Moreover, a petitioner must have presented the same factual basis and legal theory in state court for

2    the claim that he presents in federal court.  Gray v. Netherland, 518 U.S. 152, 163 (1996).

3         Respondent alleges that "Bemore suggests a new factual scenario never before suggested in

4    his state court appeal, state habeas petition, or federal habeas corpus petition, to wit: Lead trial counsel

5    McKechnie concocted the false alibi story described by Bemore in his guilt phase trial testimony."

6    (Opp. at 107.)  Indeed, in his opening brief Petitioner alleges that his attorney was an active and

7    knowing participant in presenting a false and weak alibi defense to the jury[21] and contends that "[e]ven

8    if believed, the lead lawyer's *concocted* alibi defense did not stand up."  (Pet. Brief at 111) (emphasis

9    added.)

10        An examination of the state court briefs confirm that this argument was never presented to the

11   state court for review.  Instead, Petitioner's argument before the California Supreme Court on state

12   habeas review alleged that trial counsel was ineffective for employing an untenable alibi defense,

13   failing to adequately investigate that defense, and failing to consider other available mental defenses.

14   (Lodgment No. 15 at 118-30.)  Petitioner never presented the state court with an allegation that trial

15   counsel knowingly participated in presenting a false alibi to the jury.  "A thorough description of the

16   operative facts before the highest state court is a necessary prerequisite" for providing that court a fair

17   opportunity to hear a claim.  Kelly v. Small, 315 F.3d 1063, 1069 (9th Cir. 2003).  It appears that the

18   state court did not have a fair opportunity to hear this factual assertion on the merits.  Nonetheless, a

19   federal court has the discretion to deny a claim on the merits despite a petitioner's failure to fully

20   exhaust state judicial remedies.  See 28 U.S.C. 2254(b)(2); Gatlin, 189 F.3d at 889.  As Claim 10 is

21   without merit, the Court denies the claim notwithstanding Petitioner's failure to exhaust.

22   ///

23   ///

24

---

25   [21] Petitioner's opening brief also contends that: "Lead counsel knew that Petitioner did not commit the
     Wherehouse robbery and that the alibi was false.  Yet, the lawyer had his client lie by testifying that he
26   committed the robbery.  That absurd testimony failed and harmed Petitioner at the guilt phase, but also greatly
     harmed him at the penalty phase.  Following [his] lead attorney's instructions, Petitioner who [sic] stated that
27   on August 26, 1985, at approximately 9:00 p.m. he committed the robbery at the Wherehouse record store."
     (Pet. Brief at 108-09.) Petitioner also noted that his testimony regarding the Wherehouse surroundings did not
28   reflect their 1985 appearance, but instead reflected their appearance at the time of trial because "Mr.
     McKechnie has provided the unsuspecting Petitioner with false information concerning the physical facts and
     encouraged him to incorporate the information in his testimony."  (Id. at 113.)

2.      Merits

Petitioner advances a number of arguments with respect to his alibi defense, which the Court will address in turn.  First, to the extent Petitioner now asserts that lead counsel knowingly "concocted" and presented a false alibi defense to the jury, rather than simply failed to investigate a weak alibi defense, the Court finds no support for this new contention.  Petitioner, who submitted his own declaration in support of the federal habeas petition, makes no such claim.  The state trial record indicates that Petitioner maintained his innocence of the Aztec crime throughout the trial and post-trial proceedings, and offered no indication that his alibi defense had been advanced at the behest of trial counsel.  (RT 24000-04) (Petitioner denied involvement in the Aztec robbery-murder in San Diego and testified that at the time of the Aztec crimes, he was committing a robbery of the Wherehouse Records store in the neighboring city of El Cajon); (See CT 1491) (Letter from John T. Culberson to the trial court, stating that Petitioner told him "you know I wouldn't kill anyone"); (CT 1573-74) (probation report stating that in a 10/9/89 interview Petitioner "maintains his innocence and states that at the time of the murder he was, in fact, involved in the robbery at the Wherehouse records in El Cajon," and in a 10/20/89 interview "[t]he defendant was cooperative in the probation interview and maintained his innocence throughout.")  Similarly, Ms. Barranco, who asserts that she and lead counsel rendered ineffective assistance of counsel in many aspects of their trial representation of Petitioner, offers no indication that she or lead counsel were involved in "concocting" or presenting a false alibi defense at trial.

Second, to the extent Petitioner contends that trial counsel was ineffective for failing to adequately investigate the alibi defense prior to presenting it, the Court finds that the California Supreme Court's rejection of this claim was reasonable, as the claim is without merit.  Specifically, Petitioner alleges that trial counsel failed to interview any of the three testifying eyewitnesses to the Wherehouse robbery, and asserts that "[h]ad counsel adequately investigated the case, they would have realized that the alibi defense was stupid and had not [sic] possibility of success."  (Pet. Brief at 111.) Ms. Barranco indicates that Mr. McKechnie had "apparently not directed investigators to interview a number of key witnesses like [Wherehouse records witness] Yolanda Salvatierra."  (Ex. 3 at ¶ 27.) "[A] particular decision not to investigate must be directly assessed for reasonableness in all the

circumstances, applying a heavy measure of deference to counsel's judgments." Strickland, 466 U.S. at 691.  A review of the state record reveals that the defense was already in possession of police statements and preliminary hearing testimony from the three Wherehouse eyewitnesses, two of whom had identified Petitioner as the perpetrator, and clearly shows that trial counsel examined the witnesses to the robbery and the police officers involved at the preliminary hearing.  (See e.g., RT 24408; 24288-97.)  Moreover, when counsel previously examined those three witnesses - Ms. Salvatierra,[22] Ms. Rainer,[23] and Ms. Jacobs[24] - at the preliminary hearing in the Wherehouse case, he questioned each individual at length regarding their description of the assailant and identification of Petitioner.  (See Lodgment No. 2; Volume XIV - Salvatierra and Rainer, Volume XVIII - Jacobs.)  Thus, granting the strong presumption that counsel's conduct "falls within the wide range of reasonable professional assistance," Petitioner fails to demonstrate that counsel's decision not to conduct additional interviews of these witnesses violated the dictates of Strickland.  Id., 466 U.S. at 689.

The cases Petitioner relies on in support of his claim are distinguishable.  In Johnson v. Baldwin, 114 F.3d 835 (9th Cir. 1997), trial counsel was ineffective in failing to investigate the defendant's "incredibly lame" alibi, in which the defendant denied that he was present at the scene of the crime but "did not state where he was, or elaborate in any other way."  Id. at 838.  In light of the

---

[22] Yolanda Salvatierra, who worked at the Wherehouse Records store in 1985, testfied at trial that on August 26 at 9 p.m., a man came in, asked about records, then went out to get his checkbook.  (RT 24285-88.)  Salvatierra stated that the same man returned to the store, said he had his checkbook with him all along, pulled out small gun, and asked her to open the register.  (Id.)  At trial, Salvatierra acknowledged that she testified previously about the robbery [at the preliminary hearing on the Wherehouse robbery case] in November 1986 and identified Petitioner as the robber at that time but stated that she was unsure who robbed her when she testified in 1986, was not sure of her identification at that time, and was currently unsure if Petitioner was the assailant.  (RT 24288-95.)

[23] Kim Rainer, who worked at the Wherehouse store at the time of the robbery, testified at Petitioner's trial that she was shook up by the robbery and therefore initially described the perpetrator as taller than he actually was.  (RT 24410-13.)  Rainer later amended her description to state that the assailant was likely 6'2" rather than 6'4", athletic, and very muscular.  (RT 24413-15.)  In her trial testimony, Rainer stated that she did not recall the assailant's face, but believed he had fair skin and a lighter complexion than Petitioner, and could not currently identify anyone as the perpetrator of that crime.  (RT 24415-19.)

[24] Carrie Jacobs, whose prior [preliminary hearing] testimony was read to the jury due to her unavailability as a witness, lived in El Cajon in 1985, and was in the Wherehouse Records store on August 26 during the robbery.  (RT 24341-43.)  Jacobs was not aware that a robbery had occurred until the suspect left, and described the suspect as a man, 6'1", muscular African-American, with close-shaven hair, who was wearing a shirt, shorts, and worn-out tennis shoes.  (Id.)  Jacobs identified Petitioner as the perpetrator, after previously identifying Petitioner at a line up and picking his photo out of an array when police came to her home after the robbery.  (RT 24343-67.)

State's "extremely weak" case against the defendant, the reviewing court found it was the jury's "adverse credibility determination that probably tipped the balance against him." Id. at 840. In contrast, Petitioner's alibi defense was supported by the prior identifications of two witnesses to the Wherehouse robbery, in addition to Petitioner's own detailed testimony. Moreover, the State's case against Petitioner was not weak, as a car similar to Petitioner's was seen in the vicinity, Petitioner admitted to helping open and dispose of the Aztec safe, shavings from the safe were in his rented garage, shoe prints similar to his size and type were found at the crime scene, and he made damaging admissions about the crime to several individuals in the weeks and months after the murder.

In Phillips v. Woodford, 267 F.3d 966 (9th Cir. 2001), the Ninth Circuit found colorable a claim of ineffective assistance of counsel where trial counsel presented a weak and uncorroborated alibi defense and failed to pursue a stronger alternative defense despite available evidence supporting that defense. Phillips' own trial counsel admitted that he "never thought [the defendant's] alibi defense had any merit." Id. at 977. In contrast, Petitioner's alibi was detailed, partially corroborated by witness testimony, and the jury was aware that Petitioner had been arrested and charged with the Wherehouse robbery and that a preliminary hearing had been held on that case at which witnesses testified he was the perpetrator. Moreover, Petitioner offers nothing to support his conclusory contention that trial counsel knew or believed the alibi defense was false or lacked merit.

Third, with respect to Petitioner's contention that trial counsel was ineffective for failing to explore and pursue other defenses such as mental defenses, circuit authority clearly indicates that it is "within the broad range of professionally competent assistance for [defense counsel] to choose not to present psychiatric evidence which would have contradicted the primary defense theory." Correll v. Stewart, 137 F.3d 1404, 1411 (9th Cir. 1998); see also Stern, 519 F.2d at 524-25. Given that Petitioner maintained his innocence of the Aztec crimes, and that several witnesses had identified him as the assailant in a store robbery in a nearby city that occurred at roughly the same time as the Aztec murder/robbery, counsel was not ineffective in choosing to present that defense at trial and declining to present mental state evidence that would have contradicted the primary defense theory of alibi/innocence.

///

1    To the extent Petitioner asserts that trial counsel was ineffective for failing to investigate and

2  present Petitioner's drug use to the jury, the contention is without merit.  Petitioner notes that

3  "[c]ounsel possessed information indicating that at the time prior to and including the homicide,

4  Petitioner was suffering from severe mental illness including bi-polar affective disorder, organic

5  impairment, and impaired judgment.  Counsel was also aware that Petitioner had a long history of drug

6  use which began at the age of nine, and that prior to and at the time of the homicide he had been

7  ingesting large quantities of drugs." (Pet. Brief at 113.)  While the mental state information was not

8  presented to the guilt phase jury,[25] the state trial record reveals that Petitioner and several other guilt

9  phase witnesses testified about Petitioner's drug use in the summer of 1985, the time surrounding the

10  Aztec robbery/homicide.  (See e.g. RT 23531-34 - Angela Tabor testified that Cosby and Petitioner

11  used drugs and argued over amounts of drugs, money, and sharing drugs; RT 23711-15 - Lloyd

12  Howard testified that he sold drugs to Petitioner in 1985; RT 23993-96 - Petitioner testified that he

13  used drugs in 1985; RT 23996-24004 - Petitioner testified that he used drugs on the day of the Aztec

14  crimes.)

15    Petitioner adds that "[t]he prejudice is apparent in the outcome of the co-defendant's case,"

16  contending that "Keith Cosby, who was tried prior to Petitioner, admitted to being present at the

17  [Aztec] homicide scene, but denied killing the deceased" and "[h]ad trial counsel bothered to observe

18  the co-defendant's trial" they could have better assessed the prosecution's case and refuted the

19  allegations.  (Pet. Brief at 114-15.)  While Ms. Barranco concedes that she did not sit in on Mr.

20  Cosby's trial, she states "I did read transcripts of portions of it," and notes that "[a] mental defense was

21  presented to Cosby's jury and as a result, he did not receive a death sentence even though he was

22  convicted of two separate murders."  (Ex. 3 at ¶ 7.)[26]  Regardless of the fact that Mr. Cosby's trial

23  defense strategy and ultimate outcome differed from Petitioner's, Petitioner fails to demonstrate that

24  his own trial counsel's decision to present the ultimately unsuccessful alibi defense constituted

25

26    [25] Trial counsel's allegedly prejudicial failure to investigate and present mental state defenses at the
27  guilt phase is the subject of Claim 7, supra.

28    [26] See also Lodgment No. 23 at 9 (state appellate court's account of factual background recounted that,
at trial, "Cosby claimed he lacked the specific intent to rob in either case because of brain damage suffered as
a result of childhood absue, childhood head injuries, and drug ingestion.")

1   prejudicially deficient performance.  See Strickland, 466 U.S. at 689 ("It is all too tempting for a

2   defendant to second-guess counsel's assistance after a conviction or adverse sentence, and it is all too

3   easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a

4   particular act or omission was unreasonable.")

5          3.    Conclusion

6          "There are countless ways to provide effective assistance in any given case."  Strickland, 466

7   U.S. at 689.  Here, Petitioner fails to demonstrate that trial counsel's decision to present an alibi

8   defense in lieu of a mental state or other potentially available defense constituted deficient

9   performance.   Nor does he establish that "there is a reasonable probability that, but for counsel's

10  unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  For these

11  reasons, the Court concludes that the California Supreme Court's rejection of this claim was not

12  objectively unreasonable.  Petitioner is not entitled to habeas relief or an evidentiary hearing.

13  **K.    Claim 11- Ineffective Assistance of Trial Counsel- Performance in Selecting the Jury**

14         In Claim 11, Petitioner alleges that trial counsel was prejudicially ineffective during jury

15  selection, violating Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to

16  the United States Constitution.  (Pet. at 113.)  Specifically, Petitioner contends that he was prejudiced

17  by counsel's: (1) failure to prepare for voir dire and conduct an adequate voir dire examination,

18  particularly during the death qualification voir dire; (2) failure to exercise more than two of the twenty-

19  six allotted peremptory challenges; (3) failure to remove Juror Ghaderi, who was in favor of the death

20  penalty; and (4) entering into a stipulation with the prosecutor to remove prospective jurors from the

21  panel based on their homosexuality.  (Pet. Brief at 116-21.)

22         1.    Preparation for and Conduct of Voir Dire

23         Petitioner asserts that "[l]ead counsel's participation in jury selection was perfunctory," and

24  asserts that counsel failed to review the juror questionnaires prior to voir dire or to consult adequately

25  with the retained jury-selection expert.  (Pet. Brief at 119.)  Petitioner claims that Mr. McKechnie, who

26  as lead counsel retained control over the direction of the case, which included voir dire, failed to

27  adequately prepare for and conduct jury selection.

28  ///

On direct appeal[27] the California Supreme Court reasoned in relevant part:

Viewed in context, jury selection as a whole occurred over a 10-week period. Present in court throughout this process, including death qualification, was Dr. Jo-Ellan Dimitrius, a jury expert assisting the defense.

Our review discloses nothing perfunctory about *Hovey* voir dire in general, or about defense counsel's performance in particular. (Cf. *People v. Lewis* (1990) 50 Cal.3d 262, 290-291 [266 Cal.Rptr. 834, 786 P.2d 892][no incompetence based on counsel's participation in one-day voir dire in capital case].) Six and one-half weeks-or 65 percent-of the time spent selecting the jury was devoted to death qualification. Around 160 prospective jurors appeared during this phase and were not excused for hardship or by stipulation of the parties. Individual *Hovey* examinations-which consumed about 3,500 pages of the reporter's transcript-followed the same basic pattern. The trial court first asked questions, and then gave both defense counsel and the prosecutor the opportunity to do so. Sometimes follow-up inquiries were made. No restrictions appear to have been placed on the number or nature of questions that could be asked. (Cf. *People v. Tuilaepa* (1992) 4 Cal.4th 569, 586-587 [15 Cal.Rptr.2d 382, 842 P.2d 1142] [approving *Hovey* voir dire limited to four questions with almost no follow-up inquiry by defense counsel].)

Contrary to what defendant now claims, the record suggests his trial attorneys "participated fully in the process, and did so intelligently." (*People v. Freeman* (1994) 8 Cal.4th 450, 485 [34 Cal.Rptr.2d 558, 882 P.2d 249, 31 A.L.R.5th 888] [rejecting ineffectiveness claim based on the nature and extent of counsel's questions about capital punishment].) Defense counsel questioned at least 86 prospective jurors, including a large number of actual jurors in the case.[FN15] Counsel also exercised at least 34 challenges for cause, and vigorously opposed several prosecutorial challenges based on the individual's views on capital punishment.

> FN15 Defense counsel did not question four people selected as jurors (Augustine A., Kenneth A., Carl C., and Clayton C.), and two people originally chosen as alternate jurors (Elizabeth D. and James H.). Alternate Elizabeth D. replaced an actual juror during trial, bringing to five the total number of persons who voted as jurors and were not questioned by the defense during *Hovey* voir dire.

Counsel's decision to forgo questioning in some instances seems tactically sound on this record. (E.g., *People v. Freeman, supra,* 8 Cal.4th 450, 485; see *People v. Smithey* (1999) 20 Cal.4th 936, 986-987 [86 Cal.Rptr.2d 243, 978 P.2d 1171] [stating general rule that ineffectiveness claims are rejected on appeal unless "there could be no satisfactory explanation for counsel's performance"].) Defendant's attorneys typically remained silent when the examination otherwise revealed that a prospective juror did not strongly favor capital punishment, or was amenable to life imprisonment without parole. By not probing deeper into the matter, defense counsel reduced the risk of

---

[27] In his Motion for Evidentiary Hearing, Petitioner argues that the direct appeal opinion could not consider the full scope of this claim because the declarations of Ms. Dimitrius and Ms. Barranco were not submitted until state habeas review. (Mot. at 13.) However, when Petitioner re-raised this claim on state habeas review, the California Supreme Court would have considered the claim and exhibits at that time.

Separately, as the state habeas petition was rejected on the merits without a statement of reasoning, the Court must "look through" that order to the last reasoned decision on this claim, which is the direct appeal. See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991) ("The essence of unexplained orders is that they say nothing. We think that a presumption which gives them *no* effect- which simply "looks through" them to the last reasoned decision- most nearly reflects the role they are ordinarily intended to play.") (italics in original).

"antagoniz[ing] the juror," or exposing pro-life scruples that might "give the prosecution a reason to use a peremptory challenge or even grounds for a challenge for cause." (*People v. Freeman*, *supra*, 8 Cal.4th at p. 485; see *People v. Cox* (1991) 53 Cal.3d 618, 657-659 [280 Cal.Rptr. 692, 809 P.2d 351].) At bottom, nothing shows counsel was incompetent for the reasons urged by defendant.

Bemore, 22 Cal. 4th at 835-36.

Ms. Barranco asserts that:

During jury selection, Logan never took home any questionnaires. As a result, he did not review these materials before speaking with the prospective panel members. I would review them each night as would our jury expert, Jo-Ellan Dimitrius. Both of us had many conversations about our frustration over the fact that Logan never seemed to prepare for voir dire. It was as if he relied on us to tell him what he needed to ask. Logan's lack of preparedness was visibly noticeable even to our trial judge. On the day set for examination of the panel as a group (versus the individualized Hovey inquiry), the court criticized Logan out of the prospective jurors' presence. The court stated that if he had read the jurors' questionnaires, he would have found the answers to most [of] the questions he posed. Logan was so offended by the judge's comment that when court reconvened, he only asked a couple more questions and then angrily stated that he passed for cause as he slammed his files onto the table. As a result of this, to my horror, several of the jurors who eventually sat on Petitioner's case were never examined during general voir dire. Logan was so angered by the court's comments that he refused to do any more voir dire even though the alternates had not been examined. That was why I questioned the prospective alternates the following morning.

(Ex. 3 at ¶ 24.)[28]  In a memo to trial counsels' file dated April 19, 1989, Ms. Barranco memorialized her dissatisfaction with the voir dire examination, expressing her disappointment that Mr. McKechnie initially "asked questions only of those persons he thought he could have excused for cause," and that upon her inquiry into his reasons for conducting the death qualification voir dire in this manner, Mr. McKechnie stated that he "intended our general voir dire to take a long time." (Ex. 42.) On the day of general voir dire, Ms. Barranco states that Mr. McKechnie's questions were "short and perfunctory because he was mad at the judge" for chastising him for asking irrelevant questions. (Id.) Ms. Barranco concludes by stating that "[a]lthough I was pleased with our jury because it includes a definite LWOP'er, I am displeased that there are people on the jury we haven't spoken to." (Id.)

---

[28] Under Pinholster, the Court's review under section 2254 "is limited to the record that was before the state court that adjudicated the claim on the merits." Id., 131 S.Ct at 1398. Upon review, it is clear that exhibits 3 and 17 were not a part of the state record at the time the California Supreme Court adjudicated this claim on direct appeal. However, because Petitioner re-raised this claim as claim 11 on state habeas review, and these two exhibits were submitted in support of the state habeas petition, the exhibits are a part of the record before the state court that adjudicated that claim, and are thus properly considered by this Court in determining, based on an independent review, whether the state court's rejection of this claim was unreasonable under section 2254(d).

08cv0311

Jury consultant Dimitrius generally states that:

> During the approximate three months I worked on the case, I observed a total lack of preparedness for jury selection and trial by Mr. McKechnie, lead counsel.  He lacked a basic understanding of the case facts and relevant law.  His performance during voir dire consequently fell below an objective, reasonable standard of competence.  I have never worked with an attorney who was as poorly prepared in a case as Mr. McKechnie in Bemore.

(Ex. 17 at 1-2.)  Ms. Dimitrius was retained by Mr. McKechnie, with whom she exchanged a few phone calls prior to trial but did not personally meet with until the first day of jury selection, and she prepared the juror questionnaire "without any guidance from Mr. McKechnie or anyone else."  (Ex. 17 at ¶¶ 8-9.)  Ms. Dimitrius met with McKechnie minimally during jury selection process, states that his "lack of availability and focus on the case concerned me," asserts that he "would not follow my advice," and states that Mr. McKechnie said Petitioner's case was strictly a guilt phase case, and that he was unconcerned about the penalty phase.  (Id. at ¶¶ 10-13.)  She describes Petitioner's case as "a ship without a rudder, it had no rational strategy or direction," and adds that "[c]o-counsel [Barranco] and I were certainly interested and willing to help, but we were hampered by our inexperience and Mr. McKechnie's dominance over the case."  (Id. at ¶¶ 13-14.)

Petitioner contends that "Mr. McKechnie's lack of preparation was apparent to the trial judge," who admonished counsel for inquiring into areas covered in the jury questionnaires.  (Pet. Brief at 121.)  Both Ms. Barranco and Ms. Dimitrius assert that Mr. McKechnie failed to review the jury questionnaires, referencing a particular exchange between lead counsel and the trial court as evidence of Mr. McKechnie's lack of preparation for voir dire.  (See Ex. 3 at ¶ 24; Ex. 7 at ¶ 14.)

During voir dire, the trial court admonished lead defense counsel outside the presence of the jurors, stating that "I am going to become increasingly intolerant of your asking them things which are set forth in the questionnaires."  (RT 22602-03.)  The trial court cited to several instances of such questioning, expressed frustration that counsel asked irrelevant questions, and cautioned Mr. McKechnie that "If you continue with that I'm going to embarrass you in front of the jurors."  (Id.) However, contrary to Ms. Barranco's assertion that following the admonition, Mr. McKechnie asked "only asked a couple more questions and then angrily stated that he passed for cause," a review of the voir dire transcripts reveal that immediately following the exchange, McKechnie continued the general

group examination for some time, asking questions of seven additional prospective jurors prior to passing for cause. (RT 22604-18.) This Court cannot speculate on lead counsel's non-verbal reaction to the trial court's statement, and can only note that the record fails to reflect any verbal indication that Mr. McKechnie's reaction was angry or involved the slamming of files on the table, as second counsel asserts. Taking Ms. Barranco's assertion regarding Mr. McKechnie's pique and response to be true, Petitioner has not shown that the failure to individually question certain jurors resulted in prejudice.

Evidently overlooked by both Petitioner and Respondent, the record reveals that the trial court issued a similar admonition to the prosecutor. Expressing a desire to be "evenhanded," he cited several instances where the prosecutor posed what he perceived to be irrelevant questions and stated:

> I fail to see the relevance of some of these inquiries, other than to build up some rapport with the jurors, which we all know is part of counsels' general voir dire. But I don't think is [sic] recognized as a proper purpose for voir dire. So I didn't embarrass you in front of the jury, just as I didn't embarrass Mr. McKechnie, but that's my thoughts on that matter. So unless you have some -- some -- unless I'm missing some obvious relevance of those inquiries, why, a word to the wise should be sufficient.

(RT 22710-11.) Thus, it appears by the trial court's own words that both the prosecutor and defense counsel were attempting to gain rapport or favor with jurors through friendly, though potentially repetitive or irrelevant inquiries. Given the record before the Court, and indulging a strong presumption that counsel's conduct "falls within the wide range of reasonable professional assistance," the Court is not persuaded that counsel failed to prepare for voir dire. Strickland, 466 U.S. at 689.

In fact, contrary to Petitioner's contention that lead counsel failed to review the juror questionnaires, the state record reflects multiple instances in which lead counsel indicated potential problems with certain prospective jurors based on answers provided in their questionnaires. (See e.g. RT 19217 (lead counsel voices problems in translating answer of prospective juror in questionnaire); RT 19842 (lead counsel expresses concerns regarding the literacy of a prospective juror due to several "inappropriate" answers in questionnaire); RT 19893-94 (lead counsel cites presence of potentially disqualifying answers in questionnaires of two prospective jurors regarding feelings on guilt verdict and death penalty); RT 19942 (lead counsel notes an "absolute total change" between prospective jurors answers in questionnaire and answers to questions posed by trial court).)

///

As far as the other evidence of inadequate performance, Petitioner's allegations are unsupported by the record.  Jo-Ellan Dimitrius asserts that lead counsel's lack of preparation resulted in a "jury that was not favorable to the defense."  (Ex. 17 at ¶ 15.)  However, Ms. Dimitrius does not offer any explanation or foundation for this belief.  Aside from general complaints about Mr. McKechnie's lack of availability and focus on the case, and the fact that lead counsel evidently declined her advice on something possibly relating to the penalty phase, Ms. Dimitrius does not explain why she believed the trial jury was "not favorable" to Petitioner.  Similarly, Ms. Barranco's memo to trial counsels' file, in which she expresses her displeasure that the jury contained individuals that the defense had not spoken to, also neglects to articulate any specific objection to the composition of the jury panel.  In fact, the memo states that she was actually "pleased" with the makeup of Petitioner's jury, because it contained a "definite LWOP'er."  (Ex. 3 at ¶ 42.)

For all these reasons, this Court concludes that the state court's rejection of this claim was reasonable.  Petitioner's contention that lead counsel's preparation for and participation in voir dire was prejudicially inadequate is without merit.

2.   Use of Peremptory Challenges and Seating of Juror Khosrow Ghaderi

Petitioner also asserts that trial counsel's failure to use more than two of its twenty-six peremptory challenges was not a tactical decision, and resulted in a jury that was unable to fairly decide his case.  (Pet. Brief at 116.)  Petitioner specifically contends that trial counsel's failure to use a peremptory challenge against Juror Ghaderi resulted in a biased juror sitting on the panel, as Ghaderi "was resolutely in favor of the death penalty and expressed uncertainty with his ability to vote for life without parole."  (Id.)

The California Supreme Court rejected this allegation, reasoning:

Defendant also complains that the defense had exercised only two of its 26 peremptory challenges when it expressed satisfaction with the 12-member jury. The implication seems to be that counsel did not meaningfully participate in this phase of jury selection, and that defendant's jury was death prone as a result. We note, however, that defense counsel used two additional peremptories when the panel of six alternate jurors was chosen. The prosecution used a total of eight peremptory challenges in selecting all jurors, including alternates.

"Because the use of peremptory challenges is inherently subjective and intuitive, an appellate record will rarely disclose reversible incompetence in this process." (*People v. Montiel* (1993) 5 Cal.4th 877, 911 [21 Cal.Rptr.2d 705, 855 P.2d 1277].) We have consistently rejected complaints about either the failure to excuse prospective jurors

on an individual peremptory basis, or the decision to accept the jury as constituted before exhausting such challenges. (E.g., *People v. Ochoa* (1998) 19 Cal.4th 353, 448 [79 Cal.Rptr.2d 408, 966 P.2d 442]; *People v. Lucas* (1995) 12 Cal.4th 415, 480 [48 Cal.Rptr.2d 525, 907 P.2d 373]; *People v. Cain* (1995) 10 Cal.4th 1, 62 [40 Cal.Rptr.2d 481, 892 P.2d 1224]; *People v. Freeman*, *supra*, 8 Cal.4th 450, 486-487; *People v. Montiel*, *supra*, 5 Cal.4th at p. 911; *People v. Lewis*, *supra*, 50 Cal.3d 262, 290.)

No different result is warranted here. Peremptory challenges were exercised only after both *Hovey* and general voir dire were complete, and the pool of prospective jurors had been passed for cause by both sides. The defense thus had the benefit of both the protracted examination process and any advice received from its in-court jury consultant. We see no basis on which to conclude that peremptory challenges were used in an unsound or uninformed manner.

One particular exchange reinforces this view. Over the prosecutor's objection, Defense Counsel McKechnie requested and received the court's permission to use a photograph of the victim's body during general voir dire. Counsel insisted he could not otherwise "intelligently exercise my peremptory [challenges]" without knowing how people are going to react to this very bloody scene at the Aztec Liquor Store." Counsel said he planned to rely on "body language" and "eye contact" generated by the photograph. Thus, contrary to what defendant suggests, it appears counsel placed special value on the peremptory challenge process, and viewed it as a nuanced means of selecting a suitable jury.

Bemore, 22 Cal. 4th at 836-37. The California Supreme Court similarly rejected Petitioner's allegation of ineffective assistance regarding counsel's decision not to exercise a peremptory challenge against Juror Ghaderi. The court addressed counsels' failure to preserve the claim, noting that counsel had not exhausted their allotment of peremptory strikes and had accepted the jury as constituted without objection. Id. at 836-37. The state court then rejected Petitioner's contention that Juror Ghaderi was biased, reasoning in part as follows:

On the one hand, defendant emphasizes answers to questions asked by the trial court in which Juror G. said he "can't guarantee" that he would enter the penalty phase with an open mind, and that he would "probably" vote for death if first degree murder with special circumstances were found. In response to a question by defense counsel, the juror also said he was not opposed to the notion of "an eye for an eye," at least where no mitigating evidence was available to "adjus[t]" his thinking in this regard.

However, after making each of the foregoing statements, Juror G. insisted upon "explain[ing]," "elaborat[ing]," and "clarify[ing]" his answers. He rejected any insinuation that he was a religious "fanatic," and denied acceptance of the "eye for an eye" principle as literal truth. The juror also made clear that he hoped the parties would present evidence beyond the circumstances of the crime at the penalty phase, and that he would carefully consider and weigh such evidence. "Some actions," he said, "are a combination of the person and the environment and a lot of other factors, and those are the factors that I could listen to ... as an adjustment in my decision." Finally, in response to questioning by the prosecutor, Juror G. specifically rejected the notion that he would always choose death, and said he would impose a sentence of life imprisonment without parole in an appropriate case.

Deferring to the manner in which the trial court resolved any conflict or ambiguity in the juror's answers (*People v. Millwee* (1998) 18 Cal.4th 96, 146 [74 Cal.Rptr.2d 418, 954 P.2d 990]), we see no predisposition in favor of a death sentence. The court did not err in implicitly finding no substantial impairment in Juror G.'s ability to function as a juror at the penalty phase. (*People v. Crittenden*, *supra*, 9 Cal.4th 83, 121, citing *Wainwright v. Witt*, *supra*, 469 U.S. 412, 424 [105 S.Ct. 844, 854].) We also cannot fault counsel for retaining Juror G. on this record, particularly since he expressed a willingness to consider background and character evidence bearing favorably on defendant. (E.g., *People v. Freeman*, *supra*, 8 Cal.4th 450, 486-487; *People v. Montiel*, *supra*, 5 Cal.4th 877, 911.)

Id. at 837-39.

During voir questioning by the trial court, Juror Ghaderi was asked if he could enter a potential penalty phase with an open mind and replied, "I think I can try, but I've never been a juror, so my feeling is I could, but I can't guarantee that for sure." (RT 20286.) Mr. Ghaderi acknowledged that were Petitioner to be found guilty, he would be leaning towards a penalty of "probably death," but explained that even though "I might have made up my mind at the end of the trial, but depending on what I see during the extra presentation I think I can adjust and change." (RT 20288.)

Mr. Ghaderi continued to expand on his viewpoint with several more statements regarding potential penalty phase evidence, elaborating that "I think some actions are a combination of the person and the invironment [sic] and a lot of other factors, and those are the factors I could listen to. And if there's sincerely those factors, that could maybe - - well, not maybe, probably consider those as an adjustment in my decision.  Therefore, that's the defendant that would have to bring these issues up to my attention at least." (RT 20289.)

During questioning by defense counsel McKechnie, Mr. Ghaderi was asked if he could, despite his professed leanings, remain willing to listen to penalty phase evidence, give both sides a fair hearing on penalty and "not be locked into one punishment or another until you've actually heard all of the evidence," to which he replied, "Yes, I think I can do that." (RT 20295.)  Defense counsel challenged Mr. Ghaderi for cause, and after taking the matter under submission to review the record, the trial court denied the challenge.  (RT 20300-01; 22461.)  Defense counsel did not exercise a peremptory challenge on Mr. Ghaderi, who sat as a member of Petitioner's trial jury.

The Sixth Amendment "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." Irvin v. Dowd, 366 U.S. 717, 722 (1961); Green v. White, 232 F.3d 671, 676 (9th

08cv0311

Cir. 2000).  To satisfy the prejudice prong of Strickland in this instance, a petitioner must demonstrate that "as a result of trial counsel's failure to exercise peremptory challenges, the jury panel contained at least one juror who was biased."  Davis v. Woodford, 384 F.3d 628, 643 (9th Cir. 2004); United States v. Quintero-Barraza, 78 F.3d 1344, 1349 (9th Cir. 1995).  In reviewing counsel's decisions, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonably professional assistance."  Strickland, 466 U.S. at 689.  This deferential view applies to jury selection.  See Quintero-Barraza, 78 F.3d at 1349-50.

Here, trial counsel may have had a reasonable and tactical rationale for deciding not to exercise a peremptory challenge on Mr. Ghaderi and for deciding to leave some of the peremptory challenges unused, such as saving peremptory challenges for use in the event that less desirable prospective jurors made it to the jury box.  Petitioner fails to demonstrate that counsel's decision was not "strategic" in nature, nor has Petitioner shown that Mr. Ghaderi or any of the other individuals who sat as members of Petitioner's trial jury "had such fixed opinions that they could not judge impartially the guilt of the defendant."  Patton v. Yount, 467 U.S. 1025, 1035 (1984).  Mr. Ghaderi stated that while he would lean towards the death penalty if Petitioner were convicted, he could give both sides a fair hearing, and could consider factors including Petitioner's background and environment.

The state court's rejection of this contention was not an objectively unreasonable application of clearly established federal law.

### 3.    Stipulation with Prosecutor on Removal of Prospective Jurors

Petitioner alleges that Mr. McKechnie entered a stipulation with the prosecutor to remove jurors suspected to be homosexual and "asserts that the conduct of counsel for both parties in stipulating to removal of gays as a class violates his rights to a fair trial, fair cross-section of the community, due process, fundamental fairness, and equal protection of the laws."  (Pet. Brief at 121.)

This claim is unexhausted, as a review of the direct appellate and state habeas briefs reveal that Petitioner failed to raise this allegation in state court.  While the Court may not grant relief on an unexhausted claim, the Court may reject an unexhausted claim on the merits.  See 28 U.S.C. § 2254(b)(2); see also Gatlin, 189 F.3d at 889.  The sole ground for this allegation is the declaration of Ms. Barranco, who asserts:

> The other troubling aspect of voir dire was that Logan [McKechnie] insisted we excuse all men he suspected might be homosexual. He persuaded Steve Anear, the deputy district attorney trying the case, to stipulate to excusing any such person who seemed gay during the <u>Hovey</u> inquiry. I can recall at least one instance when the court asked why the parties were stipulating to the removal of one such man. I cannot recall whether Logan told the judge the reason nor whether the discussion about this was on the record. I didn't have a problem with allowing "suspected homosexuals" to sit in the jury but Logan was adamant about the fact that he "just couldn't trust 'queers.'"

(Ex. 3 at ¶ 25.)

However, Petitioner fails to identify any prospective juror who was allegedly excused for an impermissible reason, nor is there any indication in the record to support Petitioner's contention that the parties entered into an improper stipulation concerning the excusal of prospective jurors. As such, Petitioner's conclusory and unsupported allegations are insufficient to raise a colorable claim for habeas relief on this claim. <u>See</u> <u>Earp</u>, 431 F.3d at 1167.

4.    <u>Conclusion</u>

Ultimately, with respect to Claim 11 *as a whole*, Petitioner has not supported his allegations that counsel erred, and has not shown "a reasonable probability that, but for counsel's [allegedly] unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694. The state supreme court's rejection of this claim was not an objectively unreasonable application of clearly established federal law.

**L.    <u>Claim 12 - Ineffective Assistance of Trial Counsel - Witness Latonya Wadley</u>**

In Claim 12, Petitioner asserts that trial counsel was prejudicially ineffective for "failing to listen to the untranscribed tape recorded interview of a key prosecution witness, Latonya Wadley,[29]

---

[29] To provide a context for the discussion of this claim, the Court reprints the prior summary of her testimony from the Court's March 22, 2011 Order, as follows:

> LaTonya Wadley, who also lived on Bates Street in the summer of 1985, knew Cosby and Petitioner, who hung out together, and knew Howard, who dealt drugs in the area. (RT 23836-41.) Wadley heard about Aztec on the news, and that same day she saw Petitioner with his head newly shaved, acting nervous and paranoid, and overheard his stated concern about changing clothes and shoes. (Id.) Sometime after the Aztec crime, Wadley was alone in an apartment with Petitioner when he had been doing cocaine, and Petitioner told her he was worried about what was in the trunk of his car. (RT 23841-46.) Petitioner started to pace, and spoke of blood, footprints, and of stabbing someone 20 times, then talked about leaving and going to Louisiana or Arkansas. (Id.) Petitioner also told Wadley that Cosby ran his mouth and may have to be taken care of before Petitioner left the area. (Id.) Wadley acknowledged that when she was arrested in 1988, she had initially confused Aztec with AM-PM when talking to investigator Cooksey. (RT 23846-50.)

concerning her alleged photo line-up identification of Petitioner as the individual involved with the homicide, and thus were unaware of its unreliability," violating his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.  (Pet. at 122.)

Petitioner asserts that there "is no reason for Mr. McKechnie not to have impeached [district attorney's investigator] Mr. Cooksey with the contents of the tape-recorded interview"[30] and to "fail[] to question Ms. Wadley concerning her tenuous photo line-up identification."  (Pet. Brief at 128.) Petitioner contends that "[g]iven that the prosecution's case against Petitioner rested primarily with the credibility of its witnesses who testified to alleged [] admissions and observations of Petitioner, trial counsel's error in attacking the credibility of the district attorney's investigator and the reliability of Ms. Wadley was highly prejudicial and cannot be deemed harmless."  (Id. at 131.)

In an interview investigator Cooksey conducted with Ms. Wadley on June 1, 1988, Ms. Wadley was shown several photos, and while she eventually selected Petitioner's photo, she first denied that Petitioner's photo was amongst the ones shown, stating "I don't know none of these," and adding "Bemore? I know what Bemore looks like.  None of these [photos] could be Bemore.  Cause I remember Bemore bald-headed and no hair."  (Ex. 23 at 2.)  At trial, Mr. Cooksey testified that Ms. Wadley "selected Mr. Bemore's photo from the group of five that I showed her," and while he conceded that it may have taken her several minutes to do so, he failed to acknowledge that Ms. Wadley initially denied that Petitioner's photo was in the group she was shown. (Pet. Brief at 129-30.)

As an initial matter, the trial record clearly shows that Ms. Wadley's testimony was not presented without impeachment. For instance, during cross-examination, defense counsel elicited Ms. Wadley's concession that her statements had been inconsistent, in that she had previously confused Aztec with AM/PM.  (RT 23846-49.)  Defense counsel also impeached Ms. Wadley with her prior arrests and warrants, the fact that she was using drugs when arrested, and that she first spoke to investigator Cooksey while she was in jail, only four days after her arrest in April 1988.  (RT 23846-

---

[30] Petitioner also notes that "[e]ven though the reports of Mr. Cooksey indicate that all three tape-recorded interviews would be transcribed, the June 1 interview consisting of the photo line-up apparently was not," and that "[a] transcription of that interview was therefore not provided to trial counsel."  (Pet. Brief at 126.)  This separate contention is not relevant to the instant claim of ineffective assistance of counsel, and is addressed in the discussion of Claim 19, infra.

08cv0311

50.) Thus, Ms. Wadley's credibility was already at issue through several pertinent avenues aside from her uncertain initial photo identification of Petitioner.

At any rate, Ms. Wadley knew Petitioner personally, and had acknowledged in her own testimony that Petitioner had changed his appearance after the homicide. (RT 23836-41.) Petitioner's change in appearance after the homicide also provided an understandable and valid explanation for the difficulty Ms. Wadley experienced in making a photo identification at the June 1, 1988 interview.

Even if trial counsel performed deficiently in failing to specifically cross-examine Ms. Wadley about the June 1 interview, Petitioner fails to establish prejudice. While it is possible that additional questions regarding Ms. Wadley's difficulty in identifying Petitioner's photo could have further impeached her testimony, Petitioner made similar admissions about the Aztec crimes to Angela Tabor, Lloyd Howard and Glen Heflin. Thus, in light of the record as a whole, the Court cannot conclude that trial counsel's alleged error undermines confidence in the verdict. See Richter, 131 S. Ct. at 787; see also Luna v. Cambra, 306 F.3d 954, 966 (9th Cir.), amended, 311 F.3d 928 (9th Cir. 2002) (prejudice inquiry is to be considered in light of the strength of the prosecution's case.)

In sum, Ms. Wadley's credibility was already at issue due to her prior arrests and warrants, her drug use, her delayed identification of Petitioner's photo, and the fact that she confused the crimes at the AM/PM and Aztec. Even had trial counsel examined her at length over her trouble in identifying Petitioner's photo at the June 1 interview, it is unlikely that "the result of the proceedings would have been different." Strickland, 466 U.S. at 694. Petitioner has not shown the California Supreme Court's rejection of this claim to be an objectively unreasonable application of clearly established federal law. Neither an evidentiary hearing nor habeas relief is warranted on Claim 12.

**M.   Claims 13 and 23 - Ineffective Assistance of Trial Counsel - Failure to Move for Mistrial on Juror's Out-of-Court Experiment; Juror Misconduct - Juror Albarrin's Out-of-Court Experiment**

In Claim 13, Petitioner alleges that counsel was ineffective in failing to move for a mistrial based on an out-of-court experiment conducted by Juror Augustin Albarrin during guilt phase deliberations, violating Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. (Pet. at 129.) Investigator Dorothy Ballew spoke to Juror Albarrin

1    after the trial and he admitted to conducting a timing experiment during the trial; Ms. Ballew relayed

2    this information to trial counsel Barranco, who admits that she failed to move for a mistrial.  (Id. at

3    132-35.)   In Claim 23, Petitioner alleges that Juror Augustin Albarrin "committed prejudicial

4    misconduct by conducting an out-of-court timing experiment during guilt-phase deliberations to test

5    the validity of the defense theory of alibi," violating Petitioner's constitutional rights guaranteed by

6    the Fifth, Sixth, Eighth and Fourteenth Amendments.  (Pet. at 224.)

7         With respect to Claim 13, Respondent argues that California Evidence Code section 1150(a)

8    bars Petitioner, as it barred state trial counsel, "from introducing any evidence to show the effect of

9    any statement, conduct, condition or event upon a juror, either in influencing the juror to assent or

10   dissent from the verdict or concerning the mental processes by which the verdict was determined."

11   (Id. at 46.)  However, because Claim 13 is without merit for the reasons discussed below, the Court

12   need not consider this state-law contention.

13        As discussed above in Section III, the Court will review Claim 23 on the merits irrespective

14   of the state supreme court's application of procedural bars.  The Court will consider Claim 23 first,

15   as the alleged juror misconduct occurred prior to counsel's failure to move for a mistrial as a result of

16   the juror's actions.

17         1.    Facts Relevant to Claims 13 and 23

18        During the trial's guilt phase, after Petitioner's testimony, district attorney's investigator

19   Cooksey testified on rebuttal that he conducted an additional investigation regarding the Wherehouse

20   robbery, including a timing experiment.  (RT 24467-75.)  Cooksey explained that the distance from

21   K-Mart to Wherehouse was 0.7 miles down Fletcher Parkway and that it would only take minutes to

22   get to the freeway from the area.  (Id.)  Cooksey testified that he drove the route from the two crime

23   scenes, obeying all speed limits and stopping at all lights, and found the time it took to travel from

24   Wherehouse Records to Aztec Liquor was less than 16.5 minutes.  (Id.)  This testimony allowed the

25   prosecution to argue that Petitioner could have committed both crimes.

26        After the trial, defense investigator Ballew interviewed several of the jurors on Petitioner's

27   case.  In the course of one such interview, Juror Augustin Albarrin informed Ms. Ballew that, during

28   guilt-phase deliberations, he conducted a timing experiment to help him determine whether Petitioner

1   could have committed the robbery/murder at the Aztec Liquor store.  (Ex. 40 at 3.)  Based on that

2   timing experiment Albarrin concluded that Petitioner could have committed the Wherehouse robbery

3   and the Aztec crime and "[h]e therefore rejected the defense argument of alibi."  (Id. at 4.)

4          2.    Claim 23- Juror Misconduct

5         The Sixth Amendment guarantees a criminal defendant a fair trial with "a jury capable and

6   willing to decide the case solely on the evidence before it."  McDonough Power Equipment, Inc. v.

7   Greenwood, 464 U.S. 548, 554 (1984) (quoting Smith v. Phillips, 455 U.S. 209, 217 (1982)).  "Jurors

8   have a duty to consider only the evidence which is presented to them in open court."  Bayramoglu v.

9   Estelle, 806 F.2d 880, 887 (9th Cir. 1986) (citing Turner v. Louisiana, 379 U.S. 466, 472-73 (1965));

10  United States v. Bagnariol, 665 F.2d 877, 884 (9th Cir.1981).  Once a juror has violated that duty and

11  introduced extrinsic evidence into the jury deliberations, "reversible error commonly occurs where

12  there is a direct and rational connection between the extrinsic material and a prejudicial jury

13  conclusion, and where the misconduct relates directly to a material aspect of the case."  Marino v.

14  Vasquez, 812 F.2d 499, 506 (9th Cir. 1987).  To prevail on this claim, Petitioner must demonstrate

15  that there is a "reasonable possibility" that the extrinsic material could have affected the verdict.  Fahy

16  v. Connecticut, 375 U.S. 85, 86-87 (1963).

17        Ms. Ballew asserts that "it was apparent that [Juror Robert Rowe] was aware of the results of

18  Mr. Albarrin's timing experiment," because Mr. Rowe told her that the jurors "knew that it was not

19  that far from the Wherehouse to the Aztec." (Ex. 40 at 4.)  However, Ms. Ballew's declaration fails

20  to acknowledge that the evidence regarding the distance between the two locations was already part

21  of the guilt phase evidence *prior to* Juror Albarrin's out-of-court experiment.  Investigator Cooksey

22  testified to this very evidence during the guilt phase, and the jury would thus necessarily have been

23  aware of this evidence at the outset of the guilt-phase deliberations.

24        "Juror misconduct typically occurs when a member of the jury has introduced into its

25  deliberations matter *which was not in evidence* or in the instructions."  Thompson v. Borg, 74 F.3d

26  1571, 1574 (9th Cir. 1996) (citing Marino, 812 F.2d at 504 (emphasis added)).  As such, even if the

27  results of Albarrin's timing experiment were relayed to the jury during deliberations, of which there

28  is no evidence, those results were merely duplicative of the Cooksey timing experiment, which was

actually introduced into evidence at trial.  Juror Rowe's statement that the jury "knew that it was not that far from the Wherehouse to the Aztec" is indicative of nothing more than that the jury had been attentive during the guilt phase presentation of evidence at trial.

Tellingly, the Ballew declaration is silent on whether Mr. Albarrin ever related the results of his experiment to the other jurors, or whether the results of his experiment, rather than the experiment introduced into evidence through investigator Cooksey's testimony, was considered in deliberations. In any event, Petitioner has not shown that the jury actually relied on extrinsic evidence in their deliberations, rather than the nearly identical evidence previously and properly introduced at trial.  See Hughes, 898 F.2d at 700; Eslaminia v. White, 136 F.3d 1234, 1239 (9th Cir. 1998) (acknowledging that "a jury's consideration of extrinsic evidence may be harmless if the evidence is merely cumulative of other evidence adduced at trial," and noting that "[t]o be truly considered cumulative, there must be an extremely close relationship between the extrinsic evidence and the evidence actually admitted.") Accordingly, Petitioner fails to demonstrate a "reasonable possibility" that the results of Juror Albarrin's experiment affected the verdict, and as such, Claim 23 does not warrant habeas relief.  Fahy, 375 U.S. at 86-87.  The California Supreme Court's rejection of this claim was not an objectively unreasonable application of clearly established federal law. An evidentiary hearing is not warranted on Claim 23.

## 2.   Claim 13 - Trial Counsel's Failure To Move For A Mistrial

As stated above, the trial record reveals that the issue of the distance between the Wherehouse Records store and the Aztec Liquor store was in evidence prior to Juror Albarrin's out-of-court experiment.  District Attorney Investigator Cooksey testified during the guilt phase presentation that the distance between the locations took approximately 16.5 minutes of travel time via car. (RT 24467-75.)  Cooksey's testimony took place on May 31, 1989.  (Id.)  The trial court issued the final jury instructions on the afternoon of June 1, 1989, upon which the jury was sent to the jury room to "put your note pads there and spend a few minutes talking in general, and then abiding by all the admonitions over the evening recess we'll see you at 9:00 o'clock," at which point the jury would begin their guilt-phase deliberations.  (RT 24669.)  The guilt phase verdict was announced on June 6, 1989.  (RT 24681-83.)  Juror Albarrin informed Ms. Ballew that he performed the timing experiment

1    during guilt-phase deliberations.  (See Ex. 40 at 3.)  Ultimately, Petitioner fails to demonstrate that the

2    jury ever considered the Albarrin timing experiment in its deliberations, rather than the evidence and

3    testimony concerning Mr. Cooksey's earlier timing experiment.

4         Ms. Barranco acknowledges that Ms. Ballew apprised her of the post-trial interview with Juror

5    Albarrin, stating that "[a]lthough I can now see how [t]his clearly established juror misconduct and

6    tainted the jury verdict, I did not direct Ms. Ballew to obtain a declaration from Mr. Albarrin."  (Ex.

7    3 at ¶ 38-39.)[31]  Despite trial counsel's apparent concession on the performance prong of Strickland,

8    Petitioner fails to demonstrate that he suffered actual prejudice from trial counsel's failure to move

9    for a mistrial.  Specifically, Petitioner fails to show that the results of Juror Albarrin's duplicative

10   experiment was actually discussed in deliberations, or that it had any influence on the jury verdict.  See

11   Hughes v. Borg, 898 F.2d 695, 700 (9th Cir. 1990) (consideration of extrinsic material is less likely

12   to constitute prejudicial juror misconduct when material is duplicative of or cumulative to evidence

13   properly introduced in open court); (see also Claim 23, infra.)  A motion for a new trial based on the

14   evidence detailed in this claim would have failed, and thus trial counsel cannot be faulted for failing

15   to pursue the matter.  See Baumann, 692 F.2d at 572 ("The failure to raise a meritless legal argument

16   does not constitute ineffective assistance of counsel.)  Petitioner does not establish that counsel's

17   failure to move for a mistrial constitutes an error so serious that "there is a reasonable probability that,

18   but for counsel's unprofessional errors, the result of the proceeding would have been different."

19   Strickland, 466 U.S. 668.

20        Petitioner separately contends that trial counsel "failed to investigate the timing aspect of the

21   alibi defense, and thus were unable to rebut the experiment conducted by Mr. Cooksey," and asserts

22   that "[t]here is no reasonable tactical justification for counsel's deficient act and/or omission."  (Pet.

23   Brief at 132.)  This assertion is merely speculative, as Petitioner fails to identify any evidence that

24   could have supported the timing aspect of the alibi defense.  An examination of the trial record reflects

25   that defense counsel cross-examined Mr. Cooksey on the timing experiment, bringing out that the

26   investigator had been working on Petitioner's case for two years prior to the trial, and was similarly

27   _____

28        [31] While her declaration is inelegantly worded, it appears that Ms. Barranco is admitting a failure to act in not pursuing the Albarrin matter; Ms. Barranco concludes her declaration by generally asserting that Petitioner was not adequately represented at trial and was prejudiced as a result.  (Id. at ¶ 41.)

1   aware of the Wherehouse records case for two years prior to the trial, but had failed to conduct any

2   such timing experiment until the week prior to his rebuttal testimony.  (RT 24477-81.)  With nothing

3   more than a vague and conclusory allegation that counsel should have done more to rebut the

4   prosecution's evidence, Petitioner fails to demonstrate that trial counsel was prejudicially ineffective.

5   See James, 24 F.3d at 26.  Habeas relief is not warranted on this claim because, based upon an

6   independent review of the record, the state supreme court's adjudication of the claim was not an

7   objectively unreasonable application of Strickland.  Nor does the claim merit an evidentiary hearing.

8   **N.**      **Claim 15 - Ineffective Assistance of Trial Counsel - Failure in Presenting Evidence on**

9   **Petitioner's Life in Custody**

10          In Claim 15, Petitioner asserts counsel was ineffective at the penalty phase of trial for "opening

11   the door to Petitioner's life in custody without first conducting a reasonable investigation," violating

12   his right to the effective assistance of trial counsel.  (Pet. at 157.)  At the penalty phase, defense

13   counsel offered evidence of Petitioner's good behavior in custody, including his position as a tank

14   captain, which allowed the prosecutor to introduce rebuttal evidence concerning Petitioner's

15   involvement in a jail food tampering incident.

16          In adjudicating the claim on appeal, the California Supreme Court first recounted the penalty

17   phase proceedings and noted defense counsels' attempt to prevent the introduction of evidence

18   regarding a food tampering incident.  See Bemore, 22 Cal. 4th at 847-49.  Before the trial court ruled

19   on that issue, Ms. Barranco noted for the record that when she made the decision to present evidence

20   of Petitioner's good conduct in jail, she was under the belief that the food tampering incident had been

21   dismissed due to a finding of factual innocence, and would not have introduced any "good inmate"

22   evidence had she known that incident had occurred and that it could be introduced on rebuttal.  Id. at

23   849.  The trial court ultimately denied the defense's request to disallow evidence of the food tampering

24   incident on rebuttal, but instructed the jury that the rebuttal evidence was not aggravating and only

25   went to the weight or validity of the evidence offered in mitigation.  Id. at 849-50.  The California

26   Supreme Court rejected this claim on the merits, reasoning as follows:

27          Defendant first argues that, in light of Barranco's assessment of her own performance,
           the decision to present good inmate evidence was flawed because it was based on
28          inadequate investigation of the facts giving rise to food poisoning charges, and the
           reasons underlying dismissal of those charges in municipal court. The argument seems

to be that trial counsel would not have opened the door to admission of this disruptive incident or to other unfavorable rebuttal evidence if the omission identified by Barranco had not occurred.

However, evidence concerning the food tampering incident, standing alone, could not have fundamentally altered defense strategy or otherwise deterred a reasonably competent attorney in Barranco's position from presenting substantial mitigating evidence of defendant's life in custody. Nothing in the record indicates that Barranco was unaware of all the other evidence admitted on rebuttal, including various threatening and assaultive acts similar to conduct described by inmate Heflin at the guilt phase. (See *ante*, fn. 9.) Indeed, by negative inference from Barranco's remarks, the defense went forward with its case in mitigation, and decided to inform jurors of defendant's good qualities as an inmate, despite its awareness that the prosecution could rebut with a sizeable body of previously unpresented evidence placing his jailhouse behavior in an unfavorable light. For this reason, Barranco's claim that admission of the food tampering evidence was a surprise material to her entire strategy carries little weight on appeal. We decline to find ineffective assistance of counsel on this narrow ground.

Defendant argues more broadly that trial counsel's decision to present "good inmate" evidence invited a "bad inmate" rebuttal of greater weight, and was thus incompetent. Defendant claims that no effective attorney, aware as trial counsel was, or should have been, of all potentially damaging rebuttal would have introduced any evidence bearing on defendant's positive qualities as an inmate.

However, the decision to present mitigating evidence at the penalty phase, and thus risk unfavorable revelations on rebuttal, calls for a tactical judgment not normally second-guessed on appeal. We generally defer to such decisions, and assume trial counsel properly weighed the relative risks and benefits. (*People v. Ervin* (2000) 22 Cal.4th 48, 101 [91 Cal.Rptr.2d 623, 900 P.2d 506]; *People v. Ochoa*, *supra*, 19 Cal.4th 353, 468; see *People v. Freeman*, *supra*, 8 Cal.4th 450, 513; *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1251 [275 Cal.Rptr. 729, 800 P.2d 1159].) Nothing in the record demonstrates that competent counsel, armed with the information defendant's trial attorneys knew or should have known, would necessarily have reached a different conclusion on the matter.

In any event, none of the acts or omissions characterized as incompetent by defendant could have prejudiced him at sentencing. (See *Strickland v. Washington* (1984) 466 U.S. 668, 691-696 [104 S.Ct. 2052, 2066-2069, 80 L.Ed.2d 674]; *People v. Fosselman* (1983) 33 Cal.3d 572, 584 [189 Cal.Rptr. 855, 659 P.2d 1144].) We reach this conclusion first by comparing the penalty trial that actually occurred, including evidence introduced about defendant's life in jail, with the penalty trial defendant would have received if no such evidence had been presented in mitigation, rebuttal, and surrebuttal.

As we have seen, the jury heard new information on rebuttal-offered primarily by inmates who were portrayed as biased and untruthful-about defendant's shrewd and predatory behavior as captain and his possible involvement in a bizarre food tampering incident. This new bad inmate evidence tempered the strong praise defendant received from several law enforcement officers and chaplains who testified on his behalf, and could have raised concerns in jurors' minds as to whether defendant would be dangerous or prone to escape if sentenced to life imprisonment without parole. However, had trial counsel proceeded in the manner defendant now suggests and withheld *all* good inmate evidence, the life history presented in mitigation would have ended with defendant's descent into cocaine addiction and his commission of the gruesome crime against Muck. In other words, the penalty jury would have received

*no* information from which it could infer that defendant was willing or able to conform in prison, and could have placed undue weight on the jailhouse assault on Heflin admitted in the prosecution's case-in-chief (see *ante*, fn. 9). It is not reasonably probable that a more lenient sentence would have been imposed under such circumstances.

We reach no different conclusion based on the overall effect of rebuttal at the penalty phase. In addition to the assault on Heflin (see *ante*, fn. 9), the prosecution sought a death sentence based on the capital crime and the violent acts later committed on Bates Street while defendant was addicted to cocaine. The defense responded with comprehensive evidence suggesting that, until shortly before the capital crime, defendant had worked to overcome his troubled childhood, and had performed fairly well as a college athlete, minister, police officer, soldier, husband, and father. Defense evidence further suggested that defendant's respect for authority and interest in religion had reemerged after his arrest in this case, and that he could conform in a structured custodial setting.

To the extent the prosecution established that defendant may have abused his position as captain and behaved in an aggressive or disruptive fashion in jail, such rebuttal evidence could not have materially affected the foregoing balance of factors in aggravation and mitigation. The jury was already aware that defendant had threatened and assaulted at least one cellmate. More importantly, the jury knew from the court's instructions and the prosecutor's argument that evidence admitted on rebuttal was not aggravating and, at most, merely offset defendant's good inmate evidence-a discrete segment of the case in mitigation. We find no reasonable probability that any ineffective assistance of counsel permitting the introduction of such rebuttal evidence affected the penalty determination.

Id. at 850-53.

Petitioner relies heavily on Exhibit 3, a declaration signed by second chair trial counsel Barranco on June 12, 2000, and Exhibit 64, a declaration signed by Ms. Barranco on January 9, 2009, in support of this claim. Yet, under the Supreme Court's recent decision in Pinholster, this Court's review under section 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." Pinholster, 131 S.Ct at 1398. As such, the Court cannot consider either exhibit in deciding whether the California Supreme Court's rejection of this claim on direct appeal was contrary to, or an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts because neither exhibit was part of the state record at the time this issue was adjudicated by the California Supreme Court.[32]

---

[32] Exhibit 64 was executed in 2009, well after state court proceedings were concluded, and was never presented to the state court at all. An examination of the state record reveals that Exhibit 3 was first submitted to the California Supreme Court in support of the state habeas petition (see Lodgment No. 15, Cal. Supreme Court Case No. S089272), yet Claim 15 was only raised on direct appeal (see Lodgment No. 6, Cal. Supreme Court Case No. S012762), and was not re-raised on state habeas review. The California Supreme Court affirmed Petitioner's conviction and sentence, including Claim 15, in a direct appeal opinion issued on April 20, 2000 (see Lodgment No. 9), several months before Exhibit 3 was signed and submitted to the state court

1    Ms. Barranco, who claimed responsibility for the preparation and presentation of evidence at

2    the penalty phase including the decision to present the "good inmate" evidence, indicated that this

3    decision was based in part on her mistaken belief regarding the food tampering incident, as follows:

4          There's something I want to put on the record in regards to that though, and it's
     not something that I'm in the habit of doing and I take very lightly.
5
6          But when Mr. McKechnie states that I didn't know anything about the food
     poisoning case, what I knew was that it had been dismissed because he was factually
     found innocent.
7
8          And so when I made a strategic decision to put on evidence of his good conduct
     in jail, I - - I remember thinking in my mind, "Well, I don't have to worry about the
     food poisoning in [sic] because there's no basis for it."  That was the only thing I knew
9    about the case was that there was no basis for it.

10         In my work at appellate defenders I've written a number of habeas corpus
     petitions on ineffective assistance of counsel, and I know a strategic [sic] like that
11   usually exempt from ineffective assistance claims, however, it's got to be based on
     knowledge that's true and accurate.
12
13         And I feel for Mr. Bemore's sake I should state this in the record.  I'm not
     trying to throw myself on the sword of I.A.C. as a last resort.  But I feel if the door was
     opened it was - - I should have checked it out and found out more about the case than
14   I did, that just relying on the fact that what has been represented to me there was no
     case and he was innocent.
15
16         And so in that regard I wanted to state that for the record now while my mind
     is clear on it rather than years down the road in a habeous [sic] proceeding.  But my
17   thought - - my decision to put on this evidence at all - - and I know that the fact it may
     or may not have occurred is not a factor in aggravation but simply rebuts our
     mitigation, but puts us in a bat [sic] spot in the case, and I wouldn't have done it had
18   I known this evidence was in fact - - had happened and it could come in; that I would
     be put in a posture of having to defend it as the last evidence the jury hears before they
19   deliberate penalty.

20   (RT 25571-73.)

21         "Judicial scrutiny of counsel's performance must be highly deferential," and a reviewing court

22   must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable

23   professional assistance."  Id. at 689.  Here, both Mr. McKechnie and Ms. Barranco professed a belief

24   that Petitioner had been found factually innocent of the food tampering charges.  (See RT 25466;

25   25615.)  Both counsel also stated that Ms. Barranco had not been provided with, nor performed further

26   _____

27   in support of the state habeas petition, in June 2000.  Exhibit 3 was therefore not a part of the state court record
     at the time that Claim 15 was adjudicated on the merits on direct appeal.  Accordingly, the Court will not
28   consider either Exhibits 3 or 64 in its review of Claim 15 under section 2254(d).  See Pinholster, 131 S. Ct.
     at 1399 ("It would be strange to ask federal courts to analyze whether a state court's adjudication resulted in
     a decision that unreasonably applied federal law to facts not before the state court.")

                                              73                                    08cv0311

1    investigation of, the food tampering incident or the charges arising from it prior to presenting the good

2    inmate evidence.  (See RT 25564 - counsel McKechnie states that "I've not discussed the facts of this

3    [food tampering] case, I've not briefed Ms. Barranco, we have not had any mutual discovery under the

4    cocounsel aspect of this case.  She is handling the penalty phase.  She knows nothing.  I have not told

5    her anything about it; RT 25615 - counsel Barranco conceded that she did not have a copy of the

6    records of the food tampering case, and explained that "I should have, you know, gone beyond just the

7    verbal representation to me that that had happened . . .We haven't done the investigation on it.")

8        Despite Ms. Barranco's admission that she had not mounted an investigation into the food

9    tampering charges, she was evidently aware that the incident had occurred, had asked Mr. McKechnie

10    about it, and acknowledged that the decision to present the good inmate evidence was a "strategic"

11    decision, even though the decision had been based on her erroneous belief that Petitioner had been

12    found factually innocent.  (See RT 25571); Strickland, 466 U.S. at 690-91 ("strategic choices made

13    after thorough investigation of law and facts relevant to plausible options are virtually

14    unchallengeable; and strategic choices made after less than complete investigation are reasonable

15    precisely to the extent that reasonable professional judgments support the limitations on

16    investigation.")  Moreover, the trial prosecutor noted that "there are two people sitting at that [defense]

17    table and one of them is the lead attorney and she [Ms. Barranco] is assisting the lead attorney.  And

18    one can only - - only believe that they are mutually charged and did in fact have knowledge of that

19    incident.  It was in the newspaper in this town for a week.  Both the Los Angeles Times and the San

20    Diego Union carried banner headlines about that incident.  And I - - I - - I'm sure that they knew that

21    it happened."  (RT 25574.)

22        Petitioner has not shown that, given the evidence counsel knew or should have known, that

23    they performed deficiently in presenting the good inmate evidence in mitigation.  At any rate, even if

24    Ms. Barranco performed deficiently, either by failing to investigate the food tampering incident, or in

25    deciding to present good inmate evidence and thus opening the door to rebuttal by the prosecution,

26    Petitioner fails to demonstrate prejudice.  See Strickland, 466 U.S. at 694.

27        By that stage of the proceedings, the prosecution had already presented guilt phase evidence

28    that Petitioner assaulted Glen Heflin in jail and penalty phase evidence of both an assault and a sexual

1  assault committed in the fall of 1985, subsequent to the murder of Mr. Muck.  Without the "good

2  inmate" evidence, the jury would have been presented with testimony about Petitioner's difficult

3  childhood, his interest and talent in basketball, his past interest and work in the ministry, the military,

4  and law enforcement, and his struggle with and descent into substance abuse.  The testimony presented

5  by the correctional officers and prison chaplains, while opening the door to rebuttal evidence, allowed

6  the defense to introduce evidence of Petitioner's positive and peaceful behavior and influence, as well

7  as his spirituality, subsequent to the violent acts committed at the Aztec store and on Bates Street.  The

8  rebuttal evidence admittedly muted the impact of the good inmate evidence, but Petitioner fails to

9  show that, absent counsel's alleged errors, the jury "would have concluded that the balance of

10  aggravating and mitigating circumstances did not warrant death."  Strickland, 466 U.S. at 695.

11         The Court is similarly unpersuaded that trial counsel's decision to request "only" a two week

12  continuance to proceed with rebuttal and prepare the surrebuttal presentation constituted ineffective

13  assistance.  (See Pet. Brief at 166.)  Petitioner asserts that counsel's "failure to request a reasonable

14  continuance was prejudicial to [Petitioner] because it resulted in a patently inadequate investigation,

15  preparation, and presentation of mitigating evidence."  (Id.)  Petitioner fails to indicate how the

16  investigation was inadequate or how counsel could have better prepared with additional time.  See

17  James, 24 F.3d at 26.  He also fails to identify any mitigation evidence that could have been discovered

18  or introduced had counsel requested, and been granted, a lengthier continuance.  As such, this

19  allegation is without merit.

20         With respect to the primary argument at issue in Claim 15, Ms. Barranco's decision to present

21  good inmate evidence, Petitioner fails to demonstrate that counsel's performance was prejudicially

22  deficient.  Strickland, 466 U.S. at 687.  The California Supreme Court's rejection of this claim on

23  appeal was not contrary to, nor an unreasonable application of, Strickland.  See Richter, 131 S. Ct. at

24  785.  An evidentiary hearing is not warranted on Claim 15.  See Ortiz, 149 F.3d at 934.

25  ///

26  ///

27  ///

28  ///

08cv0311

O.      **Claim 16 - Ineffective Assistance of Trial Counsel - Failure to Investigate Uncharged Carlton Rape**

In Claim 16, Petitioner alleges that trial counsel was prejudicially ineffective in "failing to investigate the uncharged, alleged rape of Zelda Mae Carlton,[33] and failing to move to exclude the prejudicial evidence due to its inherent unreliability because the witness had undergone hypnosis regarding the incident," violating Petitioner's rights guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments. (Pet. at 164.)

Petitioner contends that trial counsel should have: (1) conducted a background investigation regarding the Carlton assault by interviewing the other men present at the Carlton apartment that evening; and (2) consulted with an expert and presented evidence regarding the unreliability of hypnotized witnesses. (Pet. Brief at 167.) He argues that "[g]iven the fact that Ms. Carlton did not report the rape incident when it occurred, that she was subsequently hypnotized in [sic] forgetting the incident, that she was unable to identify Petitioner from a set of photos shown to her by the prosecution, her testimony should have been excluded at trial due to its inherent unreliability and prejudicial nature." (Id. at 168.)

Recognizing the "distorting effects of hindsight" in evaluating a claim of ineffective assistance of counsel, the Court will "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. In this case, Petitioner's assertions regarding what trial counsel should have done are purely speculative, and he fails to demonstrate that but for these actions, the result of his trial would have been different. Id. at 694. For instance, Petitioner offers no indication that interviewing the other men present at Ms. Carlton's apartment the evening of the assault would have resulted in any evidence favorable to Petitioner or

---

[33] At the penalty phase, the prosecution introduced evidence of an unadjudicated sexual assault Petitioner committed against Ms. Carlton through the testimony of four witnesses.  Ms. Carlton testified that she lent her apartment out to Mr. Lloyd Howard, a drug dealer, in exchange for drugs. (RT 24786-90.) One evening in October or November 1985, Petitioner, who had originally been in her apartment in the company of Mr. Howard and several other men, stayed after the other men left and sexually assaulted her by knife point. (RT 24794-800.) Ms. Parker and Ms. Moreno, two of Ms. Carlton's sisters, each testified that Ms. Carlton called them crying and distraught and relayed the details of the sexual assault to each sister. (RT 24828-34; 24834-37.) Mr. Howard testified that Ms. Carlton was crying and shaking when she spoke to him the morning after the assault, at which time she also identified Petitioner as her assailant, and he also observed a small cut on her neck. (RT24846-49.)

08cv0311

1   would have proven useful in the cross-examination of Ms. Carlton.  Indeed, Petitioner fails to even

2   identify any other man present at the apartment aside from Petitioner or Mr. Howard.  Moreover,

3   Petitioner fails to demonstrate that Ms. Carlton's testimony was inherently unreliable as a result of an

4   attempted hypnotism.  Authority on this subject primarily involves testimony that has been refreshed

5   or enhanced through hypnosis.  See generally Rock v. Arkansas, 483 U.S. 44 (1987); Mancuso v.

6   Olivarez, 292 F.3d 939 (9th Cir. 2002).  Here, the trial record reflects that Ms. Parker instead

7   hypnotized Carlton in an attempt to aid Ms. Carlton in *forgetting* the assault, and Petitioner thus fails

8   to establish how expert testimony would have assisted the defense.  Even if the defense had called an

9   expert witness to testify that hypnotism may have impacted Ms. Carlton's trial testimony, Ms.

10   Carlton's prior accounts of the assault, made to her two sisters and to Mr. Howard just after the crime,

11   were consistent with her trial testimony and were all made prior to any attempted hypnotism.

12       Defense counsel's cross-examination of Ms. Carlton revealed that she did not report the crime

13   to the police (RT 24805), that her sister hypnotized her in an attempt to forget about the incident (RT

14   24823-25), and that, in the photo array shown to her, she initially identified another man as resembling

15   her assailant, prior to her identification of Petitioner in court.  (RT 24825-28.)  This impeachment

16   information was already presented to the jury for consideration.  Petitioner fails to demonstrate that

17   calling an expert witness or interviewing other men present in the apartment that evening would have

18   provided additional evidence favorable to the defense.  The Court cannot conclude that counsel's

19   conduct "fell below an objective standard of reasonableness."  Strickland, 466 U.S. at 688.

20       In sum, Petitioner has not shown that trial counsel's conduct was unreasonable, or that

21   Petitioner suffered any resulting prejudice.  Id. at 687.  Because an independent review of the record

22   does not reveal that the state supreme court's adjudication was objectively unreasonable, Petitioner

23   does not merit habeas relief on this claim.  An evidentiary hearing is not warranted on Claim 16.

24   **P.   Claim 17 - Ineffective Assistance of Trial Counsel - Testimony of Sarah Parker**

25       In Claim 17, Petitioner alleges that trial counsel was ineffective for failing to object to the

26   hearsay testimony of Sarah Parker at the penalty phase, resulting in a violation of Petitioner's rights

27   under the Fifth, Sixth, Eighth and Fourteenth Amendments.  (Pet. at 166-67.)  Because the trial record

28   demonstrates that the victim, Ms. Carlton, was hypnotized by her sister, Ms. Parker, in order to forget

08cv0311

the sexual assault, Petitioner asserts that trial counsel "were ineffective for failing to object to the witness's testimony based upon its inherent unreliability as a result of the hypnotism, and on hearsay grounds." (Pet. Brief at 169.)

Here, even if counsel's performance in failing to object to Parker's testimony was deficient, Petitioner's claim fails due to his inability to demonstrate any resultant prejudice. Based on a review of the penalty phase transcripts, it is clear that the evidence introduced regarding the uncharged sexual assault was substantial, independent from the testimony of Sarah Parker. As previously discussed regarding Claim 26 of the Court's Order on Petitioner's Motion for Summary Judgment:

> The victim, Zelda Carlton, testified in detail regarding the assault. (RT 24786-823.) She stated that Petitioner was in her apartment as an associate of Howard's. (RT 24786-90.) Carlton stated that Petitioner refused to leave when she asked, followed her into her bedroom brandishing a knife, and forced himself upon her. (RT 24790-800.) Carlton stated that after he left, she gathered her children to tell them they were leaving for Texas. (RT 24800-02.) Carlton stated that she called her sisters to relate the incident, and also informed Lloyd Howard. (RT 24802-08.) Howard then testified that one night after leaving Carlton's apartment, Petitioner remained there, and Carlton came to him the following morning to inform him that Petitioner had put a knife to her throat and raped her. (RT 24846-49.) Howard stated that when he confronted Petitioner with this information, Petitioner said something about letting Carlton come between their friendship. (Id.) The testimony of Carlton and Howard amply supported the prosecution's case in aggravation, and was persuasive evidence of the prior uncharged sexual assault.

(Doc. No. 88 at 61-62.)

As the Parker testimony was merely cumulative to that of Lloyd Howard, even if trial counsel was deficient in failing to object to her testimony on hearsay grounds, that failure could not have resulted in prejudice to Petitioner. See Strickland, 466 U.S. at 691 ("An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.")

Petitioner also asserts that trial counsel was ineffective for failing to question Ms. Parker "concerning the details of the hypnotism" and for failing to "present expert testimony as to the effects hypnotism may have on an individual's memory," contending that trial counsel was "ineffective in failing to object to the witness's testimony based upon its inherent unreliability as a result of the hypnotism." (Pet. Brief at 169.) The Court finds no evidence that counsel's performance was deficient in this respect. While the record clearly indicates that Ms. Parker *conducted* hypnotism on

1  her sister, Ms. Carlton, there is nothing in the record to suggest that Ms. Parker ever *underwent*

2  hypnotism herself.  As such, trial counsel would not have had any grounds to object to the reliability

3  of the Parker testimony due to the effects of hypnotism on a witness.  Similarly, expert testimony

4  regarding the effects of hypnotism on a witness' memory would have been irrelevant to the reliability

5  of Ms. Parker's testimony as again, the evidence does not show that Ms. Parker was hypnotized.

6      Petitioner has not shown that trial counsel's conduct was unreasonable, or that he suffered any

7  prejudice.  Strickland, 466 U.S. at 687.  Based on an independent review of the record, the state court's

8  rejection of this claim did not involve an objectively unreasonable application of Strickland.  An

9  evidentiary hearing is not warranted on Claim 17.

10  **Q.    Claim 18 - Ineffective Assistance of Trial Counsel - Cumulative Effect**

11      In Claim 18, Petitioner contends that the cumulative effects of trial counsel's ineffective

12  assistance and conflicts of interest deprived him of his rights guaranteed by the Fifth, Sixth, Eighth

13  and Fourteenth Amendments to the United States Constitution.  (Pet. at 168.)

14      The courts have recognized that the "cumulative effect of multiple errors can violate due

15  process even where no single error rises to the level of a constitutional violation or would

16  independently warrant reversal."  Parle, 505 F.3d at 927 (citing Chambers, 410 U.S. at 290).  As

17  discussed in the resolution of Claims 1-6, Petitioner fails to demonstrate that counsel's fraud or alleged

18  conflicts had any adverse impact on the quality of his representation, or that there was any error to

19  accumulate in that respect.  The same is true with respect to counsels' representation at all stages of

20  trial, as discussed in the adjudication of Claims 7-17.  Petitioner fails to persuasively demonstrate that

21  counsels' conduct "fell below an objective standard of reasonableness," at any stage during his trial

22  that resulted in prejudice.  Strickland, 466 U.S. at 687-89.  Because Petitioner fails to demonstrate any

23  such deficiencies, "there is nothing to accumulate to a level of a constitutional violation."  Mancuso,

24  292 F.3d at 957 (citing Fuller, 182 F.3d at 704).

25      Based on an independent review, Petitioner has not shown that the California Supreme Court's

26  rejection of this claim was an objectively unreasonable application of clearly established federal law.

27  Neither an evidentiary hearing nor habeas relief is warranted on Claim 18.

28  ///

**R.      Claim 19 - Brady violation - Testimony of Investigator Cooksey**

In Claim 19, Petitioner alleges that the district attorney's investigator, Richard L. Cooksey, "gave false and/or misleading testimony with respect to the unreliable photo line-up identification by Latonya R. Wadley, in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and the prosecutor committed prejudicial misconduct in failing to correct the error because he knew or should have known about the falsehood," in violation of <u>Napue v. Illinois</u>, 360 U.S. 264 (1959). (Pet. at 174.) Petitioner alleges that this violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments. (<u>Id.</u>) As discussed above in Section III, <u>supra</u>, the Court will review this claim on the merits irrespective of the state court's application of a procedural bar.

1.      <u>Brady</u>

In <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), the United States Supreme Court held that the government must disclose all material evidence that is favorable to the defendant. A successful <u>Brady</u> claim requires three findings: (1) that the prosecution suppressed evidence, (2) that the withheld evidence was favorable to the accused; and (3) that the evidence was material to the issue of guilt or punishment. <u>Id.</u>, 373 U.S. at 87. Full compliance with <u>Brady</u> includes the disclosure of "evidence that the defense might have used to impeach the Government's witnesses by showing bias or interest." <u>United States v. Bagley</u>, 473 U.S. 667, 676 (1985). Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>Kyles v. Whitley</u>, 514 U.S. 419, 434 (1995). A "reasonable probability" is demonstrated when the failure to disclose evidence "undermines confidence in the outcome of the trial." <u>Id.</u> (quoting <u>Bagley</u>, 473 U.S. at 678).

Petitioner states that the prosecution conducted three interviews with Ms. Wadley but only transcribed one. (<u>See</u> Ex. 22.) Petitioner asserts that "[t]he fact that the prosecution chose not to transcribe or withheld the June 1, 1988, interview is disturbing in light of its significance," and notes that "[t]he taped interview was generated by the prosecution and within their possession and control." (Pet. Brief at 179.)

As an initial matter, the Court finds no evidence of suppression. The record clearly indicates that the *tape* of the June 1, 1988 interview was turned over to trial counsel, as was investigator

Cooksey's *report* of the interview.  (See Ex. 22, 23 to Pet.)  In fact, state habeas co-counsel Pamela Sayasane specifically acknowledged that the taped interview with Latonya Wadley had been provided to defense counsel at trial.  (See Ex. 23) ("The tape of the June 1, 1988 interview was turned over to trial counsel, but a transcription was not provided.")  As such, Petitioner fails to demonstrate that the prosecution withheld favorable evidence material to his defense in violation of Brady.

Petitioner contends that "[d]efense counsel must have been unaware of the contents of the tape-recorded interview because they failed to impeach Mr. Cooksey with the evidence."  (Mot. at 179.) This specious assertion fails to support a Brady claim, particularly in light of the explicit concession by state habeas counsel that trial counsel was provided with a tape of the interview.  Petitioner fails to cite to any clearly established precedent that requires a prosecutor to provide both a tape and transcription of an interview in order to comply with Brady, and the Court finds no support for his assertion of error.  In any event, Petitioner fails to demonstrate a Brady violation.[34]

2.   Napue

It is well-established that the presentation of false evidence violates due process.  See Napue, 360 U.S. at 269 ("a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction...")  Petitioner asserts that the prosecution violated Napue when it failed to correct the false and misleading testimony of Mr. Cooksey at trial.  Based on a review of Cooksey's testimony, however, the Court is unpersuaded that he testified falsely in the first place.

Mr. Cooksey stated that Ms. Wadley selected Petitioner's photo from a group, but conceded that the selection of Petitioner may have been "tentative" and it may have taken Ms. Wadley "a few minutes" to make the identification.  (RT 23975-76.)  Upon further examination, Mr. Cooksey repeated that he handed a set of photos to Ms. Wadley, agreed that "she looked at these photographs for a while" and noted that she selected Petitioner's photo.  (RT 23983-84.)  Mr. Cooksey stated that

---

[34] In another section of Claim 19, Petitioner directs the Court's attention to a letter dated May 10, 1988 from prosecutor Anear stating that Ms. Wadley was a protected witness and was being provided room and board.  Petitioner asserts that "had Ms. Wadley's status as a protected witness been fully disclosed to the jury, i.e., that she was being housed and fed by the prosecution, it would have affected the weight given her testimony."  (Pet. Brief at 180.)  Petitioner repeats this exact information and allegations in Claim 20.  As Claim 19 alleges Brady error regarding the interview of Ms. Wadley, and Claim 20 alleges Brady error regarding the failure to turn over evidence regarding favorable treatment given to witnesses, the Court will consider the May 10, 1988 letter in conjunction with Claim 20.

once Ms. Wadley made the identification, she was shown an individual photo of Petitioner, and after that photo she did not "equivocate" about her identification. (RT 23984.) During cross-examination, Mr. Cooksey noted that the Ms. Wadley's identification of Petitioner was "collateral" to the investigation, and had she been a crime victim of the crime or had not known the people in question, he would not have shown her an individual photo of Petitioner or Cosby. (RT 23985-86.)

Based on the partial transcription of the June 1, 1988 interview provided by Petitioner, the Court cannot conclude that investigator Cooksey testified falsely at trial. The partial transcription only reveals that Ms. Wadley viewed the photographs in the lineup for a length of time and eventually selected a photo of Petitioner, stating that the photo she selected did not look like Petitioner as Wadley recalled him, which was "bald-headed and no hair." (Ex. 23 to Pet. at 2.) The partial transcription does not appear to include the portion of the interview in which Ms. Wadley was provided with an individual photo of Petitioner, and Petitioner fails to provide the remainder of the interview or demonstrate through other means that Ms. Wadley continued to equivocate about her identification of Petitioner. Mr. Cooksey testified that after being shown the individual photo, Ms. Wadley did not equivocate. Petitioner fails to show that this testimony was untrue.

Petitioner has not established that the prosecution either solicited false evidence, or allowed false evidence, once given, to go uncorrected. See Napue, 360 U.S. at 269; Hayes v. Brown, 399 F.3d 972, 978 (9th Cir. 2005). The Court concludes that the California Supreme Court's rejection of this claim was not an objectively unreasonable application of clearly established federal law. Neither habeas relief nor an evidentiary hearing is warranted.

**S.    Claim 20 - Brady violation - Failure to Disclose Favorable Treatment Given to Witnesses**

In Claim 20, Petitioner asserts that the prosecutor violated Brady by: (1) failing to disclose benefits and/or favorable treatment provided to numerous witnesses; (2) misrepresenting to the trial court that no benefits were conferred to those witnesses; and (3) failing to correct false and/or misleading witness testimony, in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. (Pet. at 184.)

As stated above in the discussion of Claim 19, pursuant to Brady, the government must disclose all material evidence that is favorable to the defendant, which includes "evidence that the

defense might have used to impeach the Government's witnesses by showing bias or interest." Bagley, 473 U.S. at 676. If a petitioner can also demonstrate that the withheld evidence was favorable to the accused, and material to guilt or punishment, a constitutional violation may be shown. See Brady, 373 U.S. at 87. Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Kyles, 514 U.S. at 434. A petitioner must ultimately show that the failure to disclose the favorable and material evidence "undermines confidence in the outcome of the trial." Id. (quoting Bagley, 473 U.S. at 678.)

A prosecutor's failure to correct the false testimony of a witness about promises in consideration for his testimony violates due process. Napue, 360 U.S. at 269. Moreover, when a witness' testimony is central to a case, their credibility is also an "important issue in the case." Giglio v. United States, 405 U.S. 150, 155 (1972). Yet, "[t]he prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial." Bagley, 473 U.S. at 675.

In this case, Petitioner asserts that the prosecutor failed to disclose favorable treatment provided to witnesses including Troy Patterson, Echo Ramey, Latonya Wadley, Kim Strickler, and Glen Heflin, and lied to or misled the trial court and jury in arguing that only Glen Heflin received consideration for his trial testimony.

      1.    Troy Patterson

Petitioner asserts that both Mr. Patterson and the trial prosecutor "lied in court that the witness was not offered or provided any favorable treatment in exchange for his testimony." (Pet. Brief at 184.) Despite the denial of the witness and prosecutor that Patterson was not provided with consideration, Petitioner contends that the prosecutor offered deals for Patterson's testimony, provided the witness a transfer to a more desirable correctional facility, and threatened and intimidated the witness into cooperating.

Petitioner first contends that "[o]n cross-examination, Patterson falsely testified that the prosecution did not offer him deals in exchange for his testimony against Petitioner." (Id. at 185.) This assertion is clearly contradicted by the trial record, which reveals Patterson testified as follows:

      Q:      They wanted - - they offer you some deals?

1    A:      No.

2    Q:      Take five years off your pending sentence if you could help them out?

3    A:      One did, yes.

4    (RT 23590.)  Indeed, Mr. Patterson explicitly conceded that he had been offered consideration.  It is

5    also clear that Mr. Patterson acknowledged discussing his case with the district attorney, as follows:

6    Q:      Didn't you ask and get assurances from the district attorney they would talk to
             Bill Collins of the district attorney's office about your case?
7

8    A:      That I did.

9    Q:      And isn't Mr. Collins the person who prosecuted you?

10   A:      That's true.

11   (RT 23591-92.)

12          Petitioner additionally asserts that in an October 6, 1987 interview with trial prosecutor Anear

13   and investigator Cooksey, Mr. Anear "suggested" Patterson could receive a sentence reduction if he

14   testified against Petitioner, as follows:

15   Troy:       Do you plan on using ROCK and ECHO at the trial?

16   Cooksey:    More than likely.

17   Troy:       You don't plan on yankin' me down there, too, do you?

18   Anear:      Depends.  You know you can get a year off your sentence?

19   Troy:       Whas [sic] a year or thirteen years? That's nothing.

20   Anear:      It's a year off of your good time.

21   Troy:       I get paid for that now?  That's - - that's - -

22   Cooksey:    That's for each - - each case.

23   Troy:       I don' unnerstan. [sic]

24   Cooksey:    Well, it's two separate trials.

25   Troy:       Okay.  So there's two separate trials - -

26   Cooksey:    If you were to testify in both trials, you have the potential of - - of two
                 years - -
27

28   Anear:      That's 730 days.

| | | |
|---|---|---|
| 1 | Cooksey: | That's 730 days off your sentence.  I'm not promising you that that's what's going to happen, but the potential of that is there. |
| 2 | ... | |
| 3 | Anear: | Now, I'm not promising you this stuff, and I want you to understand this - - |
| 4 | Troy: | Yeah, I-I unnnerstan, I unnerstan [sic]. |

(Ex. 10 at 29, Discovery at 4025.)  Petitioner also directs the Court to an October 26, 1987 interview

that the trial prosecutor and investigator Cooksey conducted with Troy Patterson, in which they

discussed Patterson's desire to have someone look into his own case, as follows:

| | | |
|---|---|---|
| 8 | Patterson: | Ok, do you know Collins, right? How well do you know him? |
| 9 | Anear: | I've worked with him for six, seven years. |
| 10 | Patterson: | Do you know him pretty well?  Uh, has he included you in on what's happening?  On my case? |
| 11 | Anear: | Just very (unintelligible). |
| 12 | Patterson: | Uh huh, uh. |
| 13 | Anear: | What I know about your case I mostly know from reading the file. |

(Lodgment No. 16, Ex. 4, Discovery at 4151.)  In the same interview, after Patterson asks about a

witness and the conversation turns to the possible appeal of his conviction, the prosecuting attorney

responds as follows:

| | | |
|---|---|---|
| 17 18 19 | Anear: | Ok, but it, that's the kind of thing I'm talking about when you say look into this detail or look into that detail.  Your lawyer tells us that.  I'll guarantee you I'm not making any promises that anything is ever going to come of it, but I will see that it's done.  I will see that it's looked into. |
| 20 | Patterson: | Ok, let me ask |
| 21 | Anear: | I don't promise results, but I promise some consideration. |
| 22 | Patterson: | I understand. |

(Id. at 4151-52.)

Based on these interviews, Petitioner contends that "the state made offers of favorable

treatment in exchange for the witness's cooperation" and that when asked, "Patterson falsely testified

that the prosecution did not offer him any deals in exchange for his testimony against Petitioner." (Pet.

Brief at 185.)  However, while it is evident from the transcripts that the prosecuting attorney and the

witness had discussed the potential for a deal, the transcripts fail to demonstrate that the prosecution

entered any deal with Mr. Patterson for his testimony, and as stated above, Patterson acknowledged a prior offer of consideration for his testimony.  (See RT 23590.)  Moreover, the prosecutor never denied that offers had been made or discussed, only stating that "no deals" had been reached.  (RT 23585.)  In any event, transcripts of these interviews were turned over to defense counsel, who could have impeached Mr. Patterson on his prior conversations with the prosecutor and investigator.

Petitioner also asserts that Mr. Patterson received a transfer to another institution, and falsely testified that the transfer had not been arranged by the prosecution, as follows:

> Q:   Did you not also ask the district attorney or the district attorney investigator to have you transferred from - - ?
>
> A:   I did.
>
> Q:   Did they have you transferred?
>
> A:   No.
>
> Q:   Have you been transferred?
>
> A:   Yes, I have been.
>
> Q:   But they didn't do that?
>
> A:   No.

(RT 23592.)  The record shows that the prosecutor disclosed to defense counsel and the trial court that "[t]he only agreement with [Patterson] has been that at his request we move him out of the prison he's in now, if in fact he feels his life is threatened as a result of the testimony."  (RT 23585.)  This disclosure is not contradicted by the memo and declaration submitted by Petitioner.  In fact, the trial prosecutor's March 24, 1988 memo appears to confirm that Mr. Patterson was transferred from Folsom to Donovan only "during the pendancy of the trial" and specifically indicated that "it would be unlikely that Patterson would ever receive a permanent transfer" to the Donovan facility.  (Ex. 33.)

Moreover, the trial prosecutor's declaration and trial court's order, file stamped May 3, 1989, did not relate to the Folsom-Donovan transfer, but to Patterson's "transfer from the institution to the court for the purposes of offering his testimony."  (Ex. 34.)  The declaration specifically notes that the district attorney requested a transfer for security purposes and to "prevent other inmates from learning of Mr. Patterson's status as a witness," and requested that the transport orders be listed under Patterson's own case, rather than Petitioner's or Mr. Cosby's criminal cases.  (Id.)  Thus, it is plain that

the purpose of the declaration was to provide secure and safe arrangements for a testifying witness, and was not a benefit or consideration in exhange for testimony.  At any rate, the prosecutor disclosed to defense counsel and the trial court that prison transfer arrangements were something he had discussed and agreed upon with Mr. Patterson in the event that security became an issue due to the witness' testimony in Petitioner's case.  (RT 23585.)  While Exhibits 33 and 34 to the federal Petition may not have been in the possession of defense counsel, counsel certainly was privy to the fact that the prosecutor had discussed and agreed upon a potential transfer with the witness.  Moreover, it is clear that these documents were not favorable to Petitioner, as cross-examination on this matter would undoubtedly have elicited that Mr. Patterson was being transferred for his protection and due to a fear for his safety as a result of his testimony.  This information would not have benefitted Petitioner's case, and Petitioner cannot demonstrate that the prosecution's failure to disclose the transfer information constituted <u>Brady</u> error.

In a related matter, Petitioner alleges Mr. Patterson was intimidated and threatened by the prosecution into supporting the prosecution's theory of the case, yet fails to contend that the prosecution *suppressed* any evidence of intimidation or threats.  Petitioner's argument in this respect is wholly supported by citations that include discovery numbers.  (See e.g. Ex. 10 at 4, 22-23, 66-69, Discovery at 4000, 4018-19, 4062-65; Ex. 11 at 50-51, Discovery at 3627-28.)  Accordingly, as it is evident that these documents were in the possession of defense counsel, there was no failure to disclose, and thus no <u>Brady</u> error with respect to this information.

2.  <u>Echo Ramey</u>

Based on a review of the record and materials submitted in support of this claim, the Court finds no evidence that the prosecution violated his duty under <u>Brady</u>, made any misrepresentations to the trial court, or failed to correct false and/or misleading testimony by Echo Ramey.  In fact, Petitioner fails to present any evidence that Ms. Ramey received a benefit as a result of her cooperation with the prosecution.

Petitioner concedes that "[w]hile there is yet evidence to be found that a direct benefit was provided to Ramey in exchange for her testimony, there is evidence to suggest that she was benefited indirectly as a result of favorable consideration provided to her live-in boyfriend, Mr. Littleton." (Pet.

Brief at 198.) Petitioner directs the Court to an October 9, 1987 letter from prosecuting attorney Anear to Judge Greer, who presided over the sentencing on Stacy Littleton's criminal case. In this letter, Mr. Anear stated that Littleton had been cooperative with the District Attorney's office in the Cosby and Bemore cases, and while "[t]his letter is not intended as a plea for lenient treatment" the prosecutor sent it to "inform the court of a factor that may have some bearing in the court's decision process." (Ex. 35.) Petitioner contends that "[i]t is conceivable that the prosecutor's letter on Mr. Littleton's behalf served as an intended benefit for Ms. Ramey, since the two were romantically involved and living together." (Pet. at 199.)

As an initial matter, Petitioner acknowledges that the letter "was listed in the list of materials provided to trial counsel in discovery, so the defense were [sic] apparently aware of the information."[35] (Pet. Brief at 194.) Accordingly, Petitioner cannot sustain the allegation of <u>Brady</u> error, as the letter was clearly disclosed to the defense. <u>See Brady</u>, 373 U.S. at 87 (a successful <u>Brady</u> claim requires a showing that the prosecution suppressed evidence). Moreover, Petitioner fails to demonstrate that there is any connection between Ms. Ramey's cooperation and the prosecutor's letter on behalf of Mr. Littleton. While Petitioner may consider it "conceivable" that the letter was an intended benefit to Ms. Ramey, this unsupported assertion is insufficient to state a claim. <u>See James</u>, 24 F.3d at 26.

In addition to the speculative benefit to Ms. Ramey through Mr. Littleton, Petitioner asserts that the jury "would have had additional reason to question Ms. Ramey's credibility had they been privy to the prosecution's interviews with Mr. Patterson, in which Ramey is painted as a liar." (Pet. Brief at 195.) Ms. Ramey testified that on the night of the Aztec robbery/murder, she was in the apartment she shared with her boyfriend Stacy Littleton and Troy Patterson, when Petitioner knocked on the door, and appeared "scary" and "sweaty." (RT 23615.) Ramey stated that Petitioner asked for Mr. Patterson, and inquired whether they had anything to cover up a safe, and Patterson followed

---

[35] In a declaration submitted by Pamela Sayasane, who was Petitioner's second chair state habeas counsel, Ms. Sayasane states that she copied several documents from the district attorney's files, and lists the October 9, 1987 letter from Mr. Anear to Judge Greer among "[t]he copied documents not disclosed to trial counsel." (Ex. 24 at 4-5.) However, the Court's examination of the letter, which was Exhibit 35 to the federal Petition, reveal that the document is stamped with a discovery number. Based on this, and on Petitioner's concession that trial counsel was evidently provided with this letter, it appears Ms. Sayasane's contrary assertion is erroneous.

08cv0311

1   Petitioner out of the apartment.  (Id.)  Ramey also testified that Patterson was at their apartment

2   between 9 p.m. and 11 p.m. on the night of the robbery/murder.

3        Meanwhile, Mr. Patterson disputed that he was in the company of Ms. Ramey on the night of

4   the Aztec homicide.  In one interview, Mr. Cooksey stated that "Echo [Ramey] said she answered the

5   door and [Petitioner] asked for you, specifically.  She turned around and said--," to which Patterson

6   replied, "--no, that's not true.  She wasn't there.  She wasn't there." (Ex. 10 at 4.)  Petitioner alleges

7   that, despite the fact that these interviews were disclosed to the defense, and even though defense

8   counsel declined to use the impeachment evidence, the "prosecutor nonetheless had an affirmative duty

9   not to mislead the jury." (Pet. Brief at 195.)

10       While a prosecutor cannot present testimony he knows to be false, Petitioner offers nothing to

11  demonstrate that the prosecutor doubted the veracity of Ms. Ramey's version of events.  Petitioner also

12  fails to indicate how the prosecutor "misled" the jury by declining to raise the letter written on Mr.

13  Littleton's behalf or declining to questioning Ms. Ramey on Mr. Patterson's contradictory statement.

14  The defense was also privy to both pieces of evidence and was equally able to cross-examine Ms.

15  Ramey about the Littleton letter or the Patterson interview.  At any rate, a prosecutor is not required

16  to attempt to impeach his own witness with contradictory statements given by a second witness.

17  Petitioner's assertions of error with respect to Ms. Ramey are without merit.

18       3.   Latonya Wadley

19       Petitioner contends that the prosecutor withheld evidence demonstrating that witness Latonya

20  Wadley was provided consideration for her trial testimony.  A letter from prosecuting attorney Anear

21  dated May 10, 1988 states that Ms. Wadley "is a protected witness by this department and is being

22  provided room and board in-kind." (Ex. 32.)  Petitioner asserts that this information was not provided

23  to the defense and was not included in the prosecution Discovery Index. (Pet. Brief at 196.)  Petitioner

24  alleges that because Ms. Wadley was an important witness, the withheld information would have

25  affected her credibility and the weight the jury accorded her testimony, particularly because Ms.

26  Wadley's testimony was already replete with inconsistencies.  (Id.)

27       It appears that this document was not turned over to the defense at trial, and the Court must

28  therefore proceed to a review of whether the evidence was favorable to Petitioner.  While the

1  document reveals that Ms. Wadley received in-kind room and board due to her status as a witness,

2  there is no evidence that the prosecution made any deal with her in exchange for her testimony.

3  Furthermore, the information about Ms. Wadley being a protected witness was not likely to be

4  favorable to Petitioner, as it would have allowed the jury to conclude that Ms. Wadley was being

5  protected due to a fear of Petitioner.  Yet, even though the information was not wholly favorable, and

6  any benefit given to Ms. Wadley was modest, the Supreme Court has instructed that favorable

7  evidence includes "evidence that the defense might have used to impeach the Government's witnesses

8  by showing bias or interest." Bagley, 473 U.S. at 676.  Nevertheless, the withholding of this evidence

9  by itself does not undermine confidence in the outcome. Id. at 678.  The Court will, however, consider

10  the materiality of this undisclosed document, together with any other undisclosed evidence, when

11  addressing the cumulative aspect of this Claim in Section 7 below.

12          4.    Kim Strickler

13          Petitioner alleges that, contrary to the prosecution's argument in closing that "nobody's

14  testimony was bought here," (see RT 24588), letters from the District Attorney's Office to the

15  Department of Social Services reveal that "benefits were in fact provided to [Kim] Strickler."  (Pet.

16  Brief at 199.)  Petitioner asserts that two documents reflecting such consideration were never turned

17  over to the defense or listed in the prosecution Discovery Index.  (Id.)  Respondent does not appear

18  to contest this assertion.

19          The first document is a letter from the San Diego District Attorney's Office to the Department

20  of Social Services dated April 1, 1988, which states in part:

21                  It has come to our attention that sources claim Ms. Strickler's address is being
          provided to the defense through the Department of Social Services.  We are aware any
22        number of county departments have access to welfare EDP screens.  In order to better
          protect the confidentiality of her address we are requesting that her warrants, food
23        stamps, and Medi-Cal cards be sent to a post office box.  We propose that our
          department will obtain and pay for this box.  The box will be accessible by our
24        department and we will be responsible for delivering said items to Ms. Strickler.

25                  Ms. Strickler advised our Investigator, Richard Cooksey, that she recently
          became eligible for Section 8 housing and plans to move.  We intend that the post
26        office box procedure will begin when Ms. Strickler has actually moved and will so
          notify you.  We are also requesting that the actual case file be protected so that a
27        limited number of Social Service personnel have access to the file and therefore her
          new address.
28

(Ex. 36.)  A second letter from the District Attorney's office to the Department of Social Services, dated May 11, 1988, stated in part:

> This letter is to thank you for your attention to the protected witness matter we discussed on the phone yesterday.  I have been advised by Guy Johnson, our Investigator, that Ms. Betty Webb was very professional and expedited the matter and issuance of the Medi-Cal card.  They were only in your office for one-half hour.

(Ex. 37.)

Because it is apparent that these documents were not turned over to the defense at trial, the Court must proceed to review whether the evidence was favorable to Petitioner.  A review of the documents reveal that Ms. Strickler received re-routing of her mail and possible expedition of certain social welfare benefits due to her status as a witness.  While these actions were apparently taken in response to "security concerns," and there is no evidence that the prosecution made any deal with the witness in exchange for her testimony, the post office box and prompt issuance of a Medi-Cal card could arguably be construed as a benefit.  Yet, as with the evidence regarding Ms. Wadley, these documents are not wholly favorable.  Revealing Ms. Strickler's status as a protected witness was not necessarily helpful to Petitioner's defense, as it would have allowed the jury to conclude that her address was being protected due to her fear of Petitioner as a result of her testimony in his case.

Accordingly, even though any benefit conferred to Ms. Strickler was modest indeed, and the information was not wholly favorable, the defense could have arguably used the evidence "to impeach the Government's witnesses by showing bias or interest."  Bagley, 473 U.S. at 676.  By itself, the withholding of this evidence does not undermine confidence in the outcome.  Id. at 678.  The Court will, however, consider the materiality of these undisclosed documents, together with any other undisclosed evidence, when addressing the cumulative effect of the errors in Section 7 below.

### 5.   Glen Heflin

Trial prosecutors disclosed that they made a deal with witness Glen Heflin, agreeing to reduce his thirteen-year prison sentence by five years, in exchange for his testimony against Petitioner at trial.  (See RT 23450.)  Petitioner now asserts that Mr. Heflin was afforded an additional benefit, a prison transfer, that the prosecutor failed to disclose to the trial court, the defense, or the jury.  (Pet. Brief at 200.)

1     A June 12, 1989 letter from the prosecutor to the Board of Prison Terms details Mr. Heflin's

2  testimony at Petitioner's trial and in the unrelated trial of Ricky Thompson, and requests that the

3  witness be transferred to another prison, stating in relevant part as follows:

> The purpose of this letter is to request that the above-named inmate, Glen Edward Heflin, be considered for housing at the California Mens Colony in San Luis Obispo, California.  The reason for this request is that it is our belief such housing would be in the best interests and safety of Mr. Heflin...
>
> During the pendency of these cases, Mr. Heflin has been the victim of numerous threats and attempts at intimidation by other inmates...
>
> We believe that Mr. Heflin would be at risk should he be housed in the Reception and Guidance Center at Chino, including the protective custody unit at Palm Hall.  We further believe that Mr. Heflin would be at risk in any of the normal prison housing settings within the state of California, due to the general knowledge of the inmate population of his status as an informant who has testified in murder cases.
>
> Mr. Heflin has expressed a desire to be housed at the California Mens Colony and has stated that he would feel secure in that facility.  Given the nature and level of the threats risks posed to Mr. Heflin within the correctional system, we believe that housing Mr. Heflin at the California Mens Colony would be in the best interests of the inmate.  Therefore, I respectfully request that the Board of Prison Terms consider housing Mr. Heflin at the California Mens Colony, and that it be done so by way of a direct transfer from San Diego to the California Mens Colony.

15  (Ex. 38.)  As an initial matter, this letter alone does not evidence that the prosecutor and witness had

16  made any actual agreement for a prison transfer in exchange for trial testimony.  Despite a lack of

17  concrete evidence, Petitioner maintains that "[i]t is inconceivable that such an arrangement with Heflin

18  to have him transferred to a correctional facility of his choosing was not discussed prior to his

19  testimony."  (Pet. Brief at 201.)

20     In any event, Heflin acknowledged in his trial testimony that he had requested protection when

21  he previously testified at Mr. Thompson's trial, that he had been disappointed by the level of

22  protection he was given, and that he was interested in protection when he spoke to the authorities about

23  Petitioner's case.  On cross-examination by defense counsel, Mr. Heflin testified as follows about his

24  conversation with investigator Cooksey:

> Q:  Did you have an agreement prior to the tape being turned on, regardless of what you said, regardless of what you said, that Mr. Cooksey was going to get you protective custody?
>
> A:  I was already in protective custody.
>
> Q:  So what was your concern?

92

A:   My concern?

Q:   You said you were only concerned about your own safety.  What was your concern?

A:   Concerned that that [sic] recordings would be released.

Q:   But you knew because you had previously given recordings in another murder case that whatever statements you made would be released to the defendant, didn't you?

A:   Okay.  That's the main reason why I wanted it to be known I wanted protection, because I wasn't getting protection on the other case.

...

Q:   And you felt like you weren't getting your deal from the Thompson case because they weren't protecting you?

A:   It wasn't a deal.

Q:   What was it?

A:   They told me they would give me protection, that is no deal, is it?  Whether they kept up with their promise or not is on them.  I mean they housed me in protective custody, but a lot of good that did.

Q:   When you met with Mr. Cooksey you were concerned that you have some more rules, some more ground rules on how they were going to protect you?

A:   I asked that if I would be protected and how I would be protected.  That's when he turned on the tape and said right there on the tape he would do what he could.

(RT 23500-02.)  It is clear from the above exchanges that the jury was already aware that Mr. Heflin was motivated into cooperating with the authorities by a fear for his safety and desire for protection, in addition to the sentence reduction he had received.  Petitioner fails to indicate how further cross-examination about a potential transfer to another institution would have been favorable to his defense, as it would have only served to substantiate and emphasize Heflin's fear of Petitioner, revealing that Heflin had been subject to threats and intimidation as a result of his testimony.  Because Petitioner fails to demonstrate that this information would have been favorable to his defense, his claim of Brady error is without merit.

       6.   Misrepresentation During Closing

       Petitioner contends that the prosecutor "falsely asserted that none of the state's witnesses, with the exception of Glen Heflin, received any deals in exchange for their testimony," which exacerbated the misconduct in this case.  (Pet. Brief at 202.)  In closing arguments, the prosecutor asserted that:

1    She [witness Angela Tabor] get any deals?  No.  She's still in jail.  She didn't get any
2    deals.  Nobody bought her testimony.  Much as the same as nobody's testimony was
     bought here.  I'll get to a fellow in a while that something was done for.

3    (RT 24588.)  With respect to Mr. Heflin, the prosecutor acknowledged:

4    He got a deal.  If you think that bought his testimony, if you look at his testimony in
5    light of what he said and how he said it, how he was corroborated and how it makes
     sense, you'd come to the conclusion Mr. Heflin is not a nice guy but he told you the
6    truth about what Mr. Bemore told him.

7    (RT 24593.)  In light of the evidence presented in support of Claim 20, Petitioner contends that the

8    prosecutor committed misconduct by "mislead[ing] the jury in thinking that the State's witnesses were

9    not motivated by personal gain."  (Pet. Brief at 203.)

10        Inappropriate statements by a prosecutor, particularly during closing arguments, may present

11   a claim of constitutional magnitude if the comments were so prejudicial that they rendered the trial

12   fundamentally unfair.  Donnelly v. DeChristoforo, 416 U.S. 637 (1974).  To succeed on a prosecutorial

13   misconduct claim, a petitioner must demonstrate that the misconduct was "so egregious that it infects

14   the trial with such unfairness as to make the resulting conviction a denial of due process."  Darden v.

15   Wainwright, 477 U.S. 168, 193 (1986).

16        Here, the prosecutor asserted that no witness, aside from Glen Heflin, was given a deal for his

17   testimony.  Petitioner fails to establish that this was untrue.  While it appears that several witnesses

18   were provided with protective measures in the form of room and board, prison transfers or a post office

19   box, there is no evidence that any of these arrangements were undertaken in accordance with a deal

20   for their testimony.  It is just as resaonable to assume that the prosecution took these measures in an

21   effort to assure that these individuals would be available to testify at trial, given that several had been

22   threatened or intimidated due to their status as witnesses.  Petitioner fails to demonstrate that the

23   prosecutor misled or misrepresented to the jury that any witness, other than Glen Heflin, was actually

24   given a deal for his or her testimony.  In any event, Petitioner fails to demonstrate that the prosecutor's

25   comment was "so egregious" as to result in a denial of due process.  Darden, 477 U.S. at 193.  The

26   contention is without merit.

27   ///

28   ///

7. <u>Cumulative Effect</u>[36]

Petitioner contends that there were "repeating instances of <u>Brady</u> violations and prosecutorial misconduct in this case, resulting in prejudice to Petitioner."[37]  (Pet. Brief at 204.)

In order to properly determine whether the suppression of impeachment or other favorable evidence resulted in sufficient prejudice to constitute a <u>Brady</u> violation, the entirety of the undisclosed evidence "must be evaluated in the context of the entire record."  <u>United States v. Agurs</u>, 427 U.S. 97, 112 (1976); <u>see also</u> <u>Kyles</u>, 514 U.S. at 436 (In evaluating materiality under <u>Bagley</u>, "suppressed evidence [is to be] considered collectively, not item by item.")  Accordingly, the Court has considered any potential prejudice arising from the prosecution's failure to disclose documents relating to payments for Latonya Wadley's room and board, and a post office box and expedited social welfare benefits for witness Kim Strickler.

Even considering the undisclosed evidence collectively, and in the context of the entire record, Petitioner fails to establish that this evidence is material under <u>Brady</u>.  Information regarding the room and board provided to Ms. Wadley, as with the post office box arrangement and expedited social welfare assistance for Ms. Strickler, would have opened up the door to the fact that these measures were taken in order to protect the witnesses, which is unlikely to have reflected favorably on Petitioner.

Evidence affecting the credibility of a government witness may be material under <u>Brady</u>.  <u>See</u> <u>Giglio</u>, 405 U.S. at 154.  Moreover, as stated above, when a witness' testimony is central to a case,

---

[36] Petitioner has also included several letters and declarations detailing the efforts made by counsel to obtain discovery of the prosecution's files during state habeas proceedings, and asserts that "[t]he prosecutor stonewalled Petitioner's efforts for further review of the state files when the case was in state post-conviction proceedings." (Pet. Brief at 205.)  Petitioner asserts that "[w]ithout complete discovery power, it was not possible for Petitioner to know during the state proceedings the full extent of the prosecution's misconduct." (<u>Id.</u> at 209.)  To the extent Petitioner moves for discovery, he offers no evidence, other than counsel's belief, that additional discoverable material has been withheld by the prosecution in violation of <u>Brady</u>.  Accordingly, Petitioner fails to demonstrate good cause for additional discovery on this claim.  <u>See</u> Rule 6, Rules foll. Section 2254 Cases.

[37] Petitioner also notes that the San Diego District Attorney's office has been "plagued with prosecutorial misconduct resulting in cases being overturned," and cites to several attached newpaper articles which detail incidents of misconduct in a 1988 homicide case, a 1996 murder case, a 1998 theft and forgery case, a 1989 conspiracy and aggravated mayhem case, and detailed in a 1998 grand jury report. (<u>See</u> Exs. 44-48.)  Based on the incidents detailed in the exhibits, Petitioner asserts that "[i]t is reasonable to belief [sic] that other instances of misconduct occurred in this case, especially given the pattern of wrongdoing by members of the DA [sic]."  (Pet. Brief at 204.)  However, the cited incidents of misconduct detailed in the attached articles do not support Petitioner's allegation that the prosecutor *in his case* suppressed material evidence.

their credibility is also an "important issue in the case." Id. at 155; see also Bagley v. Lumpkin, 798 F.2d 1297, 1302 (9th Cir. 1986) ("By failing to produce the inducements made to its two witnesses, who supplied the only evidence to convict Bagley, the government unconstitutionally interfered with Bagley's right to a fair trial.")  Neither Ms. Strickler nor Ms. Wadley[38] can be considered crucial or central witnesses in the case against Petitioner, nor was their credibility an important aspect of the trial, as there was substantial direct and circumstantial evidence against Petitioner outside of their testimony.

Additionally, with respect to Ms. Wadley, defense counsel already possessed and employed much stronger impeachment material in cross-examining her at trial, such as the fact that upon her arrest she had fresh tracks marks from drug use, had several charges or warrants against her, and that she initially confused AM/PM with Aztec in discussing the case with the prosecutor's investigator. In any event, the benefits alleged conferred as a result of these witnesses' testimony were marginal at best, and the Court cannot conclude that the prosecution's failure to disclose the evidence "undermines confidence in the outcome of the trial."  Kyles, 514 U.S. at 434.

### 8.    Conclusion

In sum, even assuming that the prosecution had a duty to disclose the benefits provided, Petitioner fails to show that this evidence would have put the case against him "in such a different light as to undermine confidence in the verdict."  Kyles, 514 U.S. at 435.  The state supreme court reasonably could have concluded that the undisclosed evidence was not favorable to Petitioner and/or material to Petitioner's guilt or penalty.  The state court could have also reasonably concluded that no prosecutorial misconduct occurred.

For all these reasons, Petitioner has not shown the California Supreme Court's rejection of this claim to be an objectively unreasonable application of clearly established federal law.  An evidentiary hearing is not warranted.

---

[38] Petitioner contends that "the jury considered Wadley's testimony to be very important and requested a read-back of her statements during the guilt-phase deliberations." (Pet. Brief at 197.)  However, the Court cannot arrive at a similar conclusion based only on the jury's request to rehear her testimony, as the jury also requested to rehear the testimony of John Verdugo and Petitioner. (CT 1746.)  Moreover, it is unclear whether the jury asked to hear portions of her testimony or her entire testimony, as the trial court explained that "[b]ecause there's a danger of taking things out of context...my normal approach is to tell the reporter to read all of the testimony of that witness...even though it may mean that they [the jury] have to listen to more than they really wanted to listen to, I just think out of fairness to everybody that's the only way to do it." (RT 24675.)

**T.** **Claim 29 - State Delay in Appointing State Appellate Counsel and Interference with Attorney-Client Relationship**

In Claim 29, Petitioner asserts that the "excessive delay caused by the state in appointing counsel and in interfering with the attorney-client relationship" violated his "right to speedy post-conviction remedies" under the Fifth, Sixth and Fourteenth Amendments.[39] (Pet. at 238.) Unlike each of the other claims adjudicated in this Order, Petitioner has not moved for an evidentiary hearing on this claim.

The Court initially observes that Petitioner fails to offer citation to any legal authority, much less clearly established federal law, in support of his claim that delay by the state supreme court violated his constitutional rights, despite the numerous pages of argument he devotes to Claim 29.[40] Petitioner contends that excessive delay in the appointment of counsel, error by the trial court, and inaction by the state supreme court, coupled with and contributing to appellate counsel's conflict of interest, violated his constitutional right to due process. Petitioner notes that his death judgment was entered on November 2, 1989, and that appellate counsel was not appointed until May 14, 1992.[41] Petitioner details alleged trial and state court error in the record correction proceedings, which spanned between February 8, 1993 and March 23, 1994. The record was certified on March 25, 1996 and he alleges that "[i]t was during this 1994-1996 period that a conflict of interest became apparent between Mr. Newman and Petitioner." (Pet. Brief at 235.) The record also reflects that the opening brief on appeal was filed on February 18, 1998, and the Reply brief was filed on May 29, 1998. On June 17,

---

[39] In arguments on Claim 29, Petitioner has included assertions regarding appellate counsel's alleged conflict of interest, which are also asserted separately in Claim 31. Thus, in adjudicating Claim 29, the Court will also consider the impact the state court's actions had in creating a conflict; the alleged conflict itself will be considered in Claim 31.

[40] Claim 29 spans pages 226-38 of the Opening Brief, but fails to contain any legal citation in support of his claim. In fact, the only case citation is to the direct appeal opinion in his case. (See Pet. Brief at 227.)

[41] Petitioner also notes that the appointment of Mr. Newman as state appellate counsel "was the first appointment made by the California Supreme Court following its decision to take over the function of recruiting and recommending counsel for appointments from the California Appellate Project," and asserts that in this appointment, "the California Supreme Court did not comply with the standards employed by CAP in the selection of counsel for appointment in capital cases, nor with the recommendations of the American Bar Association or other legal entities regarding the minimum qualifications for appointment in a capital appeal." (Pet. Brief at 227.) While this information is illuminating, Petitioner fails to demonstrate how it is pertinent to the instant claim of prejudicial delay.

1    1998, the California Supreme Court granted appellate counsel's March 26, 1998 motion to withdraw

2    as counsel for habeas corpus/clemency proceedings, appointed Robert Bryan as counsel for habeas

3    corpus/clemency proceedings, but retained Mr. Newman as counsel for the remainder of the direct

4    appeal proceedings, including oral arguments held on February 9, 2000.

5            As a general matter, it is clearly established that a state is not required to provide a right to

6    appeal a criminal conviction.  Griffin v. Illinois, 351 U.S. 12, 18 (1951).  However, when a state

7    provides such a right, the state is then required to ensure that the appeal satisfies constitutional

8    guarantees of due process.  Evitts v. Lucey, 469 U.S. 387, 396 (1985) ("A first appeal as of right

9    therefore is not adjudicated in accord with due process of law if the appellant does not have the

10   effective assistance of an attorney.")

11           This Court's own review finds that the Ninth Circuit, and several other circuit courts,

12   acknowledge that in some circumstances an "extreme delay in the processing of an appeal may amount

13   to a violation of due process."  United States v. Antoine, 906 F.2d 1379, 1382 (9th Cir. 1990); but see

14   United States v. DeLeon, 444 F.3d 41 (1st Cir. 2006) ("A due process claim about delays on appeal

15   is not the same as a Sixth Amendment speedy trial claim.")  However, neither the Ninth Circuit nor

16   the Supreme Court have ever extended this holding to apply to delays inherent in the capital appellate

17   appointment process.  Ultimately, regardless of the whether delays in the appointment of counsel are

18   included in the consideration of this claim, "a due process violation cannot be established absent a

19   showing of prejudice to the appellant."  Antoine, 906 F.2d at 1382; see also Coe v. Thurman, 922 F.2d

20   528, 532 (9th Cir. 1990).  Courts analyzing this type of claim have identified three potential types of

21   prejudice that could result from such delay: "(1) oppressive incarceration pending appeal, (2) anxiety

22   and concern of the convicted party awaiting the outcome of the appeal, and (3) impairment of the

23   convicted person's grounds for appeal or of the viability of his defense in case of retrial."  Antoine,

24   906 F.2d 1382 (citing Rheuark v. Shaw, 628 F.2d 297, 303 n.8 (5th Cir. 1980)).

25           Even if the standard outlined in Antoine applied to his case, Petitioner's claim fails because

26   he has not shown prejudice.  Petitioner's alleges two forms of prejudice.  The first stems from the

27   deaths of potential habeas witnesses Charles Small, Mary Laurence, and Augustin Albarrin, which

28   occurred during the pendency of his appeal.  (Pet. Brief at 238.)  The second allegation of prejudice

1   is that "state delay contributed to a breakdown in the attorney-client relationship" between himself and

2   state appellate counsel.  (Id.)

3          Regarding the second allegation, Petitioner specifically asserts that:

4          With the record still uncertified, appellate counsel had no means to earn fees in his only
           case.  He therefore cashed in his retirement and began a private practice.  Thus began

5          his conflict of interest between his legal duties to Petitioner and his personal financial
           obligations.  Mr. Newman opened up a criminal law practice in Parker, Arizona, taking

6          on a variety of criminal law cases and developing a thriving law practice.  During this
           time, unbeknown to Petitioner, the lawyer became a misdemeanor prosecutor in

7          Quartzite, Arizona.  He also sought elective office as a county prosecutor.

8   (Id. at 237.)

9          As appellate counsel and Petitioner both acknowledge, any appellate delay caused by the

10  actions of the state court was certainly not the sole contributor to difficulties in the attorney-client

11  relationship in this case.  Mr. Newman states that "the combination of delay caused by the Court *and*

12  my own workload, *coupled* with the perception that any one who would run for the Office of Chief

13  Prosecutor must not have the committment to work on his case caused a complete breakdown in the

14  attorney client process." (Ex. 16 at ¶ 21) (emphasis added.)   Moreover, Petitioner has not produced

15  evidence that the attorney-client situation resulted in actual prejudice to his case on appeal.  As

16  discussed below in Claim 30, Petitioner fails to show that Mr. Newman's performance was deficient,

17  or that he suffered prejudice due to the representation.  Finally, Petitioner's implication that state delay

18  in record correction proceedings caused or contributed to Mr. Newman's assumption of a prosecutorial

19  position in Arizona is inaccurate.  Mr. Newman's declaration clearly states that he took a job as a

20  misdemeanor prosecutor in Quartzite, Arizona, very early in his representation of Petitioner.  The state

21  record confirms that Mr. Newman was retained as a prosecutor on July 28, 1992, only a few months

22  after his appointment as Petitioner's appellate counsel, and well over six months before record

23  correction proceedings commenced in Petitioner's case.  (See Lodgment No. 15, Ex. 60 at Ex. M.)

24         Petitioner similarly fails to demonstrate that the intervening deaths of the three potential

25  witnesses prejudiced his case.  Petitioner asserts that trial investigator Charles Small "was a key

26  witness to the issue of trial counsel's fraud, conflicts of interest, and ineffectiveness," and that Ms.

27  Laurence was "a crucial witness as to the attorney's fraud and conflicts of interest as a result of his

28  gambling habit."  (Pet. Brief at 238.)  However, as discussed above, these claims are without merit,

1    as Petitioner has not shown either: (1) a connection between the alleged fraud or conflicts of interest

2    and the quality of his representation; or that (2) counsel's representation of Petitioner was prejudicially

3    deficient.  (See Claims 1-6, supra.)  Petitioner's contention that these individuals would have provided

4    support for his claims is purely speculative.   Similarly, as Claims 13 and 23 are without merit,

5    Petitioner fails to demonstrate that the death of juror Augustin Albarrin, who conducted an out-of-

6    court experiment replicating evidence introduced at trial, resulted in any prejudice to his case on

7    appeal.  (See Claims 13, 23, supra.)

8         Based on an independent review of the record, the Court concludes that the state court's

9    adjudication of the claim was not an objectively unreasonable application of clearly established federal

10   law.  Petitioner has not offered any clearly established federal law that lends support to his claim of

11   constitutional error, and this Court finds none.  Pursuant to this Court's analysis under Antoine,

12   Petitioner's claim also fails.

13        Accordingly, absent any persuasive demonstration of prejudice, Claim 29 fails on the merits.

14   **U.     Claim 30 - Ineffective Assistance of Appellate Counsel**

15        In Claim 30, Petitioner asserts that Matthew Newman, state appellate counsel, rendered

16   prejudicially ineffective assistance on Petitioner's direct appeal, in violation of the Fifth, Sixth, Eighth,

17   and Fourteenth Amendments to the United States Constitution.[42] (Pet. at 257.)  Specifically, Petitioner

18   contends that Mr. Newman erred in conceding the torture special circumstance without Petitioner's

19   consent and refused to withdraw the concession after Petitioner requested he do so.  Petitioner also

20   asserts that Mr. Newman was unqualified, failed to raise meritorious arguments on appeal, failed to

21   adequately brief the issues he did raise on appeal, and was ineffective at oral arguments.  (Id.)

22        Due process guarantees a criminal defendant the effective assistance of counsel on a first

23   appeal as of right.  Lucey, 469 U.S. at 396.  The Court shall review this claim under the deferential

24   standard set forth in Strickland.  See United States v. Birtle, 792 F.2d 846, 847 (9th Cir. 1986) (The

25

26        [42] In the heading to Claim 30, Petitioner generally asserts that he is being denied "reasonable access
27   to courts" and "a reasonably expeditious appeal," but fails to support or even acknowledge either contention
     in the text of Claim 30.  Unsupported allegations are insufficient to raise a colorable claim for habeas relief.
     See generally, Earp, 431 F.3d at 1167.  However, the Court notes that Petitioner raised a claim of appellate
28   delay in Claim 29 and an access to courts claim as a part of Claim 33.  As such, both contentions have been
     addressed in the Court's adjudication of the Petition.

two-prong test set forth in <u>Strickland</u> is properly applied to claims of ineffective assistance of counsel on appeal.)

### 1. Concession on Torture Special Circumstance

Petitioner contends that state appellate counsel wrongfully conceded the torture special circumstance in the reply brief and that he refused to withdraw the concession pursuant to Petitioner's request. Indeed, Petitioner's direct appeal reply brief clearly states that "[u]pon further reflection Appellant concedes that the evidence was sufficient to support the torture special circumstance." (Lodgment No. 8 at 5.) Petitioner maintains that "[s]uch a concession was unprecedented and essentially conceded his client to the execution chamber." (Pet. Brief at 240.) Yet while appellate counsel's action may potentially constitute deficient performance, the Court need not reach a decision on this first <u>Strickland</u> prong, because Petitioner fails to demonstrate that he suffered actual prejudice from the concession. <u>See</u> <u>Strickland</u>, 466 U.S. at 697 (A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.")

Despite counsel's concession, the California Supreme Court's direct appeal opinion outlined and addressed several claims Petitioner had previously advanced in the opening brief regarding the torture-murder special circumstance. The claims were outlined as follows:

> Defendant contends the trial court's refusal to dismiss the torture-murder special circumstance undermined the fundamental fairness of the proceedings at both the guilt and penalty phases. Here, as below, the gravamen of the claim is that the evidence does not sustain the elements of the charge.
> ...
>
> Defendant observes that the pathologist, Dr. Bucklin, gave no opinion concerning the order in which the 37 knife wounds occurred, or the point during the attack at which Muck died. Thus, with respect to the five deep wounds to the torso identified as fatal, defendant suggests there is no proof they occurred last or that Muck was alive when any of the other 32 cuts were made. Defendant also notes that Dr. Bucklin did not describe the degree of pain experienced by Muck before he died. Based on these factors, defendant claims there was insufficient evidence that Muck's injuries would have caused extreme pain.
> ...
>
> Defendant next argues that any inference of an intent to cause extreme pain is speculative and unsupported by the record. According to defendant, no evidence bearing on the requisite mental state exists aside from the "condition of the victim's body." The argument seems to be that since multiple stab wounds can be as consistent with a rash explosion of violence as with an intent to inflict cruel suffering, the evidence is insufficient to sustain the torture-murder special-circumstance finding.

...

Defendant next challenges the torture-murder special-circumstance finding on the ground the prosecution failed to establish a "causal relationship" between the intentional infliction of extreme pain and the murder.  He insists that, to the extent the torturous acts merely facilitated the robbery and did not lead directly to Muck's death, the murder could not properly have found to "involve" torture within the meaning of section 190.2(a)(18).

Bemore, 22 Cal. 4th at 839-842.

Moreover, the California Supreme Court explicitly considered and rejected any challenge to the sufficiency of the evidence supporting the torture-murder special circumstance, as follows:

However, as we have explained in rejecting similar claims in other cases, the trier of fact may find intent to torture based on all the circumstances surrounding the charged crime, including the nature and severity of the victim's wounds and any statements by the defendant revealing his state of mind during the crime. (*People v. Crittenden*, *supra*, 9 Cal.4th 83, 141 [torture-murder special circumstance]; *People v. Proctor* (1992) 4 Cal.4th 499, 531 [15 Cal.Rptr.2d 340, 842 P.2d 1100] [same]; see *People v. Raley* (1992) 2 Cal.4th 870, 888 [8 Cal.Rptr.2d 678, 830 P.2d 712] [first degree torture murder]; *People v. Pensinger* (1991) 52 Cal.3d 1210, 1239 [278 Cal.Rptr. 640, 805 P.2d 899] [same].) Contrary to what defendant suggests, there was sufficient evidence that he committed the crime with a "sadistic intent to cause the victim to suffer pain in addition to the pain of death." (*People v. Davenport*, *supra*, 41 Cal.3d 247, 271.)

For background purposes, we note the evidence established the following chain of events: Muck was murdered during the course of a robbery, the object of which was money located in the Aztec Liquor Store. Entry of the store for this illicit purpose occurred around closing time, after money had been transferred from the register to the top chamber of the safe. Using his own knives and stepping in the victim's blood, defendant stabbed Muck 37 times over a 15 to 30-minute period on the floor of the storage room near the safe. With apparent difficulty, defendant and a third person then moved the safe from the store to defendant's garage on Bates Street. There, the safe was forced open after defendant and his friends devoted substantial time and effort to the project. At trial, defendant admitted receiving money from the top and bottom chambers of the safe. Heinkel believed both compartments contained $1,200.

Based on this chronology, and consistent with the prosecution's closing argument, the jury could infer that defendant intentionally tortured Muck to gain entry to the safe and easy access to the cash while inside the store, and that Muck was killed after he failed to comply. Defendant's postcrime statements to various witnesses indicated that Muck was stabbed because he did not cooperate with demands made during the robbery ("if he would have did what I told him I wouldn't have had to stab him so many times"), and because he did not open the safe ("the stupid son-of-a-bitch would have opened the safe"). Other evidence established that Muck could not extract money from the top chamber of the safe because he did not know the combination. Also, since money was present in the bottom chamber when the safe was finally opened in defendant's garage, an inference was raised that Muck refused access to this compartment even though he knew the combination.

The painful series of flank wounds could readily be viewed as one means by which defendant sought to compel Muck to open the safe. As we have explained, autopsy and crime scene evidence suggests that these particular wounds were administered

methodically rather than in a blind fury; that they were not inflicted with lethal intent or towards the end of the attack; and that the victim was alive and rendered incapable of resisting at the time. The jury could conclude that defendant repeatedly stabbed Muck in the flank as part of a calculated and cruel attempt to extract money from the safe before leaving the store, and before intentionally killing him as a potential witness to the robbery. (E.g., *People v. Crittenden*, *supra*, 9 Cal.4th 83, 108-109, 141 [evidence of torturous intent supplied by nonfatal premortem cuts inflicted on one victim as part of apparent effort to compel a second victim to execute a check payable to defendant].) We therefore reject defendant's complaint about the sufficiency of the evidence of intent to torture.

Id. at 841-42.

Additionally, the record clearly indicates that the jury found true *two* special circumstances in Petitioner's case, including: (1) murder during the commission of a robbery and (2) that the murder was intentional and involved the infliction of torture. (RT 24682-83.) A true finding on one special circumstance is sufficient to support a death verdict. See Cal. Penal Code § 190.3. Therefore, it is extremely doubtful that appellate counsel's concession regarding the sufficiency of the torture special circumstance claim, which the state supreme court nevertheless addressed on the merits, "essentially conceded his client to the execution chamber." (Pet. Brief at 244.) Petitioner's contention fails because he has not established any "reasonable probability that, but for counsel's unprofessional errors [in conceding the torture murder special circumstance], the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

2.   Qualifications and General Performance

Petitioner also contends that Mr. Newman was unqualified to handle a capital appeal and asserts that counsel's performance was below constitutionally acceptable standards. In particular, Petitioner asserts that counsel failed to raise potentially meritorious issues and inadequately briefed the issues that were actually raised on appeal.

Petitioner alleges that Mr. Newman "did not meet the California Supreme Court guidelines for attorneys qualified to undertake capital appeals, and was only appointed because of his friendship with former Chief Justice Malcolm M. Lucas." (Pet. Brief at 239.) Petitioner states that at the time Mr. Newman was appointed to his case, counsel "had never handled a death penalty appeal or even a simple homicide case." (Id.) Mr. Newman's declaration indicates that "in 1992, I resigned my position as Chief Deputy Public Defender in Sacramento to return home to Arizona." (Ex. 16 at ¶ 2.)

However, the record before this Court does not indicate what type of cases Mr. Newman handled or did not handle at the Public Defender's Office; more importantly, Petitioner fails to indicate how this is relevant to the present allegations of ineffective assistance of appellate counsel.  Petitioner also fails to articulate what the California Supreme Court guidelines were in 1992, nor does he specifically assert how Mr. Newman failed to meet these guidelines.  Ultimately, even if true, appellate counsel's alleged lack of qualifications does not satisfy the deficient performance prong of Strickland.  Nonetheless, the Court will consider it to the extent it provides context for the alleged deficiencies outlined below.  Indeed, "'[t]he character of a particular lawyer's experience may shed light in an evaluation of his actual performance, but it does not justify a presumption of ineffectiveness in the absence of such an evaluation.'" Ortiz v. Stewart, 149 F.3d 923, 933 (9th Cir. 1998) (quoting United States v. Cronic, 466 U.S. 648, 655 (1984)); see also LaGrand v. Stewart, 133 F.3d 1253, 1275 (9th Cir. 1998) ("In considering a claim of ineffective assistance of counsel, it is not the experience of the attorney that is evaluated, but rather his performance.")

Petitioner also asserts that counsel failed to raise a multitude of "viable" issues on direct appeal despite the fact that the "California Appellate Project recommended that the claims be raised."  (Pet. Brief at 243.)   Petitioner states that appellate counsel should have raised issues including the following:

> Blood splatter evidence; stipulations to evidence; Evidence code section 352 objections; exclusion of Wherehouse robbery evidence; testimony of Lloyd Howard; prosecutorial misconduct regarding testimony on drugs; statements of co-defendant; possible Bruton/Aranda issues; testimony of Angela Tabor; recusal of DA's office; reference to other trial; [i]nformant issue; admissions; prosecutor's chart of Bemore statements; insufficient evidence; various instances of instructional errors; insufficiency of torture evidence; torture instruction; constitutional deficiency of specials; judicial error; improper rebuttal evidence regarding jail food poisoning; inadmissible speculative evidence as to escape motive; and insufficiency of evidence as to specials.

(Id.) Petitioner asserts that "[a]s a result of appellate counsel's failure to raise these claims, Petitioner was denied effective assistance on appeal."  (Id. at 244.)

When filing an appeal, "counsel has no constitutional obligation to raise every nonfrivolous issue requested by the defendant." Miller v. Keeney, 882 F.2d 1428, 1434 (9th Cir. 1989) (citing Jones v. Barnes, 463 U.S. 645, 751-54 (1983)); see id. at 751 ("Neither Anders [v. California, 386 U.S. 738

1    (1967)] nor any other decision of this Court suggests, however, that the indigent defendant has a

2    constitutional right to compel appointed counsel to press nonfrivolous points requested by the client,

3    if counsel, as a matter of professional judgment, decides not to present those points.")  In fact, courts

4    have recognized that "the process of winnowing out weaker arguments on appeal and focusing on

5    those more likely to prevail ... is the hallmark of effective appellate advocacy."  O'Sullivan v.

6    Boerckel, 526 U.S. 838, 858 (1999) (quotation marks and citations omitted); see also Gerlaugh v.

7    Stewart, 129 F.3d 1027, 1045 (9th Cir. 1997) (same).

8           Here, Petitioner fails to allege facts showing that there is a "reasonable probability that, but for

9    counsel's [failure to raise the "viable" claims listed], the result of the [appeal] would have been

10   different."  Strickland, 466 U.S. at 694.  He does not substantively support his contention that appellate

11   counsel's decision not to include the listed arguments in the direct appeal was prejudicially deficient.

12   That the California Appellate Project advocated advancing certain claims which appellate counsel

13   declined to include in the appellate briefs does not, on its own, allege a prima facie case of ineffective

14   assistance of counsel.[43]   Perhaps had Petitioner provided detailed or substantive information

15   demonstrating that the omitted appellate claims were meritorious,[44] the Court could have potentially

16   concluded that appellate counsel's performance was deficient.  Given the highly deferential Strickland

17   standard and Petitioner's generalized showing, this Court is unable to conclude, based on an

18   independent review of the record, that the California Supreme Court's rejection of this claim was an

19   objectively unreasonable application of Strickland.  Claim 30 is without merit, and does not warrant

20   habeas relief or an evidentiary hearing.

21   ///

22   ///

23

24          [43] Similarly, Petitioner's comment that "[t]he Attorney General's Office took just three weeks to file
     a 24-page response [to the opening brief], probably a record," offers little support to his repeated contention
25   that the opening brief was inadequate.  (Pet. Brief at 240); (see also Pet. Brief at 258) ("Respondent's Brief
     was filed on March 12, 1998, just over three weeks later- a probable record in modern times.") While Petitioner
26   advances specific assertions concerning the adequacy of the Reply brief, i.e. the concession of the torture-
     murder special circumstance, he fails to articulate any basis for his general assertion that the issues that were
27   included in the opening brief were inadequately briefed.

28          [44] The Court is also left to speculate why these claims were not raised by state or federal habeas
     counsel, given Petitioner's arguments about their viability.

08cv0311

**V.      Claim 31 - Conflict of Interest of Appellate Counsel**

In Claim 31, Petitioner contends that he was prejudiced on direct appeal and state habeas corpus proceedings as a result of the conflicts of interest of state appellate counsel Newman, including "(1) functioning as a prosecutor while simultaneously representing Petitioner, (2) failing to adequately communicate with the client, and (3) agreeing with the State and conceding his client guilty of capital murder," in violation of Petitioner's constitutional rights.  (Pet. at 263.)

The Sixth Amendment right to counsel requires effective assistance by an attorney, which in turn is comprised of two elements: (1) competence; and (2) conflict-free representation.  See Wood v. Georgia, 450 U.S. 261, 271 (1981); see also Lucey, 469 U.S. at 398 (effective assistance of counsel guaranteed on appeal where state provides a criminal appeal as of right).  To prevail on a conflict of interest claim, a petitioner must demonstrate that "a conflict of interest actually affected the adequacy of his representation."  Sullivan, 446 U.S. at 348-49.  "[U]ntil a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim."  Id. at 350.

As an initial matter, the Court finds no merit to Petitioner's argument that appellate counsel's failure to communicate with his client and his concession on the torture special circumstance each constitute an independent conflict of interest.  Neither of these events, considered on their own, provide evidence that appellate counsel "actively represented conflicting interests."  See Sullivan, 446 U.S. at 350.  Moreover, Petitioner's allegation of appellate counsel error in conceding the torture special circumstance was previously considered and rejected in the adjudication of Claim 30, supra. However, to the extent Petitioner contends that counsel's communication failures and concession were a result of the conflict created by his employment as a prosecutor, the Court will consider the allegations in that limited context.

The record reflects that state appellate counsel Matthew Newman, who was appointed as state appellate counsel in 1992 and withdrew in 1998, also functioned as a criminal prosecutor during this period of time, as Mr. Newman was hired as a criminal prosecutor in the town of Quartzsite, Arizona in 1992 and campaigned for the position of County Attorney for Parker, Arizona in 1996.  Petitioner asserts that during portions of 1996, Mr. Newman told Petitioner that he did not have adequate time

to devote to Petitioner's appeal, yet represented defendants in 40 other criminal cases and worked on several civil cases. (<u>Id.</u> at 245.)  Petitioner states that Mr. Newman was quoted as expressing "firm support" for the death penalty during a 1996 political campaign for a county attorney position and contends that "[d]ue to the political campaign and prosecutorial activities of Mr. Newman, he was conflicted as to his responsibilities to the California Supreme Court and his client, thereby causing irreparable harm to Petitioner." (<u>Id.</u> at 247.)

As an initial matter, the Court's review of the state record fails to locate any quote from Mr. Newman that explicitly notes his "firm support" for the death penalty.  Instead, the newspaper article that Petitioner cites in support of this contention actually discusses Mr. Newman's County Attorney campaign pledge concerning plea bargaining, as follows:

> Matt Newman has pledged to virtually eliminate plea bargaining in serious felony cases.  "Why should someone who committed a terrible murder be allowed to avoid the death penalty simply because the County Attorney doesn't want to 'bother' with the time necessary for trial?  Take them to trial, let a jury decide guilt, and the judge decide whether they are executed or not.  The family of the victims deserves this, at the very least.  I am sure I will have a worse conviction rate (the ratio of cases filed to guilty verdicts or pleas) than Suskin's office did, but that is because I will take the tough cases to trial and let the jury decide, instead of plea bargaining them away."

(Lodgment No. 15, Ex. 60 at Ex. K.)  Moreover, with regards to his employment as a criminal prosecutor, Mr. Newman explains that "[t]he justice system in Arizona is a little different, in that each town has a Magistrate Court, with usually non-lawyer judges, which handle only misdemeanor offenses.  Quartzsite is so small that it can not afford a full-time attorney, so they have always contracted with a local lawyer with a private practice for the work. *I did not then nor do I now see any conflict of interest in this situation*." (Ex. 16 at ¶ 3) (emphasis added.)  Mr. Newman acknowledges that "[o]nce Mr. Bemore learned that I had run for the office of County Attorney, the attorney/client relationship seriously deteriorated.  Mr. Bemore has always wanted his day in court, and the combination of delay caused by the Court and my own workload, coupled with the perception that any one [sic] who would run for the Office of Chief Prosecutor must not have the committment to work on his case caused a complete breakdown in the attorney client process." (<u>Id.</u> at ¶¶ 19-21.)

Petitioner alleges that Mr. Newman acknowledged an actual conflict of interest in a letter he sent Petitioner dated December 9, 1996, by writing that "as we discussed, we really do have a very

08cv0311

1   serious conflict of interest, due to the breakdown in attorney/client relations, to the point where we

2   cannot even communicate about the case." (Lodgment No. 15, Ex. 60 at Ex. J.)  Yet it is clear from

3   the Court's review of the letter that appellate counsel Newman's use of the term "conflict of interest"

4   was in explicit reference to the lack of communcation between himself and Petitioner and was not an

5   admission that his prosecutorial position, candidacy for elected office, or views on capital punishment

6   had created any actual conflict.  That this informal letter constitutes an admission that counsel

7   "actively represented conflicting interests," as defined in <u>Sullivan</u> and its progeny, is unpersuasive.

8         Petitioner's assertion that Mr. Newman's employment as a prosecutor and candidacy for a

9   prosecutorial position created an actual conflict of interest that adversely impacted his representation

10  of Petitioner is similarly tenuous.  Claim 31 is without merit because Petitioner fails to demonstrate

11  that the alleged inadequacies of appellate counsel are reasonably attributable to his personal views on

12  the death penalty or employment as a prosecutor.  <u>See e.g.</u> <u>United States v. Unruh</u>, 855 F.2d 1363 (9th

13  Cir. 1987) (rejecting conflict of interest claim where counsel failed to inform defendant of application

14  for employment with United States Attorney's office, concluding that petitioner "has not shown that

15  he was victimized by ill-advised strategy produced by counsel's alleged conflict of interest."); <u>Garcia</u>

16  <u>v. Bunnell</u>, 33 F.3d 1193, 1199 (9th Cir. 1994) (rejecting claim of ineffective assistance of counsel and

17  concluding that defense counsel's plan to work for District Attorney's office after defendant's trial did

18  not create an actual conflict of interest, reasoning that "[g]iven the inherently transitory nature of

19  representation in the area of criminal law, as well as the potentially unlimited reach of the guilt by

20  association logic Garcia would have us apply, we must significantly rely on the integrity of counsel

21  in evaluating such potential conflicts.")

22        It is evident from a review of the record that the breakdown in attorney-client communications

23  was likely attributable to a myriad of factors, including but not limited to counsel's employment as a

24  misdemeanor prosecutor, the political campaign, and his other civil and criminal caseload.  Petitioner

25  fails to demonstrate that the breakdown in communications or appellate counsel's decision to concede

26  the sufficiency of the torture special circumstance is attributable to the alleged conflict of interest.

27        The California Supreme Court's rejection of this claim was not an objectively unreasonable

28  application of <u>Sullivan</u>.  Petitioner fails to demonstrate that Mr. Newman's position as a misdemeanor

08cv0311

1   prosecutor in Arizona or candidacy for a county prosecutor position constituted an actual conflict of

2   interest, or that the alleged conflict "actually affected the adequacy of his representation." <u>Sullivan</u>,

3   446 U.S. at 348.  Petitioner does not merit habeas relief nor an evidentiary hearing on Claim 31.

4   **W.**      **Claim 32- State Supreme Court Erred in Failing to Find Trial Counsel Prejudicially**

5           **Ineffective During Voir Dire**

6           In Claim 32, Petitioner asserts that the "record which was before the California Supreme Court,

7   standing alone and especially when viewed in light of the new evidence presented herein, supports the

8   conclusion that trial counsel was prejudicially ineffective in *voir dire*, and the state court erred in its

9   decision that trial counsel were competent," violating his federal constitutional rights.  (Pet. at 271.)

10          Here, Petitioner largely reiterates assertions made in Claim 11, including allegations that: (1)

11  counsel was unprepared, as evidenced by the trial court's admonishment of lead counsel during jury

12  selection; (2) counsel failed to adequately question several individuals who sat as members of the trial

13  jury; and that (3) counsel excused suspected homosexual individuals from the venire.  Regarding the

14  allegations that were previously raised in Claim 11, this Court concluded above that Petitioner's

15  allegations of deficient performance were largely unsupported by the record and that in any event,

16  Petitioner failed to demonstrate prejudice pursuant to <u>Strickland</u>.  (<u>See</u> Section VI.K., <u>supra</u>.)

17          In the instant claim, Petitioner raises an additional contention not included in Claim 11,

18  asserting that lead "[c]ounsel even misunderstood the purpose of <u>Hovey</u> voir dire" and "displayed an

19  astonishing level of ignorance" when informing the trial court that "'[m]y perception of <u>Hovey</u>, and

20  I think my perception has been demonstrated in the way that I've conducted <u>Hovey</u> to this point, is that

21  <u>Hovey</u> was created to allow the District Attorney the opportunity to eliminate from the panel those

22  people who are opposed to the death penalty.' (RT 19407.)" (Pet. Brief at 251.) Petitioner argues that

23  the state supreme court did not properly consider this fact in rejecting the claim of ineffective

24  assistance of counsel during voir dire.  (Pet. at 271.)

25          However, the record reveals that the state court considered and rejected this contention on

26  direct appeal, reasoning in relevant part:

27          Finally, defendant insists trial counsel viewed the death qualification process as merely
            a one-sided tool by which the prosecution eliminates potential jurors biased in favor
28          of life imprisonment without parole: "Due to this fallacious interpretation of the critical

109

importance of sequestered voir dire, trial counsel performed below the standards to be expected of diligent counsel in a death penalty case."

The record does not support the claim. The defense repeatedly made clear its intent to excuse individuals whose views in favor of capital punishment would "'prevent or substantially impair'" their performance as jurors. (*People v. Crittenden* (1994) 9 Cal.4th 83, 121 [36 Cal.Rptr.2d 474, 885 P.2d 887], quoting *Wainwright v. Witt* (1985) 469 U.S. 412, 424 [105 S.Ct. 844, 852, 83 L.Ed.2d 841].) Counsel expressed this understanding both orally and in writing when presenting the trial court with reasons underlying numerous challenges for cause during *Hovey* voir dire. No fundamental misunderstanding of counsel's role during this phase of trial has been demonstrated by defendant.

Bemore, 22 Cal. 4th at 837.

The California Supreme Court's decision was correct. As an initial matter, Petitioner's above citation to the trial record omits the remainder of trial counsel's statement, in which Mr. McKechnie added "[a]nd while many of the writers say that it is reverse Hovey on Witt/Witherspoon, and those people that are absolutely totally against the death penalty, or for the death penalty, may also be excused, as was the example yesterday with Mr. Carter."[45]  (RT 19407.)  Moreover, the record is replete with instances in which defense counsel challenged prospective jurors for cause based on their views in favor of the death penalty.  (See e.g. RT 19803-05; 19868-70; 19892-93; 20022-30; 20152-57; 20579-82; 20774-78; 20947-51; 21077-88; 21942-45.)  The record also reflects that counsel filed written challenges regarding several prospective jurors based on their views on capital punishment. (See CT 1172-89.)  Considering lead counsel's complete statement regarding the purposes of Hovey voir dire, in conjunction with his actions in challenging and excusing jurors who were biased in favor of the death penalty, the record clearly refutes Petitioner's contention that counsel "misunderstood" the purposes of Hovey voir dire.

Petitioner has not shown that the California Supreme Court's rejection of this claim was an objectively unreasonable application of clearly established federal law.  Accordingly, Claim 32 does not merit habeas relief, and does not warrant an evidentiary hearing.

///

---

[45] Prospective juror Morris Carter was questioned the previous day, stated that he believed in the death penalty for a variety of crimes other than murder, and that if he found the defendant guilty of murder with special circumstances, he would always vote for the death penalty, because "I know of nothing that could override it." (RT 19381.)  Mr. Carter was excused from the jury venire.  (RT 19384.)

08cv0311

**X.      Claim 33 - State Supreme Court's Denial of Petitioner's Constitutional Rights**

In Claim 33, Petitioner asserts that the California Supreme Court denied Petitioner a multitude of constitutional rights, including his right to "(a) competent and conflict-free counsel on direct appeal, (b) reasonable access to the courts, and (c) a fair and meaningful review on appeal," in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.  (Pet. at 278.)

Petitioner states that "[a]s alleged in Claims 29-31, the California Supreme Court knowingly appointed for Petitioner counsel on direct appeal who was: (1) inexperienced, (2) had never prepared an Appellant's Opening Brief, (3) had never handled a murder case, and (4) did not meet the Court's own guidelines for counsel entrusted to handle capital appeals." (Pet. Brief at 258.)  In support of this claim, Petitioner largely repeats assertions previously advanced in support of Claims 29-31, including, but not limited to: (a) the fact that appellate counsel took six years to file the opening brief on direct appeal; (b) that Respondent's brief was filed approximately three weeks after the opening brief, demonstrating the inadequacy of the opening brief; (c) that the reply brief included a concession regarding the sufficiency of the evidence supporting the torture-murder special circumstance; (d) that appellate counsel served as a prosecutor in Arizona; and (e) that Petitioner and state habeas counsel had unsuccessfully requested Mr. Newman's removal as counsel.

### 1.      Denial of Competent and Conflict-Free Counsel

Petitioner first contends that the California Supreme Court denied Petitioner his constitutional right to competent and conflict-free representation on appeal.  However, because this Court denied both claims upon which this claim is based (claim 30 - ineffective assistance of appellate counsel and claim 31 - conflict of interest of appellate counsel) for lack of merit, this contention is similarly without merit.

### 2.      Denial of Reasonable Access to the Courts

Petitioner next contends that the California Supreme Court violated his constitutional rights by denying him reasonable access to the courts.  Petitioner asserts that he "filed numerous pro se motions" requesting the removal of appellate counsel, which "were summarily denied without a hearing," and contends that the state supreme court "failed to provide Petitioner with any semblance of due process." (Pet. at 279.)

08cv0311

It is well-established that prisoners challenging their conditions of confinement or attacking their conviction, whether directly or collaterally, have a constitutional right of access to the courts. See Bounds v. Smith, 430 U.S. 817, 825 (1977) (an inmate is entitled to "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the Courts."), holding limited by Lewis v. Casey, 518 U.S. 343, 352-53 (1996) (actual injury is a "constitutional prerequisite" for relief, which only exists if a "nonfrivolous legal claim had been frustrated or was being impeded.")

Claims concerning denials of access to courts may be either backward-looking or forward-looking. See Christopher v. Harbury, 536 U.S. 403, 413-14 (2002). As Petitioner contends that the California Supreme Court deprived him of an attorney who would have litigated claims that are now lost, his is a backward-looking claim, as a forward-looking claim would involve actions that were "presently denying an opportunity to litigate." See id. at 413. In order to state a claim for a backward-looking claim involving a lost opportunity to litigate, a petitioner must identify: (1) a "nonfrivolous" and "arguable" underlying claim, whether anticipated or lost; (2) the official acts frustrating his litigation; and (3) a remedy that may be awarded, otherwise unavailable in a future suit. Id. at 413-15.

As an initial matter, Petitioner fails to show that the unraised claims were not frivolous. While Petitioner asserts that appellate counsel failed to raise several potentially meritorious claims on direct appeal, he does not indicate why those claims could not have been raised on state habeas review. Instead, Petitioner generally asserts that appellate counsel's concessions regarding the torture-murder special circumstance (which the California Supreme Court addressed on the merits despite the reply brief concession), "materially conflict[ed] with and hindered[ed] the effective preparation and presentation" of the state habeas petition. (Pet. Brief at 259.) As stated above, vague and conclusory allegations do not provide sufficient grounds for habeas relief. See James, 24 F.3d at 26. Moreover, as this Court already concluded that appellate counsel was not ineffective in declining to raise those claims on appeal, Petitioner cannot demonstrate any actual injury. See Lewis, 518 U.S. at 352-53.

///

///

///

08cv0311

1    Even though Petitioner has directed the Court to specific acts or omissions of the California

2    Supreme Court that may have frustrated his litigation on direct appeal,[46] he also fails to satisfy the third

3    Harbury prong, as he has not demonstrated that he was unable to raise these claims in a subsequent

4    petition and thus obtain the remedy (reversal of his conviction or sentence) that was sought in the

5    direct appeal.  The state record clearly shows that Petitioner was afforded a direct appeal proceeding

6    consisting of a 170 page opening brief, response, reply, and oral argument, and the California Supreme

7    Court issued a thorough and detailed opinion on his appellate claims.  In addition, state habeas counsel

8    filed a 300-plus page petition containing 32 claims on Petitioner's behalf.  In this Court, the federal

9    Petition contained 38 enumerated claims and spanned nearly 300 pages.

10    Simply put, while the California Supreme Court may have denied Petitioner replacement

11    counsel in the timeframe he requested, it does not support a conclusion that Petitioner was denied

12    reasonable access to the courts.  Indeed, the state supreme court eventually acquiesed to the request

13    for new counsel.  Instead, it is evident that Petitioner was afforded "a reasonably adequate opportunity

14    to present claimed violations of fundamental constitutional rights to the Courts."  Bounds, 430 U.S.

15    at 825.  Accordingly, this contention is without merit.

16                    3.    Denial of a Fair and Meaningful Review on Appeal

17    For the reasons detailed above in section 2 of this claim, see supra, this contention is similarly

18    without merit.  Again, the California Supreme Court reviewed a lengthy direct appeal opening brief,

19    response, and reply, held oral arguments, and issued a detailed direct appeal opinion addressing a

20    multitude of claims including, but not limited to, claims of trial court error, ineffective assistance of

21    trial counsel, statutory death penalty claims, and allegations of prosecutorial misconduct.  In short,

22    Petitioner's contention that the California Supreme Court denied Petitioner a fair and meaningful

23    review on appeal by appointing Mr. Newman as appellate counsel and declining to remove him upon

24    Petitioner's request, rather than when counsel requested to withdraw from the case, is without merit.

25    Based on an independent review of the record, this Court cannot conclude that the California Supreme

26

27    [46] Petitioner contends that the California Supreme Court ignored Petitioner's and undersigned habeas
counsel's numerous motions and petitions requesting to remove Mr. Newman as appellate counsel. (Pet. Brief

28    at 258-59.)  Petitioner also contends that the state supreme court permitted Mr. Newman to orally argue on
Petitioner's behalf, at which he performed deficiently, and permitted Mr. Newman to continue to represent
Petitioner on rehearing.  (Id. at 259-60.)

08cv0311

1  Court's rejection of Claim 33 was an objectively unreasonable application of clearly established

2  federal law.  Petitioner does not merit habeas relief or an evidentiary hearing on this claim.

3  **X.      Petitioner's Eighth Amendment Claims**

4          With respect to Claims 1-20, 23, and 30-33, Petitioner makes the bare assertion that the various

5  errors or deficiencies deprived him of a reliable determination of guilt, special circumstance and/or

6  sentence, but fails to offer reasoned argument supporting those contentions.  Regardless, because

7  Petitioner's claims of ineffective assistance, conflict of interest, and other error, implicating

8  constitutional guarantees of effective assistance of counsel and due process under the Fifth, Sixth, and

9  Fourteenth Amendments, are without merit, so too are Petitioner's Eighth Amendment claims.

10  **Y.      Appellate Counsel's Failure to Raise Claims 1-20, 23, 29, and 32-33 on Appeal**

11          State appellate counsel's failure to raise Claims 1-20, 23, 29 and 32-33 on appeal did not

12  constitute ineffective assistance of counsel because the allegations raised in these claims do not merit

13  habeas relief.  See Boag, 769 F.2d at 1344; Baumann, 692 F.2d at 572 ("The failure to raise a meritless

14  legal argument does not constitute ineffective assistance of counsel.")  When filing an appeal, "counsel

15  has no constitutional obligation to raise every non-frivolous issue requested by the defendant." Miller,

16  882 F.2d at 1434 (citing Jones, 463 U.S. at 751-54).  Petitioner has not demonstrated that state

17  appellate counsel's failure to raise these issues on appeal was error so serious that "there is a

18  reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would

19  have been different." Strickland, 466 U.S. at 694.

20                                **VII. DISCOVERY**

21          Petitioner has also filed a motion for leave to take the depositions of three witnesses: (1)

22  second chair trial counsel Elizabeth Barranco, (2) former law clerk Richard Kharas, and (3) co-

23  defendant Keith Cosby.  (See Doc. No. 110, hereinafter "Mot. for Depos.")  Petitioner states that Ms.

24  Barrranco suffered from pancreatic cancer and underwent surgery in 2004 and 2005.  He acknowledges

25  that "the cancer has been in remission, but there is fear that it may return.  (Mot. for Depos. at 2.)

26  Petitioner notes that Mr. Kharas is 79 years old and as such, "[t]here is a likelihood he will become

27  unavailable due to death or poor health."  (Id.)  Petitioner states that co-defendant Keith Cosby is

28  currently serving a prison sentence of 33 years to life, "is in a dangerous prison environment, and

1   counsel is concerned that he might not survive and thus his testimony would be lost." (Id. at 3.)  All

2   three individuals have provided declarations or other statements in support of the federal habeas

3   petition. (See Doc. No. 26, Exs. 3 and 64, Declarations of Elizabeth Barranco; Doc. No. 36, Ex. 4,

4   Affidavit of Richard Kharas; Doc. No. 106, Ex. 66 Declaration of Keith S. Cosby.)

5       A habeas petitioner is not entitled to discovery "as a matter of ordinary course." Bracy v.

6   Gramley, 520 U.S. 899, 904 (1997). Instead, Rule 6 of the Rules Governing Section 2254 Cases states

7   that "[a] judge may, for good cause, authorize a party to conduct discovery under the Federal Rules

8   of Civil Procedure and may limit the extent of discovery." See Rule 6(a). The Supreme Court has

9   instructed that in undertaking a determination on whether discovery is appropriate, a court must

10  consider the petitioner's claim and evaluate whether "specific allegations before the court show reason

11  to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is ...

12  entitled to relief." Bracy, 520 U.S. at 904, 908-09 (quoting Harris v. Nelson, 394 U.S. 286, 300

13  (1969)). Courts should not permit a petitioner to "use federal discovery for fishing expeditions to

14  investigate mere speculation." Calderon v. United States Dist. Ct. for the Northern Dist. of Cal.

15  (Nicolaus), 98 F.3d 1102, 1106 (9th Cir. 1996); see also Rich v. Calderon, 187 F.3d 1064, 1067 (9th

16  Cir. 1999) (quoting Aubut v. Maine, 431 F.2d 688, 689 (1st Cir. 1970) ("Habeas corpus is not a

17  general form of relief for those who seek to explore their case in search of its existence."))

18      However, the United States Supreme Court has held that, for claims previously decided on the

19  merits by a state court, the Court's "review under § 2254(d)(1) is limited to the record that was before

20  the state court that adjudicated the claim on the merits." Cullen v. Pinholster, 563 U.S. ___, 131 S.Ct.

21  1388, 1398 (2011). The Supreme Court noted that "[a]lthough state prisoners may sometimes submit

22  new evidence in federal court, AEDPA's statutory scheme is designed to strongly discourage them

23  from doing so." Id. at 1401.

24      Petitioner asserts that he has satisfied the good cause standard under Rule 6 and Bracy,

25  contending that "[s]pecific allegations are before this Court, showing that but for trial counsel's

26  ineffective assistance, it is reasonably probably that the jury would have returned a more favorable

27  verdict at both the guilt and penalty phases of Petitioner's trial." (Mot. for Depos. at 3.) Petitioner

28

08cv0311

1    additionally argues that "should this Court grant relief on Petitioner's claims, it is crucial that the

2    testimony of all the witnesses be preserved." (Id.)

3         However, Petitioner fails to persuade the Court that he is entitled to discovery in light of the

4    Supreme Court's recent decision in Pinholster. He fails to establish that factual development at this

5    stage would be anything other than futile, since this Court is unable to consider any new or additional

6    information in considering his claims under AEDPA because each of the claims were rejected on the

7    merits by the California Supreme Court. See Pinholster, 131 S. Ct. at 1398 (a habeas court is "limited

8    to the record that was before the state court that adjudicated the claim on the merits."); Ybarra v.

9    McDaniel, 656 F.3d 984, 992 n.3 (9th Cir. 2011) ("Remand to the district court is unnecessary because

10   there can be no additional factfinding by the district court," as federal habeas review is limited to the

11   state record under Pinholster.)  At oral argument, Petitioner repeated his general concern for the

12   potential future unavailability of the three witnesses and the desire to preserve their testimony, but did

13   not cite any persuasive authority that would support conducting discovery under the circumstances

14   presented here.

15        Additionally, as discussed above, the Court has concluded that Petitioner is not entitled to

16   federal habeas relief or an evidentiary hearing on any of the above claims, and the Ninth Circuit has

17   upheld prior denials of discovery or other evidentiary development under similar circumstances. See

18   Kemp v. Ryan, 638 F.3d 1245, 1260 (9th Cir. 2011) ("Because Kemp is not entitled to an evidentiary

19   hearing, the district court did not err in denying his request for discovery, as well as his request for a

20   hearing ... [B]ecause the district court was not authorized to hold an evidentiary hearing on Kemp's

21   deliberate elicitation claim, obtaining discovery on that claim would have been futile."); see also

22   Woods v. Sinclair, 655 F.3d 886, 904 n.10 (9th Cir. 2011) (affirming district court's denial of

23   evidentiary hearing, reasoning that "[b]ecause our review of a claim adjudicated on the merits by the

24   state court under 28 U.S.C. § 2254(d)(1) is limited to the record before the state court under Pinholster,

25   131 S. Ct. at 1398, we see no need to afford Woods an opportunity to develop evidence in support of

26   his argument that the state supreme court unreasonably applied Brady.")  Other circuits have arrived

27   at a similar conclusion. See Kirby v. AG ex rel. New Mexico, 2011 WL 4346849 (10th Cir. Sept. 19,

28   2011) ("Mr. Kirby's request to expand the record or to hold an evidentiary hearing seeks to place

1   additional evidence before the federal district court that was not part of the record before the state

2   court.  This is no longer permitted under [Pinholster v.] Cullen.") (citing Atkins v. Clarke, 642 F.3d

3   47 (1st Cir. 2011) and Pape v. Thaler, 645 F.3d 281, 288 (5th Cir. 2011)).

4        Accordingly, as Petitioner does not warrant habeas relief under section 2254(d), nor is an

5   evidentiary hearing warranted on any of the claims, the requested factual development is inappropriate

6   in the instant case.  Petitioner's motion for leave to take depositions is **DENIED**.

7                   **VIII.  CERTIFICATE OF APPEALABILITY**

8        The Anti-Terrorism and Effective Death Penalty Act ("AEDPA") amended 28 U.S.C. § 2253

9   to require a "certificate of appealability" for § 2254 cases on a claim-specific basis.  Specifically,

10   section 2253(c) provides:

11        (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may
          not be taken to the court of appeals from–

12
13        (A) the final order in a habeas corpus proceeding in which the detention
          complained of arises out of process issued by a State court; or

14        (B) the final order in a proceeding under section 2255.

15        (2) A certificate of appealability may issue under paragraph (1) only if the applicant has
          made a substantial showing of the denial of a constitutional right.

16
17        (3) The certificate of appealability under paragraph (1) shall indicate which specific
          issue or issues satisfy the showing required by paragraph (2).

18        The Supreme Court has elaborated on the application of this requirement, stating that "[w]here

19   a district court has rejected the constitutional claims on the merits, the showing required to satisfy

20   section 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find

21   the district court's assessment of the constitutional claims debatable or wrong."  Slack, 529 U.S. at

22   484; see also Miller-El v. Cockrell, 537 U.S. 322, 327 (2003) ("Indeed, a claim can be debatable even

23   though every jurist of reason might agree, after the COA has been granted and the case has received

24   full consideration, that Petitioner will not prevail.")

25        A claim may also warrant a certificate of appealability when the "questions are adequate to

26   deserve encouragement to proceed further."  Barefoot v. Estelle, 463 U.S. 880, 893 (1983), overruled

27   in part on other grounds by Lindh v. Murphy, 521 U.S. 320 (1997).  Mindful of the "relatively low"

28

08cv0311

threshold for granting a certificate of appealability, <u>Jennings</u>, 290 F.3d at 1010, the Court finds Claims 1, 2, 6, 7, 8, 10, 14, 15, 18, 20, 30 and 31 suitable for a COA.

## IX.  CONCLUSION

For the reasons discussed above, Petitioner's motion for an evidentiary hearing on Claims 1-20, 23, and 30-33 [Doc. No. 69] is **DENIED**.  Respondent's request to dismiss Claims 19 and 23 on procedural grounds is **DENIED**.  The Court concludes that habeas relief is not warranted on Claims 1-20, 23, and 29-33, and **DENIES** those claims on the merits.  Petitioner's motion for leave to take depositions [Doc. No. 110] is **DENIED**.

The Court will, in the final order, **GRANT** a COA on Claims 1-2, 6-8, 10, 14-15, 18, 20 and 30-31 and **DENY** a COA on Claims 3-5, 9, 11-13, 16-17, 19, 23, 29, and 32-33.

**IT IS SO ORDERED.**

DATED:  September 19, 2012

*Larry A. Burns*

**HONORABLE LARRY ALAN BURNS**
United States District Judge

08cv0311